IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE:                                    :
                                          :
KAISER ALUMINUM CORP., et al.,            :        Bankruptcy Case 02-10429 (JKF)
                                          :
            Debtors.                      :

_____

LAW DEBENTURE TRUST COMPANY     :
OF NEW YORK,                              :
                                          :
            Appellant,                    :
                                          :
      v.                                  :        Civil Action No. 05-135 (JJF)
                                          :
KAISER ALUMINUM CORP., et al.,            :
                                          :
            Appellees.                    :

_____

**APPENDIX OF KAISER PLANS OF LIQUIDATION AND COMPENDUIM OF
UNREPORTED DECISIONS IN APPELLANT'S BRIEF**

> MONZACK AND MONACO,
> P.A.
> Francis A. Monaco, Jr. (#2078)
> 1201 Orange Street, Suite 400
> Wilmington, Delaware 19801
> (302) 656-8162
>
>                - and -
>
> PRYOR CASHMAN SHERMAN
> & FLYNN LLP
> Tina Niehold Moss, Esq.
> Steven M. Rabinowitz, Esq.
> 410 Park Avenue
> New York, New York 10022
> (212) 421-4100
>
> Attorneys for Appellant

#419249
Document: 43903

## INDEX OF PLANS OF LIQUIDATION

**Plans**                                                                    **Tab**

Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica
Corporation (D.I. 6261)……………….………………………………………………..1

Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and
Kaiser Finance Corporation (D.I. 6265)…………………………………………………..2

## INDEX OF CASES

**Cases**                                                                    **Tab**

In re Columbia Gas Sys., Inc.,
      Nos. 91-803, 91-804, 1995 WL 404892 (Bankr. D. Del. June 16, 1995)…………3

In re Burnham, Connelly, Oesterle and Henry,
      No. 95-1306, 1996 WL 580475 (6th Cir. 1996)……………………….................4

In re Walnut Equip. Leasing Co.,
      Nos. 97-19699, 97-19700 (DWS), 1999 WL 288651 (Bankr. E.D. Pa. May 4,
      1999)……………………………………………………………………………5

# TAB "1"

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                            :
In re:                                      :
                                            :        Chapter 11 Case Nos.
ALPART JAMAICA INC. and                     :        03-10144 and 03-10151
KAISER JAMAICA CORPORATION,                 :        Jointly Administered Under
                                            :        Case No. 02-10429 (JKF)
                                            :
                  Debtors.                  :
                                            :
------------------------------------------------------x
```

## THIRD AMENDED JOINT PLAN OF LIQUIDATION
## FOR ALPART JAMAICA INC. AND KAISER JAMAICA CORPORATION

Daniel J. DeFranceschi (DE 2732)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Dated: February 25, 2005

**TABLE OF CONTENTS**

Page

| ARTICLE I | DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME | 1 |
|---|---|---|
| 1 1 | Defined Terms | 1 |
| 1 2 | Rules of Interpretation | 9 |
| 1 3 | Computation of Time | 9 |
| ARTICLE II | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | 10 |
| 2 1 | General | 10 |
| 2 2 | Administrative Claims | 10 |
| 2 3 | Priority Tax Claims | 11 |
| 2 4 | Classified Claims | 11 |
| 2 5 | 7-3/4% SWD Revenue Bond Dispute and Settlement | 14 |
| 2 6 | Senior Note Indenture Trustee and Ad Hoc Group Counsel Fees and Expenses; 7-3/4% SWD Revenue Bond Plaintiffs' Fees | 14 |
| 2 7 | Allowance of Certain Public Note Claims | 15 |
| 2 8 | Substantive Consolidation | 15 |
| 2 9 | Order Granting Substantive Consolidation | 15 |
| 2 10 | No Effect on Claims Against or Interests in Other Kaiser Debtors | 15 |
| ARTICLE III | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 15 |
| 3.1 | Executory Contracts and Unexpired Leases to Be Rejected | 15 |
| 3.2 | Bar Date for Rejection Damages | 16 |
| ARTICLE IV | RELEASE, LIMITATION OF LIABILITY AND INJUNCTION PROVISIONS | 16 |
| 4 1 | Release of Claims; Limitation of Liability | 16 |
| 4 2 | Injunctions | 17 |
| 4 3 | No Discharge | 17 |
| ARTICLE V | CRAMDOWN | 17 |
| ARTICLE VI | CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 17 |
| 6 1 | Conditions to Confirmation | 17 |
| 6 2 | Conditions to the Effective Date | 17 |
| 6.3 | Waiver of Conditions to the Confirmation or Effective Date | 18 |
| ARTICLE VII | MEANS FOR IMPLEMENTATION OF THE PLAN | 18 |
| 7.1 | Liquidating Transactions | 18 |
| 7 2 | Corporate Action | 18 |
| 7 3 | No Revesting of Assets | 18 |
| 7 4 | Recourse Solely to Trust Accounts | 18 |
| 7.5 | Release of Liens | 18 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 7.6 | Exemption from Certain Taxes | 19 |
| ARTICLE VIII | DISTRIBUTION TRUST | 19 |
| 8.1 | Creation | 19 |
| 8.2 | Distribution Trustee | 19 |
| 8.3 | Preservation of Causes of Action | 20 |
| 8.4 | Reports to be Filed with the Bankruptcy Court | 20 |
| 8.5 | Payment of Distribution Trust Expenses | 21 |
| 8.6 | Use of Other Entities | 21 |
| 8.7 | Indemnification | 21 |
| 8.8 | Tax Treatment | 21 |
| 8.9 | Creation of Trust Accounts | 21 |
| 8.10 | Funding of Distribution Trust Expenses Account | 22 |
| 8.11 | Funding of Priority Claims Trust Account | 22 |
| 8.12 | Funding of Unsecured Claims Trust Account | 23 |
| 8.13 | Undeliverable Cash Trust Account | 23 |
| ARTICLE IX | PROVISIONS GOVERNING DISTRIBUTIONS | 23 |
| 9.1 | Method of Distributions to Holders of Allowed Claims | 23 |
| 9.2 | Delivery of Distributions | 23 |
| 9.3 | Means of Cash Payments | 24 |
| 9.4 | Timing and Calculation of Amounts to Be Distributed | 24 |
| 9.5 | Setoffs | 27 |
| 9.6 | Compensation and Reimbursement for Services Related to Distributions | 27 |
| 9.7 | Payments Limited to Trust Accounts | 27 |
| 9.8 | Insufficient Funds | 27 |
| ARTICLE X | DISPUTED CLAIMS | 28 |
| 10.1 | Prosecution of Objections to Claims | 28 |
| 10.2 | Treatment of Disputed Claims | 28 |
| ARTICLE XI | RETENTION OF JURISDICTION | 28 |
| ARTICLE XII | MISCELLANEOUS PROVISIONS | 29 |
| 12.1 | Preservation of Insurance | 29 |
| 12.2 | Modification of the Plan | 30 |
| 12.3 | Revocation of the Plan | 30 |
| 12.4 | Limitation on Certain Actions | 30 |
| 12.5 | Severability of Plan Provisions | 30 |

**TABLE OF CONTENTS**
(continued)

Page

12 6    Notices .................................................................................................  30

12 7    Successors and Assigns ....................................................................... 31

12 8    Further Action ....................................................................................... 31

12 9    Exhibits ................................................................................................ 31

## TABLE OF EXHIBITS[*]

Exhibit A — Distribution Trust Agreement

---

[*] The Plan, Disclosure Statement and Distribution Trust Agreement will be available on the Document Website promptly following approval of the Disclosure Statement by the Bankruptcy Court.

## INTRODUCTION

Alpart Jamaica Inc ("AJI") and Kaiser Jamaica Corporation ("KJC") (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") propose the following joint plan of liquidation (the "Plan") for the resolution of the outstanding claims against and equity interests in the Debtors

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION
## AND COMPUTATION OF TIME

1.1    Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below. Any term that is not otherwise defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, will have the meaning given to that term in the Bankruptcy Code or Bankruptcy Rules, as applicable.

(1)    "7-3/4% SWD Revenue Bond Dispute" means Adversary Proceeding No. 04-51165 commenced by the 7-3/4% SWD Revenue Bond Indenture Trustee and certain holders of 7-3/4% SWD Revenue Bonds in connection with the Kaiser Cases.

(2)    "7-3/4% SWD Revenue Bond Indenture" means the Trust Indenture, dated as of December 1, 1992, between Parish of St. James, State of Louisiana, and the 7-3/4% SWD Revenue Bond Indenture Trustee, together with all instruments and agreements related thereto.

(3)    "7-3/4% SWD Revenue Bond Indenture Trustee" means J P. Morgan Trust Company, N A., as successor indenture trustee under the 7-3/4% SWD Revenue Bond Indenture

(4)    "7-3/4% SWD Revenue Bonds" means the Parish of St. James, State of Louisiana, Solid Waste Disposal Revenue Bonds (Kaiser Aluminum Project) Series 1992 issued pursuant to the 7-3/4% SWD Revenue Bond Indenture in an outstanding principal amount of $20,000,000.

(5)    "9-7/8% Senior Note Claim" means a Claim against a Debtor under or in respect of one or more 9-7/8% Senior Notes and the 9-7/8% Senior Note Indenture.

(6)    "9-7/8% Senior Note Indenture" means the Indenture, dated as of February 17, 1994, by and among the Debtors, certain Other Kaiser Debtors (including KACC) and the 9-7/8% Senior Note Indenture Trustee, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto

(7)    "9-7/8% Senior Note Indenture Trustee" means U.S. Bank National Association, as successor indenture trustee under the 9-7/8% Senior Note Indenture.

(8)    "9-7/8% Senior Notes" means the 9-7/8% senior notes due 2002, issued by KACC pursuant to the 9-7/8% Senior Note Indenture in an outstanding principal amount of $172,780,000

(9)    "10-7/8% Senior Note Claim" means a Claim against a Debtor under or in respect of one or more 10-7/8% Senior Notes and the applicable 10-7/8% Senior Note Indenture.

(10)    "10-7/8% Senior Note Indentures" means, together, the Indenture, dated as of October 23, 1996, and the Indenture, dated as of December 23, 1996, in each case, by and among the Debtors, certain Other Kaiser Debtors (including KACC) and the 10-7/8% Senior Note Indenture Trustee, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

(11)     "10-7/8% Senior Note Indenture Trustee" means U.S. Bank National Association, as successor indenture trustee under the 10-7/8% Senior Note Indentures.

(12)     "10-7/8% Senior Notes" means the 10-7/8% Series B senior notes due 2006 and the 10-7/8% Series D senior notes due 2006, issued by KACC pursuant to the 10-7/8% Senior Note Indentures in outstanding principal amounts of $175,000,000 and $50,000,000, respectively.

(13)     "Ad Hoc Group" means the ad hoc group of holders of Senior Notes comprised of Trilogy Capital, Caspian Capital Partners, Canyon Partners, Citadel Equity Fund Ltd., Citadel Credit Trading Ltd , Durham Asset Management L.L.C., Farallon Capital Management L.L.C. and TCM Spectrum Fund L.P.

(14)     "Administrative Claim" means a Claim for costs and expenses of administration allowed under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date in preserving the respective Estates and operating the businesses of the Debtors; (b) Professional Fee Claims; and (c) US Trustee Fees; *provided, however,* except as provided in the Intercompany Claims Settlement, Administrative Claims will not include any Intercompany Claim.

(15)     "Administrative Claim Bar Date" means the date by which all requests for payment of Administrative Claims (other than Professional Fee Claims and US Trustee Fees) are required to be Filed with the Bankruptcy Court.

(16)     "Administrative Claim Bar Date Order" means the order of the Bankruptcy Court establishing the Administrative Claim Bar Date.

(17)     "Allowed Claim" means:

(a)     a Claim that (i) has been listed by a particular Debtor on its Schedules as other than disputed, contingent, or unliquidated and (ii) is not otherwise a Disputed Claim;

(b)     a Claim (i) for which a proof of Claim or request for payment of Administrative Claim has been Filed by the applicable Bar Date or otherwise been deemed timely Filed under applicable law and (ii) that is not otherwise a Disputed Claim; or

(c)     a Claim that is allowed: (i) in any Stipulation of Amount and Nature of Claim executed by the applicable Debtor and Claim holder prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any Stipulation of Amount and Nature of Claim executed by the Distribution Trustee and Claim holder after the Effective Date; (iii) in any contract, instrument or other agreement or document entered into in connection with the Plan prior to the Effective Date and approved by the Bankruptcy Court; (iv) in a Final Order; or (v) pursuant to the terms of the Plan.

(18)     "Alpart Proceeds" means the net Cash proceeds allocable to AJI and KJC in the aggregate in connection with the sale of their respective interests in Alumina Partners of Jamaica Inc. pursuant to the Alpart Purchase Agreement, after taking into account the costs and expenses of the sale payable by AJI and KJC in accordance with the Intercompany Claims Settlement and the satisfaction of any applicable Allowed Secured Claim with a valid and enforceable Lien against such proceeds.

(19)     "Alpart Purchase Agreement" means that certain Purchase Agreement, dated as of June 8, 2004, by and among KACC, Kaiser Aluminum International, Inc., Kaiser Bauxite Company, KJC and AJI and Quality Incorporations I Limited.

(20)     "Ballot" means the form or forms distributed to each holder of an impaired Claim entitled to vote on the Plan on which the holder indicates acceptance or rejection of the Plan.

(21)     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1130, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

(22)    "Bankruptcy Court" means the United States District Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to 28 U.S.C. § 157, the bankruptcy unit of such District Court.

(23)    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

(24)    "Bar Date" means the applicable bar date by which a proof of Claim must be or must have been Filed, as established by order of the Bankruptcy Court, including the general Bar Date of May 15, 2003.

(25)    "Bar Date Order" means an order of the Bankruptcy Court establishing Bar Dates for Filing proofs of Claims in the Chapter 11 Cases, as the same may be amended, modified or supplemented, including the order entered March 17, 2003.

(26)    "Beneficiaries" means the creditors and claimants of the Estates.

(27)    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

(28)    "Cash" means the legal tender of the United States of America.

(29)    "Chapter 11 Cases" has the meaning set forth in the introductory paragraph of the Plan.

(30)    "Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code, against either Debtor.

(31)    "Claims Objection Bar Date" means, for all Claims, other than those Claims allowed in accordance with Sections 1.1(17) and 2.7, the latest of: (a) 120 days after the Effective Date; (b) 60 days after the Filing of a proof of Claim for such Claim; and (c) such other period of limitation for objecting to such Claim as may be specifically fixed by the Plan, the Confirmation Order or a Final Order.

(32)    "Claims Report" means, with respect to each Estate, a report certified by the claims agent for such Estate setting forth: (a) a listing, as of the Effective Date, of: (i) all Allowed Secured Claims of such Estate; (ii) all Allowed Administrative Claims of such Estate; (iii) all Allowed Priority Claims of such Estate, (iv) all Allowed Priority Tax Claims of such Estate; (v) all Allowed Unsecured Claims of such Estate; and (vi) all Disputed Claims of such Estate; and (b) for each Claim so listed (i) the name, address and federal taxpayer identification number or social security number (if known) of the holder thereof as of the Distribution Record Date and (ii) the amount thereof, including the amount of unpaid principal and accrued interest (if known).

(33)    "Class" means a class of Claims or Interests, as described in Article II.

(34)    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

(35)    "Confirmation Hearing" means the hearing before the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

(36)    "Confirmation Order" means the order or orders of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

(37)    "Contractual Subordination Disputes" means any or all of the following matters pending in the Kaiser Cases: (i) the 7-3/4% SWD Revenue Bond Dispute; (ii) the motion filed on August 14, 2004, by the Senior Subordinated Note Indenture Trustee to determine the classification of the Senior Subordinated Note Claims under any plan of reorganization filed by the Debtors or the Other Kaiser Debtors that guaranteed the Senior Subordinated

Notes (including the Plan), and (iii) the adversary proceeding filed August 16, 2004, and styled *U.S. Bank National Association v. Kaiser Aluminum & Chemical Corporation*, Adv. Pro. No. 04-55115 (JFK).

(38)    "Creditors' Committee" means the official committee of unsecured creditors of the Debtors and the Other Kaiser Debtors appointed by the US Trustee pursuant to section 1102 of the Bankruptcy Code in the Kaiser Cases, as such appointment has been subsequently modified.

(39)    "Debtors" has the meaning set forth in the introductory paragraph of the Plan.

(40)    "Disbursing Agent" means the Distribution Trustee, in its capacity as a disbursing agent pursuant to the Plan, or any third party acting as disbursing agent at the direction of the Distribution Trustee.

(41)    "Disclosure Statement" means the disclosure statement that relates to the Plan (including all Exhibits), as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

(42)    "Disputed Claim" means:

(a)    if no proof of Claim has been Filed by the applicable Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but as to which the applicable Debtor or the Distribution Trustee, or prior to the Confirmation Date, any other party in interest, has Filed an objection by the Claims Objection Bar Date and such objection has not been withdrawn or denied by a Final Order; or (ii) a Claim that is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or

(b)    if a proof of Claim or proof of Administrative Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law: (i) a Claim for which no corresponding Claim is listed on a Debtor's Schedules; (ii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted in the proof of Claim varies from the nature and amount of such Claim as it is listed on the Schedules; (iii) a Claim for which a corresponding Claim is listed on a Debtor's Schedules as disputed, contingent or unliquidated; or (iv) a Claim for which an objection has been Filed by the applicable Debtor or the Distribution Trustee or, prior to the Confirmation Date, any other party in interest, by the Claims Objection Bar Date, and such objection has not been withdrawn or denied by a Final Order.

(43)    "Disputed Claims Reserves" means, with respect to each of the Trust Accounts, the reserve of Cash retained in such Trust Account to satisfy Disputed Claims against the Estate of AJI or the Estate of KJC, if, as and when they are allowed, or, to the extent such Disputed Claims are not allowed, to satisfy Claims that are allowed in accordance with the terms of the Plan.

(44)    "Distribution Record Date" means the close of business on the Confirmation Date.

(45)    "Distribution Trust" means the trust established pursuant to the Plan, among other things, to hold the Distribution Trust Assets and make distributions pursuant to the Plan.

(46)    "Distribution Trust Agreement" means the trust agreement, to be dated on or prior to the Effective Date, between the Debtors and the Distribution Trustee, governing the Distribution Trust, which will be substantially in the form of Exhibit A to the Plan.

(47)    "Distribution Trust Assets" means collectively: (a) the Trust Accounts and any Cash held by such Trust Accounts; (b) the rights of the Debtors under or in respect of the Intercompany Claims Settlement, the Alpart Purchase Agreement or any causes of action not released by the Plan, including the Recovery Actions, and any proceeds thereof; and (c) the Alpart Proceeds to the extent that such funds are not included in (a) or (b).

(48)    "Distribution Trust Expenses" means any and all reasonable fees, costs and expenses incurred by the Distribution Trustee (or any Disbursing Agent, person, entity or professional engaged by the Distribution Trustee) in connection with the performance by the Distribution Trustee of its duties under the Plan or Distribution Trust Agreement.

(49)    "Distribution Trust Expenses Account" means the segregated trust account to be established and maintained pursuant to Sections 8.9 and 8 10 to fund the payment of Distribution Trust Expenses

(50)    "Distribution Trustee" means the trustee selected by the Creditors' Committee with the consent of the Debtors and identified in the Distribution Trust Agreement (or any successor trustee), in its capacity as the trustee of the Distribution Trust.

(51)    "Document Website" means the Internet site with the address www.kaiseraluminum.com at which the Plan, the Disclosure Statement and all of the Exhibits and schedules to the Plan and to the Disclosure Statement will be available, without charge, to any party in interest and the public

(52)    "Effective Date" means a day, as determined by the Debtors, that is the Business Day as soon as reasonably practicable after all conditions to the Effective Date have been satisfied or waived pursuant to the Plan.

(53)    "Equity Claim" means a legal, equitable or contractual Claim arising from any share or other stock ownership interest in a Debtor, whether or not transferable or denominated "stock", or similar security, and any options, warrants, convertible security, liquidation preference or other right to acquire such shares or other stock ownership interests, including but not limited to Claims arising from rescission of the purchase or sale of such stock ownership interests, for damages arising from the purchase or sale of a such stock ownership interest, or for reimbursement or contribution on account of such Claim

(54)    "Estate" means, as to each Debtor, the estate created for that Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code

(55)    "Executory Contract and Unexpired Lease" means a contract or lease to which one or both of the Debtors is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code

(56)    "Face Amount" means, when used with reference to a Disputed Claim: (a) the full stated amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law, if the proof of Claim specifies only a liquidated amount; or (b) if no proof of Claim has been Filed by the Bar Date or has otherwise been deemed timely Filed under applicable law, or if the proof of Claim specified an unliquidated amount, the amount of the Claim (i) acknowledged by the applicable Debtor in any objection Filed to such Claim or in the Schedules as an undisputed, noncontingent, and liquidated Claim, (ii) estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, (iii) proposed by the applicable Debtor and approved by the Creditors' Committee prior to the Effective Date, or (iv) established by the Distribution Trustee on behalf of the Distribution Trust following the Effective Date; or (c) if neither (a) nor (b) above are applicable, an amount estimated by the applicable Debtor or the Distribution Trustee, but such estimated amount will be no less than either (i) the amount of the claim estimated by the Bankruptcy Court or (ii) the liquidated portion of the amount claimed by the holder of such Claim in any proof of Claim Filed by the Bar Date or otherwise deemed timely Filed under applicable law.

(57)    "File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

(58)    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Bankruptcy Case or the docket of any other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has

been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied or resulted in no modification of such order.

      (59)     "Indenture Trustee" means the 9-7/8% Senior Note Indenture Trustee, 10-7/8% Senior Note Indenture Trustee, Senior Subordinated Note Indenture Trustee or 7-3/4% SWD Revenue Bond Indenture Trustee, or any successor thereto.

      (60)     "Intercompany Claim" means a Claim held by a debtor in the Kaiser Cases against another debtor in any of the Kaiser Cases.

      (61)     "Intercompany Claims Settlement" means the settlement and release agreement among the debtors in the Kaiser Cases and the Creditors' Committee, dated as of October 5, 2004, in such form as approved by the Intercompany Claims Settlement Order.

      (62)     "Intercompany Claims Settlement Order" means the order of the Bankruptcy Court approving the settlement of all claims by debtors in any of the Kaiser Cases against another debtor in any of the Kaiser Cases pursuant to the Intercompany Claims Settlement entered on February 1, 2005.

      (63)     "Interest" means (a) any share or other stock ownership interest in a Debtor, whether or not transferable or denominated "stock", or similar security, and any options, warrants, convertible security, liquidation preference or other right to acquire such shares or other stock ownership interests and (b) any Equity Claim.

      (64)     "IRC" means the Internal Revenue Code of 1986, as amended.

      (65)     "Jamaican Tax Claims" means collectively the Allowed Priority Tax Claims and Allowed Administrative Claims of the Government of Jamaica contemplated by Section 8.11(a), if any.

      (66)     "KAAC" means Kaiser Alumina Australia Corporation.

      (67)     "KAAC/KFC Plan" means the third amended joint plan of liquidation filed by KAAC and KFC on February 25, 2005, as such plan may be amended, modified or supplemented from time to time with the consent of the Creditors' Committee.

      (68)     "KACC" means Kaiser Aluminum & Chemical Corporation.

      (69)     "Kaiser Cases" means the chapter 11 cases styled "In re Kaiser Aluminum Corporation, a Delaware Corporation, *et al.*" jointly administered under Case No. 02-10429 (JKF) in the United States District Bankruptcy Court for the District of Delaware.

      (70)     "KFC" means Kaiser Finance Corporation.

      (71)     "Lien" means any mortgage, pledge, deed of trust, assessment, security interest, lease, adverse claim, levy, charge or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code, or a conditional sale contract, title retention contract or other contract to give any of the foregoing.

      (72)     "Liquidating Transactions" means the transactions set forth in the first sentence of Section 7.1 to effectuate a liquidation of the Debtors.

      (73)     "Other Kaiser Debtor" means any of the debtors in the Kaiser Cases except the Debtors.

      (74)     "Other Unsecured Claim" means an Unsecured Claim other than a Senior Note Claim, a Senior Subordinated Note Claim or a PBGC Claim

(75)    "Other Unsecured Claims Percentage" means the percentage equaling the ratio of (a) the aggregate amount of all allowed Other Unsecured Claims to (b) the sum of (i) the aggregate amount of all allowed Other Unsecured Claims and (ii) $1,369,073,000.

(76)    "PBGC" means the Pension Benefit Guaranty Corporation.

(77)    "PBGC Claims" means the Claims (excluding any Administrative Claims) of the PBGC against the Debtors arising from or relating to the pension plans which were or are maintained by any of the Other Kaiser Debtors in the Kaiser Cases and guaranteed by the PBGC, as such Claims are allowed pursuant to the PBGC Settlement Agreement.

(78)    "PBGC Percentage" means (a) 32% less (b) 32% of the Other Unsecured Claims Percentage.

(79)    "PBGC Settlement Agreement" means the agreement among KACC and the PBGC, dated as of October 14, 2004.

(80)    "Pending Payments" means identified amounts (excluding undeliverable Cash) held by the Distribution Trust for distribution to holders of Allowed Claims in specific amounts as of the date the Distribution Trust receives the applicable Distribution Trust Assets.

(81)    "Permitted Investment" has the meaning ascribed thereto in the Distribution Trust Agreement.

(82)    "Petition Date" means January 14, 2003.

(83)    "Plan" means this joint plan of liquidation for the Debtors, to the extent applicable to either Debtor, and all Exhibits attached hereto or referenced herein, as any of the same may be amended, modified or supplemented from time to time.

(84)    "Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

(85)    "Priority Claims Trust Account" means the segregated trust account to be established and maintained by the Distribution Trustee pursuant to Sections 8.9 and 8.11 to satisfy Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Claims and Allowed Priority Tax Claims against the Estate of AJI or the Estate of KJC.

(86)    "Priority Tax Claim" means a Claim arising under U.S. federal, state or local tax laws that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

(87)    "Professional Fee Claims" means the Claims of (a) any professional in the Chapter 11 Cases pursuant to sections 330 or 1103 of the Bankruptcy Code or (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to sections 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

(88)    "Pro Rata Share" means, when used with reference to a distribution to a holder of an Allowed Claim in a Subclass of Class 3, that share of Cash to be distributed on account of all Allowed Claims in such Subclass so that the ratio of (a)(i) the amount of Cash to be distributed on account of the particular Allowed Claim to (ii) the amount of such Claim, is the same as the ratio of (b)(i) the aggregate amount of Cash to be distributed on account of all Allowed Claims in such Subclass to (ii) the aggregate amount of all Allowed Claims in such Subclass.

(89)    "Public Note Claims" means Claims arising under the Public Notes.

(90)    "Public Note Distributable Consideration" means (a) the Public Note Percentage of the Cash in the Unsecured Claims Trust Account and (b) Cash in the amount of the aggregate fees payable under Section 2.6(a) up

to an aggregate amount not to exceed $1,500,000 (with such Cash to be allocated from the Distribution Trust Assets in accordance with Section 8.12(a) prior to the funding of the Unsecured Claims Trust Account).

(91)    "Public Note Percentage" means (a) 68% less (b) 68% of the Other Unsecured Claims Percentage.

(92)    "Public Notes" means any of (a) the 9-7/8% Senior Notes, (b) the 10-7/8% Senior Notes, or (c) the Senior Subordinated Notes.

(93)    "Quarterly Distribution Date" means, with respect to distributions subsequent to the initial distributions pursuant to Section 9.4, the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however,* that if the Effective Date is within 45 days of the end of a calendar quarter, the first Quarterly Distribution Date will be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

(94)    "Recovery Actions" means, collectively and individually, preference actions, fraudulent conveyance actions, rights of setoff, and other claims or causes of action under chapter 5 of the Bankruptcy Code and other applicable bankruptcy or nonbankruptcy law.

(95)    "Schedules" means the schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors, as required by section 521 of the Bankruptcy Code, as the same may be amended, modified or supplemented by the Debtors from time to time.

(96)    "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a) and, if applicable, 1129(b) of the Bankruptcy Code.

(97)    "Senior Note Claims" means 9-7/8% Senior Note Claims and 10-7/8% Senior Note Claims.

(98)    "Senior Subordinated Note Claim" means a Claim against a Debtor under or in respect of one or more Senior Subordinated Notes and the Senior Subordinated Note Indenture.

(99)    "Senior Subordinated Note Indenture" means the Indenture, dated as of February 1, 1993, by and among the Debtors, certain Other Kaiser Debtors (including KACC) and the Senior Subordinated Note Indenture Trustee, as the same may have been subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

(100)    "Senior Subordinated Note Indenture Trustee" means Law Debenture Trust Company of New York, as successor indenture trustee under the Senior Subordinated Note Indenture.

(101)    "Senior Subordinated Notes" means the 12-3/4% senior subordinated notes due 2003 issued by KACC, pursuant to the Senior Subordinated Note Indenture in the outstanding aggregate principal amount of $400,000,000.

(102)    "Settlement Percentage" means the percentage equaling the ratio of (a) $4,000,000 to (b) 51.42% of the Public Note Percentage of the Cash in the Unsecured Claims Trust Account.

(103)    "Steering Committee" means a committee comprised of the members of the Alumina Creditor Subcommittee (as defined in the Intercompany Claims Settlement) other than any member thereof that is (a) a holder of a Senior Subordinated Note Claim or (b) the Senior Subordinated Note Indenture Trustee.

(104)    "Stipulation of Amount and Nature of Claim" means a stipulation or other agreement between the applicable Debtor or Distribution Trustee and a holder of a Claim or Interest, or an agreed order of the Bankruptcy Court, establishing the amount and nature of a Claim or Interest.

(105)    "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any U.S. federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity

(106)    "Trust Accounts" means, collectively, the Distribution Trust Expenses Account, the Priority Claims Trust Account, the Unsecured Claims Trust Account and the Undeliverable Cash Trust Account

(107)    "Undeliverable Cash Trust Account" means the segregated trust account to be established and maintained by the Distribution Trustee pursuant to Sections 8.9 and 8.13 to hold undeliverable Cash for the benefit of holders of Allowed Unsecured Claims against the Estate of AJI or the Estate of KJC otherwise entitled to such distributions.

(108)    "Unsecured Claim" means any Claim that is not an Administrative Claim, Priority Claim, Priority Tax Claim, Secured Claim or Intercompany Claim and includes, without limitation, Senior Note Claims, Senior Subordinated Note Claims and the PBGC Claims.

(109)    "Unsecured Claims Trust Account" means the segregated trust account to be established and maintained by the Distribution Trustee pursuant to Sections 8.9 and 8.12 to satisfy Allowed Unsecured Claims against the Estate of AJI or the Estate of KJC.

(110)    "US Trustee Fees" means all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930.

1.2     Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (b) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (d) any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns and affiliates; (e) all references in the Plan to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (h) subject to the provisions of any certificates of incorporation, by-laws or similar constituent documents or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules; and (i) the rules of construction set forth in section 102 of the Bankruptcy Code will apply.

1.3     Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply.

## ARTICLE II

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

2.1    General  All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in Classes  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

(a)    Unimpaired Classes of Claims.

Class 1 (Priority Claims):  Priority Claims against either of the Debtors

Class 2 (Secured Claims):  Secured Claims against either of the Debtors.

(b)    Impaired Classes of Claims and Interests.

Class 3 (Unsecured Claims):  Unsecured Claims against either of the Debtors other than Claims otherwise classified under the Plan, subclassified as follows:

Subclass 3A:  Senior Note Claims against the Debtors.

Subclass 3B:  Senior Subordinated Note Claims against the Debtors

Subclass 3C:  PBGC Claims against the Debtors.

Subclass 3D:  Other Unsecured Claims against either of the  Debtors.

Class 4 (Intercompany Claims):  Intercompany Claims against the Debtors

Class 5 (Interests in the Debtors):  Interests in either of the Debtors.

2.2    Administrative Claims.

(a)    Administrative Claims in General.  Except as otherwise provided herein or unless otherwise agreed by the holder of an Administrative Claim and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash from the Priority Claims Trust Account in an amount equal to the allowed amount of such Administrative Claim either (a) on or promptly after the Effective Date or (b) if the Administrative Claim is not allowed as of the Effective Date, on or promptly after the date that is 30 days after the date on which (i) an order allowing such Administrative Claim becomes a Final Order or (ii) a Stipulation of Amount and Nature of Claim is executed by the Distribution Trustee and the holder of the Administrative Claim  Pursuant to the PBGC Settlement Agreement, the PBGC has agreed not to assert any Administrative Claims against the Debtors.

(b)    US Trustee Fees  On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the applicable Debtor or the Distribution Trustee in Cash equal to the amount of such Administrative Claims.  All fees payable pursuant to 28 U.S.C. § 1930 will be paid by the Distribution Trustee in accordance herewith from the Priority Claims Trust Account until the closing of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

(c)     Bar Dates for Administrative Claims.

(i)     *General Bar Date Provisions.* As provided in the Administrative Claim Bar Date Order, any holder of an Administrative Claim against a Debtor that was required to File and serve a request for payment of such Administrative Claim and does not File and serve such a request in accordance with the Administrative Claim Bar Date Order by the Administrative Claim Bar Date, will be forever barred from asserting such Administrative Claim against the Debtors, the Distribution Trustee or the property of any of them, or the Trust Accounts, and such Administrative Claim will be deemed waived and released as of the Effective Date. Objections to an Administrative Claim must be Filed by the Distribution Trustee and served on the requesting party by the later of (A) 45 days after the Effective Date and (B) 60 days after the Filing of the request for payment of an Administrative Claim.

(ii)     *Bar Dates for Professional Fees.* Except as otherwise set forth herein or in the Intercompany Claims Settlement, professionals or other entities asserting a Professional Fee Claim for services rendered solely with respect to the Debtors before the Effective Date must File and serve on the Debtors and the Distribution Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Fee Claim no later than 60 days after the Effective Date. Objections, including any objections by the US Trustee, to any Professional Fee Claim must be Filed and served on the Distribution Trustee and the requesting party by the later of (A) 90 days after the Effective Date and (B) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Professional Fee Claims (other than the Intercompany Claim Settlement Order) solely with respect to the Debtors.

To the extent that any professional has provided services in the Kaiser Cases, the Bar Date for Professional Fee Claims in this Section 2.2(c)(ii) relates only to such professional's fees for services and reimbursement of expenses reasonably allocable by such Professional solely to the Debtors and not otherwise treated pursuant to the Intercompany Claims Settlement Order; Claims relating to such professional's fees for services and reimbursement of expenses to the Other Kaiser Debtors may be sought against the estates of such Other Kaiser Debtors. The failure of a professional to allocate any particular charges to the Debtors will not foreclose, waive or affect in any way the professional's right to seek allowance and payment of such charges from the Other Kaiser Debtors.

2.3     Priority Tax Claims.

(a)     Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor or the Distribution Trustee, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, the full amount thereof in Cash, without postpetition interest or penalty, from the Priority Claims Trust Account as soon as practicable after the later of (i) the Effective Date and (ii) the date on which the Priority Tax Claim becomes an Allowed Claim.

(b)     Notwithstanding the provisions of Section 2.3(a), the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty (i) will be subject to treatment in Subclass 3D and (ii) the holder of an Allowed Priority Tax Claim will not be entitled to assess or attempt to collect such penalty from the Debtors, the Distribution Trustee, their properties or the Trust Accounts (other than as the holder of an Allowed Subclass 3D Claim).

2.4     Classified Claims.

(a)     Class 1 - Priority Claims.  On the later of the Effective Date and the date on which a Priority Tax Claim is allowed, each holder of an Allowed Priority Claim will, in full and complete settlement and satisfaction of such Claim, receive either: (i) Cash in the amount of such holder's Allowed Priority Claim without interest or

penalty; or (ii) such other treatment as may be agreed upon in writing by such holder and the Debtors or the Distribution Trustee. Class 1 is unimpaired under the Plan. Each holder of an Allowed Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

(b)      Class 2 - Secured Claims. On the later of the Effective Date and the date on which a Secured Claim is allowed, each holder of an Allowed Secured Claim will, in full and complete settlement and satisfaction of such Claim, at the sole option of the Debtors, receive either (i) Cash in an amount equal to such Allowed Secured Claim, including such interest as is required to be paid pursuant to section 506(b) of the Bankruptcy Code; or (ii) the collateral securing such Allowed Secured Claim and Cash from the Priority Claims Trust Account an amount equal to such interest as is required to be paid pursuant to section 506(b) of the Bankruptcy Code. Class 2 is unimpaired under the Plan. Each holder of an Allowed Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote on the Plan.

(c)      Class 3 - Unsecured Claims. Subclass 3A, Subclass 3B, Subclass 3C and Subclass 3D are impaired under the Plan and holders of Allowed Claims in each of such Subclasses are entitled to vote on the appropriate Ballot to accept or reject the Plan. For voting purposes, each Subclass will vote as a separate class.

(i)      *Subclass 3A (Senior Note Claims):*

(A)      *Plan Accepted by Subclass 3A and Subclass 3B.* On the Effective Date, if both Subclass 3A and Subclass 3B vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each holder of an Allowed Senior Note Claim will, in full and complete satisfaction of such Claim, be entitled to receive Cash from the Unsecured Claims Trust Account equal to its Pro Rata Share of the Public Note Distributable Consideration remaining after first giving effect to the following payments on the Effective Date by the Distribution Trustee from the Public Note Distributable Consideration: (I) the payment to be made to the 7-3/4% SWD Revenue Bond Indenture Trustee for the benefit of the holders of the 7-3/4% SWD Revenue Bonds pursuant to Section 2.5 and the payment of all amounts payable pursuant to Section 2.6(b); (II) the payment of all amounts payable pursuant to Section 2.6(a); and (III) the payment of $8,000,000 to be made to the Senior Subordinated Note Indenture Trustee for the benefit of the holders of Senior Subordinated Note Claims. If both Subclass 3A and Subclass 3B vote to accept the Plan, as of the Effective Date the treatment provided pursuant to this Section 2.4(c)(i)(A) and Section 2.4(c)(ii)(A) will be deemed to be in full and complete satisfaction of any and all obligations of holders of Senior Subordinated Note Claims relating to the contractual subordination provisions under the Senior Subordinated Note Indenture and any and all claims of holders of Senior Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture, as such obligations and claims relate to AJI and KJC.

(B)      *Plan Rejected by Subclass 3A or Subclass 3B.* If either Subclass 3A or Subclass 3B fails to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the obligations of holders of Senior Subordinated Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture and the claims of holders of Senior Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture, as such obligations and claims relate to AJI and KJC, will be preserved under the Plan to the extent enforceable under section 510(a) of the Bankruptcy Code. In such event: (I) the holders of Senior Note Claims will not become entitled to receive the distribution described in Section 2.4(c)(i)(A); and (II) the Bankruptcy Court will enter an order (which will be the Confirmation Order) pursuant to which the Bankruptcy Court will determine the respective entitlement of the holders of Allowed 9-7/8% Senior Note Claims, Allowed 10-7/8% Senior Note Claims, Allowed Senior Subordinated Note Claims and, if applicable under Section 2.5(b), 7-3/4% SWD Revenue Bonds to the Public Note Distributable Consideration. The distributions ultimately made to a holder of an Allowed Senior Note Claim in accordance with this Section 2.4(c)(i)(B) will be reduced by such holder's proportional share of (x) all amounts

payable pursuant to Section 2.6(a) and (y) if the Bankruptcy Court determines that holders of Allowed Senior Subordinated Note Claims are not entitled to any portion of the Public Note Distributable Consideration, the payment, if any, to be made to the 7-3/4% SWD Revenue Bond Indenture Trustee for the benefit of the holders of 7-3/4% SWD Revenue Bonds pursuant to Section 2.5 (or a reservation in lieu thereof in accordance with Section 2.5(b)) and any amounts payable pursuant to Section 2.6(b).

(ii)     *Subclass 3B (Senior Subordinated Note Claims):*

    (A)     *Plan Accepted by Subclass 3A and Subclass 3B.*  On the Effective Date, if both Subclass 3A and Subclass 3B vote to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, each holder of an Allowed Senior Subordinated Note Claim will, in full and complete satisfaction of such Claim, be entitled to receive its Pro Rata Share of $8,000,000 in Cash to be paid to the Senior Subordinated Note Indenture Trustee as contemplated by clause (III) of the first sentence of Section 2.4(c)(i)(A), provided that any and all fees or expenses payable to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture will, in all events, be payable solely from such $8,000,000.  If both Subclass 3A and Subclass 3B vote to accept the Plan, as of the Effective Date the treatment provided pursuant to Section 2.4(c)(i)(A) and this Section 2.4(c)(ii)(A) will be deemed to be in full and complete satisfaction of any and all obligations of holders of Senior Subordinated Note Claims relating to the contractual subordination provisions under the Senior Subordinated Note Indenture and any and all claims of holders of Senior Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture, as such obligations and claims relate to AJI and KJC.

    (B)     *Plan Rejected by Subclass 3A or Subclass 3B.*  If either Subclass 3A or Subclass 3B fails to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the obligations of holders of Senior Subordinated Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture and the claims of holders of Senior Note Claims relating to the contractual subordination provisions of the Senior Subordinated Note Indenture, as such obligations and claims relate to AJI and KJC, will be preserved under the Plan to the extent enforceable under section 510(a) of the Bankruptcy Code  In such event:  (I) the holders of Senior Subordinated Note Claims will not become entitled to receive the distribution described in Section 2.4(c)(ii)(A); and (II) the Bankruptcy Court will enter an order (which will be the Confirmation Order) pursuant to which the Bankruptcy Court will determine the respective entitlement of the holders of Allowed 9-7/8% Senior Note Claims, Allowed 10-7/8% Senior Note Claims, Allowed Senior Subordinated Note Claims and, if applicable under Section 2.5(b), 7-3/4% SWD Revenue Bonds to the Public Note Distributable Consideration  Any distributions ultimately made to a holder of an Allowed Senior Subordinated Note Claim in accordance with this Section 2.4(c)(ii)(B) may be reduced by such holder's proportional share of any and all fees and expenses payable to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture, which will, subject to such Trustee's right to seek payment by the Debtors of such fees and expenses pursuant to section 503(b)(5) of the Bankruptcy Code, be payable solely from such distributions

(iii)     *Subclass 3C (PBGC Claims):*  On the Effective Date, the PBGC as holder of the PBGC Claims will, in full and complete satisfaction of such Claims, be entitled to receive the PBGC Percentage of the Cash in the Unsecured Claims Trust Account.

(iv)     *Subclass 3D (Other Unsecured Claims):*  On the Effective Date, each holder of an Allowed Other Unsecured Claim will, in full and complete satisfaction of such Claim, be entitled to receive a Pro Rata Share of the Other Unsecured Claims Percentage of the Cash in the Unsecured Claims Trust Account.

(d)     <u>Class 4 - Intercompany Claims</u>. On the Effective Date, each holder of an Intercompany Claim will be entitled to receive the treatment set forth in the Intercompany Claims Settlement. Class 4 is impaired under the Plan. Notwithstanding this treatment of Class 4 Claims, each of the holders of Class 4 Claims will be deemed to have accepted the Plan.

(e)     <u>Class 5 - Interests in the Debtors</u>. No property will be distributed to, or retained by, KACC as the holder of the Interests on account of such Interests, and such Interests will be cancelled on the Effective Date. Notwithstanding this treatment of Class 5 Interests, each of the holders of Class 5 Interests will be deemed to have accepted the Plan.

    2.5     <u>7-3/4% SWD Revenue Bond Dispute and Settlement</u>.

(a)     <u>Plan Accepted by Subclass 3A</u>. If (i) Subclass 3A votes to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code and (ii) unless the holders of Senior Note Claims otherwise agree pursuant to a settlement, all holders of Allowed Senior Note Claims are entitled under the Plan to identical treatment in respect of contractual subordination claims under the Senior Subordinated Note Indenture, then, on the Effective Date, an amount equal to the Settlement Percentage of the Cash in the Unsecured Claims Trust Account that would otherwise have been distributed in respect of the Senior Subordinated Note Claims but which, after giving effect to the contractual subordination provisions of the Senior Subordinated Note Indenture and pursuant to Sections 2.4(c)(i) and 2.4(c)(ii) but prior to giving effect to any payments under this Section 2.5, is to be distributed to holders of Senior Note Claims will, in full and complete satisfaction of the claims of holders of 7-3/4% SWD Revenue Bonds asserted in the 7-3/4% SWD Revenue Bond Dispute in respect of the Debtors, be paid to the 7-3/4% SWD Revenue Bond Indenture Trustee for the benefit of holders of 7-3/4% SWD Revenue Bonds. Notwithstanding the foregoing, in no event will the amount paid under this Section 2.5(a), when aggregated with any amount payable under any comparable provision of the KAAC/KFC Plan, exceed $8,000,000. If the Debtors do not File a separate motion, the Plan will serve as a motion pursuant to Bankruptcy Rule 9019 seeking entry of an order approving the foregoing settlement. Unless an objection to such settlement is made in writing by any creditor or claimant affected thereby, Filed with the Bankruptcy Court and served on the parties identified in Section 12.6 on or before April 5, 2005, such order (which will be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

(b)     <u>Plan Rejected by Subclass 3A</u>. If Subclass 3A fails to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code, the rights, if any, of the holders of 7-3/4% SWD Revenue Bonds to payments from the Public Note Distributable Consideration will be as determined in an order of the Bankruptcy Court (which may be the Confirmation Order) in connection with the determinations contemplated by Sections 2.4(c)(i)(B) and 2.4(c)(ii)(B); provided that if the determination with respect to the rights of the holders of 7-3/4% SWD Revenue Bonds to such payment has not been made by the Bankruptcy Court prior to the Effective Date, then, in order to ensure the funding of such payment, on the Effective Date the Distribution Trustee will reserve from the Public Note Distributable Consideration any amount that may be ordered by the Bankruptcy Court to be so reserved pending such determination.

    2.6     <u>Senior Note Indenture Trustee and Ad Hoc Group Counsel Fees and Expenses; 7-3/4% SWD Revenue Bond Plaintiffs' Fees</u>.

(a)     <u>Senior Note Indenture Trustee and Ad Hoc Group Counsel Fees and Expenses</u>. The fees and expenses of (a) the 9-7/8% Senior Note Indenture Trustee, (b) the 10-7/8% Senior Note Indenture Trustee, and (c) counsel for the Ad Hoc Group through the Effective Date will be paid out of the Public Note Distributable Consideration. No later than two Business Days prior to the Effective Date, each of the entities to which reference is made in clauses (a), (b) and (c) of the first sentence of this Section 2.6(a) will furnish to the Creditors' Committee and the Debtors information in respect of such fees and expenses incurred and estimated to be incurred through the Effective Date.

(b)     <u>7-3/4% SWD Revenue Bond Plaintiffs' Fees</u>. If a payment is required to be made to the 7-3/4% SWD Revenue Bond Indenture Trustee for the benefit of holders of 7-3/4% SWD Revenue Bonds under the first sentence of Section 2.5(a), the reasonable out-of-pocket expenses (including attorneys' fees) incurred and paid by the plaintiffs in the 7-3/4% SWD Revenue Bond Dispute in connection with the Chapter 11 Cases and the chapter 11

cases of the Other Kaiser Debtors, including in connection with the 7-3/4% SWD Revenue Bond Dispute, and that certain civil action currently pending before the United States District Court for the Eastern District of Louisiana styled *Paul J. Guillot, et al. v. Credit Suisse First Boston, LLC,* and numbered 03-0797, will be paid out of the Public Note Distributable Consideration otherwise payable to holders of Allowed Claims in Subclass 3A; *provided, however,* that in no event will the amount paid under this sentence, when aggregated with any amount payable under any comparable provision of the KAAC/KFC Plan, exceed $500,000; *provided further, however,* that nothing in this Section 2.6(b) will prejudice the rights of such plaintiffs to seek additional recoveries (i) from amounts otherwise to be paid to or for the benefit of holders of 7-3/4% SWD Revenue Bonds under the Plan or the KAAC/KFC Plan or (ii) from, or in respect of amounts otherwise to be paid to or for the benefit of holders of 7-3/4% SWD Revenue Bonds by, any Other Kaiser Debtor other than KAAC or KFC. No later than two Business Days prior to the Effective Date, the plaintiffs in the 7-3/4% SWD Revenue Bond Dispute will furnish to the Creditor's Committee, the Debtors, the 9-7/8% Senior Note Indenture Trustee and the 10-7/8% Senior Note Indenture Trustee information in respect of such fees and expenses incurred and estimated to be incurred through the Effective Date

2.7    Allowance of Certain Public Note Claims.  The 9-7/8% Senior Note Claims are allowed in the aggregate amount of $196,856,413.06, the 10-7/8% Senior Note Claims are allowed in the aggregate amount of $255,450,000 and the Senior Subordinated Note Claims are allowed in the aggregate amount of $478,661,479.17

2.8    Substantive Consolidation.  In connection with confirmation of the Plan, the Debtors will seek Bankruptcy Court approval of the substantive consolidation of the Debtors for the purpose of implementing the Plan, including for purposes of voting, confirmation and distributions to be made under the Plan.  Pursuant to the relevant order of the Bankruptcy Court: (a) all assets and liabilities of the Debtors will be deemed merged; (b) all guarantees by, or co-obligations of, one Debtor in respect of the obligations of the other Debtor will be deemed eliminated so that any Claim against either Debtor and any guarantee by, or co-obligation of, the other Debtor and any joint or several liability of either of the Debtors will be deemed to be one obligation of the consolidated Debtors; and (c) each and every Claim Filed or to be Filed in the Chapter 11 Case of either Debtor will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors.  Such substantive consolidation (other than for the purpose of implementing the Plan) will not affect the legal and corporate structures of the Debtors, nor will such substantive consolidation affect or be deemed to affect any Intercompany Claim in any manner contrary to the Intercompany Claims Settlement, nor will such substantive consolidation be deemed to affect any Other Kaiser Debtor or claims against any Other Kaiser Debtor

2.9    Order Granting Substantive Consolidation.  The Plan will serve as a motion seeking entry of an order substantively consolidating the Debtors, as described, and to the limited extent set forth, in Section 2.8.  Unless an objection to such substantive consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties identified in Section 12.6 on or before April 5, 2005, or such other date as may be fixed by the Bankruptcy Court, the substantive consolidation order (which will be the Confirmation Order) may be entered by the Bankruptcy Court.  In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

2.10    No Effect on Claims Against or Interests in Other Kaiser Debtors.  Nothing in the Plan will be deemed to affect any person's claim against or interest in any Other Kaiser Debtor or any of their respective present or former directors, officers, employees, agents, advisors, attorneys, accountants, underwriters, investment bankers or other representatives, acting in such capacity, or any rights, including contractual subordination rights, that any person may have in respect of any such claim against or interest in any such Other Kaiser Debtor.

## ARTICLE III

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

3.1    Executory Contracts and Unexpired Leases to Be Rejected.  On the Effective Date, except for an Executory Contract or Unexpired Lease that previously was assumed and assigned or rejected by an order of the Bankruptcy Court, each Executory Contract and Unexpired Lease entered into by a Debtor prior to the Petition Date that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to section 365 of the Bankruptcy Code.  The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to section 365 of the Bankruptcy Code, as of the Effective Date.

3 2    <u>Bar Date for Rejection Damages</u>  Notwithstanding anything in the Bar Date Order or in the Administrative Bar Date Order to the contrary, if the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim will be forever barred and will not be enforceable against the Debtors, the Distribution Trustee, the Debtors' Estates or the Trust Accounts unless a proof of Claim or request for payment of Administrative Claim is Filed and served on the Distribution Trustee, pursuant to the procedures specified in the Confirmation Order, the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court, no later than 30 days after the Effective Date.

## ARTICLE IV

## RELEASE, LIMITATION OF LIABILITY AND INJUNCTION PROVISIONS

4.1    <u>Release of Claims: Limitation of Liability</u>

(a)    <u>Releases by the Debtors</u>.  As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors on behalf of themselves, their Estates, creditors and Interest holders will be deemed to release, waive and discharge all claims and rights of any nature in connection with or related to the Debtors, the Chapter 11 Cases or the Plan (other than the rights of the Distribution Trustee to enforce the Plan and any contracts, instruments, releases and other agreements and documents delivered thereunder, and to pursue objections to and resolve Disputed Claims), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising (including, without limitation, those arising under the Bankruptcy Code), based on any act, omission or occurrence on or before the Effective Date, against the Creditors' Committee, its members, any Indenture Trustee, any of the Debtors' present or former directors or officers, or any of the respective present or former directors, officers, employees, agents, advisors, attorneys, accountants, underwriters, investment bankers or other representatives of the Debtors, the Creditors' Committee, its members, or the Indenture Trustees, acting in such capacity, except for such Claims or rights based on: (i) acts or omissions of any such person constituting gross negligence or willful misconduct; (ii) if the holders of the Senior Subordinated Note Claims are determined by the order contemplated by Sections 2.4(c)(i)(b) and 2.4(c)(ii)(b) to be entitled to a distribution in respect to such Claims, acts or omissions of any such person related to or giving rise to the circumstances underlying any of the Contractual Subordination Disputes; or (iii) contractual obligations of, or loans owed by, any such person to a Debtor

(b)    <u>General Releases by Holders of Claims</u>.  Subject to the provisions of Section 2 10, as of the Effective Date, in consideration for the obligations of the Debtors and the Distribution Trustee under the Plan and the Cash to be distributed in connection with the Plan, each holder of a Claim that votes in favor of the Plan will be deemed to forever release and waive all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the right to enforce the Debtors' or the Distribution Trustee's obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising in law, equity or otherwise, that are based in whole or in part on any act, omission, transaction or other occurrence taking place on or prior to the Effective Date in any way relating to a Debtor, the Chapter 11 Cases or the Plan that such entity has, had or may have against the Creditors' Committee, its members, any Indenture Trustee, either Debtor and any of their respective present or former directors, officers, employees, agents, advisors, attorneys, accountants, underwriters, investment bankers or other representatives, acting in such capacity, except for those based on: (i) acts or omissions of any such person constituting gross negligence or willful misconduct; (ii) if the holders of the Senior Subordinated Note Claims are determined by the order contemplated by Sections 2 4(c)(i)(b) and 2 4(c)(ii)(b) to be entitled to a distribution in respect to such Claims, acts or omissions of any such person related to or giving rise to the circumstances underlying any of the Contractual Subordination Disputes; or (iii) contractual obligations of, or loans owed by, any such person to a Debtor

(c)    <u>Limitation of Liability</u>.  The Debtors, the Distribution Trust, the Distribution Trustee, the Indenture Trustees and their respective directors, officers, employees and professionals, acting in such capacity, and the Creditors' Committee, its members and their respective professionals will neither have nor incur any liability to any entity for any act taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into, or any other act taken or omitted to be

taken, in connection with the Plan; *provided, however,* that the foregoing provisions of this Section 4.1 will have no effect on: (i) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan; or (ii) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.

**4.2     Injunctions.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Debtors, or an Interest or other right of an equity security holder with respect to the Debtors, that is released, waived, settled or deemed satisfied pursuant to the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights:  (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Distribution Trust, the Distribution Trustee or the property of any of them other than to enforce any right pursuant to the Plan to a distribution from the Trust Accounts; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Distribution Trust or the Distribution Trustee, other than as permitted pursuant to (a) above; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors, the Distribution Trust, the property of any of them or the Trust Accounts; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Distribution Trust; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.**

4.3     No Discharge.  In accordance with section 1141(d)(3) of the Bankruptcy Code, the confirmation of the Plan will not discharge either Debtor.

## ARTICLE V

## CRAMDOWN

The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code  The Debtors reserve the right to modify the Plan to the extent, if any, that confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code requires modification  Subclass 3A, Subclass 3B, Subclass 3C, and Subclass 3D each constitute a separate class pursuant to section 1122(a) of the Bankruptcy Code

## ARTICLE VI

## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

6.1     Conditions to Confirmation.  The following are conditions to the confirmation of the Plan:

(a)     The Confirmation Order shall have been entered on the docket of the Clerk of the Bankruptcy Court in form and substance acceptable to the Debtors and the Creditors' Committee;

(b)     All Exhibits to the Plan shall be in form and substance satisfactory to the Debtors and the Creditors' Committee; and

(c)     The Intercompany Claims Settlement shall have become effective.

6.2     Conditions to the Effective Date.  The following are conditions to the occurrence of the Effective Date:

(a)     The Confirmation Order shall have become a Final Order;