(c)    Tax Requirements for Income Generated by Disputed Claim Reserves. The Distribution Trustee will include in the Tax returns of the Trust Accounts all items of income, deduction and credit of the Trust Accounts, except to the extent such items are included in the income of the Beneficiaries of the Trust Accounts as grantors of grantor trusts  The Distribution Trustee will pay, or cause to be paid, out of the funds held in applicable Trust Accounts, any Tax imposed on the Trust Accounts by any governmental unit with respect to income generated by the funds held in the Trust Accounts  The Distribution Trustee also will file or cause to be filed any Tax or information return related to the applicable Trust Account that is required by any governmental unit.

## ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain all such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, reclassify, estimate or establish the priority, secured or unsecured status (or proper Plan classification) of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, and the resolution of any objections to the allowance, priority, or classification of Claims or Interests;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

(c)    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which either Debtor is a party or with respect to which either Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(d)    Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

(e)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, including the Recovery Actions and claims of the holders of the 7-3/4% SWD Revenue Bonds in respect of subordination rights under the Senior Subordinated Note Indenture, and grant or deny any applications involving the Debtors or the Distribution Trustee that may be pending on the Effective Date or brought thereafter;

(f)    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Distribution Trust Agreement;

(g)    Resolve any cases, controversies, suits or disputes that may arise in connection with the Recovery Actions or the consummation, interpretation, or enforcement of the Plan or any contract, instrument, release, or other agreement or document that is entered into or delivered pursuant to the Plan (including the Distribution Trust Agreement), or any entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)    Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(i)      Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

(k)      Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(l)      Enter a final decree closing the Chapter 11 Cases in accordance with the Bankruptcy Rules; and

(m)      Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

12.1      Preservation of Insurance.

(a)      Nothing in the Plan will diminish or impair the enforceability of any insurance policies that may cover Claims against either Debtor.

(b)      Nothing in the Plan or in the Confirmation Order shall preclude any entity from asserting in any proceeding any and all claims, defenses, rights or causes of action that it has or may have under or in connection with any insurance policy or insurance settlement agreement. Nothing in the Plan or the Confirmation Order shall be deemed to waive any claims, defense, rights or causes of action that any entity has or may have under the provisions, terms, conditions, defenses and/or exclusions contained in such policies or settlements.

(c)      Notwithstanding the provisions of Section 12.1(b) and the substantial consummation of the Plan, in connection with any possible settlements made in any of the Kaiser Cases which concern any insurance policies, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases to issue or approve buybacks of such insurance policies under section 363 of the Bankruptcy Code and/or to issue or approve injunctions, releases and/or exculpations under the Bankruptcy Code (including, without limitation, section 105 of the Bankruptcy Code) for purposes of, *inter alia*, protecting any such settling insurers against claims or demands made against the Debtors. In this regard, as between KACC and the Debtors, KACC will have full and sole right and authority to settle, release, compromise and enter into buybacks by insurers of insurance policies as to which the Debtors, or any of them, have or may assert rights as an insured. The Debtors shall not be entitled to any consideration or other value as a result of any such exercise of rights by KACC.

12.2      Modification of the Plan.  Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan before its substantial consummation, with the consent of the Creditors' Committee.

12.3      Revocation of the Plan.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date, with the consent of the Creditors' Committee.  If the Debtors so revoke or withdraw the Plan, or if confirmation of the Plan does not occur, the Plan will be null and void in all respects, and nothing contained in the Plan will:  (a) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; or (b) prejudice in any manner the rights of either Debtor or any other party.

12.4      Limitation on Certain Actions.  Notwithstanding any other provision in the Plan, the Plan shall not be amended, modified, revoked or withdrawn with the intent of altering or undermining in any way the Bankruptcy

DLI-5900999v11                                        31

Court's determination of the respective entitlement of holders of Allowed Claims under Sections 2.4(c)(i)(B) and 2.4(c)(ii)(B)

12 5    Severability of Plan Provisions. If, prior to confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision then will be applicable as altered or interpreted; *provided, however,* that any such alteration or interpretation must be in form and substance acceptable to the Debtors and the Creditors' Committee. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

12 6    Notices. Any pleading, notice, or other document required by the Plan or Confirmation Order to be served on or delivered to the Debtors, the Distribution Trustee or the Creditors' Committee must be sent by overnight delivery service, facsimile transmission, courier service, or messenger to:

    (a)    The Debtors:

        Daniel J. DeFranceschi
        RICHARDS, LAYTON & FINGER, P.A.
        One Rodney Square
        P.O. Box 551
        Wilmington, Delaware 19899
        Facsimile: (302) 651-7701

        Gregory M. Gordon
        Henry L. Gompf
        Troy B. Lewis
        Daniel P. Winikka
        JONES DAY
        2727 North Harwood Street
        Dallas, Texas 75201
        Facsimile (214) 969-5100

        (Counsel to the Debtors)

    (b)    The Distribution Trustee:

        Distribution Trustee
        [The identity and address of the Distribution Trustee to be disclosed at least ten days prior to the Confirmation Hearing as provided in Section 8 2(a) ]

    (c)    The Creditors' Committee:

        Lisa G. Beckerman
        AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
        590 Madison Avenue
        New York, NY 10022

William P Bowden
ASHBY & GEDDES
222 Delaware Avenue
P O Box 1150
Wilmington, DE 19899

(Counsel to the Creditors' Committee)

12 7    Successors and Assigns.  The rights, benefits, and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity, regardless of whether such entity voted to accept the Plan.

12 8    Further Action.  Nothing contained in the Plan will prevent the Debtors or the Distribution Trustee from taking such actions as may be necessary to consummate the Plan, even though such actions may not be specifically provided for within the Plan.

12 9    Exhibits  All Exhibits to the Plan are incorporated by reference and are intended to be an integral part of this document as though fully set forth in the Plan.

Dated: February 25, 2005

Respectfully submitted,

KAISER ALUMINA AUSTRALIA CORPORATION

By:_____
Name:
Title:


KAISER FINANCE CORPORATION

By:_____
Name:
Title:


COUNSEL:

_____
Daniel J. DeFranceschi (DE 2732)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

  -- and --

Gregory M. Gordon (TX 08435300)
Henry L. Gompf (TX 08116400)
Troy B. Lewis (TX 12308650)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

# TAB "3"

Westlaw.

Not Reported in B.R.

1995 WL 404892 (Bankr.D.Del.)

**(Cite as: 1995 WL 404892 (Bankr.D.Del.))**

◄
Only the Westlaw citation is currently available.

United States Bankruptcy Court, D. Delaware.
In re The COLUMBIA GAS SYSTEM, INC.,
Debtor.
In re COLUMBIA GAS TRANSMISSION
CORPORATION, Debtor.
**Bankruptcy Nos. 91-803, 91-804.**

June 16, 1995.

Robert S. Brady, Young, Conaway, Stargatt &
Taylor, Wilmington, DE, Laurence Greenwald,
Stroock & Stroock & Lavan, New York City, for
debtors.

Michael P. Morton, Wilmington, DE, David I.
Herbst, Holleb & Coff, Chicago, IL, for CNG
Producing Co. and Total Minatome Corp.

Douglas A. Shachtman, Wilmington, DE, for Cabot
Oil & Gas Corp.

Mark Minuti, Saul Ewing Remick & Saul,
Wilmington, DE, for ALAMCO, Inc.

Jeoffrey L. Burtch, Cooch & Taylor, Wilmington,
DE, for Official Committee of Equity Sec. Holders.

John D. Demmy, Morris, James, Hitchens &
Williams, Wilmington, DE, for New Bremen Corp.
and New ULM Gas, Ltd.

Stephen M. Miller, Smith Katzenstein & Furlow,
James L. Marketos, Lane & Mittendorf,
Washington, DC, for Seneca/Upshur.

Kevin Gross, Rosenthal, Monhait & Gross,
Wilmington, DE, Larry J. Nyhan, David M.
Schiffman, Sidley & Austin, Chicago, IL, for
Official Committee/Unsecured Creditors of TCo.

Thomas Herlihy, III, Herlihy, Harker &
Kavanaugh, Wilmington, DE, Michael P. Kessler,
Weil, Gotshal & Manges, Houston, TX, for
EXXON Corp.

COURT'S RULING ON MOTION OF
COLUMBIA GAS TRANSMISSION
CORPORATION AND THE
COLUMBIA GAS SYSTEM, INC. FOR ENTRY
OF AN ORDER APPROVING PRODUCER
SETTLEMENT

HELEN S. BALICK, Bankruptcy Judge.

*1 THE COURT: Columbia Gas System and
Columbia Gas Transmission moved this Court to
approve a settlement of TCo's objections to certain
producer-creditor claims. CG and TCO also moved
for a deferral of further proceedings in the claims
estimation process.

The settlement motion is brought pursuant to
Sections 105 and 502 of the Bankruptcy Code, and
Bankruptcy Rule 9019 and seeks approval of the
agreement relating to sixteen claims that were filed
in an aggregate amount of nearly $10 billion. The
settlement would allow those claims in an aggregate
amount of only $1,327,362,353. These sixteen
claims represent approximately 80 percent by dollar
amount of the producer claims against TCo. A
schedule attached to the second amended TCo plan
filed June 14, 1995 also contains proposed
settlement amounts to the remaining producers.

For this Court to approve the settlement, TCo must
show that the settlement is fair and equitable. The
record must be sufficient to allow the Court to
assess the wisdom of the proposed compromise.
Relevant factors to consider in evaluating the
settlement include the probability of success in the
claims litigation, complexity of litigation, expense,
inconvenience and delay attending to the litigation,
interests of creditors, and the extent to which the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

1995 WL 404892 (Bankr.D.Del.)

**(Cite as: 1995 WL 404892 (Bankr.D.Del.))**

settlement is truly the product of arm's length bargaining and not of fraud and collusion.

Several objections have been raised in opposition to this settlement motion. This Court has already rejected the arguments relating to the prematureness of this motion at the June 5 hearing. The objectors argue that the disclosure statement and plan contain insufficient information to evaluate the settlement and that the plan may not be confirmable. This is neither a disclosure, nor a plan confirmation hearing. The record established yesterday is sufficient to rule on the settlement motion.

Considering TCo's burden to show that the settlement is fair and equitable, the claims litigation is very complex, as indicated by the appointment of a claims mediator, and the duration of the Boston proceedings, which have already consumed two-and-one-half years, and are only at the recalculation phase of the estimation procedures. The mediator still needs to issue a final recommendation for the resolution of generic issues. It appears that the generic phase of the process will not be completed until late 1995. Following the submission of recalculated claims, the mediator will still have to address contract-specific issues and recommend allowed amounts for each non-settled claim. Without this settlement, the claims mediation process will likely continue for three to five years. The additional expense to the estate if these sixteen claims are not settled will be enormous. The likely duration of such continued litigation would be significantly long.

As exemplified by the testimony of John Beerbower in settling with the sixteen producers, TCO has considered the effect of several major legal issues that will affect the range of outcomes for producer claims. These include take-or-pay issues, price deficiency issues, life of reserve issues, and the appropriate discount rate to be applied to future producer gas revenues. TCo has generated numbers to portray a dollar range of possible outcomes under the more likely litigation scenarios. These numbers represent a range of reasonable litigation outcomes. The settlement, as detailed in

Debtors' Exhibit 2, provides for allowance levels that represent compromises well within the range of these reasonable litigation outcomes. The TCo creditors' committee has also presented its views on a range of litigation outcomes, which the Court also finds to be reasonable. It is particularly significant, that despite the differences in these two sets of ranges, which were prepared by parties with differing interests, the settlement numbers fall within both ranges, and do so at the lower end of those ranges.

*2 As indicated by the testimony of John Beerbower, the settlements were negotiated at arm's length and in good faith.

The settlement is in the best interest of the estate. The savings in time and money to the estate by the settlement of these claims is substantial. The settlement is also having a beneficial carryover effect, in that it is encouraging other producers to settle, further reducing costs and enhancing the prospects of a consensual plan. The settlement is in the best interest of the unsecured creditors. In addition to the reasons just mentioned, the settlement will enhance the possibility of distribution before year's end.

Furthermore, the Court finds the settlement specifically benefits the non-settling producer creditors. By reducing the universe of the claims at issue in the claims mediation process, that process can only become more streamlined and efficient. The non-settling producers can liquidate their claims more cheaply and receive distribution faster.

The objectors also argue relatedly that this settlement is part of a creeping or de facto plan. This is not a de facto plan. The settlement is conditioned upon confirmation of a plan subject to all of the processes and safeguards of the Bankruptcy Code and Rules. There are no distributions prior to confirmation. TCo is entitled to enter into conditional settlements prior to a confirmation hearing. The applicable law does not support the objectors' position on the de facto plan argument in the circumstances here.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                           Page 3

1995 WL 404892 (Bankr.D.Del.)

**(Cite as: 1995 WL 404892 (Bankr.D.Del.))**

The objectors also argue that the settlement is discriminatory, that the settlement offers to the present non-settling producers may be for a lower percentage than the sixteen settling producers. Relatedly, the objectors insist that the settlement formula should be disclosed. The Court finds these arguments to be red herrings. While TCo has offered to settle the remaining non-settled producer claims, and while any such effort is encouraged, TCo is under no obligation to settle all claims prior to the plan confirmation hearing.

If TCo and a producer ultimately do not settle a claim, the producer retains its rights to seek the full amount of its filed proof of claim, which in each case is higher than any settlement offer. As to the treatment of claims within the same class, that is a confirmation issue.

The objectors suggest that the settlement is not feasible, in that the debtors will have insufficient cash to fund the settlement or to pay the claims of non-settling producers. While this settlement fixes the amount of the allowed claims of the sixteen producers, they will be paid only upon confirmation of a plan and in accordance with the terms of that plan. Feasibility of the plan is a confirmation issue.

The objectors question the propriety of the debtors settling with TCo's largest producer creditors. To the Court, it makes eminent sense to attempt to do so, as this process can result in the formation of a building block to a consensual plan of reorganization, which should be the goal of every Chapter 11 proceeding.

**\*3** In conclusion, the Court finds each objection, including the objection to the Exxon-UPR-Koch agreement, to be without merit, and each is overruled. The motion to approve the producer settlement is granted.

The debtors have also requested a deferral of the claims estimation procedures until after this Court's ruling on the settlement motion. The Court is sympathetic to the concern of the non-settling producers that further delay could be used as negotiation leverage. The debtors do not object to

the non-settling producers having a role in recommending procedures to the Court to be followed in liquidating the remaining claims, and the Court agrees that they should have such a role, along with the claims mediator, TCo, and the TCo creditors' committee. No other official committee need participate in that recommendation process.

The claims mediator has set June 30 as the deadline for filing recalculated claims. After that date, the mediator and other interested parties will know the universe of remaining objected-to claims. As soon as possible thereafter, the above-mentioned parties in the claims estimation process are instructed to convene concerning revising procedures, if revisions are appropriate, and to fully cooperate in doing so. The Court will grant a short deferral to allow these talks to take place. The Court will not tolerate an unreasonable delay in any recommendation of implementation of revised procedures.

The proceedings are deferred through July 21, 1995. I have prepared and will now sign an order in accordance with my remarks.

*ORDER*

AND NOW, June 16, 1995, following hearing on the Motion of Columbia Gas Transmission Corporation and The Columbia Gas System, Inc. For Entry of an Order Approving Producer Settlement, and for the reasons stated in open court,

IT IS ORDERED THAT:

1. The Motion as it relates to requesting approval of the producer settlement is GRANTED.

2. The Motion as it relates to deferral of the claims estimation procedures is GRANTED only to the following extent. As soon as possible after June 30, 1995, the claims mediator, TCo, the TCo creditors' committee, and any non-settling producer creditor who wishes to participate, shall convene to discuss revising procedures if revisions are appropriate, and to fully cooperate in doing so. The proceedings are deferred through July 21, 1995.

1995 WL 404892 (Bankr.D.Del.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 4

1995 WL 404892 (Bankr.D.Del.)

**(Cite as: 1995 WL 404892 (Bankr.D.Del.))**

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB "4"

Westlaw.

98 F.3d 1341 (Table)                                                                                       Page 1

98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050
**Unpublished Disposition**

**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

▷

NOTICE:   THIS   IS   AN   UNPUBLISHED
OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing in
the Federal Reporter. Use FI CTA6 Rule 28 and FI
CTA6 IOP 206 for rules regarding the citation of
unpublished opinions.)

United States Court of Appeals, Sixth Circuit.
In the Matter of BURNHAM, CONNOLLY,
OESTERLE and HENRY, Debtor.
UNITED STATES of America, Plaintiff-Appellee,
v.
Basil T. SIMON, Trustee, Defendant-Appellant.
**No. 95-1306.**

Oct. 8, 1996.

On Appeal from the United States District Court
for the Eastern District of Michigan, No. 94-74511;
Horace W. Gilmore, Judge.

E.D.Mich., 199 B.R. 156.

REVERSED.

Before: GUY, NELSON and BATCHELDER,
Circuit Judges.

DAVID A. NELSON, Circuit Judge.

**1** The question in this appeal is whether a proof
of claim, filed by the Internal Revenue Service in a
proceeding under Chapter 7 of the United States
Bankruptcy Code prior to the 1994 Bankruptcy
Amendments, is entitled to "first-tier" priority even
though filed long after the deadline established
under Bankruptcy Rule 3002--a deadline of which
the IRS presumably had timely notice.

The Second, Ninth and Eleventh Circuits have
accorded first-tier status to claims filed under
similar circumstances. See *In re Vecchio,* 20 F.3d
555 (2d Cir.1994); *In re Pacific Atlantic Trading
Co.,* 33 F.3d 1064 (9th Cir.1994); *In re Davis,* 81
F.3d 134 (11th Cir.1996). The Fifth Circuit,
however, has held first-tier status unavailable. See
*In re Waindel,* 65 F.3d 1307 (5th Cir.1995). We
think that the Fifth Circuit's is the better view, and
we conclude that the claim at issue here should be
relegated to third-tier status.

I

The debtor filed a voluntary petition under Chapter
7 in November of 1988. The clerk of the
bankruptcy court subsequently sent creditors a
notice to file claims by March 29, 1989. The IRS
tells us that its file in this case has been destroyed,
but the agency was listed on the matrix of creditors
filed with the bankruptcy court. Absent evidence
to the contrary, we must presume that the IRS
received its copy of the notice.

On June 21, 1994--more than five years after the
deadline--the IRS filed "an unsecured priority
claim" for $81,231.58 in 1988 payroll taxes and "an
unsecured non-priority claim" for $30,261.08 in
related penalties. The only excuse offered for the
delay in filing is that, for reasons not explained, the
IRS was initially under the impression that no assets
would be distributed.

The bankruptcy court disallowed the IRS claim as
untimely. The district court reversed the
disallowance and held that the tax claim should be
allowed as a priority claim. The trustee has
appealed to this court.

II

Section 726(a) of the Bankruptcy Code sets forth
the order in which the assets of a Chapter 7 estate
are to be distributed to unsecured creditors. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 F.3d 1341 (Table)                                                                                          Page 2

98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050
**Unpublished Disposition**

**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

version of that section in effect at the time this case was commenced provided as follows:

"(a) Except as provided in section 510 of this title, property of the estate shall be distributed--

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title;

(2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is--

(A) timely filed under section 501(a) of this title;

(B) timely filed under section 501(b) or 501(c) of this title; or

(C) tardily filed under section 501(a) of this title, if--

(i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

**\*2** (ii) proof of such claim is filed in time to permit payment of such claim;

(3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection;

(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture

\* \* \*

(5) fifth, in payment of interest ...

(6) sixth, to the debtor."

Among the claims specified in section 507 are "allowed unsecured claims of governmental units," a category that includes claims for delinquent withholding taxes. If the unsecured payroll tax claim at issue in this case had been timely filed, therefore, it would be entitled to first-tier distribution under § 726(a)(1). The IRS concedes that the claim for related penalties is not entitled to priority status.

The Bankruptcy Code does not itself contain a claims deadline. By distinguishing between timely and tardily filed claims in §§ 726(a)(2) and (3), however, and by allowing a debtor or the trustee to

file a proof of claim on behalf of a creditor who has not filed a timely notice of claim under § 501(c), the Code clearly reflects an understanding that a claims deadline will exist. *Waindel*, 65 F.3d at 1309.

Such a deadline has been provided by Bankruptcy Rule 3002(a), which says that a proof of claim must be filed within 90 days of the first meeting of creditors if the claim is to be "allowed."

Despite its literal language, it is apparent that Rule 3002(a) should not be deemed to set an absolute bar to allowance of tardy claims in Chapter 7 proceedings. The statute authorizing the Supreme Court to prescribe rules for bankruptcy proceedings, 28 U.S.C. § 2075, provides that the rules "shall not abridge, enlarge, or modify any substantive right." Consequently, "any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code." *Pacific Atlantic*, 33 F.3d at 1066. The Code clearly contemplates situations--see § 726(a)(2), *e.g.*--where a tardily filed claim is "allowed." In addition, § 502(a) provides that a claim is allowed unless a party in interest objects. Section 502(b) lists eight grounds for disallowance, none of which is untimely filing. "We cannot have a statute that specifically allows payment of tardily filed claims and rules that prohibit their filing. Accordingly, to the extent that [the Rule] contradicts the statute, it cannot stand." *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1089 (6th Cir.1990); see also *Vecchio*, 20 F.3d at 559.

To the extent that the Rule does not contradict the statute, conversely, there is no reason for the Rule to be ignored. In Chapter 7 cases, at least, we believe that the Rule may appropriately be read as "providing a dividing line between timely and tardy claims, rather than a flat ban on the allowance of late-filed claims." *Waindel*, 65 F.3d at 1309.

III

**\*3** If the claim for delinquent payroll taxes is one that may be "allowed" even though tardily filed, we must determine the tier to which the claim is to be assigned under § 726. The IRS argues that the claim is entitled to top-priority status under §

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 F.3d 1341 (Table)                                                                                              Page 3

98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050
**Unpublished Disposition**

**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

726(a)(1) because that section explicitly accords such status to "unsecured claims of governmental units"--and § 726(a)(1), unlike § 726(a)(2), makes no distinction between timely and tardily filed claims. Accord, *Vecchio,* 20 F.3d at 557 ("[t]he absence of a timeliness distinction in § 726(a)(1) strongly suggests that this subsection encompasses all priority claims whenever filed"); *Davis,* 81 F.3d at 135; *Pacific-Atlantic,* 33 F.3d at 1067.

Such a result, however, requires us to ignore the express of language of 11 U.S.C. § 726(a)(3). That section prescribes third-tier status for "*any* allowed unsecured claim proof of which is tardily filed under § 501(a)." (Emphasis added.) We follow the familiar principle of statutory interpretation that when confronted by a choice between a general statutory provision and a specific one, we are to prefer the specific over the general. Section 726(a)(3) is clearly the more specific provision, and it means what it says: "for obvious reasons going to the heart of the efficiency and fairness of the bankruptcy system, the Code attaches consequences to failure to comply with proof of claim deadlines." *Waindel,* 65 F.3d at 1311.

The interpretation offered by the IRS is not only inconsistent with § 726(a)(3), it is inconsistent with § 501(c). The latter section provides that where a creditor has not filed a timely proof of claim, the debtor or the trustee may do so in his stead. Such claims are entitled to second-tier status under § 726(a)(2)(B). As the *Waindel* Court explained,
"This provision was intended to allow debtors to complete the list of claims against the estate in a timely fashion and to ascertain the basis for and amounts of creditors' distributions. The particular object of this salutary provision was untimely priority claims, because of their potentially heavy impact on a case." 65 F.3d at 1311.
If we were to accord such claims first-tier priority status, we would "emasculate[ ]" the scheme established by § 726(a)(2)(B) and § 501(c). *Id.*

Nor do we agree with the argument that it would be "anomalous" not to allow § 726(a)(1) status for

tardily filed priority claims because otherwise creditors with general unsecured claims filed tardily because of lack of notice would receive distributions under § 726(a)(2) ahead of similarly situated priority claimants. There can be no such anomaly in this circuit, because our court has already decided that a creditor who files a priority claim tardily because of late notice is entitled to § 726(a)(1) status absent bad faith or unreasonable delay. *In re Century Boat Co.,* 986 F.2d 154 (6th Cir.1993); *Cardinal Mine,* 916 F.2d 1087.

Strong practical considerations also support denying § 726(a)(1) status to claims filed tardily despite the giving of notice. A trustee often will undertake litigation to reduce the amount of general unsecured claims so as to allow other claimants a greater distribution. If priority claims can be asserted at the last minute, the trustee's efforts will sometimes be wasted. In fact, as the *Vecchio* court acknowledged, the logic of the IRS interpretation would lead "to the conclusion that first priority payment could be accorded even to claims filed after the distribution of the estate's assets." 20 F.3d at 560. The *Vecchio* court thought these problems could be dealt with under principles of equitable subordination and the exercise of discretion over whether to enter disgorgement orders. *Id.* Possibly so, but it seems to us the interests of efficient management of bankruptcy estates would be better served by an interpretation eliminating these problems at the source.

**\*\*4** An untimely priority claimant who has received notice must, in our view, stand in line behind the creditors listed in §§ 726(a)(1) and (2). Accord, *In re Larry Merritt Co.,* 169 B.R. 141 (E.D.Tenn 1994). Existing Sixth Circuit precedent, as we read it, is not inconsistent with this view.

In *Cardinal Mine,* 916 F.2d 1087, we held that first-tier creditors who did not file timely claims because they did not receive notice of the bankruptcy are entitled to first-tier status. The *Cardinal Mine* decision was premised on "[d]ue process and equitable concerns" not implicated here--*i.e.* concerns that "basic principles of justice

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 F.3d 1341 (Table)                                                                                                  Page 4

98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050
**Unpublished Disposition**

**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

require notice and an opportunity to be heard." *Id.* at 1089, 1092.

As the district court noted in the case at bar, there are dicta in *Cardinal Mine* which might be read as suggesting that *all* untimely filed first-tier claims retain their priority status. *Id.* at 1091 ("Since [the] priority [of § 726(a)(1) claims] is set in the statute, it is reasonable that that priority is more important than whether they were tardily filed either because they had received no notice of the bankruptcy or for some other reason"). Any question that such statements are anything more than dicta, however, was put to rest in *Century Boat Co.,* 986 F.2d at 158:

> "We simply decided [in *Cardinal Mine Supply* ], and we reaffirm today, the principle that a priority creditor who fails to receive notice of the bankruptcy and consequently files an untimely proof of claim is not barred from receiving priority distribution as a matter of law. Generally, every creditor will adhere to the timing requirements established in Bankruptcy Rule 3002. *Cardinal Mine Supply* established a narrow exception for priority creditors who lack notice of the bankruptcy."

In a Chapter 13 case where notice was received, this circuit seems to have held that tardiness in the filing of a proof of claim bars recovery altogether. See *In re Chavis,* 47 F.3d 818 (6th Cir.1995). This result goes beyond the one we reach here under Chapter 7. But the *Chavis* panel-- at pains to distinguish *Vecchio* and *Pacific-Atlantic*--stressed the differences between Chapter 7 and Chapter 13 bankruptcies. *Chavis,* 47 F.3d at 824. Although there may be little point in drawing an "extra-textual distinction" between the two chapters, *Waindel,* 65 F.3d at 1309 n. 6, it is clear that section 726, with its explicit contemplation of untimely but allowed claims, applies by its terms only to Chapter 7, not to Chapter 13.

### IV

We note in closing that the problem presented here will not trouble the courts much longer. The 1994 Bankruptcy Amendments, which govern cases filed

after October 22, 1994, provide that a tardily filed claim is disallowed except to the extent that the provisions of § 726 allow distribution on such claims. 11 U.S.C. § 502(b)(9). A claim of a governmental unit is deemed timely if filed "before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide." *Id.* Section 726(a)(1) has been modified to allow first-tier distribution status to timely filed claims and those that are "tardily filed before the date on which the trustee commences distribution." As the *Chavis* panel observed, the amendments "reveal[ ] Congress' intent to demand that claims be timely filed." 47 F.3d at 823.

### V

**\*\*5** The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion.

98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050 Unpublished Disposition

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB "5"

# Westlaw.

Not Reported in B.R.

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

Page 1

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court, E.D. Pennsylvania.
In re WALNUT EQUIPMENT LEASING CO.,
INC., Debtor.
**No. 97-19699DWS, 97-19700DWS.**

May 4, 1999.
Charles M. Golden, Esquire, Philadelphia, Counsel
for Debtor.

Francis J. Lawall, Esquire, Philadelphia, Counsel
for the Committee.

Stuart L. Melnick, Esquire, New York, NY,
Counsel for Rflafferty.

John F. Innelli, Esquire, Innelli & Molder,
Philadelphia, Counsel for Class Plaintiffs.

Dave P. Adams, Esquire, Office of the U.S.
Trustee, Philadelphia, United States Trustee.

## MEMORANDUM OPINION

SIGMUND, Bankruptcy J.

**\*1** Before the Court is the Motion of the Official
Committee of Unsecured Creditors of the Debtors
[FN1] (the "Committee") for an Order Approving
Compromise Concerning Substantive Consolidation
of the Estates of the Debtors (the "Motion"). The
Motion is supported by the Debtors and six
bondholders. Opposing the Motion are the plaintiffs
certified as a class (the "Class Plaintiffs") [FN2] in
securities litigation ("Class Action") pending before
the United States District Court for the Eastern
District of Pennsylvania, RFLafferty [FN3] and
fourteen bondholders. [FN4] The only opponents
participating in the hearing were the Class
Plaintiffs. The Motion seeks approval of a
compromise (the "Compromise") negotiated by and
between the representatives of each estate serving
on the Committee and paves the way for a
consensual reorganization plan which will offer
each creditor holding an ELCOA Unsecured Claim
two times the amount to be offered to each creditor
holding a Walnut Senior Unsecured Claim. The
Compromise does not contemplate any distribution
to holders of Walnut Subordinated Unsecured
Claims. For the reasons that follow, the Motion will
be granted.

> FN1. The Debtors are Walnut Equipment
> Leasing Co. ("Walnut") and its wholly
> owned subsidiary, Equipment Leasing
> Corporation of America ("ELCOA").
> Pursuant to Order of this Court, the
> Debtors' cases have been jointly
> administered.

> FN2. The Class Plaintiffs are ELCOA
> certificate holders. It is unknown to what
> extent the members of the class have been
> consulted about this Motion. Thus while
> counsel represents that the class consists of
> 80%- 90% of the ELCOA certificate
> holders, I do not extrapolate from that fact
> that a like number oppose the Motion.
> Indeed Stewart Axtell ("Axtell"), the Chair
> of the Committee, an ELCOA certificate
> holder and member of the class, takes a
> contrary view as does Arnold
> Coopersmith, another committee and class
> member who supports the Motion.

> FN3. Lafferty, which did not appear at the
> hearing, claims to be an ELCOA creditor
> by reason of certain indemnification
> agreements it received in connection with
> its activities as an underwriter on certain
> securities. It is a defendant in the Class
> Action.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                    Page 2

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

FN4. Of these opponents, four were subordinated certificate holders objecting to the proposed plan treatment of their claims and the balance consisted of an equal number of Walnut and ELCOA creditors. An additional twelve responses were received which addressed matters other than substantive consolidation. Index of Responses. Notably, notice of the Motion was provided to approximately 1300 creditors.

## BACKGROUND

Before addressing the merits of the Motion it is important to set forth the process that culminated in the Compromise. The Debtors' cases were filed on August 8, 1997. Shortly thereafter, the United States Trustee appointed a single committee to represent the unsecured creditors of both estates. The Committee consists of seven members, three holding ELCOA certificates, three holding Walnut certificates and one holding both ELCOA and Walnut debt. A creditor holding Walnut subordinated certificates participated in the Committee meetings but was not a voting member. Likewise certain of the Indenture Trustees were involved but not in a voting capacity. As stated above, the Chair of the Committee is Axtell, an ELCOA creditor.

The issue of substantive consolidation was presented to the Committee early in their proceedings. The members were advised as to the legal and financial consequences of this doctrine and made to understand the inherent conflict in their body by reason of the existence of two estates, each with its own assets and liabilities. Committee professionals, including counsel, accountants and leasing consultants, provided them with helpful background but could not assist them *vis a vis* each other. Rather they were urged on several occasions to bifurcate into two subcommittees for the purpose of this issue and retain separate counsel. *See* Exhibit C-16. The Committee was adverse to taking this step, viewing a compromise to be in the best interests of both estates.

The Committee worked hard at reaching a fair and equitable solution. They held six or seven (out of 30) meetings just on this issue, and talked about it other times as well. They applied all the relevant information from financial statements and securities prospectuses to the principles articulated in the background memoranda prepared by their professionals. Exhibits C-1, C-2, C-3. They considered the recommendation of the court-appointed examiner Brian Moore ("Moore") that a compromise on substantive consolidation was advisable. They had before them all the facts and were totally aware of their respective strengths and weaknesses if the issue were to be litigated.

*2 I find that the process used by the Committee in reaching the Compromise was untainted by the adverse positions the members held as creditors of different estates. I agree with their conclusion that a litigated solution would have been costly and an obstruction to confirmation of a consensual plan that could soon begin to make some distribution, albeit small, to creditors. I also sadly agree that formalization into subcommittees with separate representation could have increased the likelihood of litigation over settlement and certainly would have added to the costs of administering these estates. Thus, I reject the Class Plaintiffs' objection to the compromise to the extent the Motion seeks a finding that the Committee and its Professionals acted reasonably, without conflict, and in the best interest of the estates regarding the compromise proposed and approved herein. Such a finding is clearing warranted.

## DISCUSSION

Substantive consolidation is an equitable remedy which may be ordered by the bankruptcy court under appropriate circumstances. The effect of it is to treat the assets and liabilities of multiple estates as though they were but one estate. While there is no express statutory authorization for substantive consolidation, the court's general equitable powers and section 105 of the Code which provides the court with the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" support this outcome.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                           Page 3

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

I begin by noting that the Motion does not ask that I order substantive consolidation of the estates. Such a request would require me to apply the facts of these cases to various criteria and reach one of two conclusions, *i.e.*, (1) that the two estates may be substantively consolidated with creditors [FN5] of both having *pari passu* claims against the combined assets or (2) that they may not and creditors would have claims against the assets of their estate only. The Committee eschewed this all or nothing approach and negotiated a outcome between these two extremes. It is with respect to this Compromise that the Committee seeks approval.

> FN5. For the purpose of this discussion, I draw no conclusion on whether the Walnut subordinated debt will participate on the same basis as the Walnut Senior debt. The Compromise is premised on the assumption that subordination will be enforced. If it is not, the Compromise will be ineffective. This issue will be presented as an objection to confirmation as presaged in one subordinated creditor's objection to the Debtors' Disclosure Statement. Moreover, I am advised that an adversary proceeding has been filed by a holder of subordinated debentures seeking, *inter alia,*
>   a declaration that the subordination provisions are unenforceable and classification of the claims arising therefrom in the same class as the holders of Walnut Senior debt. Adv. No. 99-0327. Should such a remedy be afforded, the Compromise, by its own terms, would be "null and void unless otherwise approved by the Committee." Motion ¶ 26.

It is well accepted that compromises are favored in bankruptcy in order to minimize the cost of litigation to the estate and expedite its administration, and that the approval of a compromise is within the sound discretion of the bankruptcy judge. [FN6] In *In re Martin,* 91 F.3d 389, 392 (3d Cir.1996), the Court of Appeals outlines my task as follows:

> FN6. Bankruptcy Rule 9019 governs the

procedure for securing the bankruptcy court's approval of a compromise and has been followed here.

This particular process of bankruptcy court approval requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. Taking our cue from *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163-64, 20 L.Ed.2d 1 (1968), we recognize four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D.Pa.1986).
\*3 *See also Jeffrey v. Desmond,* 70 F.3d 183, 185 (1st Cir.1995) (*quoting In re GHR Cos.,* 50 B.R. 925, 931 (Bankr.D.Mass.1985)) ("In determining whether the compromise should be approved, the bankruptcy judge is required to 'assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposed." ')). The court's role is not to conduct a trial or mini-trial, or to decide the merits of individual issues. Rather, it is to determine whether the settlement as a whole is fair and equitable. *Anderson,* 390 U.S. at 423. Moreover, the judge is not to substitute her judgment for that of the trustee [FN7] whose determination is to be accorded deference. *Martin,* 91 F.3d at 395 ("[U]nder normal circumstances the court would defer to the trustee's judgment so long as there is a legitimate business justification."). *See also Hill v. Burdick (In re Moorehead),* 208 B.R. 87, 89 (1st BAP1997). Only if the Court concludes that the settlement falls below the lowest point in the range of reasonableness should the compromise be rejected. *In re Pennsylvania Truck Lines, Inc.,* 150 B.R. 595, 601 (E.D.Pa.1992). While this Motion is somewhat unique in that I am required to assess the claims of two estates that are being compromised

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                        Page 4

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

*vis a vis* each other, the principles that govern its resolution are nonetheless also applicable here. [FN8]

> FN7. Trustee in this context would also mean the debtor-in-possession. 11 U.S.C. § 1107. Here the compromise is being advanced by the Committee upon authorization and support of the Debtors. The compromise also forms the basis of a jointly proposed plan of reorganization. Charged with a fiduciary obligation to their constituency and given the statutory role to study and decide issues such as this, 11 U.S.C. § 1104(c), the Committee's business judgment will likewise be accorded deference.

> FN8. While, the second factor, *i.e.*, the difficulty of collection would appear to be inapplicable, I note that the Committee's counsel has on several occasions expressed his concern that if a plan cannot be confirmed quickly the consensus built with the Debtors and embodied in the joint plan may slip away.

1. *Probability of success on the merits.* Based on comprehensive legal research as memorialized in legal memoranda prepared by Committee counsel, Exhibit C-1, and Debtors' counsel, Exhibit C-3, Francis Brulenski ("Brulenski"), the Committee's accountant accurately observed:

It is apparent that the law of substantive consolidation has been developed on a case by case basis. A single set of objective standards does not exist that can be simply applied point by point. The facts and circumstances of each case must be evaluated within the context of each unique bankruptcy proceeding.

Exhibit C-1, Memorandum dated March 17, 1998 at 2. There is no Third Circuit Court of Appeals authority that proscribes a test for this Court to follow in making a substantive consolidation ruling. Moreover, while there is decisional law from this district's other bankruptcy judges, I have never addressed what test I would utilize in deciding a contested substantive consolidation motion. Thus,

the expected uncertainty of a ruling made on a case by case basis is compounded by the uncertainty of not knowing the test that will be employed here by this Court or ultimately if an appeal is taken. [FN9] With that recognition, Brulenski rendered an analysis of the facts in these cases as they relate to the various factors employed by other courts. Brulenski's analysis and the background legal memoranda were supplied to the Committee members who conducted their own analysis as well. According to the testimony of Committee Chair Axtel, he reviewed the multiple factors against the facts and concluded that some factors support consolidation and other factors do not. [FN10] Neither position, in his mind, carried the point.

> FN9. As noted by both legal memoranda, while courts have historically been reluctant to approve substantive consolidation due to the drastic nature of the remedy, there has been a liberalization in recent years in recognition of the realities of corporate life. *See, e.g., Eastgroup Properties v. Southern Motel Assoc. Ltd.,* 935 F.2d 245, 248-49 (11th Cir.1991). Where in this trend, this Court would fall is another unknown that pointed to a compromise solution.

> FN10. For example, the Debtors did maintain separate books and financial statements and bank accounts. However, the methodology for allocating costs to ELCOA was found to be suspect, perhaps undermining the integrity of the separate records that were maintained. Moreover, the inter-company loan balance might be indicative of co-mingling of cash assets since funds from one debtor account were routinely passed through an inter-company account to fund obligations of the other debtor. The management of cash lacked the formality that one might expect with independent entities. As further example, there are no explicit parent or inter-corporate guarantees. However, the Walnut prospectus suggested that both Debtors' assets were available to satisfy a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                      Page 5

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

$18,500,000 Walnut deficiency). Exhibit C-11 at 20.

**\*4** 2. *Complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it.* The issue of substantive consolidation was also analyzed as part of the charter of the court-appointed examiner Moore. [FN11] After meeting with attorneys for the Debtors and Committee and reviewing their analyses of the relevant case law and the prospectuses issued in connection with the issuance of debt securities by both Debtors, he concluded in his Report dated April 27, 1998, that given the complexity of the issue, a resolution through negotiation was strongly recommended. Testifying in support of the Motion, Moore stated that he had concluded that litigation of substantive consolidation would involve a cost and time that would impair asset value for all creditors.

> FN11. The appointment of an examiner was authorized by Order of the Court dated September 27, 1997, Exhibit C-11B. Pursuant thereto, the United States trustee appointed Moore, a partner in the accounting firm of Arthur Andersen. Moore's experience runs the full gamut of Chapter 11 work over many years and in several hundred cases.

Concern over the escalating administrative expenses burdening the estate was also a factor relied upon by the Committee in opting for a negotiated rather than litigated resolution to substantive consolidation. According to Axtell, a case could be made for both estates' positions, *i.e.,* no consolidation to the benefit of ELCOA, the richer estate or total consolidation to the benefit of Walnut, the poorer estate. [FN12] Good lawyers, he reasoned, would advocate their sides zealously. The result, he feared, would be costly and time consuming litigation which would be harmful to all creditors. The cost of litigation is two-fold here since both estates would have to bear the cost (and concomitant learning curve) of entirely new professionals given the inability of the joint professionals to serve the adverse estates. [FN13] Taking into account the complexity of the issues

and a mind set that engenders rigorous advocacy in such circumstances, the cost of the litigation would likely be substantial. Moreover, the Debtors and Committee have filed their joint plan of reorganization embodying the compromise solution. A litigation of the issue would substantially delay the conclusion of this reorganization and the distribution to creditors. Indeed the need for closure was a theme that was sounded in a number of the bond holder written responses to the Motion.

> FN12. Based on the Debtors' respective adjusted balance sheets as of 4/3/98 and without regard to intercompany debt, Elcoa had assets of approximately $13 million versus liabilities of $27 million compared to Walnut's assets of $2 million to liabilities of $32.8 million inclusive of subdebt or $26.6 million absent subdebt. Thus, for Elcoa, consolidation lowers a best case potential dividend of 48.7% to 39.2% and for Walnut, increases a worse case of 6.1% to 14.6% or 7.5% to 18.0% (depending on the enforceability of subordination). *See* Exhibit C-9.

> FN13. Counsel to the Class Plaintiffs willingly offered its services to the ELCOA Committee members, noting that while it reviewed the legal memoranda of the Committee's attorneys and the Debtor's attorney, "in order to satisfy the procedural rules, we would have to conduct our own independent review of the relevant law--a task I would pursue only if retained to do so. Exhibit C-18. Counsel was not retained.

3. *Paramount interests of creditors.* In evaluating this prong of the test, I begin with the observation that the Compromise is the unanimous desire of the creditors of *both* estates as articulated by their representative body after significant study and arms length negotiation. The only opponent of the Compromise that articulated a basis therefore (other than the Walnut subordinated creditors who object to their exclusion) was the Class Plaintiffs who believe, notwithstanding the contrary view of the ELCOA Committee members who studied the issue,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                          Page 6

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

that the Compromise is unfair to ELCOA creditors. The Class Plaintiffs take issue with Brulenski's analysis. They dispute Brulenski's conclusion that the movement of money from ELCOA to Walnut creating intercompany loan balances to compensate was, in substance, a comingling of funds. They find no merit to the premise that ELCOA underpaid for Walnut's services. The Class Plaintiffs believe that the real problem was not ELCOA's failure to pay Walnut for its services on a profit basis but that Walnut was mismanaged and not performing the services at industry prices. They point to Walnut's historic losses which predate the formation of ELCOA as its wholly owned subsidiary in 1989. While this is historical fact, it misses the point. Since Walnut and ELCOA had common management, the very same officers who were allegedly "mismanaging" Walnut were causing Walnut to perform services for ELCOA for which they were incapable of generating a profit. The Class Plaintiffs' challenges to the Brulenski's analysis support, rather than refute, the Committee's business judgment by demonstrating the potential for contentious, protracted litigation on these points.

*5 The Class Plaintiffs were especially troubled by the fact that ELCOA bond proceeds were used to fund losses at Walnut and their counsel repeatedly asked the witnesses whether the Committee was aware of that fact. The answer was affirmative. Indeed Moore testified based on his review of the prospectuses since 1986, that purchasers of ELCOA certificates would have been aware of Walnut and its relationship to ELCOA, that Walnut's financial condition was precarious and that if Walnut discontinued operations, ELCOA would not have been able to secure as favorable business terms as it enjoyed with Walnut. On the latter point, the ELCOA creditors were advised that in a Walnut bankruptcy, its creditors might seek substantive consolidation of ELCOA's assets although management also stated its belief, "without the benefit of independent counsel, that it has taken the necessary steps to prevent such consolidations from occurring." ELCOA Prospectus dated August 31, 1992, Exhibit C15 at 5-6. Reliance is one of the factors a court should consider in determining the appropriateness of substantive consolidation. *See*

*e.g., In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518 (2d Cir.1988). Based on the facts that have been elicited on this issue, there are factors that point to sole reliance on ELCOA by ELCOA certificate holders and other facts that arguably undercut that position, again underscoring the prudence of

Thus, I cannot agree with the Class Plaintiffs that there is no risk that substantive consolidation could ever be ordered. More significantly, they give no weight to the deleterious impact litigation over substantive consolidation would have on both these estates. While they have focused on the unfairness of a complete substantive consolidation to ELCOA creditors who would stand to lose a significant part of their distribution, the Compromise does not seek such a drastic result. Rather the Motion should be approved if the parties' agreement is within the range of reasonableness and is fair and equitable. *Martin, supra.*

Brulenski explained how the settlement ratio was determined. Scenario 1 was based on a balance sheet analysis of each entity. It began with assumed asset values of $2,000,000 for Walnut and $13,000,000 for ELCOA. Exhibit C-4. [FN14] Before applying the inter-company adjustment for the underbilling, the distribution would have been 7.5% to Walnut senior creditors [FN15] and 48.7% to ELCOA creditors. The analysis assumes no inter-company debt exists. To calculate the adjusted distribution, the Walnut assets were increased to $4,798,000 to account for the underbilling of ELCOA by Walnut for originating and servicing the lease portfolio and providing bookkeeping services. The resulting percentages are 18.0% to Walnut and 39.2% to ELCOA or a ratio of approximately 2 to 1. Exhibit C-9. Scenario 2 was based on a liquidation analysis. Starting with assets of $1,697,000 for Walnut and $11,448,000 for ELCOA, [FN16] a distribution profile of 6.4% and 42.9% for Walnut and ELCOA, respectively, was calculated. Exhibit C-5. Making the same adjustment to the asset values, the distributions became 15.7% and 34.5%, respectively, again a roughly 2 to 1 ratio. These analyses were provided to the Committee. Exhibit C-17. According to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.

1999 WL 288651 (Bankr.E.D.Pa.)

**(Cite as: 1999 WL 288651 (Bankr.E.D.Pa.))**

Axtell's testimony, while Berlinski's schedules were reviewed and considered, the Committee gave the matter independent thought and in their own work found that a number of analyses came in around the 2 to 1 ratio. Based thereon, and believing there to be no requirement that they do so, they agreed to the Compromise as in the best interests of all creditors. [FN17]

> FN14. Beginning with cash balances as of April 3, 1998 plus gross receivables as of February 28, 1998, Brulenski subtracted receivables in legal collection, then added estimated new leases for March 1998 less an estimated reduction on investment in lease receivables for March 1998, and then added an assumed intangible value of Walnut's business (ELCOA conducts no business to be valued) and the residual value of the equipment at 50%. There was no challenge to this analysis.

> FN15. The numbers were also provided including the subordinated debt which, of course, has the effect of lowering the percentage to Walnut creditors. Since the Compromise assumes enforcement of contractual subordination, those numbers are not relevant for these purposes.

> FN16. This is based on the assumption that the entire lease bundle including leases in collection could be sold for $10,000,000.

> FN17. The Compromise was reached in May 1998. Approval was not sought until now because the other plan issues had not been resolved. Notwithstanding the year that has passed and the many events, including the loss of the Quaker lease sale, that have transpired, no Committee member has asked to revisit the unanimous decision to seek approval of this Compromise.

*6 Finding the Committee's deliberations to have been thorough and thoughtful, their conclusions sound and well reasoned and the Compromise fair

and equitable, I find no reason to withhold my approval. An Order consistent with this Memorandum Opinion shall be entered.

### ORDER

AND NOW, this 4th day of May, 1999, upon consideration of the Motion of the Official Committee of Unsecured Creditors of the Debtors (the "Committee") for an Order Approving Compromise Concerning Substantive Consolidation of the Estates of the Debtors (the "Motion") and after hearing and notice and for the reasons set forth in the accompanying Memorandum Opinion;

It is hereby ORDERED that the Motion of the Committee is GRANTED.

1999 WL 288651 (Bankr.E.D.Pa.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

**I, Kristie L. Dalton, certify that I am not less than 18 years of age, and that I caused service of the foregoing document to be made by electronic service, hand delivery (local counsel only) and U.S. Regular Mail on May 18, 2005 upon:**

Frank J. Perch, III, Esq.
David Klauder, Esq.
Office of the U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE 19801

Daniel J. DeFranceschi, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Gregory M. Gordon, Esq.
Jones Day
2727 North Harwood Street
Dallas, Texas 75201-1515

Lisa A. Beckerman, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022-2524

Francis A. Monaco, Jr., Esq.
Monzack and Monaco, PA
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Kathleen M. Miller, Esq.
Smith, Katzenstein, & Furlow
800 Delaware Ave.
P.O. Box 410
Wilmington, DE 19899

Document #: 43895

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904, P.O. Box 1351
Wilmington, Delaware 19899

Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103

Patrick M. Healy
Law Debenture Trust Company of New York
767 Third Avenue, 31st Floor
New York, NY  10017

James L. Eggeman
Pension Benefit Guaranty Corporation
Office of the General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026

Carl N. Kunz, III, Esq.
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  May 18, 2005

Kristie L. Dalton

Document #: 43895