IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | Bankruptcy Case 02-10429 (JKF) |
| | : | |
| Debtors. | : | |

| | | |
|---|---|---|
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 05-135 JJF |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | |
| | : | |
| Appellees. | : | |

ON APPEAL FROM THE UNITED STATES BANKRUPTCY
COURT FOR THE DISTRICT OF DELAWARE

_____

**BRIEF FOR APPELLANT**

_____

May 18, 2005

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF THE CASE ....................................................................................... 1

   I.    NATURE AND STAGE OF THE PROCEEDING ................................................... 1

   II.   SUMMARY OF ARGUMENT ................................................................................... 1

   III.  STATEMENT OF FACTS ............................................................................................ 2

        A.  Introduction ........................................................................................................ 2

        B.  The PBGC Claims And The LDTC Claim Objection .......................................... 5

        C.  The PBGC Settlement Motion ............................................................................ 6

        D.  The November 8, 2004 Hearing .......................................................................... 8

        E.  The Motion for Reconsideration ......................................................................... 8

        F.  The January 18, 2005 Evidentiary Hearing ....................................................... 9

           1.  Evidence Concerning the Negotiation of the PBGC Settlement ................. 11

           2.  Calculation of the PBGC's Unfunded Benefit Liability Claims .................. 14

ARGUMENT ................................................................................................................ 17

   POINT I ...................................................................................................................... 17

   THIS COURT SHOULD DETERMINE THAT, AS A MATTER OF
   LAW, THE PENDING LDTC CLAIM OBJECTION PRECLUDED THE
   BANKRUPTCY COURT'S CONSIDERATION OF THE PBGC SETTLEMENT
   MOTION PENDING RESOLUTION OF THE LDTC CLAIM OBJECTION ............... 17

    A.  The Settlement Order Violates The Mandate That
       Any Conflict Between The Bankruptcy Code And
       The Bankruptcy Rules Must Be Resolved In Favor Of The Code ............................... 18

    B.  The Bankruptcy Court Erred In Permitting The Debtors To
       Proceed With Prosecution Of The PBGC Settlement Motion
       In The Face Of The Pendency Of The LDTC Claim Objection ................................. 19

i

**TABLE OF CONTENTS, *Continued***

C. The Bankruptcy Court's Determination To Proceed With Consideration Of The PBGC Settlement Motion Notwithstanding The Pendancy Of The LDTC Claim Objection Is Highly Prejudicial To The Rights Of LDTC As A Creditor........21

POINT II...........................................................................................................24

THE SETTLEMENT ORDER CAN NOT PROPERLY RESOLVE THE LDTC CLAIM OBJECTION BECAUSE LDTC WAS NOT A PARTY TO THE PBGC SETTLEMENT AGREEMENT ..................................24

A. Because LDTC Was Not A Party To The PBGC Settlement And Was Not Represented In The Negotiations Of The Treatment Of The PBGC's Unfunded Benefit Liability Claims Thereunder, LDTC Should Not Be Bound By The Terms Of The PBGC Settlement ....................24

B. A Court Cannot Force Parties To Settle ......................................................28

POINT III ........................................................................................................28

THE BANKRUPTCY COURT ABUSED ITS DISCRETION IN APPROVING THE PBGC SETTLEMENT ........................................28

A. The Settlement Process Was Prejudicial To LDTC And The Interests Of The Senior Subordinated Noteholders..............................30

B. The Bankruptcy Court Erred In Approving The PBGC Settlement Because It Is Patently Unreasonable In Light Of Applicable Law And Improperly Provides A Windfall To The PBGC ...........................................................................................32

CONCLUSION...................................................................................................37

## TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(s)**

In re AWECO, Inc.,
    725 F.2d 293 (5th Cir. 1984)...................................................................29

In re Allegheny International, Inc.,
    107 B.R. 518 (W.D. Pa. 1989) ...............................................................18

In re Allegheny International, Inc.,
    954 F.2d 167 (3d Cir. 1992)...................................................................22

In re American Family Enterprises,
    256 B.R. 377 (D.N.J. 2000).................................................22, 29, 30, 31

In re American Reserve Corp.,
    841 F.2d 159 (7th Cir. 1987)..................................................................28

In re Beck,
    220 B.R. 573 (Bankr. D. Md. 1998)........................................................18

In re Boston & Providence R.R. Corp.,
    673 F.2d 11 (1st Cir. 1982) ....................................................................29

In re Burnham, Connelly, Oesterle and Henry,
    98 F.3d 1341, 1996 WL 580475 (6th Cir. 1996)......................................18

In re CF&I Fabricators of Utah, Inc.,
    150 F.3d 1293 (10th Cir. 1998)....................................................33, 34, 35

In re CSC Industries, Inc.,
    232 F.3d 505 (6th Cir. 2000)........................................................33, 34, 35

In re Chateaugay Corp.,
    94 F.3d 772 (2d Cir. 1996) ..........................................................25, 26

Chateaugay Corp. v. United States Department of Labor,
    23 F.3d 396 (2d Cir. 1994) ..........................................................25, 26

Chemetron Corp. v. Jones,
    72 F.3d 341 (3d Cir. 1995)............................................................17, 24

In re Columbia Gas System, Inc.,
    Nos. 91-803, 91-804, 1995 WL 404892 (Bankr. D. Del. June 16, 1995) ...................22

**CASES**                                                                                    **PAGE(s)**

In re Combustion Engineering, Inc,
     391 F.3d 190 (3d Cir. 2004) ...................................................................8, 19, 20, 21

In re Continental Airlines Corp.,
     907 F.2d 1500 (5th Cir. 1990) .......................................................................23

Donaldson v. Bernstein,
     104 F.3d 547 (3d Cir. 1997) ......................................................................17, 24

In re Foster Mortgage Corp.,
     68 F.3d 914 (5th Cir. 1995)...............................................................22, 29, 30, 31

In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,
     55 F.3d 768 (3d Cir. 1995) .....................................................................26, 27

In re Kincaid,
     917 F.2d 1162 (9th Cir. 1990) ........................................................................34

Kothe v. Smith,
     771 F.2d 667 (2d Cir. 1985) .........................................................................28

In re Little,
     161 B.R. 164 (Bankr. E.D. La. 1993)...................................................................18

In re Martin,
     91 F.3d 389 (3d Cir. 1996) ......................................................................22, 29

Newton v. A.C.&S., Inc,
     918 F.2d 1121 (3d Cir. 1990) .........................................................................28

In re Pacific Atlantic Trading Co.,
     33 F.3d 1064 (9th Cir. 1994)..........................................................................18

In re Pennsylvania Truck Lines, Inc.,
     150 B.R. 595 (E.D. Pa. 1992)..........................................................................23

In re Pillowtex, Inc.,
     349 F.3d 711 (3d Cir. 2003) ..........................................................................23

In re Present Co.,
     141 B.R. 18 (W.D.N.Y. 1992)......................................................................30, 31

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc.
     v. Anderson, 390 U.S. 414 (1968).................................................................28, 29

**CASES**                                                                                    **PAGE(s)**

In re RFE Industries, Inc.,
    283 F.3d 159 (3d Cir. 2002) ................................................................22, 29

Raleigh v. Illinois Department of Revenue,
    530 U.S. 15 (2000) ........................................................................32, 35

Reiss v. Hagmann,
    881 F.2d 890 (10th Cir. 1989) ...............................................................29

In re Sterling Die Casting Co.,
    118 B.R. 205 (Bankr. E.D.N.Y. 1990) ......................................................34

In re US Airways Group, Inc.,
    303 B.R. 784 (Bankr. E.D. Va. 2003) ..................................................35, 36

In re United Cos. Financial Corp.,
    267 B.R. 524 (Bankr. D. Del. 2000).........................................................22

Vanston Bondholders Protective Committee v. Green,
    329 U.S. 156 (1946) .........................................................................32

In re Walnut Equipment Leasing Co.,
    Nos. 97-19699, 97-19700 (DWS), 1999 WL 288651
    (Bankr. E.D. Pa. May 4, 1999).............................................................22

In re Woskob,
    305 F.3d 177 (3d Cir. 2002), cert. denied, 538 U.S. 961 (2003)................................23

**STATUTES**

Fed. R. Bank. Pro. 9019(a) ....................................................................21, 23, 28

Fed. R. Bankr. Pro. 1001.............................................................................18

Fed. R. Evid. 201 .....................................................................................4

11 U.S.C. § 105.....................................................................................2, 19
    § 502 .............................................................................................*passim*
    § 502(a) ...........................................................................................*passim*
    § 502(b) ..............................................................................................34
    § 1123(a)(4).........................................................................................33

## STATUTES

<strong>PAGE(s)</strong>

28 U.S.C. § 2075 (2005) ........................................................................................18

29 U.S.C § 1144(d) ..............................................................................................34
       § 1301(a)(18) ....................................................................................4, 33, 34
       § 1321-22 ........................................................................................4
       § 1341-42 ........................................................................................4
       § 1361 ............................................................................................4
       § 1362(a) ........................................................................................4
       § 1362(b) ........................................................................................4, 6
       § 1944(d) ........................................................................................34

## TREATISE

1 Collier on Bankruptcy ¶ 3.04[2][c] (Lawrence P. King, ed., 15th ed.) ...............................18

## STATEMENT OF THE CASE

### I.

## NATURE AND STAGE OF THE PROCEEDING

This appeal arises from the Bankruptcy Court's (i) approval of a settlement agreement between the Debtors (as defined below) and the Pension Benefit Guaranty Corporation (the "PBGC") and (ii) determination that such approval mooted the claim objection of Law Debenture Trust Company of New York, Appellant herein ("LDTC" or "Appellant"), a creditor and non-party to the settlement agreement. Thus, the Bankruptcy Court erred in (i) approving the settlement agreement, (ii) failing to hear LDTC's previously filed objection to the PBGC's claims prior to its consideration of the proposed settlement agreement, and (iii) binding LDTC to a settlement agreement to which it was not a party. Therefore, by this appeal, LDTC respectfully requests that this Court reverse the Bankruptcy Court's orders approving the settlement agreement and dismissing as moot LDTC's objection to the PBGC's claims and remand this matter for further consideration by the Bankruptcy Court.

### II.

## SUMMARY OF ARGUMENT

1.      Section 502 of the Bankruptcy Code provides creditors, such as LDTC, with the right to object to claims of other creditors, such as the PBGC. The plain language of section 502 does not restrict or circumscribe this right in any manner. LDTC objected to the PBGC's claims because, *inter alia*, they are grossly overstated.

2.      Rather than joining in LDTC's pending claim objection or filing their own, one of the Debtors entered into a global settlement with the PBGC that incorporated a

resolution of the PBGC's claims and then filed a motion under Bankruptcy Rule 9019 seeking approval of that settlement and dismissing as moot LDTC's claim objection. As the statutory predicate for this extraordinary relief, the Debtors relied upon section 105 of the Bankruptcy Code.

3.      Notwithstanding federal statutory authority that elevates Bankruptcy Code provisions over Bankruptcy Rules, the Bankruptcy Court erroneously entertained the Debtors' motion to approve its settlement with the PBGC prior to hearing LDTC's objection to the PBGC's claims.

4.      The Bankruptcy Court abused its discretion in approving the PBGC Settlement because the settlement process was unfair and prejudicial to LDTC and the settlement itself is patently unreasonable.

5.      The Bankruptcy Court compounded this error by holding that LDTC's claim objection was moot and binding LDTC to the Debtors' settlement with the PBGC.

### III.

### STATEMENT OF FACTS

**A.      Introduction**

This appeal arises in connection with the Chapter 11 bankruptcy of Kaiser Aluminum Corporation, who along with its wholly owned subsidiary Kaiser Aluminum & Chemical Corporation ("KACC"), and KACC's subsidiaries and affiliates (collectively, the "Debtors") filed for bankruptcy protection in early 2002 in the Bankruptcy Court for District of Delaware (the "Bankruptcy Court") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330, et seq., as amended (the "Bankruptcy Code").

2

At issue are the competing claims of certain unsecured creditors held against certain subsidiaries (the Alumina Estates, as defined below) in the Kaiser bankruptcy. These are the PBGC and two groups of noteholders holding several hundred million dollars of unsecured notes issued by KACC and guaranteed by certain of its subsidiaries, including the Alumina Estates. LDTC represents one of these groups of noteholders in its capacity as successor Indenture Trustee under the Indenture dated February 1, 1993 (the "Indenture") between KACC and the First National Bank of Boston, as original indenture trustee, whereby KACC issued $400 million of KACC's 12 3/4% Senior Subordinated Notes due 2003 (the "Senior Subordinated Notes").[1] In its capacity as the indenture trustee for the Senior Subordinated Notes, LDTC is a creditor of KACC and certain of the other Debtors, including the Alumina Estates. The other group of noteholders holding claims against the Alumina Estates in an amount not less than $452 million at AJI (as defined below) and KJC (as defined below) and not less than $414 million at KAAC (as defined below) and KFC (as defined below) are the holders of Senior Notes also issued by KACC in 1994 and 1996 (the "Senior Notes") and guaranteed by the same Debtor subsidiaries as those that guarantee the Senior Subordinated Notes, including the Alumina Estates.

The PBGC is a wholly-owned United States government corporation that administers

---

[1] Pursuant to the Indenture, Kaiser Alumina Australia Corporation ("KAAC"), Alpart Jamaica Inc. ("AJI") and Kaiser Jamaica Corporation ("KJC") guaranteed payment of the Notes as Subsidiary Guarantors. Pursuant to four supplemental indentures subsequently executed, Kaiser Finance Corporation ("KFC"), Kaiser Micromill Holdings, LLC, Kaiser Sierra Micromills, LLC, Kaiser Texas Sierra Micromills, LLC, Kaiser Texas Micromills Holdings, LLC, Kaiser Bellwood Corporation, and Kaiser Transaction Corporation were added as Subsidiary Guarantors under the Indenture. Hereinafter, KAAC, AJI, KJC and KFC shall collectively be referred to as the "Alumina Estates". KACC and the Subsidiary Guarantors (which include the Alumina Estates) are indebted to LDTC, as Indenture Trustee under the Indenture, in an amount not less than $474 million at AJI and KJC and not less than $427 million at KAAC and KFC, plus unliquidated amounts owed to LDTC and its predecessors for their respective fees and expenses.

the defined benefit pension plan termination insurance program under Title IV of ERISA, 29

U.S.C. §§ 1301-1461. (D.I. 5003, LDTC Claim Objection at Ex. A, Binder 1, Tab 1.)[2]

PBGC guarantees the payment of certain pension benefits upon the termination of a single-

employer defined benefit pension plan covered by Title IV of ERISA. (D.I. 5003, LDTC

Claim Objection at Ex. A, Binder 1, Tab 1.) When an underfunded pension plan terminates,

PBGC generally becomes trustee of the plan and, subject to certain statutory limitations, pays

the plan's unfunded benefits with its insurance funds. 29 U.S.C. §§ 1321-22, 1341-42, 1361

(2005). (D.I. 5003, LDTC Claim Objection at Ex. A, Binder 1, Tab 1.)

If any of the Debtors' eight defined benefit pension plans (the "Pension Plans")

terminate, the assets of such Pension Plan may be insufficient to cover the benefit liabilities

of the Pension Plan. (D.I. 5003, LDTC Claim Objection at Ex. A, Binder 1, Tab 1.) This

insufficiency is the amount of the Pension Plan's "unfunded benefit liabilities." 29 U.S.C. §

1362(b) (2005). (D.I. 5003, LDTC Claim Objection at Ex. A, Binder 1, Tab 1.) Upon

termination of each Pension Plan, its contributing sponsor and each member of the

contributing sponsor's controlled group become jointly and severally liable to PBGC for the

total amount of the Pension Plan's unfunded benefit liabilities. 29 U.S.C. § 1362(a), (b); see

also 29 U.S.C. 1301(a)(18). (D.I. 5003, LDTC Claim Objection at Ex. A, Binder 1, Tab 1.)

The PBGC and the noteholders described above are the only general unsecured

creditors of the Alumina Estates.[3] (D.I. 6261, App. 1, Third Amended Joint Plan of

---

[2] For the convenience of the Court, each document in the record includes a reference to the binder and tab under which the document can be located.

[3] The Alumina Estate debtors have filed plans of reorganization with the Bankruptcy Court, which have yet to be confirmed. Although these plans are not part of the record below, this Court may take judicial notice of them. Fed. R. Evid. 201. For the convenience of the Court, copies of the plans of reorganization of AJI and KJC and KFC and KAAC have been filed contemporaneously herewith in an appendix.

Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation; D.I. 6265, App. 2, Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation.) In connection with the Debtors' reorganization, the Debtors have liquidated the assets of the Alumina Estates and, pursuant to the respective plans of reorganization for the Alumina Estates now pending before the Bankruptcy Court, the proceeds of these assets are to be distributed to satisfy creditors. (D.I. 6261, App. 1, Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation; D.I. 6265, App. 2, Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation.) However, those proceeds fall substantially short of satisfying the claims of the PBGC and the noteholders in full. (D.I. 6261, App. 1, Third Amended Joint Plan of Liquidation for Alpart Jamaica Inc. and Kaiser Jamaica Corporation; D.I. 6265, App. 2, Third Amended Joint Plan of Liquidation for Kaiser Alumina Australia Corporation and Kaiser Finance Corporation.) Thus, a resolution of the claims of the noteholders and the PBGC at the Alumina Estates amounts to a determination of the fair allocation of the Alumina Estate assets. [4]

**B.    The PBGC Claims And The LDTC Claim Objection**

On January 29, 2003, the PBGC filed Proofs of Claim Nos. 1932 and 1936-1958 against the Debtors with respect to the Debtors' eight defined benefit pension plans (collectively, the "PBGC Claims"). (D.I. 5003, LDTC Claim Objection at Ex. A., Binder 1, Tab 1.) The PBGC Claims include (i) liquidated claims for estimated unfunded benefit liabilities totaling approximately $620 million and unliquidated claims for unfunded benefit

---

[4] There is a dispute as to whether the Senior Subordinated Notes are subordinated to the Senior Notes at the Alumina Estates. This dispute has been litigated before the Bankruptcy Court in the context of confirmation proceedings conducted with respect to the plans of reorganization proposed by the Alumina Estate debtors and remains *sub judice*.

5

liabilities for certain of the Pension Plans, (ii) a $17.1 million claim for minimum funding contributions related to the Pension Plan for salaried employees and unliquidated claims for minimum funding contributions related to the remaining seven Pension Plans for hourly employees, and (iii) unliquidated claims for missed statutory insurance premiums. (D.I. 5003, LDTC Claim Objection at Ex. A., Binder 1, Tab 1.) All of the PBGC Claims were asserted against each Debtor and alleged to have administrative expense and/or tax priority status.[5] (D.I. 5003, LDTC Claim Objection at Ex. A., Binder 1, Tab 1.)

On the basis that the Unfunded Benefit Liability Claims were grossly inflated by the PBGC in contravention of federal appellate authority, on September 15, 2004, LDTC filed an objection (the "LDTC Claim Objection") to the PBGC Claims, which include the Unfunded Benefit Liability Claims. (D.I. 5003, LDTC Claim Objection, Binder 1, Tab 1.)

C.    **The PBGC Settlement Motion**

Rather than filing their own objection to the PBGC Claims or joining in the pending

---

[5] See Debtors' Response to the LDTC Claim Objection. (D.I. 5306 at ¶ 2, Binder 1, Tab 5.) The PBGC's Proofs of Claim numbers 1938, 1941, 1944, 1947, 1950, 1953, 1956 and 1932 are contingent on the termination of the Pension Plans, and provide as follows: (i) Proof of Claim No. 1938 is for unfunded benefit liabilities under the Kaiser Aluminum Tulsa Pension Plan in the estimated amount of $1,600,000; (ii) Proof of Claim No. 1941 is for unfunded benefit liabilities under the Kaiser Aluminum Sherman Pension Plan in the estimated amount of $2,100,000; (iii) Proof of Claim No. 1944 is for unfunded benefit liabilities under the Kaiser Aluminum Salaried Employees Retirement Plan in the estimated amount of $232,600,000; (iv) Proof of Claim No. 1947 is for unfunded benefit liabilities under the Kaiser Aluminum Los Angeles Pension Plan in the estimated amount of $4,000,000; (v) Proof of Claim No. 1950 is for unfunded benefit liabilities under the Kaiser Aluminum Inactive Pension Plan in the estimated amount of $43,900,000; (vi) Proof of Claim No. 1953 is for unfunded benefit liabilities under the Kaiser Aluminum Pension Plan in the estimated amount of $332,100,000; (vii) Proof of Claim No. 1956 is for unfunded benefit liabilities under the Kaiser Center Garage Pension Plan in an unliquidated amount, and    (viii) Proof of Claim No. 1932 is for unfunded benefit liabilities under the Kaiser Aluminum Bellwood Pension Plan in the estimated amount of $3,900,000. (D.I. 5003, LDTC Claim Objection at Ex. A., Binder 1, Tab 1.) All of the above claims (hereinafter collectively referred to as the "Unfunded Benefit Liability Claims") arise under 29 U.S.C. § 1362(b) and total $620,200,000 in the aggregate.

LDTC Claim Objection[6], on October 22, 2004, the Debtors filed a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of a proposed settlement reached with the PBGC on October 14, 2004 (resolving, *inter alia*, all of the PBGC Claims ("the PBGC Settlement Motion") (D.I. 5251, Binder 1, Tab 2), to which LDTC subsequently objected on November 1, 2004. (D.I. 5311, Binder 1, Tab 6.) The PBGC and the Official Committee of Unsecured Creditors filed responses in support of the PBGC Settlement Motion. (D.I. 5314, Binder 1, Tab 8; D.I. 5315, Binder 1, Tab 9).

Under the PBGC Settlement, the Debtors agreed to the allowance of the Unfunded Benefit Liability Claims *in their full amount as determined by the PBGC* ($630 million[7]) against all of the Debtors' estates, subject to a cap on the PBGC's recovery at the Alumina Estates of 32% of the net distributable proceeds available for payment to unsecured creditors under plans of reorganization. (L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶9, Binder 7, Tab 1.)

In addition to the resolution of the Unfunded Benefit Liability Claims as described above, the PBGC Settlement provided for the following additional obligations to be undertaken by the parties: (a) the PBGC's assumption of the KAP Plan (as defined in the PBGC Settlement Motion); (b) the Debtors continued sponsorship of five pension plans; (c) the Debtors' commitment to satisfying minimum funding requirements for the five retained pension plans and the Debtors' insuring that this minimum funding standard is satisfied during the remainder of the chapter 11 proceedings; (d) the PBGC's dismissal of its appeal of

---

[6] The Debtors only filed an objection to the PBGC Claims after being ordered to do so by the Bankruptcy Court at the evidentiary hearing on January 18, 2005. (D.I. 6099, Transcript of Hearing Held 1/18/2005 ("1/18 Tr.) at 22, Binder 4, Tab 41; see D.I. 5995, Binder 3, Tab 35.)

[7] This amount is reduced under the PBGC Settlement to $616 million on account of the allowance of $14 million of this amount as an administrative claim. (See L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶10, Binder 7, Tab 1.)

the Distress Termination Order (as defined in the PBGC Settlement Motion)[8]; (e) the issuance by the PBGC of a no-action letter with respect to the Replacement Plans (as defined in the PBGC Settlement Motion); (f) the Debtors' agreement that prior to July 1, 2009, the Replacement Plans will not increase benefits and the Debtors will not establish or contribute to a defined benefit plan with respect to bargaining locations previously covered by the KAP Plan; (g) PBGC's release of all claims against Volta Aluminum Company Limited (as defined in the PBGC Settlement Motion); (h) PBGC's agreement to restrictions (with certain limitations) on the transfer of any equity securities to be received by it pursuant to a plan of reorganization for KACC. (L-1, Trial Exhibit of LDTC – *filed under seal* – Binder 7, Tab 1.)

**D.     The November 8, 2004 Hearing**

On November 8, 2004, the Bankruptcy Court held a hearing on the LDTC Claim Objection and the PBGC Settlement Motion. At this hearing, the Bankruptcy Court ruled that it would "stay the objection to claim process until [the Bankruptcy Court] get[s] through the settlement process." (D.I. 6099, 1/18 Tr. at 72, Binder 4, Tab 41.) Further, the Court stated that if the PBGC Settlement were approved, it may moot the LDTC Claim Objection. (D.I. 6099, 1/18 Tr. at 73, Binder 4, Tab 41.) The final hearing on the PBGC Settlement was set for January 18, 2005.

**E.     The Motion for Reconsideration**

Subsequent to the November 8, 2004 hearing, on December 2, 2004, the Third Circuit Court of Appeals rendered its decision in In re Combustion Eng'g, Inc, 391 F.3d 190 (3d Cir. 2004). Relying on the Third Circuit's recent decision, on December 14, 2004, LDTC filed a motion for reconsideration of the Bankruptcy Court's stay of the LDTC Claim Objection (the

---

[8] This Court has since affirmed the Distress Termination Order and denied the PBGC's appeal.

"Reconsideration Motion"). (D.I. 5592, Binder 2, Tab 21.) In its Reconsideration Motion, LDTC requested that the stay on the LDTC Claim Objection be lifted and that the LDTC Claim Objection be heard prior to any hearing on the Kaiser/PBGC Settlement. (D.I. 5592 at ¶14, Binder 2, Tab 21.) The hearing on this motion was also set for January 18, 2005. (D.I. 5592, Binder 2, Tab 21.)

## F.    The January 18, 2005 Evidentiary Hearing

On January 18, 2005, the Bankruptcy Court conducted an evidentiary hearing on the Debtors' motion to approve the PBGC Settlement[9] and heard argument on the Reconsideration Motion. At issue, of course, was the fairness of the PBGC Settlement, which LDTC challenged principally on the basis that the PBGC's Unfunded Benefit Liability Claims were grossly overstated. The parties presented evidence concerning the fairness of the process by which the PBGC Settlement was reached, as well as evidence concerning the reasonableness of its terms, particularly with respect to the Unfunded Benefit Liability Claims.

In support of the Debtors' motion for approval of the PBGC Settlement, the Debtor offered the witness declarations of: (i) John Barneson ("Barneson"), Senior Vice President and Chief Administrative Officer of KACC (D.I. 5909, Binder 3, Tab 3); (ii) Blake O'Dowd ("O'Dowd"), Managing Director in the Restructuring Group of Lazard Fréres & Co. ("Lazard"), financial advisor to the Debtor (D.I. 5908, Binder 3, Tab 32); and Norman W. Parrish ("Parrish"), previously of Hewitt Associates LLC, a consulting actuary to the Debtors (D.I. 5907, Binder 3, Tab 31); the Creditor's Committee offered the witness declaration of:

---

[9] In connection with the evidentiary hearing held on January 18, 2005 on the PBGC Settlement Motion, the Bankruptcy Court ordered that all direct testimony be provided through witness declarations rather than live testimony. Thus, during the hearing, itself, the only live testimony permitted was cross-examination and rebuttal testimony.

(iv) Amit Patel ("Patel"), Director of the Financial Restructuring Group of Houlihan Lokey Howard and Zukin Capital ("Houlihan"), financial advisor to the Creditors Committee (D.I. 5948, Binder 3, Tab 34); and the PBGC offered the witness declaration and expert report of: (v) Karen Justesen ("Justesen"), Supervising Chief Negotiating Actuary in the Corporate Finance and Negotiations Department of the PBGC (D.I. 5903, Binder 3, Tab 29); and the witness declaration of (vi) Kenneth B. Kofsky, an Accountant in the Financial Operations Department of the PBGC (D.I. 5903, Binder 3, Tab 30).

In opposition to the PBGC Settlement Motion, LDTC submitted the witness declaration and expert report of Roger Brinner, Ph.D. ("Brinner"), Chief Economist of the Parthenon Group (Decl. of Roger Brinner – *filed under seal* – Binder 5, Tab 2; Expert Report of Roger Brinner – *filed under seal* – Binder 5, Tab 5), an expert in calculating the present discounted values of future obligations. (D.I. 6099, 1/18 Tr. at 141, Binder 4, Tab 41.) In addition, as part of its case-in-chief, LDTC offered excerpts from the deposition testimony of various witnesses.

Dr. Brinner's witness declaration and expert report, along with the deposition excerpts offered by LDTC, were admitted into evidence without objection. (D.I. 6099, 1/18 Tr. at 140, Binder 4, Tab 41.) The witness declarations of Barneson, Parrish, Kofsky and Justesen (along with her expert report), were admitted without objection. (D.I. 6099, 1/18 Tr. at 65-66, Binder 4, Tab 41.) The witness declaration of O'Dowd was admitted into evidence, except that portion in which he opined that the PBGC Settlement was fair and was conducted at arm's length. (D.I. 6099, 1/18 Tr. at 89-94, Binder 4, Tab 41.) And the witness declaration of Patel was admitted into evidence, except that portion in which he — a non-

lawyer — offered his opinion regarding legal issues. (D.I. 6099, 1/18 Tr. at 109-111, Binder 4, Tab 41.)

### 1.    Evidence Concerning the Negotiation of the PBGC Settlement

None of the parties supporting the PBGC Settlement offered any admissible evidence concerning the negotiations that led to the settlement of the PBGC's Unfunded Benefit Liability Claims. Neither the Debtors, the PBGC, nor the Creditors Committee offered the testimony of a single witness who directly participated in the negotiations leading to the settlement of the Unfunded Benefit Liability Claims. Barneson, Senior Vice-President of KACC and the only principal of the Debtors to testify regarding the PBGC Settlement acknowledged under cross-examination that he had no direct knowledge of how the Unfunded Benefit Liability Claims came to be resolved, because the Debtors ceded responsibility to the Senior Noteholders for negotiating those claims with the PBGC. (D.I. 6099, 1/18 Tr. at 72-73, Binder 4, Tab 41.) Indeed, he admitted that when he signed the PBGC Settlement, he did not even know what dollar amount the PBGC would receive as a result of that settlement.[10] (D.I. 6099, 1/18 Tr. at 79-81, Binder 4, Tab 41.)

The only hearing witnesses who offered any testimony regarding the negotiation of the Unfunded Benefit Liability Claims were O'Dowd and Patel — financial advisors to the Debtors and the Creditors Committee, respectively — each of whom confirmed that the Debtors ceded responsibility to the Senior Noteholders for negotiating with the PBGC, and each of whom admitted that they did not participate in those negotiations. (D.I. 6099, 1/18 Tr. at 92-93, 118-119, 126-127, Binder 4, Tab 41.) Thus, other than hearsay evidence –

---

[10] Similarly, at his deposition, Barneson testified that he did not know how the Senior Subordinated Noteholders would fare under the PBGC Settlement. Decl. of Tina N. Moss – *filed under seal* – Ex. B at 128, Binder 5, Tab 3.)

which the Court properly rejected (D.I. 6099, 1/18 Tr. at 92-94, Binder 4, Tab 41) – none of the parties supporting the PBGC Settlement offered any evidence that it was negotiated *by the Debtors on behalf of all interested creditors* in good faith and at arm's length; and the evidence in the record actually suggests otherwise.

To begin with, it is undisputed that the Debtors ceded responsibility to the Senior Noteholders for negotiating with the PBGC regarding its Unfunded Benefit Liability Claims. D.I. 6099, 1/18 Tr. at 92-93, 118-119, 126-127, Binder 4, Tab 41; Decl. of Steven M. Rabinowitz – *filed under seal* – Ex. B at Vol. I, 49-50 and Vol II, 15, Binder 5, Tab 4.) But more significantly, it is equally undisputed that the Senior Subordinated Noteholders — the constituency represented by LDTC — were excluded from those negotiations. (D.I. 6099, 1/18 Tr. at 72-73, Binder 4, Tab 41; Decl. of Steven M. Rabinowitz – *filed under seal* – Ex. B at Vol. I, 49-50 and Vol. II, 15, 26-28, Binder 5, Tab 4; Decl. of Tina N. Moss – *filed under seal* – Ex. C at 110-111, Binder 5, Tab 3; D.I. 5908 at ¶16, Binder 3, Tab 3.) Indeed, the record reflects that the Senior Subordinated Noteholders were not kept apprised of the negotiations or even provided with drafts of the PBGC Settlement. (D.I. 6099, 1/18 Tr. at 72-73, Binder 4, Tab 41; Decl. of Steven M. Rabinowitz – *filed under seal* – Ex. B at Vol. I, 50, Binder 5, Tab 4.)

Furthermore, evidence was presented at the evidentiary hearing (though apparently disregarded by the Bankruptcy Court) that in negotiating the PBGC Settlement, the Senior Noteholders and the PBGC colluded to benefit one another to the detriment of the Senior Subordinated Noteholders. What the Senior Noteholders and the PBGC in essence agreed was that, in return for the PBGC's support in its subordination dispute with the Senior Subordinated Noteholders, the Senior Noteholders would support the PBGC's claim for

12

Unfunded Benefits Liability.  In a proposed term sheet provided to the PBGC on July 30, 2004, a little more than two months before the PBGC Settlement, the Senior Noteholders proposed that the settlement provide, in pertinent part, that:

> The PBGC and the senior note members of the Committee will work together and with the Debtors to propose, confirm and consummate as expeditiously as possible chapter 11 plans for the Alumina Subsidiary Debtors[11], which plans shall among other things, provide for *(a) enforcement of the subordination provisions of the junior notes indenture in favor of the senior note holders (b) treatment of the PBGC claims in accordance with paragraph 2* [which provided, similarly to the final PBGC Settlement, that the PBGC shall receive a recovery against its Claims of 28% of the Alumina Estates][12] ...

(L-3, Trial Exhibit of LDTC – *filed under seal* – at ¶¶2, 6, Binder 7, Tab L-2, emphasis and explanation added.)

For obvious reasons, such a provision was not included in the final PBGC Settlement -- it would reveal the collusion between the PBGC and the Senior Noteholders.  Kurt Billick of Farallon Capital, a representative of the Senior Noteholders and member of the Creditors' Committee, participated in the negotiations with the PBGC.  Mr. Billick admitted during his deposition that the PBGC and the Senior Noteholders intended to abide by the *quid pro quo* contemplated in the July 30th proposal when performing the PBGC Settlement.  (Decl. of Tina N. Moss – *filed under seal* – Ex. C at 91-102, Binder 5, Tab 3.)

Despite uncontroverted evidence that the Debtors abdicated their responsibility for negotiating with the PBGC with respect to its staggering Unfunded Benefit Liability Claims to the Senior Noteholders, who then excluded the Senior Subordinated Noteholders from those negotiations; despite any evidence that the negotiations were conducted at arm's length

---

[11] These are the "Alumina Estates," referenced herein.
[12] The final PBGC Settlement provided that the PBGC would receive a higher percentage recovery of 32% from the Alumina Estates. (L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶9, Binder 7, Tab 1.)

and in good faith, and in the presence of uncontroverted and substantial evidence of collusion between the negotiating parties to achieve a result beneficial to their own interests at the expense of the Senior Subordinated Noteholders; the Bankruptcy Court nevertheless apparently concluded that the negotiation of the PBGC Settlement was properly conducted.[13] (D.I. 6076, Transcript of Hearing Held 1/24/2005 ("1/24 Tr.) at 99, Binder 4, Tab 39.)

### 2. Calculation of the PBGC's Unfunded Benefit Liability Claims

A significant component of the PBGC Settlement was the resolution of the PBGC's Unfunded Benefit Liability Claims. (See L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶9, Binder 7, Tab 1.) As set forth in the PBGC Settlement, those claims, aggregating $616 million, were calculated under ERISA, which calculation was not disputed by the Debtors.[14] (See L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶9, Binder 7, Tab 1.) The PBGC Settlement provides that the PBGC's Unfunded Benefit Liability Claims are to be treated as allowed general unsecured claims against the Debtors, provided that the PBGC's recovery at the Alumina Estates is limited to 32% of the net distributable proceeds payable to the Senior Noteholders, the Senior Subordinated Noteholders and the PBGC.

At the hearing, Amit Patel, financial advisor to the Creditors Committee, testified that based upon the expected values to be realized from the Alumina Estates, the PBGC's 32% recovery would total roughly $200 million. (D.I. 6099, 1/18 Tr. at 128, Binder 4, Tab 41.) In addition, Patel testified that the PBGC would recover from other debtor entities another approximately $68 million, for a total recovery against its Unfunded Benefit Liability Claims

---

[13] The Bankruptcy Court made no reference to these issues in its ruling and no finding that the negotiations were conducted at arm's length and in good faith.

[14] As discussed *supra*, the PBGC Settlement provides that the agreed-upon Unfunded Benefit Liability Claims total $630 million, $14 million of which is to be treated as an administrative claim. (See L-1, Trial Exhibit of LDTC – *filed under seal* – at ¶9-10, Binder 7, Tab 1.)

of roughly $268 million. (D.I. 6099, 1/18 Tr. at 130-131, Binder 4, Tab 41.) This testimony was not controverted by any other witness.

In challenging the PBGC Settlement Motion, LDTC argued that the ERISA methodology used to calculate the PBGC's Unfunded Benefit Liability Claims was improper as a matter of law in that it grossly overstated the present value of the PBGC's claims relative to those of other creditors. (Trial Brief of LDTC – *filed under seal* – at 17-23, Binder 5, Tab 1.) The PBGC's methodology, as Karen Justesen of the PBGC testified, employs an interest rate factor of the PBGC's own devising, which adjusts for the present value of unfunded benefit liabilities that the PBGC will pay over time. (D.I. 5903 at ¶¶7-13, Binder 3, Tab 29; D.I. 6099, 1/18 Tr. at 189-91, Binder 4, Tab 41.) The interest factor used by the PBGC ranged between 4.0 and 4.7 percent. (D.I. 5903 at ¶12, Binder 3, Tab 29.)

Relying upon the decisions of the only two Circuit Courts to opine on the issue, LDTC argued that rather than using its own interest factors, the PBGC was required to use a "prudent investor rate," in calculating its claims. (Trial Brief of LDTC – *filed under seal* – at 18, Binder 5, Tab 1.) Such a discount rate, which would be more than double the PBGC's own self-serving rate, would dramatically reduce the size of the PBGC's claim. (Trial Brief of LDTC – *filed under seal* – at 27-28, Binder 5, Tab 1.)

In support of its position, LDTC offered the affidavit and expert report of Dr. Roger Brinner, an economist with a distinguished record of achievement. (Decl. of Roger Brinner – *filed under seal* – at ¶¶3-5, Binder 5, Tab 2.) Dr. Brinner noted in his affidavit that the PBGC "deviates from accepted economic practice" by using discount rates that are not based upon any estimate of the time value of money, i.e., the dollars that must be invested today to meet

obligations tomorrow.[15] (Decl. of Roger Brinner – *filed under* seal – at ¶6, Binder 5, Tab 2.) Then, based upon his analysis of the PBGC's actual investment performance during the twenty-four year period from 1980 – 2004 — as well as of market performance in general during the past fifty years — Dr. Brinner opined that a "prudent investor rate" for the PBGC would be 10.4%. (Decl. of Roger Brinner – *filed under* seal – at ¶30, Binder 5, Tab 2.)

None of the proponents of the PBGC Settlement offered any testimony, expert or otherwise, to challenge Dr. Brinner's calculation of the "prudent investor rate." (D.I. 6099, 1/18 Tr. at 123, Binder 4, Tab 41.) Indeed, both Blake O'Dowd and Amit Patel, respectively the financial consultants for the Debtors and the Committee, provided testimony under cross-examination that supported Dr. Brinner's conclusions.[16] (D.I. 6099, 1/18 Tr. at 86 and 125, Binder 4, Tab 41.) Moreover, it was Patel who provided testimony during cross-examination which demonstrated that the amounts to be received by the PBGC under the PBGC Settlement actually exceed the amount of the PBGC's Unfunded Benefit Liability Claims, were those claims to be calculated using Dr. Brinner's prudent investor rate, rather than the self-serving rate devised by the PBGC. (D.I. 6099, 1/18 Tr. at 119-122 and 128-131, Binder 4, Tab 41; (L-9, Trial Exhibit of LDTC – *filed under seal* – Binder 7, Tab L-9.)

Patel acknowledged that there was a roughly $450 million difference between PBGC's calculation of its Unfunded Benefit Liability Claims (using the PBGC's self-devised rate) and a calculation using Dr. Brinner's prudent investor rate. (D.I. 6099, 1/18 Tr.

---

[15] Every other witness who testified at depositions about the PBGC's methodology, including those from the PBGC, admitted that the interest factors used by the PBGC in calculating it Unfunded Benefit Liability Claims have nothing to do with the PBGC's investment expectations. Decl. of Steven M. Rabinowitz – *filed under seal* – Ex. D at 49-50 and Ex. E at 38, Binder 5, Tab 4.)

[16] O'Dowd and Patel acknowledged that Brinner's prudent investor rate fell within the range each considered reasonable, though each arrived at rates — averaging about 9 percent — that were slightly lower than Brinner's. (D.I. 6099, 1/18 Tr. at 83-87, 124-125, Binder 4, Tab 41.)

at 119-122 and 128-131, Binder 4, Tab 41.)  But more significantly, he testified that PBGC's expected recovery under the PBGC settlement would be about $268 million (D.I. 6099, 1/18 Tr. at 130-131, Binder 4, Tab 41), which is more than $100 million greater than the $168 million amount he calculated the PBGC's Unfunded Benefit Liability Claim would be worth using a 10% discount rate[17] (D.I. 6099, 1/18 Tr. at 122, Binder 4, Tab 41.)

In its closing argument, LDTC stressed that with an expected payout to the PBGC that vastly exceeds the proper calculation of its claims, the PBGC Settlement was patently unfair.  Nevertheless, the Bankruptcy Court approved the PBGC Settlement, denied LDTC's Motion for Reconsideration, and declared the LDTC Claim Objection moot.

## ARGUMENT

### POINT I

### THIS COURT SHOULD DETERMINE THAT, AS A MATTER OF LAW, THE PENDING LDTC CLAIM OBJECTION PRECLUDED THE BANKRUPTCY COURT'S CONSIDERATION OF THE PBGC SETTLEMENT MOTION PENDING RESOLUTION OF THE LDTC CLAIM OBJECTION

The legal conclusions of the Bankruptcy Court embodied in the Reconsideration Order (by which the Bankruptcy Court ruled that it would not consider the LDTC Claim Objection prior to consideration of the PBGC Settlement), are subject to *de novo* or plenary review by the District Court.  See Donaldson v. Bernstein, 104 F.3d 547, 551 (3d Cir. 1997); Chemetron Corp. v. Jones, 72 F.3d 341, 345 (3d Cir. 1995).  As set forth below, as a matter of law, the Bankruptcy Court should have considered the LDTC Claim Objection prior to any hearing on the PBGC Settlement, and therefore the Bankruptcy Court's decision to approve

---

[17] Because present values decrease the higher the discount rate, Dr. Brinner's 10.4% prudent investor rate would yield an even lower figure than $168 million and, hence, an even greater difference than $100 million.

the PBGC Settlement should be reversed and this matter should be remanded for full consideration of the LDTC Claim Objection.

**A.    The Settlement Order Violates The Mandate That
        Any Conflict Between The Bankruptcy Code And
        The Bankruptcy Rules Must Be Resolved In Favor Of The Code.**

In approving the PBGC Settlement and dismissing LDTC's Claim Objection as moot, the Bankruptcy Court ignored the statutory mandate that Bankruptcy Code provisions prevail over Bankruptcy Rules.  According to federal statutory and controlling case law authority, adjudication of the PBGC Settlement Motion should have yielded to adjudication of the LDTC Claim Objection.  It is a matter of federal statutory authority that the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right" provided under the Bankruptcy Code.  28 U.S.C. § 2075 (2005).  "As a result, **any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code.**"  In re Pacific Atl. Trading Co., 33 F.3d 1064, 1066 (9th Cir. 1994) (citations omitted) (emphasis added); In re Burnham, Connelly, Oesterle and Henry, 98 F.3d 1341, No. 95-1306, 1996 WL 580475, at *2 (6th Cir. 1996).  Bankruptcy Rule 1001 states that the Bankruptcy Rules govern procedure. Fed. R. Bankr. Pro. 1001; In re Beck, 220 B.R. 573, 576 (Bankr. D. Md. 1998); In re Little, 161 B.R. 164, 169 (Bankr. E.D. La. 1993).  However, any procedural matter set out in the Bankruptcy Rules must still be consistent with applicable bankruptcy statutes in order to be valid. Fed. R. Bankr. Pro. 1001 advisory committee's note; 1 Collier on Bankruptcy ¶ 3.04[2][c] (Lawrence P. King, ed., 15th ed.); In re Allegheny Int'l, Inc., 107 B.R. 518, 524 (W.D. Pa. 1989).