**B.**    **The Bankruptcy Court Erred In Permitting The Debtors To Proceed With Prosecution Of The PBGC Settlement Motion In The Face Of The Pendancy Of The LDTC Claim Objection.**

As the Third Circuit Court of Appeals has held, section 105 of the Bankruptcy Code cannot be used to contradict or extend other specific provisions of the Bankruptcy Code. More specifically, the Third Circuit's ruling in In re Combustion Eng'g, Inc., 391 F.3d 190, compelled the conclusion that LDTC's substantive statutory right to object to the PBGC Claims under section 502(a) of the Bankruptcy Code could not be thwarted by the Debtors' reliance on section 105 for approval of the PBGC Settlement Motion.[18]  Rather, the PBGC Settlement Motion should have yielded to adjudication of the LDTC Claim Objection.  In spite of controlling authority to the contrary, the Bankruptcy Court ultimately declined to hear the LDTC Claim Objection and instead conclded that it was mooted by the approval of the PBGC Settlement. (D.I. 6076, 1/24 Tr. at 102, Binder 4, Tab 39.)

In the PBGC Settlement Motion, the Debtors sought "an order of the Court (a) approving the [PBGC Settlement], pursuant to Bankruptcy Rule 9019 and sections 105, 502 and 503 of the Bankruptcy Code; and dismissing as moot the [LDTC Claim Objection]." (D.I. 5251 at ¶18, Binder 1, Tab 2)  Unlike LDTC's express statutory right to object to another creditor's claim, there is no separate statutory basis for the relief requested by the Debtors in the PBGC Settlement Motion.  Not surprisingly, therefore, the Debtors

---

[18] By way of background, in Combustion Eng'g the Third Circuit addressed, among other issues, whether it was appropriate for the bankruptcy and district courts to use their equitable powers, under section 105 of the Bankruptcy Code, to extend the statutory channeling injunction in an asbestos bankruptcy case to include non-derivative claims against non-debtors. Section 524(g) of the Bankruptcy Code by its terms does not authorize a channeling injunction over independent, non-derivative third-party actions against non-debtors. The plan proponents, however, predicated the broader relief on section 105(a). Persuaded that the requested channeling injunction was integral to the proposed plan of reorganization, the district court agreed with the invocation of its section 105 equitable powers to extend the statutory channeling injunction to include the non-derivative claims against non-debtors. 391 F.3d at 213.

19

specifically relied upon section 105 of the Bankruptcy Code for the relief requested. That relief included both the approval of the PBGC Settlement and the dismissal of LDTC's Claim Objection as moot.

Sections 502 and 503 of the Bankruptcy Code both provide for the allowance of and objection to claims, but offer no statutory basis whatsoever for the Debtors' requested relief in a manner that cuts off another party's objections to the claim in issue. Nowhere in either of these statutory provisions can there be found any authority to permit the allowance of a claimant's asserted claims over the objection of a creditor. Rather, section 502(a) provides a creditor (here, LDTC) with an unrestricted substantive statutory right to object to the claims of another creditor. Under the Third Circuit's ruling in Combustion Eng'g, this enumerated statutory right cannot be thwarted by a debtors' reliance on section 105.

In Combustion Engineering, the Third Circuit reversed the determination of the district court by concluding that section 105 of the Bankruptcy Code could not be used to contradict or extend other specific provisions of the Bankruptcy Code. 391 F.3d at 233-234. The Court of Appeals reasoned as follows:

> *The general grant of equitable power contained in § 105(a) cannot trump specific provisions of the Bankruptcy Code, and must be exercised within the parameters of the Code itself... When the Bankruptcy Code provides a specified means for a debtor to obtain a specific form of equitable relief, those standards and procedures must be observed...* Here, the Bankruptcy Court relied upon § 105(a) to achieve a result inconsistent with § 524(g)(4)(A). Although the Bankruptcy Court has broad equitable authority to craft remedies necessary to facilitate the reorganization of a debtor, this power is cabined by the Code.

Id. at 236 (internal citations omitted) (emphasis added).

The Third Circuit further recognized that section 105 "'does not authorize the

bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" Id. (quoting In re Aquatic Dev. Group, Inc., 352 F.3d 671, 680-81 (2d Cir. 2003)). Pursuant to the Combustion Eng'g decision, the PBGC Claims should have been considered under the standards set forth in section 502(a) of the Bankruptcy Code and LDTC's objection to the PBGC Claims should have been heard. Instead the Bankruptcy Court, in contravention of the Third Circuit's ruling, allowed the PBGC Settlement Motion to be heard in the first instance. The Bankruptcy Court itself expresses its own reservations about whether its consideration of the PBGC Settlement was proper because it did not purport to resolve any claim objection by the Debtors already pending. (D.I. 6099, 1/18 Tr. at 17-22, Binder 4, Tab 41.) Indeed, at the January 18, 2005 hearing, the Bankruptcy Court ordered the Debtors to file an objection to the PBGC's claims to address this issue. (D.I. 6099, 1/18 Tr. at 22, Binder 4, Tab 41.)

C.     **The Bankruptcy Court's Determination To Proceed With Consideration Of The PBGC Settlement Motion Notwithstanding The Pendancy Of The LDTC Claim Objection Is Highly Prejudicial To The Rights Of LDTC As A Creditor.**

Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. Pro. 9019(a). The standard for determining whether to grant a motion under Bankruptcy Rule 9019 is entirely different from the standard applied in the adjudication of a claim objection under section 502 of the Bankruptcy Code. Pursuant to section 502(a), the burden of proof shifts throughout the claims process, but begins with the claimant, here the PBGC, alleging facts sufficient to support the *prima facie* validity of the PBGC Claims. The burden then shifts to the objector, here LDTC, to produce evidence sufficient to negate the *prima facie* validity of the PBGC Claims. LDTC refuted the prima facie validity of the PBGC Claims by

demonstrating at trial that the discount rate used by the PBGC in determining the amounts of its unfunded benefit liability claims was inappropriate, inconsistent with federal appellate authority, and resulted in a grossly inflated aggregate claim amount. Under these circumstances, if made to defend its claims, the PBGC would fail to meet its burden of proving the PBGC Claims by a preponderance of the evidence. See In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992); In re United Cos. Fin. Corp., 267 B.R. 524, 527 (Bankr. D. Del. 2000).

In contrast, in determining whether to grant a debtor's motion for approval of a settlement under Rule 9019, a court should consider the following factors: (i) the probability of success in the litigation; (ii) the likely difficulties in collection; (iii) the complexity, expense, and delay of the litigation; and (iv) the paramount interest of the creditors. In re RFE Indus., Inc., 283 F.3d 159, 165 (3d Cir. 2002); In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). In addition to these factors, a court should also consider whether the settlement is truly a product of arm's length negotiating and good faith. In re Foster Mortgage Corp., 68 F.3d 914, 918 (5th Cir. 1995); In re American Family Enters., 256 B.R. 377, 421 (D.N.J. 2000); In re Walnut Equip. Leasing Co., Nos. 97-19699, 97-19700 (DWS), 1999 WL 288651, at *4 (Bankr. E.D. Pa. May 4, 1999); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1995 WL 404892, at *2 (Bankr. D. Del. June 16, 1995).

In applying the analysis required under Bankruptcy Rule 9019 in lieu of that required under section 502, the Bankruptcy Court (i) allowed the PBGC to completely dodge its burdens of proof and production under section 502(a), and (ii) allowed the Debtors and the PBGC to make an "end run" around the due process procedures attendant to the LDTC Claim

Objection by allowing for the application of a qualitatively different and less exacting standard of review than that required under section 502(a) of the Bankruptcy Code.

The standards under section 502(a) of the Bankruptcy Code and Bankruptcy Rule 9019 are not able to be reconciled under the circumstances. Section 502(a) gave LDTC the right to object to the PBGC Claims. Under that section, the PBGC should have proven its claim by a preponderance of the evidence. Under Rule 9019, the burden of proof is on the Debtors, not the PBGC. Furthermore, the standard of proof is qualitatively different, takes into account numerous other considerations, and is less exacting. Moreover, an appeal, such as this, taken of the Order entered on a claim objection under section 502 would have been subject to a different standard of review than that of the Settlement Order. In re Woskob, 305 F.3d 177, 181 (3d Cir. 2002), cert. denied, 538 U.S. 961 (2003) (legal determinations are subject to plenary review and factual determinations are reviewable only for clear error); In re Pillowtex, Inc., 349 F.3d 711, 716 (3d Cir. 2003) (stating same); In re Pennsylvania Truck Lines, Inc., 150 B.R. 595, 598 (E.D. Pa. 1992) (as to Bankruptcy Rule 9019 approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion); In re Continental Airlines Corp., 907 F.2d 1500, 1520 (5th Cir. 1990) (holding same). Under these circumstances, the prejudice to LDTC as a result of the Bankruptcy Court's ruling is enormous because it permitted the approval of the PBGC Settlement under Rule 9019 that embodied the resolution of the LDTC Claim Objection, a claim objection properly raised by a creditor under Section 502, and purported to render that objection moot.

For these reasons, the Bankruptcy Court committed clear error as a matter of law and this Court should reverse its Order approving the PBGC Settlement and remand this matter to the Bankruptcy Court for consideration of the LDTC Claim Objection.

23

**POINT II**

**THE SETTLEMENT ORDER CAN NOT PROPERLY RESOLVE
THE LDTC CLAIM OBJECTION BECAUSE LDTC WAS
<u>NOT A PARTY TO THE PBGC SETTLEMENT AGREEMENT</u>**

As set forth in Point I, legal conclusions are subject to *de novo* or plenary review by the District Court. <u>See</u> <u>Donaldson</u>, 104 F.3d at 551; <u>Chemetron Corp.</u>, 72 F.3d at 345. The Bankruptcy Court erred as a matter of law when it ruled that approval of the PBGC Settlement renders the LDTC Claim Objection moot because a settlement is only binding on the parties to the settlement. LDTC is not a party to the PBGC Settlement. Therefore the Bankruptcy Court's decision should be reversed and this matter should be remanded to the Bankruptcy Court for consideration of the LDTC Claim Objection.

A.    **Because LDTC Was Not A Party To The PBGC Settlement And
      Was Not Represented In The Negotiations Of The Treatment Of
      The PBGC's Unfunded Benefit Liability Claims Thereunder,
      <u>LDTC Should Not Be Bound By The Terms Of The PBGC Settlement</u>**

The Bankruptcy Court's holding that the LDTC Claim Objection was mooted by the Settlement Order is contrary to established case law which holds that a settlement has no effect on non-settling parties' rights. Despite the fact that LDTC is one of only three creditors at the Alumina Estates, as discussed *supra*, LDTC was excluded from the settlement negotiations among the Debtors and the other two Alumina creditors, the PBGC and the Senior Noteholders, that lead to the PBGC Settlement. LDTC is not a party to the PBGC Settlement. The Bankruptcy Court nonetheless dismissed as moot the LDTC Claim Objection to the PBGC Claims based on the approval of a settlement reached by only the Debtors, the PBGC and the Senior Noteholders. This was clear error.

Under analogous case law, in this instance the Bankruptcy Court was required to hear the LDTC Claim Objection because LDTC was not a party to the PBGC settlement

24

negotiations or agreement. A non-settling party's rights cannot be affected by a settlement to which it was not a party. In re Chateaugay Corp., 94 F.3d 772, 774 (2d Cir. 1996) and Chateaugay Corp. v. United States Dep't of Labor, 23 F.3d 396 (2d Cir. 1994) (table).

In Chateaugay, LTV Steel, an owner of a coal mine, chose to insure itself for certain disability benefits as permitted by federal law. 94 F.3d at 774. Under the applicable self-insurance guidelines, a coal mine operator had to maintain a surety bond in favor of the United States so that if the mine operator defaulted, the party who issued the bond would pay the benefits up to the value of the bond. Id. Once the bond was exhausted the Department of Labor ("DOL") would be responsible for paying benefits subject to certain restrictions. Id.

Aetna issued a $5.5 million dollar bond on LTV Steel's behalf. After LTV Steel filed for bankruptcy protection, it ceased paying the self-insured benefits. Id. First the DOL paid the benefits, and then Aetna commenced payment under its bond. Once the bond was exhausted, the DOL resumed payments again. Id. Throughout the bankruptcy, Aetna sought to have the funds it had paid under the bond returned. Id. During the pendency of the bankruptcy, LTV Steel and the DOL entered into a settlement agreement which fixed the government's claims for repayment of the benefits. Id. Aetna was not a party to the settlement.

Aetna objected to the settlement arguing that "it risked extinguishing the insurance company's right to be repaid, since that right was derived from [the insurance company's] position as a subrogee to the DOL's right to reimbursement." Id. Over Aetna's objections, both the bankruptcy court and the district approved the settlement in an unpublished order. Id. The Second Circuit affirmed in a table decision, **"but expressly noted that the**

25

**settlement could have no adverse effect on [the insurance company's] rights or claims.**"
Id., citing Chateaugay Corp., 23 F.3d 396 (emphasis added).

The Second Circuit's ruling in the LTV Steel case demonstrates how the Bankruptcy Court should have treated the LDTC Claim Objection given that LDTC is an outsider to the PBGC Settlement. Just as in LTV Steel, LDTC vigorously opposed the PBGC Settlement and, in spite of those objections, the Bankruptcy Court approved the PBCG Settlement. However, as recognized by the Second Circuit, the PBGC Settlement should not adversely affect LDTC's rights or claims against the PBGC as embodied by the issues raised in the LDTC Claim Objection. Accordingly, the Bankruptcy Court's approval of the PBGC Settlement as between KACC and the PBGC (and as consented to by the Senior Noteholders) should not amount to the extinguishment of LDTC's rights as a creditor as against the PBGC under Section 502 to challenge the PBGC's Claim. Therefore, the Bankruptcy Court's dismissal of the LDTC Claim Objection as moot in light of its approval of the PBGC Settlement was clear error and should be reversed.

Similarly, in the context of its review of a proposed class action settlement, the Third Circuit recognized that "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group". In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 797 (3d Cir. 1995). In that case, the Third Circuit vacated the order approving the settlement and remanded the decision for further proceedings. Id. at 822-823.

The General Motors case concerned a class action settlement for defectively designed fuel tanks on certain pick-up trucks. There were essentially two types of owners of the trucks – individual owners and fleet owners. Id. at 777. Different types of owners were treated

differently under the settlements, raising the overarching issue of the case – whether there

was adequacy of representation in the settlement negotiations. Id. at 778. The Third Circuit,

in examining the adequacy of representation issue, questioned whether those who negotiated

the settlement really were acting on behalf of all. In that regard, the Court stated:

> Some of these courts have suggested that the fact that
> vigorous, arm's length negotiations occurred should allay
> concerns about adequacy of representation.    But **these
> inferences depend on the implicit assumption that the
> lawyers actually negotiating really were doing so on behalf
> of the entire class, . . ., assumptions which are clearly
> unjustified in a context where the potential for intra-class
> conflict further emperils the class's representation.**

Id. at 797 (citations omitted) (emphasis added).

Thus, the Third Circuit has recognized that where a party is not properly represented

in the context of settlement negotiations, they may not properly be bound by the resulting

settlement. Here, the Debtors abdicated their responsibility to negotiate on behalf of all

creditors the terms of the PBGC Settlement with respect to the Unfunded Benefit Liability

Claims and left this critical issue in the hands of the PBGC and the Senior Noteholders, the

two parties who had the most to gain by excluding LDTC and the interests it represents from

the process. Charged with this responsibility, the Senior Noteholders promptly excluded

LDTC from the negotiations and sought and obtained the PBGC's participation in a

combined effort to oppose the interests of LDTC as representative of the claims of the Senior

Subordinated Noteholders in exchange for the Senior Noteholders' consent to the treatment

of the PBGC's Unfunded Benefit Liability Claims under the PBGC Settlement. Under these

circumstances, the Bankruptcy Court's determination that LDTC is bound by the terms of the

PBGC Settlement and that the LDTC Claim Objection is mooted thereby is erroneous and

should be reversed.

**B.    A Court Cannot Force Parties To Settle**

Under controlling Third Circuit case law, courts cannot coerce parties to settlement. Newton v. A.C.&S., Inc, 918 F.2d 1121, 1128 (3d Cir. 1990). In that decision, the Third Circuit held that "[a]lthough the facilitation of settlements is a laudable goal, 'pressure tactics to coerce settlement simply are not permissible.'" Id. quoting Kothe v. Smith, 771 F.2d 667, 669 (2d Cir. 1985). Furthermore, "'[t]he court should never work to coerce or compel a litigant to make a settlement.'" Id. quoting Del Rio v. Northern Blower Co., 574 F.2d 23, 26 (1st Cir. 1978). The Bankruptcy Court's approval of the PBGC Settlement Motion had the effect of forcing a settlement on LDTC with respect to the LDTC Claim Objections even though LDTC is not a party to the PBGC Settlement, did not participate in its negotiation, and does not consent to its treatment of the PBGC's Unfunded Benefit Liability Claims. This result is contrary to Third Circuit authority and should be reversed by this Court.

**POINT III**

**THE BANKRUPTCY COURT ABUSED ITS
DISCRETION IN APPROVING THE PBGC SETTLEMENT**

Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bank. Pro. 9019(a). In determining whether to grant such approval, a bankruptcy court must apprise itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated," Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25 (1968). The court may not "simply accept the [debtor's] word that the settlement is reasonable, nor ...'rubber stamp' the [debtor's] proposal." In re American Reserve Corp., 841 F.2d 159, 162 (7th Cir. 1987). For a bankruptcy court to approve a compromise without a sufficient factual foundation constitutes

28

an abuse of discretion. <u>Reiss v. Hagmann</u>, 881 F.2d 890, 891-92 (10th Cir. 1989); <u>In re</u>
<u>AWECO, Inc.</u>, 725 F.2d 293, 299 (5th Cir. 1984); <u>accord</u> <u>Protective Comm. for Indep.</u>
<u>Stockholders</u>, 390 U.S. at 424.

      Bankruptcy courts must apply a four-factor test when determining whether the proper
factual foundation has been laid for approving the settlement of litigable claims against a
bankruptcy estate: (i) the probability of success in litigation; (ii) the likely difficulties in
collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and
delay necessarily attending it; and (4) the paramount interests of the creditors. <u>In re RFE</u>
<u>Indus.</u>, 283 F.3d at 165; <u>accord</u> <u>In re Martin</u>, 91 F.3d at 393. In addition, the bankruptcy
court must find that the negotiations regarding settlement were conducted in good faith, and
that the parties dealt with each other at arm's length. <u>In re Foster Mortgage Corp.</u>, 68 F.3d at
918; <u>In re American Family Enters.</u>, 256 B.R. at 421.

      Based upon the record before it, the Bankruptcy Court could not have properly
concluded that there was a sufficient factual showing that the negotiations leading to the
PBGC Settlement were conducted in good faith and at arm's length. Moreover, even had
those negotiations been properly conducted, the Bankruptcy Court could not have properly
concluded that the PBGC Settlement was appropriate given the "likelihood of success in
litigation" or "the paramount interests of the creditors." <u>See</u> <u>In re Boston & Providence R.R.</u>
<u>Corp.</u>, 673 F.2d 11, 12-13 (1st Cir. 1982) (rejecting approval of settlement "reluctantly —
because of the extreme prolongation of the proceedings in this matter..." because the
trustee's review was only "cursory" and "conclusory" and did not support an independent
evaluation of litigation risk).

**A.    The Settlement Process Was Prejudicial To LDTC And**
     **The Interests Of The Senior Subordinated Noteholders.**

The proponents of the PBGC Settlement -- the Debtors, the PBGC and the Creditors Committee -- did not offer any admissible evidence demonstrating that the negotiation process was fair.  Accordingly, the Bankruptcy court erred in concluding that the negotiations were properly conducted.  See In re Foster Mortgage Corp., 68 F.3d at 918; In re American Family Enters., 256 B.R. at 421.  Not a single one of the settlement proponents' witnesses directly participated in the critical negotiations concerning the PBGC's Unfunded Benefit Liability Claims, and although some opined that they understood from others that the PBGC Settlement was fairly negotiated, the Bankruptcy Court properly rejected such testimony as hearsay.  Where, as here, the Bankruptcy Court is provided with no testimony from persons actually involved in a fundamental component of a settlement, the proponents of that settlement have not sustained their burden of proof.  In re Present Co., 141 B.R. 18, 24 (W.D.N.Y. 1992) (disapproving settlement where only testimony as to arms' length bargaining was by insiders, and where objecting party was excluded from the process).

Furthermore, the Bankruptcy Court could not have properly approved the PBGC Settlement given that the evidence that the hearing witnesses did provide -- upon both direct and cross-examination -- paints a picture of a negotiation process that was anything but fair. Their testimony, along with the testimony of deposition witnesses, unequivocally showed that the Debtors ceded the responsibility for negotiating the PBGC's Unfunded Benefit Liability Claims to the Senior Noteholders and the PBGC, who then excluded the Senior Subordinated Noteholders from the process.  This alone should have warranted a finding by the Bankruptcy Court that the negotiation process was not fair or reasonable.  It is axiomatic that a debtor has a fiduciary obligation to consider the interests of all creditors, and the

Debtors here could not satisfy that duty by leaving the negotiations with the PBGC in the hands of one creditor group, the Senior Noteholders, and allowing them to exclude another group, the Senior Subordinated Noteholders. See In re Present Co., 141 B.R. at 24; accord In re Foster Mortgage Corp., 68 F.3d at 918; In re American Family Enters., 256 B.R. at 421. Yet there was even greater reason for the Bankruptcy Court to withhold approval of the PBGC Settlement.

Evidence in the record strongly suggested that the Senior Noteholders and the PBGC colluded in the settlement process to benefit themselves to the detriment of the Senior Subordinated Noteholders. As detailed in the Statement of Facts above, documentary evidence provided to the Bankruptcy Court shows that the Senior Noteholders at one point suggested to the PBGC that in return for accepting its claim calculation, the Senior Noteholders expected the PBGC to support them in their dispute with the Senior Subordinated Noteholders as to whether those Noteholders' claims were in fact subordinate to the Senior Noteholders' claims at the Alumina Estates. And testimonial evidence, from the deposition of a member of the Senior Noteholder group, strongly suggests that this *quid pro quo* was ultimately subsumed within the PBGC Settlement. This sort of collusion in the settlement process reflects anything but an "arm's length," negotiation and was highly prejudicial to LDTC and the noteholders whose interests it represents. The Bankruptcy Court plainly abused its discretion in approving the PBGC Settlement and its order should be reversed. See In re Foster Mortgage Corp., 68 F.3d at 918; accord In re Present Co., 141 B.R. at 24.

**B.**    **The Bankruptcy Court Erred In Approving The PBGC Settlement Because It Is Patently Unreasonable In Light Of Applicable Law And Improperly Provides A Windfall To The PBGC.**

In opposing the PBGC Settlement, one of the principal arguments advanced by LDTC was that the PBGC would have lost had it been required to litigate the proper amount of its Unfunded Benefit Liability Claims. That is, LDTC argued that the clear weight of authority holds that the PBGC may not use its own self-serving regulatory rates to calculate the amount of its Unfunded Benefit Liability Claims in a bankruptcy, but must use a much higher "prudent investor rate." Implicit in the Bankruptcy Court's approval of the PBGC Settlement, however, is a finding that the law permits the PBGC to use its own rates and that the litigation risk to the Debtors was therefore high. This finding of law was erroneous, as it contravenes both Supreme Court authority and the persuasive holdings of two Federal Circuit Courts of Appeal.

While the validity of a claim in bankruptcy is determined with reference to the underlying substantive state or federal law (such as ERISA), it is bankruptcy law that controls the allowability and ordering of otherwise valid claims in bankruptcy and the distribution of estate assets to creditors on account of such claims. See Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15, 23-24 (2000); accord Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 162-63, 167 (1946). In Raleigh, the Court held that the fact that a claim is founded in other substantive law does not alter the burden of proof on a claim in bankruptcy. 530 U.S. at 20 ("Creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code") (citations omitted).

32

Both the Sixth and Tenth Circuit Courts of Appeal have held that the amount of unfunded benefit liability claims filed by the PBGC should not be valued using the PBGC's regulatory rates promulgated under ERISA, because the application of bankruptcy law requires that such claims instead be determined using a "prudent investor rate." In re CSC Indus., Inc., 232 F.3d 505, 509 (6th Cir. 2000); In re CF&I Fabricators of Utah, Inc., 150 F.3d 1293, 1301 (10th Cir. 1998). No other Circuit Court has ruled on the issue. In doing so, the Sixth Circuit relied in part on the Supreme Court's then recently decided opinion in Raleigh.

In In re CF&I Fabricators of Utah, Inc., the Tenth Circuit first reviewed the question of whether the PBGC's regulatory rate should be used to calculate the present value of unfunded benefit liabilities owed by a debtor corporation, or if the "prudent investor rate" typically used in valuing bankruptcy claims should instead be applied. 150 F.3d 1293. The court recognized that "[t]he major controversy between the parties is whether the ERISA provisions carry over into bankruptcy or whether PBGC comes to Chapter 11 like any other unsecured creditor." Id. at 1295. The Tenth Circuit held that "29 U.S.C. § 1301(a)(18) defines the amount of unfunded benefit liabilities 'for purposes of this title [ERISA]' only" and therefore the statute does not extend to bankruptcy. Id. at 1301 (citations omitted).

The Tenth Circuit then concluded that 29 U.S.C. § 1301(a)(18) is in conflict with the provisions of the Bankruptcy Code, and, therefore, the Bankruptcy Code controls the conflict. This holding was based on the reasoning that if 29 U.S.C. § 1301(a)(18) were adopted in bankruptcy cases, it would violate the rule codified in 11 U.S.C. § 1123(a)(4) that all claims within the same class in bankruptcy be treated alike, and it also would violate the statutory provision of ERISA, which expressly prohibits ERISA preemption of other federal law. Id.;

33

see also, 29 U.S.C. § 1944(d); accord In re Kincaid, 917 F.2d 1162, 1164 (9th Cir. 1990) (29 U.S.C. § 1144(d) expressly prohibits ERISA preemption of other federal laws); In re Sterling Die Casting Co., 118 B.R. 205, 208 (Bankr. E.D.N.Y. 1990) (same) (citing extensive authorities). After determining that the PBGC could not use the regulatory rate to value its claims for unfunded pension benefit liabilities, the Court of Appeals held that the prudent investor rate was the proper method to use in determining the present value of the PBGC unfunded benefits liability claim. CF&I, 150 F.3d at 1301.

Two years after the CF&I decision was rendered, the Sixth Circuit also concluded that the prudent investor rate was the appropriate valuation tool for calculating unfunded pension benefit liabilities in the bankruptcy context. CSC Indus., 232 F.3d at 509 ("the PBGC should be treated like any other unsecured creditor in the bankruptcy reorganization . . . the use of the 'prudent investor rate' was appropriate."). Relying on the same arguments that it had previously advanced before the Tenth Circuit, the PBGC argued that (i) its right was derived from rulemaking authority found in 29 U.S.C. § 1301(a)(18) and (ii) "the valuation assumptions in its regulations are reasonable because they are calculated to replicate the market price of annuities sold by private insurance companies, and when employers terminate fully funded [defined benefit pension plans] voluntarily they are required to purchase annuities to cover the lifetime benefits of plan beneficiaries." CSC Indus., 232 F.3d at 508-09. The Sixth Circuit followed the Tenth Circuit and rejected the PBGC's arguments, holding that "the bankruptcy court's authority under 11 U.S.C. §§ 502(b) and 1123(a)(4) to determine the amount of claims in bankruptcy proceedings and treat creditors in the same class equally gives it the authority to value unfunded pension benefit liabilities claims using a "prudent investor rate." Id. at 509 (citations omitted).

The Sixth Circuit further explained that "[w]hile the *validity* of a claim might be a matter for nonbankruptcy law, bankruptcy courts have the statutory authority to determine the *allowability* and *amount* of the claim." Id., citing Raleigh, 530 U.S. at 17 (emphases added). Thus, the Sixth Circuit ruled that the PBGC's authority to value claims under ERISA is subordinate to the authority of bankruptcy courts to value creditor claims in a bankruptcy proceeding. Id.

The only court yet to adopt the PBGC's position is the Bankruptcy Court for the Eastern District of Virginia in In re US Airways Group, Inc., 303 B.R. 784 (Bankr. E.D. Va. 2003), which was wrongly decided. The Court in US Airways failed to follow the Supreme Court's ruling in Raleigh, that, while all claims in bankruptcy arise in the first instance from law outside of bankruptcy, a creditor's actual recovery is always "subject to any qualifying or contrary provisions of the Bankruptcy Code." Id. 530 U.S. at 20. Instead of holding in accord with CSC Indus., 232 F.3d 505 and CF&I Fabricators, 150 F.3d 1293 that the "prudent investor rate" imposed by bankruptcy law must apply when calculating the PBGC's claim, the Bankruptcy Court for the Eastern District of Virginia held that the PBGC's claim was allowable as calculated under its regulatory rate. This decision turns the holding in Raleigh on its head, as Raleigh clearly states that the allowability and amount of claims against an estate in bankruptcy should be determined by bankruptcy law. 530 U.S. at 23-24.

In view of the foregoing authority, the Bankruptcy Court failed to properly assess the Debtors' litigation risks with respect to the calculation of the Unfunded Benefit Liability Claims and should have determined that the PBGC Settlement could not be construed as fair and reasonable where the settlement ignores the most likely outcome on this issue.

35

Finally, the Bankruptcy Court abused its discretion in failing to consider the absolute windfall to the PBGC under the PBGC Settlement and its enormous impact on the recovery to the Noteholders as the only other creditors of the Alumina Estates. In U.S. Airways, the Court indicated that it was sympathetic to the PBGC's position because under any approach — using the regulatory rate or the prudent investor rate — the PBGC's recovery would have been negligible. US Airways, 303 B.R. at 791 ("Since claims are being paid with stock having an estimated value equal to less than two cents for each dollar in allowed claims, full allowance of the PBGC's claim could never result in the PBGC receiving more than the amount of its actual loss."). Here, however, the PBGC Settlement will provide the PBGC with a $268 million recovery, which represents a sizeable recovery against its Unfunded Benefit Liability Claims as calculated using the PBGC's regulatory rate, and an absolute windfall if those Claims are properly calculated using the prudent investor rate.

As discussed in the Statement of Facts above, by using its regulatory rate the PBGC calculated the value of its Unfunded Benefit Liability Claims at $616 million. But using the prudent investor rate of 10.4% established by LDTC's expert witness, Dr. Roger Brinner — whose testimony was not countered by any other witness — those claims would be valued only at roughly $168 million. Thus, the $268 million expected recovery for the PBGC under the PBGC Settlement represents a $100 million windfall beyond the true value of the PBGC's Unfunded Benefit Liability Claims.

If the prudent investor rate is the proper rate to be used in calculating the PBGC's Unfunded Benefit Liability Claims — and, as discussed above, the overwhelming weight of authority holds that it is — then the Bankruptcy Court plainly abused its discretion in approving the PBGC Settlement. No settlement could possibly be proper which gives one

creditor, here the PBGC, more than a 150% recovery against its purported claims to the detriment of another creditor, here LDTC. For these reasons, this Court should conclude that the Bankruptcy Court abused its discretion in approving the PBGC Settlement.

### CONCLUSION

For the foregoing reasons, this Court should (i) reverse the Orders approving the PBGC Settlement, dismissing the LDTC Claim Objection as moot, and denying LDTC's Motion for Reconsideration, (ii) remand this matter to the Bankruptcy Court for further proceedings with respect to the LDTC Claim Objection, and (iii) grant such other and further relief as this Court deems just and proper.

Dated: May 18, 2005

MONZACK AND MONACO, P.A.

Francis A. Monaco, Jr. (#2078)
1201 N. Orange Street, Suite 400
Wilmington, Delaware 19801
Tel: (302) 656-8162

-and-

PRYOR CASHMAN SHERMAN & FLYNN,
LLP
Tina Niehold Moss, Esq.
Steven M. Rabinowitz, Esq.
410 Park Avenue
New York, New York 10022
Tel: (212) 421- 4100

ATTORNEYS FOR LAW DEBENTURE
TRUST COMPANY OF NEW YORK, as
INDENTURE TRUSTEE

37

## CERTIFICATE OF SERVICE

I, Kristie L. Dalton, certify that I am not less than 18 years of age, and that I caused service of the foregoing document to be made by electronic service, hand delivery (local counsel only) and U.S. Regular Mail on May 18, 2005 upon:

Frank J. Perch, III, Esq.
David Klauder, Esq.
Office of the U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE 19801

Daniel J. DeFranceschi, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Gregory M. Gordon, Esq.
Jones Day
2727 North Harwood Street
Dallas, Texas 75201-1515

Lisa A. Beckerman, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022-2524

Francis A. Monaco, Jr., Esq.
Monzack and Monaco, PA
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Kathleen M. Miller, Esq.
Smith, Katzenstein, & Furlow
800 Delaware Ave.
P.O. Box 410
Wilmington, DE 19899

Document #: 43895

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904, P.O. Box 1351
Wilmington, Delaware 19899

Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103

Patrick M. Healy
Law Debenture Trust Company of New York
767 Third Avenue, 31st Floor
New York, NY 10017

James L. Eggeman
Pension Benefit Guaranty Corporation
Office of the General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026

Carl N. Kunz, III, Esq.
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated: May 18, 2005                Kristie L. Dalton

Document #: 43895