**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **KAISER ALUMINUM CORPORATION,** | ) | **Bankruptcy Case No. 02-10429 (JKF)** |
| a Delaware corporation, *et al.*, | ) | **(Jointly Administered)** |
| | ) | |
| Debtors. | ) | |

| | | |
|---|---|---|
| **LAW DEBENTURE TRUST COMPANY** | ) | |
| **OF NEW YORK,** | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **Civil Action No. 05-135 (JJF)** |
| | ) | |
| **KAISER ALUMINUM CORP., et al.,** | ) | |
| | ) | |
| Appellees. | ) | |

**BRIEF OF APPELLEE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

Dated: June 2, 2005

ASHBY & GEDDES
William P. Bowden (#2553)
Gregory A. Taylor (#4008)
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware 19899
Phone: 302-654-1888
Fax: 302-654-1067

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
Lisa Beckerman
Brian A. Kilmer
590 Madison Avenue
New York, New York 10022
Phone: 212-872-1000
Fax: 212-872-1002

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

# TABLE OF CONTENTS

I.      NATURE AND STAGE OF PROCEEDING ................................................................. 1

II.     SUMMARY OF ARGUMENT ................................................................................. 2

III.    STATEMENT OF THE FACTS ............................................................................. 4

        A.      The Pension Plans. ......................................................................................... 4

        B.      Restructuring of the Debtors' Pension and Retiree Medical Benefit Obligations.............. 5

        C.      The PBGC's Proofs of Claim and LDTC's Objection. .................................................... 8

        E.      Terms of the Settlement Agreement with the PBGC. ..................................................... 10

IV.     ARGUMENT ....................................................................................................... 11

        A.      Standard of Review. ....................................................................................... 11

        B.      The Bankruptcy Court's Approval of the Settlement Agreement was Reasonable and
                Appropriate. ................................................................................................. 13

                1.      Litigation Results Were Highly Uncertain. ........................................................14

                2.      Complexity of Issues, Costs of Litigation and Significant Delay
                        Resulting from Litigation with the PBGC Supported Approval of the
                        Settlement Agreement. ......................................................................19

                3.      The Settlement Agreement was in the Paramount Interest of Creditors. .............20

        C.      The LDTC Objection did not Preclude Bankruptcy Court Approval of the Settlement
                Agreement. .................................................................................................. 22

                1.      Creditors have Limited Standing under 502 to Object to Claims of Other
                        Creditors. ....................................................................................22

                2.      There is No Conflict between Section 502 of the Bankruptcy Code and
                        Bankruptcy Rule 9019. .......................................................................25

                3.      If Section 502 of the Bankruptcy Code limits a Debtor or Trustee's
                        Ability to Compromise and Settle Claims under Bankruptcy Rule 9019,
                        then a Debtor or a Trustee could Never Resolve Claims over the
                        Objection of Objecting Creditors. ............................................................27

                4.      Courts Have Broad Authority Under Section 105 of the Bankruptcy Code
                        to Modify Debtor-Creditor Relationships and Fashion Equitable Relief
                        Pursuant to Section 502. ....................................................................29

D.    LDTC's Allegations Surrounding the Negotiation of the Settlement Agreement are
      Completely Unfounded. ....................................................................................... 31

      1.    Evidence Concerning the Arms-Length Negotiation of the Settlement
            Agreement was Presented at the Hearing. .............................................................31

      2.    LDTC was Involved in, and Notified of, the Negotiations Surrounding
            Settlement Agreement. .........................................................................................33

      3.    LDTC's Allegations of Collusion and Coercion are Groundless. ........................34

E.    The Settlement Agreement is Binding on LDTC. ........................................................ 37

V.    CONCLUSION ....................................................................................................... 39

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaguay)*,
  94 F.3d 772 (2d Cir. 1996)....................................................................................38

*In re American Family Enterprises*,
  256 B.R. 377 (D.N.J. 2000) ..................................................................................32

*American Flint Glass Workers Union v. Anchor Resolution Corp.*,
  197 F.3d 76 (3d Cir. 1999)....................................................................................11

*In re Aweco, Inc.*,
  725 F.2d 293 (5th Cir. 1984) ................................................................................27

*In re Bell & Beckwith*,
  77 B.R. 606 (Bankr. N.D.Ohio 1987) ...................................................................28

*Capital Corp. v. Finnman (In re Johnson)*,
  960 F.2d 396 (4th Cir. 1992) ................................................................................25

*Chateaugay Corp. v. U.S. Dept. of Labor*,
  23 F.3d 396 (2d Cir. 1994)....................................................................................38

*Chaussee v. Lyngholm (In re Lyngholm)*,
  24 F.3d 89 (10th Cir. 1994) ..................................................................................25

*Citizens Bank v. Broyles (In re Broyles)*,
  55 F.3d 980 (4th Cir. 1995) ..................................................................................12

*Columbia Packing v. PBGC*,
  81 B.R. 205 (D. Mass. 1988) ................................................................................17

*In re Combustion Engineering, Inc.*,
  391 F.3d 190 (3d Cir. 2004)............................................................................29, 30

*Connecticut General Life Ins. Co. v. United Companies Financial Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914 (5th Cir. 1995) ................................................................32

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983)..................................................................................14

*Depoister v. Mary M. Holloway Found.*,
  36 F.3d 582 (7th Cir. 1994) ..................................................................................14

*In re Dow Corning Corp.*,
  244 B.R. 721 (Bankr. E.D.Mich. 1999) ...............................................................22

*In re FBN Food Services, Inc.*,
    82 F.3d 1387 (7th Cir. 1996) ...........................................................................................22

*In re Fox*,
    64 B.R. 148 (Bankr N.D.Ohio 1986) ...............................................................................23

*Fred Reuping Leather Co. v. Fort Greene Nat'l Bank (In re Honesdale Union Stamp Shoe*
    *Co.,Inc.)*, 102 F.2d 372 (3d Cir. 1939)..........................................................................22

*Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*,
    283 F.3d 159 (3d Cir. 2002)......................................................................................13, 32

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation*,
    55 F.3d 768 (3d Cir. 1995).......................................................................................38, 39

*Girsh v. Jepson*,
    521 F.2d 153 (3d Cir. 1975).........................................................................................39

*Holmberg v. Armbrecht*,
    327 U.S. 392 (1946)....................................................................................................29

*Hutchins v. Commonwealth Mortgage Corp.*,
    165 B.R. 401 (E.D. Pa. 1994) .......................................................................................35

*Katchen v. Landy*,
    382 U.S. 323 (1966)....................................................................................................30

*Krasnov v. Dinan*,
    465 F.2d 1298 (3d Cir. 1972).........................................................................................12

*Lawrence v. Steinford Holding B.V. (In re Dominelli)*,
    820 F.2d 313 (9th Cir. 1987) ............................................................................22, 23, 24

*In re Marvel Entm't Group, Inc.*,
    222 B.R. 243 (D. Del. 1998)..........................................................................................13

*In re Medomak Canning*,
    922 F.2d 895 (1st Cir. 1990).........................................................................................37

*Meza v. General Battery Corp.*,
    908 F.2d 1262 (5th Cir. 1990).......................................................................................37

*In re Middle Atl. Stud Welding Co.*,
    503 F.2d 1133 (3d Cir. 1974).........................................................................................35

*Milden v. Joseph (In re Milden)*,
    No. 94-56503, 1997 U.S. App. LEXIS 7726 (9th Cir. April 16, 1997).................................28

*Mullins v. Burtch (In re Paul J. Paradise & Assocs.)*,
    249 B.R. 360 (D.Del. 2000)...........................................................................................35

*Myers v. Martin (In re Martin)*,

    91 F.3d 389 (3d Cir. 1996) ................................................................13, 28, 32

*Newman v. Stein*,

    464 F.2d 689 (2d Cir. 1972) .........................................................................14

*Newton v. A.C.& S., Inc.*,

    918 F.2d 1121 (3d Cir. 1990) ......................................................................36

*Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*,

    318 B.R. 66 (D.N.J. 2004) .......................................................................12, i

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v.*

    *Chinery*, 330 F.3d 548 (3d Cir. 2003) .........................................................29

*Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania*

    *Truck Lines, Inc.)*,

    150 B.R. 595 (E.D.Pa. 1992) ......................................................................12

*PBGC v. LTV Corp.*,

    496 U.S. 633 (1990) ....................................................................................16

*In re Pacific Atl. Trading Co.*,

    33 F.3d 1064 (9th Cir. 1994) ......................................................................25

*Pepper v. Litton*,

    308 U.S. 295 (1939) ....................................................................................29

*Petitioning Creditors of Melon Produce v. Braunstein*,

    112 F.3d 1232 (1st Cir. 1997) ................................................................23, 37

*Pineo v. Turner (In re Turner)*,

    274 B.R. 675 (Bankr.W.D.Pa. 1992) ...........................................................26

*Power Five v. GMC (In re Automotive Armature Co.)*,

    219 B.R. 513 (S.D.Ind. 1998) .....................................................................22

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

    390 U.S. 414 (1968) ................................................................................14, 26

*Retired Pilots Ass'n of US Airways, Inc. v. US Airways Group, Inc. (In re US Airways Group,*

    *Inc.)*,

    369 F.3d 806 (4th Cir. 2004) ......................................................................17

*In re SIS Corp.*,

    108 B.R. 608 (Bankr. N.D.Ohio 1989) ...................................................26, 27

*Sacred Heart Hospital of Norristown v. Commonwealth of Penn. Dep't. of Pub. Welfare (In re*

    *Sacred Heart Hospital of Norristown)*, 133 F.3d 237 (3d Cir. 1998) ...............12

*Salvation Army v. New Jersey Dept. of Community Affairs*,

    919 F.2d 183 (3d Cir. 1990).................................................................................35

*In re Savidge*,

    57 B.R. 389 (D.Del. 1986)..............................................................................23

*Schulmberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*,

    327 F.3d 242 (3d Cir. 2003)..........................................................................12

*In re Sharon Steel Corp.*,

    871 F.2d 1217 (3d Cir. 1981).........................................................................12

*In re Simon*,

    179 B.R. 1 (Bankr. D.Mass. 1995) ...........................................................23, 29

*Singleton v. Wulff*,

    428 U.S. 106 (1976)......................................................................................35

*In re US Airways Group, Inc.*,

    303 B.R. 784 (Bankr. E.D.Va. 2003)..............................................................17

*United States National Bank v. Chase National Bank*,

    331 U.S. 28 (1947)........................................................................................30

*United States v. Energy Resources Co., Inc.*,

    495 U.S. 545 (1990)......................................................................................29

*Virgin Islands Bureau of Internal Revenue v. St. Croix Hotel Corp.*,

    60 B.R. 412 (D.V.I. 1986) ............................................................................37

*Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.)*,

    898 F.2d 1544 (11th Cir. 1990) ....................................................................22

*Wire Rope Corporation of America, Inc.*,

    287 B.R. 771 (Bankr. W.D.Mo. 2002)...........................................................15

## STATUTES

11 U.S.C. § 105(a)............................................................................................29

11 U.S.C. § 502(a)............................................................................................22

29 U.S.C. § 1342(c)............................................................................................6

## I.    NATURE AND STAGE OF PROCEEDING

On February 12, 2002 (the "Petition Date"), Kaiser Aluminum & Chemical Corporation ("KACC") and fourteen affiliates filed separate voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.  On March 15, 2002, two additional affiliates commenced their voluntary chapter 11 cases.  On January 14, 2003, nine additional affiliates (collectively with sixteen previous debtors, the "Debtors") commenced their respective reorganization cases by filing their voluntary chapter 11 cases.

On February 22, 2002, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee").

On September 15, 2004, Law Debenture Trust Company of New York ("LDTC"), which serves as indenture trustee for certain 12-3/4% Senior Subordinated Notes issued by KACC in 1993, filed an objection (the "LDTC Objection") to 24 proofs of claim filed by the Pension Benefit Guaranty Corporation (the "PBGC").(Docket No. 5003, Exhibit A, Binder 1, Tab 1.)[1]

On October 22, 2004, the Debtors filed a Motion for an Order (A) Approving a Settlement Agreement (the "Settlement Agreement") with the Pension Benefit Guaranty Corporation and (B) Dismissing as Moot the Objection of Law Debenture Trust Company of New York to the Pension Benefit Guaranty Corporation's Proofs of Claim (the "Motion"). (Docket No. 5251, Binder 1, Tab 8.)

On November 1, 2004, LDTC filed its Objection of Law Debenture Trust Company, as Indenture Trustee, to Debtors' Motion for an Order (A) Approving a Settlement Agreement with the Pension Benefit Guaranty Corporation and (B) Dismissing as Moot the Objection of Law Debenture Trust Company of New York to the Pension Benefit Guaranty Corporation's Proofs of Claim (the "LDTC Settlement Objection"). (Docket No. 5311, Binder 1, Tab 1).

On January 24, 2005, after a full evidentiary hearing (held on January 18, 2005) on the merits (the "Hearing"), the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order

---

[1]    Citations to the record herein are to the index filed by LDTC with this Court.

(a) approving the Settlement Agreement with the PBGC; (b) dismissing the LDTC Objection as moot; and (c) overruling the LDTC Settlement Objection (the "Settlement Order")(Docket No. 6005, Binder 3, Tab 36.)

LDTC also filed a Motion for Reconsideration of the Bankruptcy Court's Stay of Law Debenture Trust Company of New York's Objection to Certain Proofs of Claim Filed by the Pension Benefit Guaranty Corporation (the "Motion for Reconsideration")(Docket No. 5592, Binder 2, Tab 21.)  On January 24, 2005, the Bankruptcy Court entered an order denying LDTC's Motion for Reconsideration. (Docket No. 6006, Binder 3, Tab 37.)

LDTC subsequently appealed the order denying the Motion for Reconsideration as well as the Settlement Order (collectively, the "Orders") to this Court (collectively referred to as the "Appeal").[2]  On May 19, 2005, LDTC filed its Brief for Appellant (the "Brief") in the Appeal.

This is the Brief of Appellee Creditors' Committee.

## II.    SUMMARY OF ARGUMENT

After holding a full evidentiary hearing on the merits and hearing arguments of counsel, reviewing numerous pleadings, declarations and exhibits that were submitted by the parties as well as hearing extensive cross-examination and rebuttal testimony by numerous witnesses, the Bankruptcy Court correctly concluded that the Settlement Agreement was reasonable and in the best interest of the Debtors' estates.  In addition, approval of the Settlement Agreement by the Bankruptcy Court was appropriate because it avoided the expense and delay attendant to the litigation of highly complex issues, removed one of the major obstacles to a consensual resolution of these bankruptcy cases and pushed these bankruptcy cases closer to confirmation and distributions to creditors.

The only objection raised by LDTC to the Settlement Agreement was to the amount and priority of the PBGC's Claims that were resolved as part of the overall Settlement Agreement. LDTC did not object to any of the other provisions of the Settlement Agreement and continues to completely disregard

---

[2]    These two appeals were procedurally consolidated by this Court.

the fact that many other complex issues were resolved by the Settlement Agreement. The Bankruptcy Court correctly overruled LDTC's myopic objection to the Settlement Agreement and examined the propriety of the resolution of the PBGC's Claims in the overall context and background of the Settlement Agreement. However, even if the Bankruptcy Court had merely reviewed the resolution of the amount and priority of the PBGC's Claims in isolation, as requested by LDTC, the resolution of the PBGC's Claims provided in the Settlement Agreement was appropriate and reasonable. Indeed, due to the fact that the Settlement Agreement is so clearly beneficial to the Debtors' estates and its creditors, instead of arguing about why the Bankruptcy Court's decision to approve the Settlement Agreement was clearly erroneous, LDTC has chosen instead to cast aspersions on the negotiations leading up to the Settlement Agreement.

LDTC's strained argument that section 502 of the Bankruptcy Code somehow conflicts with Bankruptcy Rule 9019 and provides creditors like LDTC with the unfettered ability to thwart settlements entered into by a debtor is completely misguided and constitutes an attempt to rewrite the plain language, and ignore the intent of, both the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. To the contrary, there is no conflict between section 502 and Bankruptcy Rule 9019, as these two provisions work harmoniously in situations like the instant case, where the resolution of a creditor's claims involves significantly more than a resolution of the amount and priority of that creditor's claim against a bankruptcy estate. Indeed, LDTC's interpretation of 502 would result in an impairment of a debtor's right to compromise claims under Bankruptcy Rule 9019, which would have a devastating effect on the orderly administration of a bankruptcy estate and would provide litigious creditors with the ability to veto any proposed settlements of claims by a bankrupt debtor. Such a result would bring chaos to the claims administration process afforded by section 502 of the Bankruptcy Code and Bankruptcy Rule 9019. The Bankruptcy Court properly considered and rejected LDTC's unsupported arguments surrounding section 502 of the Bankruptcy Code at the Hearing.

---

For all of the reasons set forth at the Hearing and set forth in the numerous pleadings filed with the Bankruptcy Court[3], the Creditors' Committee strongly believes that the Bankruptcy Court acted appropriately by approving the Settlement Agreement and dismissing the LDTC Objection as moot. LDTC submits no new facts and cites to no new cases in this Appeal.   Accordingly, the Bankruptcy Court's Orders should be affirmed.

### III.    STATEMENT OF THE FACTS

**A.    The Pension Plans.**

Pursuant to pre-petition collective bargaining agreements entered into with certain unions, including the United Steelworkers of America, AFL-CIO-CLC (the "USWA") the International Association of Machinists & Aerospace Workers (the "IAM") and the other unions, the Debtors are currently obligated to provide various pension benefits (the "Pension Benefits") to certain current and former hourly employees, including their spouses, surviving spouses and eligible dependents (the "Hourly Retirees").

As of the Petition Date, the Debtors sponsored the following seven pension plans, covering hourly and union employees: the Kaiser Aluminum Pension Plan (the "KAP Plan"), the Kaiser Aluminum

---

[3] *See* Motion of Debtors and Debtors in Possession for an Order (A) Approving a Settlement Agreement with the Pension Benefit Guaranty Corporation and (B) Dismissing as Moot the Objection of Law Debenture Trust Company of New York to the Pension Benefit Guaranty Corporation's Proofs of Claim (Docket No. 5251, Binder 1, Tab 2); PBGC Response to Objection of Law Debenture Trust Company of New York, as Indenture Trustee, To Proofs of Claim Nos. 1932, 1936 through 1958 (Docket No. 5303, Binder 1, Tab 4); Response of Debtors and Debtors in Possession to Objection of Law Debenture Trust Company of New York to Proofs of Claim Filed by the Pension Benefit Guaranty Corporation (Docket No. 5306, Binder 1, Tab 5); Joinder in Support of Motion of Debtors and Debtors in Possession for Order (A) Approving a Settlement Agreement with PBGC and (B) Dismissing as Moot the Objection of Law Debenture Trust Company of New York to PBGC's Proofs of Claim (Docket No. 5314, Binder 1, Tab 8); Response of the Official Committee of Unsecured Creditors in Support of the Motion of Debtors and Debtors in Possession for an Order (A) Approving a Settlement Agreement with the Pension Benefit Guaranty Corporation and (B) Dismissing as Moot the Objection of Law Debenture Trust Company of New York to the Pension Benefit Guaranty Corporation's Proofs of Claim (Docket No. 5315, Binder 1, Tab 9); PBGC's Reply to Objection of Law Debenture Trust Company of New York to Motion of Debtors and Debtors in Possession for Order (A) Approving a Settlement Agreement with PBGC and (B) Dismissing as Moot the Objection of Law Debenture to PBGC's Proofs of Claim (Docket No. 5334, Binder 2, Tab 14); November 8, 2004 Hearing Transcript (Docket No. 5372, Binder 2, Tab 18); January 18, 2005 Hearing Transcript (Docket No.6099, Binder 4, Tab 42, the "January 18, 2005 Hearing Transcript").

Inactive Pension Plan (the "Inactive Plan"), the Kaiser Aluminum Tulsa Pension Plan (the "Tulsa Plan"), the Kaiser Aluminum Los Angeles Extrusion Pension Plan (the "Los Angeles Plan"), the Kaiser Aluminum Sherman Pension Plan (the "Sherman Plan"), the Kaiser Aluminum Bellwood Pension Plan (the "Bellwood Plan") and the Kaiser Center Garage Pension Plan (the "Garage Plan") (collectively referred to as the "Hourly Plans" or the  "Pension Plans").  In addition, the Debtors also sponsored the Kaiser Aluminum Salaried Employees Retirement Plan (the "Salaried Plan"), which provided benefits to salaried employees.

**B.     Restructuring of the Debtors' Pension and Retiree Medical Benefit Obligations.**

Two of the major liability issues that the Debtors were faced with when they commenced their chapter 11 cases were growing retiree medical and pension obligations.  Specifically, as of the Petition Date, Debtors KACC and Kaiser Bellwood Corporation ("Bellwood") were obligated to provide various medical, surgical, hospital, disability, death and other "retiree benefits" as such term is defined in section 1114 of the Bankruptcy Code (the "Retiree Benefits") to retired salaried employees, their spouses, surviving spouses and eligible dependants (the "Salaried Retirees") and certain retired hourly employees represented by several unions (the "Union Retirees").[4]  In the case of Union Retirees, the Retiree Benefits are provided pursuant to collective bargaining agreements with the USWA, the IAM and other unions.[5]

After significant negotiations with the various unions and the Retirees Committee, on January 11, 2004, KACC and Bellwood filed motions requesting that the Court: (i) authorize a modification of the Retiree Benefits obligations to retirees represented by the USWA, the IAM and the Retirees' Committee;[6]

---

[4]     On August 26, 2003, the United States Trustee appointed an official committee of retired employees to represent those retirees not represented by the various unions (the "Retirees Committee").

[5]     The retirees represented by the USWA account for approximately 80% of the total Retiree Benefits claims.

[6]     Because KACC and Bellwood were not as far along in negotiations with the other unions, these motions did not request modification of Retiree Benefit obligations to retirees represented by these unions or to reject collective bargaining agreements with these unions at that time.  KACC and Bellwood did subsequently reach agreement with the other unions and these agreements were later approved by the Bankruptcy Court.

(ii) determine that the financial requirements for a distress termination of the Hourly Plans were satisfied, approve a distress termination of those plans and authorize implementation of a replacement defined contribution plan (the "Distress Termination Motion"); and (iii) authorize a rejection of certain collective bargaining agreements as necessary to terminate the Hourly Plans.  In the weeks following the filing of those motions, KACC and Bellwood reached negotiated agreements with the USWA, the IAM and the Retirees' Committee and ultimately sought approval of such agreements at a February 2, 2004 special hearing (the "Legacy Liability Hearing") set for those motions.[7]

Pursuant to the agreements reached with the USWA, the IAM and the Retirees' Committee (the "Legacy Liability Agreements"), the applicable Retiree Benefit plans and Hourly Plans would be terminated and the retirees represented by the USWA, the IAM and the Retirees' Committee would be eligible to receive Retiree Benefits provided pursuant to one or more Voluntary Employee Benefit Associations ("VEBAs") that, in turn, would be funded by KACC with: (i) an initial cash contribution at emergence based on available liquidity above a minimum amount of $50 million; (ii) a variable contribution of a small percentage of KACC's adjusted after-tax cash flow (based upon a formula set forth in the agreement); and (iii) a contribution upon the effective date of a plan of reorganization based on the residual value of KACC.  Specifically, the residual value of the KACC component is 75% of the remaining value of KACC, likely in the form of equity, after full satisfaction of every administrative, priority and secured claim, and after taking into account any equity interest, debt obligation and/or cash amount necessary to create a confirmable section 524(g) trust, a confirmable resolution of silica and other tort claims, and any management incentive plan implemented concurrently with the plan of reorganization.  Each retiree group (i.e., the USWA, the IAM, the Retirees' Committee and the other unions) would be entitled to its allocable share of the contributions to the VEBAs based upon the proportion of that retiree group's retiree benefit claims to all retiree benefit claims.  In addition, with

---

[7]    The Debtors did not file a motion to terminate the Salaried Plan as the PBGC terminated the Kaiser Aluminum Salaried Employees Retirement Plan (the "Salaried Plan") pursuant to section 4042(c) of ERISA, 29 U.S.C. § 1342(c) Effective December 17, 2003, based upon its determination that termination was necessary to protect the interests of the Salaried Plans' participants.

respect to the termination of the Hourly Plans, KACC agreed to establish a replacement defined contribution plan and to participate in the USWA's and the IAM's multi-employer pension trusts.

On January 28, 2004, the PBGC filed a response (the "PBGC Response") to the Distress Termination Motion, asserting that the Bankruptcy Court needed to make separate determinations for each pension plan as to whether the Debtors satisfied the criteria for a distress termination of the Hourly Plans and reserving its right to review the proposed replacement pension plans to determine whether they were abusive under their policy guidelines.

On February 5, 2004, after a hearing, the Bankruptcy Court entered an order (the "Termination Order") determining that the financial requirements set forth in ERISA section 4041(c)(2)(B) for a distress termination of the Debtors' Hourly Plans were satisfied and that all of the Hourly Plans (with the exception of the Garage Plan) were terminated and approving the implementation of hourly and salaried replacement plans, subject to the PBGC's right to review and possibly challenge the replacement pension plans if the PBGC determined they were abusive. In addition, the Termination Order also provided that the termination of the Hourly Plans remained subject to the PBGC's determination that the requirements for distress termination have been satisfied.

In March, 2004, the PBGC appealed (the "PBGC Appeal") certain portions of the Termination Order, including those provisions of the Termination Order that concluded that: (i) the Debtors satisfied the distress termination criteria under ERISA with respect to the Los Angeles Plan, the Tulsa Plan, the Bellwood Plan and the Sherman Plan; and (ii) these four Hourly Plans could be terminated.[8] In July 2004, the PBGC informed the Debtors that the replacement defined contribution plan and the Debtors' participation in the USWA master-employer pension trust did not comply with the PBGC's guidelines regarding replacement pension plans.

---

[8]    The PBGC Appeal is currently pending before the Third Circuit.

C.     **The PBGC's Proofs of Claim and LDTC's Objection.**

On January 29, 2003, the PBGC filed 24 proofs of claim against the Debtors on behalf of the eight pension plans (the seven Hourly Plans and the Salaried Plan), including: i) claims for unfunded benefit liabilities, totaling approximately $620 million as well as other unliquidated claims related to the Hourly Plans; ii) unliquidated claims for missed statutory premiums; and iii) a $17.1 million claim for minimum funding contributions related to the Salaried Plan and unliquidated claims for minimum funding contributions related to the Hourly Plans (the "PBGC's Claims").[9]

On September 15, 2004, LDTC filed the LDTC Objection, objecting to the PBGC's Claims. As set forth in the LDTC Objection, LDTC requested that the Bankruptcy Court enter an order: i) reducing the amount of the PBGC's Claims for unfunded benefit liabilities significantly lower than the $620 million asserted by the PBGC; ii) disallowing the insurance premium and minimum funding contribution claims of the PBGC; and iii) determining that the unfunded benefit liabilities and minimum funding contribution claims are not entitled to priority.

D.     **Negotiations that Led to the Settlement Agreement.**

In an attempt to establish a framework for resolving the pension liability issues, the Debtors had an initial meeting with the PBGC in November 2002. *See* Declaration of John Barneson at ¶ 5. (Docket No. 5909, Binder 3, Tab 33, the "Barneson Declaration") The stated purpose of this meeting was to discuss the Debtors' inability to fund the Pension Plans in the context of the Debtors' business plan, to discuss the impact of certain contingent events, including retirements and asset dispositions, on the Debtors' pension liabilities and provide due diligence to the PBGC on the Debtors' Legacy Liabilities as well as initiate discussions regarding the options available to the PBGC in resolving the Debtors' pension liabilities. *See* Barneson Declaration at ¶ 5.

---

[9]     All of the claims were asserted against each Debtor and alleged administrative expense and/or tax priority for a significant portion of the claims. Specifically, with respect to the claims for unfunded contributions, the PBGC asserted that the claims are administrative expenses entitled to priority as a tax incurred by the estate in an amount up to 30% of the net value of the "controlled group," as defined by ERISA.

In the late summer of 2003, the Debtors requested another meeting with the PBGC in an effort to develop a platform for the negotiation of a global settlement. *See* Barneson Declaration at ¶ 10. At this meeting, the Debtors conveyed to the PBGC that all of the existing Pension Plans should be terminated by the PBGC, initiated negotiations regarding a resolution of the PBGC's Claims and attempted to lay the groundwork for PBGC approval of replacement or "follow on" pension plans to replace the terminated plans. *See* Barneson Declaration at ¶ 10.

In September 2003, the Debtors again met with representatives of the PBGC. *See* Barneson Declaration at ¶ 13. During this meeting, the Debtors again discussed their views as to the nature and amount of the PBGC's Claims. *See* Barneson Declaration at ¶ 13. At this meeting, the PBGC apparently indicated that it was not prepared to terminate the Pension Plans and that it would not accept a claim valuation based upon a prudent investor rate, which was what the Debtors had proposed. *See* Barneson Declaration at ¶ 13.

Shortly after the hearing on the Distress Termination Motion, which was held in early 2004, the Debtors participated in a telephonic meeting with the PBGC to discuss the replacement pension plans. *See* Barneson Declaration at ¶ 17. As a follow-up to that meeting, the Debtors submitted a term sheet to the PBGC that proposed to resolve some of the outstanding issues with the PBGC. *See* Barneson Declaration at ¶ 17.

In July 2004, the PBGC informed the Debtors that it believed the replacement plans negotiated with the USWA were "abusive" and that the PBGC intended to contest the implementation of these replacement plans. *See* Barneson Declaration at ¶ 20. Accordingly, in July 2004, the Debtors again met with the PBGC to explain that the methodology the PBGC used to evaluate the replacement plans was flawed, and apparently expressed to the PBGC that unless this issue was resolved, the only alternative would be time-consuming litigation that would delay the Debtors' emergence from bankruptcy and potentially lead to the liquidation of the Debtors, among other problems. *See* Barneson Declaration at ¶ 21.

Following the July 2004 meeting, and over the next 4-5 months, the Debtors and their advisors began negotiating with the PBGC on a global resolution of all outstanding issues with the PBGC. *See* Barneson Declaration at ¶ 22. During these negotiations, the Debtors were repeatedly informed by the PBGC that they were interested in a global resolution of all of the major outstanding issues, which included the PBGC's appeal of the Court's distress termination finding, the PBGC's challenge of the USWA replacement plans as "abusive" and the size and classification of the PBGC's Claims, particularly the size of any administrative claim. *See* Barneson Declaration at ¶ 22.

During this same time period in 2004, the PBGC also began negotiations with representatives of the holders of certain senior notes issued by KACC in 1994 and 1996 (the "Senior Noteholders") regarding the amount and priority of the PBGC's Claims, since these two parties had the primary economic interest to resolve the amount and priority of the PBGC's Claims. *See* January 18, 2005 Hearing Transcript at pp. 96-97, 134-135. LDTC participated in the first meeting between the PBGC and the Senior Noteholders which was held in May, 2004 to discuss the amount and priority of the PBGC's Claims. LDTC apparently declined to participate in future negotiation sessions until there was a resolution to certain subordination litigation that was pending between the Senior Noteholders and the holders of 12-3/4% Senior Subordinated Notes issued by KACC in 1993 was resolved. *See* January 18, 2005 Hearing Transcript at pp. 134-135. At this point in the negotiation process, while the Debtors were heavily involved in the negotiations surrounding the amount and priority of the PBGC's claims, "the Debtors could not be put in the position of supporting one unsecured creditor over others." *See* Barneson Declaration at ¶ 24. The PBGC and the Senior Noteholders continued to negotiate over the amount and priority of the PBGC's Claims until an agreement was reached.

**E.      Terms of the Settlement Agreement with the PBGC.**

The parties were ultimately able to reach agreement on the terms of the Settlement Agreement that resolved: (i) the plan termination issues set forth in the PBGC Appeal; (ii) the replacement plan issues; and (iii) the amount and nature of the PBGC's Claims. The material provisions of the Settlement

Agreement[10] included: 1) PBGC's assumption of the KAP Plan as of April 30, 2004 and the Debtors continued sponsorship of the remaining Pension Plans; 2) PBGC's agreement to dismiss the PBGC Appeal; 3) PBGC's agreement to issue a no-action letter with respect to the replacement pension plans; 4) PBGC's agreement to a full release of all claims against Volta Aluminum Company Limited; 5) an agreement that the PBGC's Claims for unfunded benefit liabilities and premiums shall be treated as general unsecured claims against all of the Debtors in the amount of $616 million, provided that the PBGC's recovery at the estates of Alpart Jamaica, Kaiser Jamaica, Corporation, Kaiser Alumina Australia Corporation and Kaiser Finance Corporation will be limited to 32% of the net distributable proceeds payable in the aggregate to the PBGC and the holders of the Senior Subordinated Notes and the Senior Notes under confirmed plans of reorganization; and 6) an agreement that the PBGC would have an allowed administrative claim in the amount of $14 million, which shall be a joint and several obligation of all Debtors other than AJI and KJC.

After the Hearing, the Bankruptcy Court entered the Settlement Order, which approved the Settlement Agreement and dismissed the LDTC Objection as moot.

## IV.    ARGUMENT

**A.    Standard of Review.**

LDTC asserts that the Orders should be reviewed on a *de novo* basis. *See* Brief at p. 17. To the contrary, under well-settled law, this Court should apply a clearly erroneous standard of review to the Bankruptcy Court's findings of fact and a *de novo* standard **only** to the Bankruptcy Court's legal conclusions. *See American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999).

The Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provide that on appeal, the district court or bankruptcy appellate panel may affirm, modify of reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Fed.R.Bankr.P. 8013. Further, the "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly

---

[10]    A copy of the Settlement Agreement is located in Binder 6, Tab D-1.

erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Id.* The appellate court applies a "clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed questions of law and fact, applying the appropriate standard to each component." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1222 (3d Cir. 1981).

Accordingly, the factual issues determined by the bankruptcy court's decision to approve the Settlement Agreement are subject to the "clearly erroneous" standard of review upon appeal. *See Sacred Heart Hospital of Norristown v. Commonwealth of Penn. Dep't. of Pub. Welfare (In re Sacred Heart Hospital of Norristown)*, 133 F.3d 237, 241 (3d Cir. 1998)(it is error for the district court, acting as appellate court, to make its own factual findings.). The Third Circuit has held that a factual determination is "clearly erroneous" when a review of all of the evidence gives rise to a firm conviction that a mistake has been committed. *Schulmberger Res. Mgmt. Servs., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.3d 242, 244 (3d Cir. 2003). Further, a "factual finding is clearly erroneous if it is either 'completely devoid of minimum evidentiary support displaying some hue of credibility or...bears no rational relationship to the supportive evidentiary data.'" *Official Comm. of Asbestos Claimants v. Bank of N.Y. (In re G-I Holdings, Inc.)*, 318 B.R. 66, 72 (D.N.J. 2004)(*citing Krasnov v. Dinan*, 465 F.3d 1298, 1302-03 (3d Cir. 1972). Moreover, if two permissible views of the evidence exist, the fact finder's choice between them cannot be "clearly erroneous." *Citizens Bank v. Broyles (In re Broyles)*, 55 F.3d 980, 983 (4th Cir. 1995).

Indeed, in the context of settlement agreements, when the issues to be decided are factual, the bankruptcy judge has broad discretion. *See, e.g., Official Unsecured Creditors' Committee v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.)*, 150 B.R. 595, 598 (E.D.Pa. 1992)(noting that approval of settlement agreement under 9019 would not be reversed on appeal absent clear abuse of discretion).[11]

---

[11]    In *In re Pennsylvania Truck Lines*, the bankruptcy court approved two settlement agreements pursuant to Bankruptcy Rule 9019(a). On appeal, the district court stated that whether the bankruptcy

**B.    The Bankruptcy Court's Approval of the Settlement Agreement was Reasonable and Appropriate.**

The only objection raised by LDTC to the Settlement Agreement was to the amount and priority of the PBGC's Claims that were resolved as part of the overall Settlement Agreement. LDTC did not object to any other provisions of the Settlement Agreement. LDTC contends that the Bankruptcy Court abused its discretion in approving the Settlement Agreement, alleging that the Settlement Agreement was patently unreasonable, notwithstanding the fact that LDTC completely disregards the remaining provisions of the Settlement Agreement and fails to consider the resolution of the amount and priority of the PBGC's Claims in the overall context of the other issues being resolved as part of the Settlement Agreement. As set forth below, the Bankruptcy Court properly analyzed <u>all</u> of the terms and conditions of the Settlement Agreement in the context of applicable Third Circuit law and concluded that the Settlement Agreement was reasonable, appropriate and in the best interests of the Debtors' estates.

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Before approving a settlement under Bankruptcy Rule 9019, a court must determine that the proposed settlement is in the best interests of the debtor's estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996); *In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry [is] whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

In order to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal, bankruptcy courts in the Third Circuit are required to weigh the following factors: (i) the probability of success in litigation; (ii) the likely

---

court used the correct standard to evaluate the settlement under Bankruptcy Rule 9019(a) is a question of law subject to plenary review. The question of whether the bankruptcy court "applied that standard correctly to the facts of this [debtor's] settlement agreement," however, required review, but "because the bankruptcy judge is uniquely situated to consider the equities and reasonableness of a particular compromise, approval or denial of a compromise will not be disturbed on appeal absent a clear abuse of discretion." *In re Pennsylvania Truck Lines, Inc.*, 150 B.R. at 598. The district court in *Pennsylvania Truck Lines* affirmed the bankruptcy court, determining that the bankruptcy court had heard all evidence, testimony and argument required to rigorously scrutinize the settlements. The district court held that the

difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (iv) the paramount interests of the creditors. *Martin*, 91 F.3d at 393; *Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002); *see also Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)(setting forth the factors above as those that courts should consider in determining whether to approve settlements under former Bankruptcy Act); *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 587 (7th Cir. 1994) (affirming order approving compromise and settlement of claims against estate where it was "unlikely" that debtor would succeed on claims, litigation of claims would involve considerable expense and claimant would withdraw all claims upon approval of settlement). Typically, a court should reject a settlement ***only*** if it "fall[s] below the lowest point in the range of reasonableness.'" *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

1.     **Litigation Results Were Highly Uncertain.**

As established at the Hearing, there were three main litigation issues that were being resolved as part of the Settlement Agreement: i) the PBGC Appeal of the Termination Order; ii) the PBGC's concerns that the replacement pension plans are abusive; and iii) the issues surrounding the amount and priority of the PBGC's Claims. The high degree of uncertainty inherent in litigating these issues favored Bankruptcy Court approval of the Settlement Agreement. Indeed, these issues are highly fact intensive and involve many uncertain areas of the law, and therefore, the outcomes were difficult to predict.

i)     **The PBGC Appeal of the Termination Order**

As noted above, the PBGC appealed the Termination Order, arguing that because section 4041(c) of ERISA uses the term "plan" rather than "plans," the Court erred by not analyzing each pension plan individually, i.e. by not utilizing a plan-by-plan financial test to determine whether each of the pension plans should be terminated under ERISA. In response, the Debtors first argued that the section 4041(c) of

---

bankruptcy court did not err in concluding that, under the circumstances, the settlements were reasonable, and did not abuse its discretion.

ERISA does not expressly set forth the proper standard to apply when a debtor has multiple pension plans and there is no indication in the ERISA statute that Congress intended that courts analyze whether distress termination is appropriate on a plan-by-plan basis. Second, the Debtors argued that the impact of all the pension plans on the Debtors' ability to reorganize must be considered and that application of a plan-by-plan test is inappropriate because it fails to consider the overall impact of the pension plans on the Debtors' financial condition and ability to reorganize. Finally, in support of distress termination of the Hourly Plans, the Debtors cited *In re Wire Rope Corporation of America, Inc.*, 287 B.R. 771, 778-779 (Bankr. W.D.Mo. 2002), which involved multiple pension plans. The *Wire Rope* court evaluated the pension plans collectively during its analysis and focused on such factors as the cash resources of the debtor, the debtor's debt capacity and debt service requirements as well as a comparison of the debtor's cash flows compared to the pension funding requirements. *See Wire Rope*, 287 B.R. at 778-779.

After litigation of these issues, the Bankruptcy Court adopted the Debtors' position and cited the *Wire Rope* decision. The PBGC appealed the Termination Order. At the time the Settlement Agreement was being considered, there were no reported decisions from either the District Court for the District of Delaware or the Third Circuit Court of Appeals that specifically address the "plan-by-plan" termination issues, there was uncertainty as to whether the Debtors would prevail in the PBGC Appeal. The Settlement Agreement resolves the PBGC Appeal by providing that KACC will retain the five smaller pension plans and the PBGC will assume the KAP Plan. The end result was that the Debtors were relieved of over 90% of their pension liabilities.

### ii)    Replacement Pension Plans

As noted above, the PBGC informed the Debtors in July 2004 that the replacement defined contribution plan and the Debtors' participation in the USWA master-employer pension trust did not comply with the PBGC's guidelines regarding replacement pension plans and, therefore, constituted an

abusive replacement pension plan.[12]  Specifically, the PBGC argued that the replacement contribution plan resulted in the PBGC subsidizing the Debtors' ongoing pension program in contravention of ERISA.

A challenge to the PBGC's position will only be successful if the PBGC's position is shown to be arbitrary and capricious or contrary to the Administrative Procedure Act.  Moreover, as noted by the Supreme Court, the PBGC's determination that a pension plan is abusive is entitled to judicial deference. *See PBGC v. LTV Corp.*, 496 U.S. 633, 642 (1990).  Hence, the Debtors' ability to successfully challenge the PBGC's determination that the replacement pension plans are "abusive" was highly uncertain.

Pursuant to the Settlement Agreement, the PBGC consented to the replacement pension plans and issued a "no-action" letter with respect to the replacement pension plans.  This was critical for these cases, because it enabled the Debtors to implement the replacement pension plans and cleared the path for the PBGC's assumption of the KAP Plan, both of which were necessary for the Debtors to file plans of reorganization/liquidation and exit bankruptcy.  As part of the amendments to the Legacy Liability Agreements, the Debtors and the USWA agreed to modify the collective bargaining agreements with the USWA to provide the replacement pension plans—which provide future benefits to the Debtors' current employees.  Without the Settlement Agreement with the PBGC surrounding the replacement pension plans, the Debtors, the USWA and the PBGC would have been forced to litigate the issues, and due to the fact that the KAP Plan was terminated, the vast majority of the Debtors' workforce (in excess of 80% of the Hourly employees) would not have accrued benefits under the replacement pension plans during this lengthy litigation process.  In addition, absent approval of the Settlement Agreement, the Debtors would have been in violation of the collective bargaining agreements, as modified by the Legacy Liability Agreements.

---

[12]     Specifically, according to the PBGC, an abusive follow-on plan is a pension plan that is established after termination of a prior pension plan that is designed to provide the benefits paid under the original pension plan.

### iii)     The PBGC's Proofs of Claim

As stated above, the PBGC filed proofs of claim alleging claims in the total amount of $637 million plus additional unliquidated amounts against each Debtor and asserted that significant portions of these claims were administrative and/or priority claims.  There are a variety of key issues surrounding the proper amount and nature of the PBGC's claims.

First, the PBGC has asserted that certain minimum funding payments that came due postpetition and premium payments that arose postpetition are entitled to administrative expense priority status.  This position has been upheld by at least one court.  *See Columbia Packing v. PBGC*, 81 B.R. 205 (D. Mass. 1988).  In addition, the PBGC has also asserted that its lien rights under certain provisions of the Internal Revenue Code and ERISA for missed minimum funding contributions are also entitled to administrative expense priority and/or priority as a prepetition or postpetition tax.  In response, the Debtors argued that the vast majority of these claims are attributable to services performed by employees prepetition. Consequently, the Debtors asserted that—other than certain claims relating to postpetition benefit accruals and certain fixed premium payments—the PBGC's Claims did not constitute actual and necessary expenses entitled to administrative priority.  Indeed, most courts that have analyzed this issue have concluded that the PBGC's claims for administrative expense priority would be limited to those amounts directly attributable to services performed by employees postpetition.  However, despite the overwhelming jurisprudence, there is no reported court decision from either the District Court for the District of Delaware or the Third Circuit Court of Appeals that controls this issue.  Hence, there was a risk that the Bankruptcy Court could conclude that significant additional amounts were also administrative and/or priority in nature.

Second, a key determinant in calculating the amount of the PBGC's unsecured claim for unfunded benefit liabilities is the discount rate utilized.  The PBGC's position is that the ERISA valuation regulations must be utilized to determine the proper discount rate, citing, *inter alia*, the court's decision in *In re US Airways Group, Inc.*, 303 B.R. 784 (Bankr. E.D.Va. 2003)(*aff'd on other grounds sub nom., Retired Pilots Ass'n of US Airways, Inc. v. US Airways Group, Inc. (In re US Airways Group, Inc.)*, 369

F.3d 806 (4th Cir. 2004)).  Conversely, the Debtors' position throughout negotiations was that the discount rate determination is governed by the "prudent investor rate" standard, based on the fact that the only circuit courts to have reviewed this issue have reached this conclusion.  However, there is no binding court decision from either the District Court for the District of Delaware or the Third Circuit Court of Appeals that controls this issue.  Consequently, the proper methodology for calculating the unfunded benefit liabilities of a distress-terminated plan was highly uncertain and it was unclear whether the Bankruptcy Court would utilize the ERISA regulations or the prudent investor rate to determine the proper discount rate.  Moreover, even if the Bankruptcy Court had determined that it was proper to utilize the prudent investor rate standard rather than the discount rate set forth in the ERISA regulations, there was considerable uncertainty regarding what the Bankruptcy Court might conclude was the prudent investor rate.

Notwithstanding the fact that the PBGC's Claims asserted claims in the amount of $637 million, the PBGC asserted throughout the settlement negotiations that they had claims against the Debtors for unpaid minimum funding requirements for the Hourly Plans, Inactive Plan and the Salaried Plan in the aggregate amount of approximately $707.8 million, excluding interest and penalties—a point that LDTC has repeated ignored in its analysis of the propriety of the Settlement Agreement.  In addition, the PBGC asserted that most of this amount was entitled to administrative and/or priority status.  The Settlement Agreement resolves the PBGC's Claims in the form of a $14 million administrative claim and a general unsecured claim in the amount of $616 million and takes into account the underlying merits of the foregoing arguments and represented a reasonable compromise of the PBGC's Claims.

Finally, PBGC's agreement to limit its recovery at certain Debtors (Alpart Jamaica Inc., Kaiser Jamaica Corporation, Kaiser Alumina Australia Corporation and Kaiser Finance Corporation) to 32% of the net distributable proceeds payable in the aggregate to the PBGC, the holders of the Senior Subordinated Notes and the Senior Notes under confirmed plans of reorganization effectively reduced the PBGC's unsecured to $438 million at Alpart Jamaica Inc. and Kaiser Jamaica Corporation and $396 million at Kaiser Alumina Australia Corporation and Kaiser Finance Corporation, which resulted in an

implied interest rate of approximately 6%. *See* Declaration of Amit Patel at ¶ 25. (Docket No. 5948, Binder 3, Tab 34, the "Patel Declaration"). Thus, even if the Bankruptcy Court had concluded that it was proper to utilize the "prudent investor standard" to determine the amount of the PBGC's Claims, the implied discount rate of 6% was well within the range of reasonableness, since the PBGC's assertions throughout negotiations was that the proper discount rate was between 4% and 5% and the Creditors' Committee's professionals analysis concluded that the proper discount rate was between 8% and 10%. *See* Patel Declaration at ¶ 25. As a result, even if the Bankruptcy Court had analyzed this one issue in isolation as requested by LDTC and concluded that the "prudent investor standard" was the appropriate legal standard, it is abundantly clear that the implied discount rate of 6% for the PBGC's Claims was within the range of reasonableness. *See* Patel Declaration at ¶ 25.

In sum, numerous arguments could have been advanced under a variety of factual and legal theories making the outcome of litigation exceedingly uncertain. Accordingly, the probability of success in litigation over these issues was sufficiently uncertain to warrant approval of the Settlement Agreement by the Bankruptcy Court.

### 2. Complexity of Issues, Costs of Litigation and Significant Delay Resulting from Litigation with the PBGC Supported Approval of the Settlement Agreement.

The legal and factual bases for the subject matter of the Settlement Agreement were complex. Litigation would have included a continuation of the PBGC Appeal, the commencement of litigation challenging the PBGC's application of its policies surrounding replacement pension plans as well as litigation surrounding the amount and priority of the PBGC's Claims. While the parties engaged in significant litigation regarding the PBGC Appeal and exchanged a tremendous amount of information surrounding all of the issues contained in the Settlement Agreement, the litigation process was still in its early stages. If it had been necessary to litigate all of these issues, the parties would have had to conduct discovery, retain experts, and prepare for multiple trials surrounding the myriad of issues that would been before the Bankruptcy Court. The pretrial phase of such litigation would have likely taken a significant amount of time to complete, and the trials of these complex issues would likely have required a

significant amount of the Bankruptcy Court's time. Undoubtedly, discovery and litigation of these issues would have diverted the parties' attention away from the various other issues associated with the Debtors' restructuring and the resolution of these cases.

In addition, litigation of these issues would have significantly delayed the resolution of all of these cases, which were commenced over three years ago as well as delay approval of plans of reorganization for those estates where all of the assets have been, or currently are being, liquidated. For example, without a resolution of the PBGC Appeal and the replacement pension plan issues, there would not have been any pension arrangements for current employees and the Debtors would have been in breach of the collective bargaining agreements and the Legacy Liability Agreements. In addition, without a resolution of the PBGC's Claims, including the administrative expense and/or priority status of such claims, none of the Debtors would be able to proceed with plans of reorganization or liquidation until the Bankruptcy Court ruled on the amount and priority of the PBGC's Claims, since the Debtors could not satisfy section 1129(a)(9) of the Bankruptcy Code—which requires that a plan of reorganization/liquidation provide for payment in full of administrative expense claims and provide for the treatment of priority claims. For all of these reasons, failure to approve the Settlement Agreement would have lead to a significant delay in these bankruptcy cases.

In sum, approval of the Settlement Agreement by the Bankruptcy Court was appropriate because it avoided the expense and delay attendant to the litigation of all of these issues, removed one of the major obstacles to a consensual resolution of these cases and pushed these cases closer to confirmation and distributions to creditors.

### 3.    The Settlement Agreement was in the Paramount Interest of Creditors.

The Settlement Agreement was undoubtedly in the paramount interests of the creditors and the Creditors' Committee believes that the Settlement Agreement was in the best interests of the Debtors' respective estates, for numerous reasons.

First, because of the magnitude and complexity of the issues discussed above, any resulting litigation would have been extremely costly. Not only would litigation have removed value from the

estates in the form of professionals' fees, but the Debtors' management and employees would also have had to dedicate significant attention to discovery and trial, diverting their attention from the Debtors' businesses and other reorganization issues.

Second, a paramount interest of the Debtors' creditors is the swift conclusion of these bankruptcy cases. The PBGC Appeal and other litigation over the remaining issues would have certainly delayed the Debtors' emergence from bankruptcy for at least another year or two. Specifically, approval of the Settlement Agreement enabled the Debtors to expeditiously proceed with confirmation of plans of liquidation for certain estates and proceed with plans of reorganization for the remaining Debtors.

Third, the Creditors' Committee, which is comprised of unsecured creditors that collectively have claims at all of the Debtors' estates, fully supported the Bankruptcy Court's approval of the Settlement Agreement because it was beneficial to these estates. *See In re Federated Dep't Stores, Inc.*, 1992 WL 605483, at *5 (Bankr. S.D. Ohio Jan. 10, 1992)(attached hereto as Exhibit A)(court noted importance of overwhelming support of settlement (as part of plan of reorganization) in the context of determining fairness and equity of settlement and extent to which settlement comports with creditors' views). Indeed, the Creditors' Committee was regularly updated throughout the negotiation process regarding the status of negotiations. Moreover, as indicated above, certain members of the Creditors' Committee participated in the negotiation of the Settlement Agreement. After the parties reached an agreement on the terms and conditions set forth in the Settlement Agreement, the Creditors' Committee and its professionals thoroughly reviewed and analyzed all of the terms and conditions the Settlement Agreement, and after discussion and deliberation (without the participation of the PBGC), the Creditors' Committee concluded that the Settlement Agreement was reasonable, appropriate and in the best interests of the Debtors' estates.

For all the foregoing reasons, the Bankruptcy Court's decision to approve the Settlement Agreement was clearly appropriate, since the evidence and argument at the Hearing on the Motion clearly established that the Settlement Agreement was reasonable and in the best interests of the Debtors' respective estates and easily satisfied the standards for approval of settlements under Bankruptcy Rule

9019 in the Third Circuit.   Without question, the Bankruptcy Court's approval of the Settlement Agreement should be affirmed.

**C.      The LDTC Objection did not Preclude Bankruptcy Court Approval of the Settlement Agreement.**

LDTC contends that the Bankruptcy Court erred by failing to consider the LDTC Objection prior to approval of the Settlement Agreement and by dismissing the LDTC Objection as moot.

**1.      Creditors have Limited Standing under 502 to Object to Claims of Other Creditors.**

Without citing any supporting authority, LDTC contends that section 502 of Bankruptcy Code provides "a creditor (here LDTC) with an unrestricted substantive statutory right to object to the claims of another creditor." *See* Brief at p. 20.  Indeed, the entirety of LDTC's arguments  at the Hearing and in this Appeal flow from this proposition.

Section 502 of the Bankruptcy Code does provide standing requirements for objectors in bankruptcy proceedings, allowing a "party in interest" to object to a claim filed in the bankruptcy. 11 U.S.C. § 502(a).[13]   Indeed, creditors of the debtor are parties in interest within the meaning of Section 502 of the Bankruptcy Code and therefore have a right to file an objection to another creditor's claim. *Power Five v. GMC (In re Automotive Armature Co.),* 219 B.R. 513, 516-17 (S.D.Ind. 1998); *See also, In re FBN Food Services, Inc.,* 82 F.3d 1387, 1391 (7th Cir. 1996); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1553 (11th Cir. 1990).

However, creditors do *not* have the unfettered right under section 502 of the Bankruptcy Code to object to any and all claims asserted against a bankruptcy estate.  In fact, courts have routinely held that while a creditor does fall within the definition of a party in interest under section 502 of the Bankruptcy Code, the needs of efficient administration have led to the recognition that the right to object to claims is generally exercised by the trustee or debtor in bankruptcy. *Lawrence v. Steinford Holding B.V. (In re Dominelli),* 820 F.2d 313 (9th Cir. 1987)("Ordinarily, the trustee is the optimal party in interest to raise objections on behalf of the estate."); *Fred Reuping Leather Co. v. Fort Greene Nat'l Bank (In re*

*Honesdale Union Stamp Shoe Co.,Inc.),* 102 F.2d 372, 373 (3d Cir. 1939)("the overwhelming weight of authority . . . is to the effect that a general creditor of a bankrupt has no right to contest another creditor's claim or to appeal from the refusal of the court to disallow it unless upon application the trustee has refused to do so and the district court has authorized the creditor to proceed in the trustee's name."); *In re Dow Corning Corp.,* 244 B.R. 721, 750-52 (Bankr. E.D.Mich. 1999)(denying creditors' committee the right to object to other creditor's claims)(*rev'd in part* at 255 B.R. 445 (E.D.Mich. 2000)); *In re Simon,* 179 B.R. 1, 7 (Bankr. D.Mass. 1995); *In re Fox,* 64 B.R. 148 (Bankr N.D.Ohio 1986); *In re Savidge,* 57 B.R. 389 (D.Del. 1986). Although the right of a creditor to object to the allowance of another creditor's claim is undisputed on principle, the "needs of orderly and expeditious administration do not permit the full and unfettered exercise of such right." 4 *Collier on Bankruptcy* ¶ 502.01[2] (15th ed. rev'd 2004).

An important qualification which attaches to a creditor's "right to object" pursuant to section 502 is that "it is the trustee who acts as the spokesman for all the creditors in discharge of the trustee's duty unless the trustee refuses to take action." *Id.*; *see also, In re Dominelli,* 820 F.2d 313 ("The trustee, as representative of the estate, normally can represent each general creditor as effectively as could the creditor itself.").[14] Further, creditors of the debtor's estate are bound by court-approved settlements since those creditors have an "identity of interest" with the settling trustee. *Petitioning Creditors of Melon Produce v. Braunstein,* 112 F.3d 1232 (1st Cir. 1997)("the trustee in bankruptcy is a fiduciary representing the estate and creditors," and "privity may be established by identification of interests, even where representation of those interests is not authorized")(*citing In re Medomak Canning,* 922 F.2d 895, 901 (1st Cir. 1990); *Meza v. General Battery Corp.,* 908 F.2d 1262, 1267 (5th Cir. 1990)).

LDTC's contention that, as a matter of law, the Bankruptcy Court should have considered the LDTC Objection prior to, and rather than, holding a hearing on the Settlement Agreement is simply unfounded. Nothing contained in section 502 of the Bankruptcy Code, or the jurisprudence construing

---

[13]    Section 502(a) provided, in pertinent part, that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a).

[14]    A debtor in possession fulfills the same role as a trustee pursuant to section 1107(a) of the Bankruptcy Code.

this section, provides LDTC with the exclusive and unfettered right to object to the claims of the PBGC or required that the Bankruptcy Court consider the LDTC Objection prior to, and rather than, holding a hearing on the Settlement Agreement.  To the contrary, the jurisprudence clearly indicates that the proper party-in-interest to pursue such an objection, as well as to resolve any objections to the PBGC's claims, was the Debtors.  As a result, once the Debtors reached an agreement regarding the amount and priority of the PBGC's Claims, LDTC no longer had standing to object to the PBGC's Claims.  Hence, the LDTC Objection became moot and properly dismissed.

Further, even if there was a plausible argument that LDTC's rights were somehow abrogated by the Bankruptcy Court's decision to dismiss the LDTC Objection, LDTC's subsequent objection to the Settlement Agreement, participation in the discovery process and participation in the Hearing before the Bankruptcy Court undeniably operates to remedy any argument that Law Debenture's rights under section 502 of the Bankruptcy were not protected.  The law certainly recognizes that creditors, such as a secured creditor, may have interests that may conflict with those of the trustee.  In such a situation, however, the problems posed by this conflict are undeniably remedied when the creditor's objection to the claim is heard by the court in the context of a 9019 Motion, which is precisely what occurred in the instant case. *See, e.g,* in *In re Dominelli*, 820 F.2d 313.[15]

---

[15]     In *Dominelli*, the junior lienholder objected to the claim of another creditor, noting that its interests as a junior lienholder were in conflict with those of the trustee, which represented all general unsecured creditors of the estate.  The district court in *Dominelli*, however, determined that the junior lienholder's "having participated" in the hearing on the 9019 Motion, seeking to approve a settlement agreement that dealt with the claims of the other creditor, by objecting to the proposed settlement agreement "remedied" any conflict between trustee's interests and those of the junior lienholder.  The district court held that the bankruptcy court, when presented with the proposed settlement under Bankruptcy Rule 9019, "expressly overruled the objection" of the junior lienholder, and, thus, the junior lienholder "had an opportunity before the bankruptcy court to represent his interests in relation to the proposed settlement."  Moreover, because the bankruptcy court was able to "consider the interests of the estate as a whole" during the settlement proceedings, which included the interests of the junior lienholder, "there was a full opportunity" for the court to consider and rule on the issues raised by the junior lienholder. *Dominelli*, 820 F.2d 313.

**2.    There is No Conflict between Section 502 of the Bankruptcy Code and Bankruptcy Rule 9019.**

LDTC argues that the Bankruptcy Court improperly utilized Bankruptcy Rule 9019[16] instead of section 502 of the Bankruptcy Code to resolve the PBGC's Claims and the LDTC Objection. LDTC further contends that the Bankruptcy Court erred because it violated the mandate that any conflict between the Bankruptcy Code and the Bankruptcy Rules must be resolved in favor of the Bankruptcy Code.

LDTC's arguments are wholly incorrect. LDTC has failed to even identify precisely how there is a conflict between Bankruptcy Rule 9019 and Section 502 of the Bankruptcy Code that somehow abrogated their rights.[17] To the contrary, there is absolutely no conflict between Bankruptcy Rule 9019 and Section 502 of the Bankruptcy Code. Indeed, section 502 of the Bankruptcy Code and Bankruptcy Rule 9019 operate similarly and harmoniously to provide a mechanism for debtors and other parties in interest to object to, and compromise, claims filed against a bankruptcy estate.

Specifically, section 502(a) of the Bankruptcy Code deals with the allowance and disallowance of claims. Once an objection is made by a party in interest to a claim filed under section 502, "the determination of whether the objection is well-founded is a judicial function to be exercised by the court." 4 *Collier on Bankruptcy* ¶502.02[2]; *see Chaussee v. Lyngholm (In re Lyngholm)*, 24 F.3d 89, 92 (10th Cir. 1994)(once objection is taken, the court may liquidate or may defer to another forum); *Capital Corp. v. Finnman (In re Johnson)*, 960 F.2d 396 (4th Cir. 1992)(allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of equitable power). Section

---

[16]    Bankruptcy Rule 9019 provides, in pertinent part, that "[o]n motion by the trustee and after notice an a hearing, the court may approve a compromise or settlement." Fed.R.Bankr.P. 9019(a).

[17]    LDTC does cite two cases, *In re Pacific Atl. Trading Co.*, 33 F.3d 1064, 1066 (9th Cir. 1994) and *In re Burnham, Connelly, Oesterles and Henry*, 1996 WL 580475, at *2 (6th Cir. 1996), arguing that these two cases support of their contention that the Bankruptcy Court somehow abrogated their rights by approving the Settlement Agreement. However, these two cases merely cite the rule that any conflict between the Bankruptcy Rules and the Bankruptcy Code must be resolved in favor of the Bankruptcy Code, which the Creditors' Committee does not dispute. These cases are clearly distinguishable from the instant case, as both cases were Chapter 7 cases that did not discuss Bankruptcy Rule 9019 or involve the approval of a settlement agreement.

502(b) provides that "[i]f such objection to a claim is made, the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition . . . ."

Similarly, Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed.R.Bankr.P. 9019(a).  As numerous cases have held, compromises of a creditor's claims against a bankruptcy estate fall squarely within the purview of Bankruptcy Rule 9019(a) and have routinely been approved by bankruptcy courts over the objection of creditors. *See, e.g., Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)(analyzing propriety of compromise or resolution of claims against the debtor); *In re Columbia Gas Systems Inc.*, Nos. 91-803 and 91-804, 1995 Bankr. LEXIS 936, *1 (Bankr. D.Del. June 16, 1995)(copy attached as Exhibit B)(bankruptcy court approved settlement of claims "pursuant to Sections 105 and 502 of the Bankruptcy Code, and Bankruptcy Rule 9019" over strident objections by creditors); *In re SIS Corp.,* 108 B.R. 608 (Bankr. N.D.Ohio 1989)(overruling objection of secured creditors to settlement of all claims among debtors and other parties to certain lease agreements that resulted in the re-allocation of collateral in order to satisfy pre-petition obligations of the debtors in addition to post-petition obligations); *Pineo v. Turner (In re Turner),* 274 B.R. 675 (Bankr.W.D.Pa. 1992).

Hence, both section 502 and Bankruptcy Rule 9019 provide clear and explicit authority for a bankruptcy court to determine, after appropriate notice and hearing, the amount of an unsecured claim, including in an instance where another creditor is objecting to the either the claim under section 502 of the Bankruptcy Code or the proposed resolution of the claim under Bankruptcy Rule 9019.  Nothing contained within the plain language of section 502 and Bankruptcy Rule 9019 indicates that there is a conflict between these two provisions.[18]  Moreover, the language contained within both provisions is

---

[18]    To the extent that the Bankruptcy Rule does not contradict the statute, "there is no reason for the Rule to be ignored." *In re Burnham, Connelly, Oesterle and Henry*, 1996 WL 580475 at *2 (attached hereto as Exhibit C).

nearly identical and merely provide that a bankruptcy court, after appropriate notice and hearing, may determine whether a settlement or claim objection is appropriate. Absolutely nothing contained in section 502 of the Bankruptcy Code prohibits a debtor or a bankruptcy court from determining the amount and priority of a claim as part of a settlement agreement under Bankruptcy Rule 9019.

Indeed, the Creditors' Committee submits that these two provisions work harmoniously, particularly in a situation like the instant case, where the resolution of a creditor's claims involves *significantly* more than a settlement of the amount and priority of that creditor's claim against a bankruptcy estate. Here, the Bankruptcy Court approved the Settlement Agreement, which resolved the amount and priority of claims filed by the PBGC against the estates as well as *numerous* other issues between the PBGC and the Debtors—a point that LDTC continues to completely ignore. In fact, these other disputed issues between the Debtors and the PBGC could not have been resolved under section 502 of the Bankruptcy Code, as they had nothing to do with the resolution of the amount and priority of the PBGC's Claims. Since all of these issues were inextricably intertwined, they had to be, and correctly were, resolved as part of one global settlement, that was presented to the Bankruptcy Court for approval.

In sum, the Bankruptcy Court's approval of the Settlement Agreement under Bankruptcy Rule 9019(a) did not abridge or modify LDTC's substantive rights under section 502(a) of the Bankruptcy Code nor did it violate, conflict with or limit the substantive protections afforded by section 502(a) of the Bankruptcy Code.

> **3.    If Section 502 of the Bankruptcy Code limits a Debtor or Trustee's Ability to Compromise and Settle Claims under Bankruptcy Rule 9019, then a Debtor or a Trustee could Never Resolve Claims over the Objection of Objecting Creditors.**

LDTC implicitly argues that section 502 of the Bankruptcy Code trumps Bankruptcy Rule 9019 and that a debtor or trustee's ability to compromise a claim under Bankruptcy Rule 9019 is limited in an instance where a creditor has filed an objection to another creditor's claim under section 502 of the Bankruptcy Code. However, this assertion is not contemplated by the plain language of section 502 and LDTC has not cited one case that provides that section 502 limits a debtor/trustee's ability to compromise or settle claims under Bankruptcy Rule 9019(a). Indeed, the reason for the dearth of jurisprudence is

obvious—because this assertion would result an improper limitation on a debtor or trustee's right to compromise under Bankruptcy Rule 9019.

The debtor's "post-petition bargaining with pre-petition creditors" is vitally necessary when the debtor has no other source for the desired relief prior to submission of a plan of reorganization. *In re SIS Corp.*, 108 B.R. at 611. Compromises may be effected separately during reorganization proceedings or in the body of the reorganization plan itself. *In re Aweco, Inc.*, 725 F.2d 293, 297 (5th Cir. 1984). Hence, compromises are favored in bankruptcy, and the decision of the bankruptcy judge to approve or disapprove the compromise pursuant to Bankruptcy Rule 9019(a) rests in the sound discretion of the bankruptcy judge. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3rd Cir. 1996); 10 *Collier on Bankruptcy* (15th ed. rev'd 2004) ¶9019-01 ("Compromises are favored in bankruptcy.").

One of the purposes of compromises under 9019 is to "allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Milden v. Joseph (In re Milden)*, No. 94-56503, 1997 U.S. App. LEXIS 7726, *9 (9th Cir. April 16, 1997)(attached hereto as Exhibit D); *In re Columbia Gas Systems, Inc.*, Nos. 91-803 and 91-804, 1995 Bankr. LEXIS 936, *1 (Bankr. D.Del. June 16, 1995)(bankruptcy court approved settlement of claims "pursuant to Sections 105 and 502 of the Bankruptcy Code, and Bankruptcy Rule 9019," concluding that "[w]ithout this settlement, the claims mediation process will likely continue for three to five years," and the "additional expense to the estate if these sixteen claims are not settled will be enormous," as the "likely duration of such continued litigation would be significantly long."). Accordingly, "the law favors compromise and not litigation for its own sake, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed." *In re Milden*, 1997 U.S. App LEXIS at *9. Indeed, to continue to delay the ultimate distribution of assets to the creditors while increasing the costs would result in a diminished estate and would serve to thwart the major purpose of the Bankruptcy Code. *In re Bell & Beckwith*, 77 B.R. 606, 614 (Bankr. N.D.Ohio 1987).

If section 502 of the Bankruptcy Code limited a debtor's ability to compromise and settle claims in an instance where a creditor has filed an objection against the claims of another creditor, that debtor's

ability to compromise claims would be detrimentally impaired and a debtor could never resolve claims over the objection of the creditor that filed a claim objection under section 502 of the Bankruptcy Code. Such a result would have a devastating effect on the orderly administration of a bankruptcy estate, would allow litigious creditors to hold a bankruptcy estate hostage by filing numerous claim objections and would enable creditors who have filed claims objections to have veto power over any attempted settlements of claims.    Such a result would bring chaos to the claims administration process and completely eviscerate one of the most fundamental protections afforded to debtors—the ability to resolve claims without costly litigation. *See In re Simon*, 179 B.R. 1, 7 (Bankr. D.Mass. 1995)("If every creditor were entitled to challenge the claim of another creditor filed in a particular case, an orderly administration could degrade to chaos.").

4.    **Courts Have Broad Authority Under Section 105 of the Bankruptcy Code to Modify Debtor-Creditor Relationships and Fashion Equitable Relief Pursuant to Section 502.**

LDTC also contends that the Bankruptcy Court improperly utilized section 105 of the Bankruptcy Code to approve the Settlement Agreement, alleging that section 105 of the Bankruptcy Code does not provide a statutory basis for the relief requested in the Settlement Agreement and that the Bankruptcy Court utilized section 105 in a way that contradicted other provisions of the Bankruptcy Code, in contravention of the Third Circuit's recent opinion in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). Once again, LDTC has failed to identify how there is a conflict between sections 105 and 502 of the Bankruptcy Code.    Notwithstanding LDTC's assertions to the contrary, section 105 also provides a statutory basis for the Bankruptcy Court to approve the Settlement Agreement.

Section 105(a) of the Bankruptcy Code provides bankruptcy courts with the equitable power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).    Pursuant to section 105(a), the bankruptcy court has "broad authority" to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings. *United States v. Energy Resources Co., Inc.,* 495 U.S. 545, 549 (1990); *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548, 568 (3d Cir. 2003)(*citing*

*Holmberg v. Armbrecht,* 327 U.S. 392, 396 (1946)("Equity eschews mechanical rules; it depends on flexibility.").

Further, section 105(a) provides the bankruptcy court with "broad authority to modify creditor-debtor relationships." *United States v. Energy Resources Co. Inc.*, 495 U.S. at 549 ("statutory directives" including section 105(a) "are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships")(*referencing, Pepper v. Litton*, 308 U.S. 295, 303-304 (1939); *United States National Bank v. Chase National Bank,* 331 U.S. 28, 36 (1947); *Katchen v. Landy*, 382 U.S. 323, 327 (1966)). *See, e.g. In re Columbia Gas Systems, Inc.,* Nos. 91-803 and 91-804, 1995 Bankr. LEXIS 936, *1 (Bankr. D.Del. June 16, 1995)(bankruptcy court approved settlement of claims "pursuant to Sections 105 and 502 of the Bankruptcy Code, and Bankruptcy Rule 9019); *In re PT-1 Communs., Inc.,* 292 B.R. 482 (Bankr. E.D.N.Y. 2003)(fashioning relief expressly under sections 105 and 502 of the Bankruptcy Code, the court denied debtor's motion to expunge untimely claim because "the equities tip in favor of allowing" the claim, "subject and without prejudice to [debtor]'s right to move to reduce or to expunge it as the facts may warrant.").[19]

While LDTC is correct that section 105 of the Bankruptcy Code cannot be utilized to contradict another section of the Bankruptcy Code, that is not what occurred in the instant case. Sections 105 and 502 of the Bankruptcy Code both provide bankruptcy courts with broad authority to equitably resolve claims and other matters before the bankruptcy court. Nothing contained within the plain language of sections 502 and 105 of the Bankruptcy Code indicates that there is a conflict between these two provisions. Indeed, there is no conflict between these two provisions, and, as indicated above, numerous

---

[19]    LDTC's reliance on the *Combustion Engineering* case for its assertion that the Bankruptcy Court improperly utilized Section 105 of the Bankruptcy Code is misplaced. While the Third Circuit addressed many issues in *Combustion Engineering*, the case dealt primarily with the limited issue of asbestos channeling injunctions under section 524(g) of the Bankruptcy Code and whether these channeling injunctions could be extended under section 105 of the Bankruptcy Code to non-derivative claims against non-debtors, which has absolutely nothing to do with the instant case. In fact, the *Combustion Engineering* decision <u>supports</u> the Bankruptcy Court's usage of Bankruptcy Rule 9019, section 105 and section 502 to determine the propriety of the Settlement Agreement. *See In re Combustion Engineering, Inc.,* 391 F.3d at 246.

courts (including the bankruptcy court in *Combustion Engineering*, which was approved of by the Third Circuit) have utilized both section 502 and 105 to fashion equitable relief surrounding the resolution of claims and approved settlements that resolved claims against a bankruptcy estate. *See, e.g., In re Columbia Gas Systems,* 1995 Bankr. LEXIS 936 at *1.

**D.     LDTC's Allegations Surrounding the Negotiation of the Settlement Agreement are Completely Unfounded.**

LDTC contends that it has been prejudiced by the Bankruptcy Court's approval of the Settlement Agreement because: 1) there was no evidence provided to the Bankruptcy Court that described the negotiations that led to the settlement of the amount and priority of the PBGC's Claims; 2) LDTC was not involved in the negotiations surrounding the Settlement Agreement; and 3) there was collusion among certain parties to benefit one another to the detriment of holders of the 12-3/4% Senior Subordinated Notes.   These contentions are totally unfounded.

**1.     Evidence Concerning the Arms-Length Negotiation of the Settlement Agreement was Presented at the Hearing.**

LDTC contends that no evidence was presented at the Hearing of the negotiations surrounding the Settlement Agreement, and that, therefore, the Bankruptcy Court erred by approving the Settlement Agreement in the absence of any evidence that the negotiations of the Settlement Agreement were conducted in good faith and at arms-length. Nothing could be further from the truth.

As the Debtors argued at the Hearing, and was clearly pointed out in numerous pleadings and declarations filed in support of the Settlement Agreement, arms-length negotiations surrounding the terms and conditions of the Settlement Agreement had been occurring since the Petition Date. *See* Barneson Declaration at ¶ 5; January 18, 2005 Hearing Transcript at pp. 24, 38-39, 41-42 and 197.  Moreover, there was ample evidence and argument presented at the Hearing surrounding the arms-length negotiations between the Debtors, the PBGC as well as other parties surrounding the amount and priority of the PBGC's Claims that began in 2003 and continued throughout 2004.  *See* Barneson Declaration at ¶¶ 13, 17, 21, 22, 23; Patel Declaration at ¶ 18; January 18, 2005 Hearing Transcript at pp. 38-39, 41-42, 68-70 and 197.  Indeed, the arms-length nature of the negotiations is clearly demonstrated by the amount of time

taken to reach an agreement on the Settlement Agreement as well the tremendous number of negotiating sessions among the parties during 2004. *See* Barneson Declaration at ¶¶ 13, 17, 21, 22 and 23. Moreover, the number of drafts of the Settlement Agreement, and the corresponding modifications to many of the material terms in these drafts, also serve as empirical evidence of the arms-length nature of the negotiations among the parties. *See* Barneson Declaration at ¶ 23.

Moreover, to the contrary of LDTC's allegations that the Debtors "abdicated" their responsibilities surrounding the negotiations of the Settlement Agreement, it is also clear that the Debtors were intimately involved in the negotiation process surrounding the Settlement Agreement. *See* Barneson Declaration at ¶¶ 13, 17, 21, 22 and 23; Patel Declaration at ¶ 18. Throughout the negotiation process, the Debtors have represented the interests of all of the estates and have fulfilled their fiduciary obligations to make certain that the Settlement Agreement is beneficial to *all* of the estates. Indeed, the Creditors' Committee strongly believes that the Debtors engaged in an open, fair and exhaustive negotiation of the Settlement Agreement. [20]

---

[20]    LDTC has asserted that approval of a settlement agreement requires the Bankruptcy Court to explicitly find "good faith" and that the transaction was the product of "arm's length" negotiations, citing *In re American Family Enterprises,* 256 B.R. 377 (D.N.J. 2000) and *Connecticut General Life Ins. Co. v. United Companies Financial Corp.* (*In re Foster Mortgage Corp.*), 68 F.3d 914 (5th Cir. 1995). However, LDTC's arguments are incorrect for several reasons. First, as noted above, there was substantial evidence presented at the Hearing regarding the negotiation process and the arms-length nature of these negotiations. Second, there is no requirement in the Third Circuit that a party seeking approval of a settlement or compromise under Bankruptcy Rule 9019 affirmatively demonstrate "good faith" or that the transaction was the product of "arms-length" negotiations. Rather, a party must only demonstrate the *Martin* factors, as required by the Third Circuit in *In re RFE Indus., Inc.,* 283 F.3d 159 (3d Cir. 2002)(factors include: (1) the probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors)*(citing In re Martin,* 91 F.3d 389, 393 (3d Cir. 1996)). Finally, the facts of the only cases cited by LDTC in support of this proposition are clearly and easily distinguishable from the facts surrounding the Settlement Agreement, as the Settlement Agreement did not involve insiders or class-action litigation. *See In re American Family Enterprises*, 256 B.R. 377 (D.N.J. 2000)(involved approval of the proposed class action settlement as part of the plan of reorganization, finding that counsel negotiating the settlement had "extensive experience in complex class action litigation, the proposed settlement was the product of extensive, good faith, arms-length negotiations, and that significant weight should therefore be given to "the belief of Lead Counsel that the proposed settlement is in the best interests of the Class and Subclass."); *In re Foster Mortgage Corp.*, 68 F.3d 914 (5th Cir. 1995)(finding that in cases where the proposed settlement (i) is opposed by nearly all creditors and (ii) the settlement is reached between insiders without participation of the creditors, the bankruptcy court must give "proper deference to the views of the creditors" and "the extent to which the

In sum, there was ample evidence presented at the Hearing to enable the Bankruptcy Court to conclude that the negotiations were properly conducted, that the negotiation process was fair and that the Settlement Agreement was negotiated in good faith and at arms-length. Indeed, no party, including LDTC, presented any evidence at the Hearing to the contrary.

>    **2.      LDTC was Involved in, and Notified of, the Negotiations Surrounding Settlement Agreement.**

LDTC contends that they have been prejudiced by the Bankruptcy Court's approval of the Settlement Agreement because LDTC was not involved in, nor apprised of, the negotiations surrounding the Settlement Agreement, particularly with regard to the negotiations surrounding the amount and priority of the PBGC's Claims. However, even a cursory review of the record at the Hearing reveals that LDTC's arguments are a distortion of the facts.

As clearly indicated by the declarations filed in support of approval of the Settlement Agreement, the arms-length negotiations among the parties surrounding the amount and priority of the PBGC's claims primarily began in 2003 and continued throughout 2004. *See* Barneson Declaration at ¶¶ 13, 17, 21, 22, 23; Patel Declaration at ¶ 18. In addition, the uncontroverted evidence also indicated that the Creditors' Committee, of which LDTC is a member, was kept regularly apprised of the status of negotiations surrounding the PBGC's Claims. *See* Barneson Declaration at ¶ 26. Indeed, throughout the summer of 2004, the Debtors and the Creditors' Committee met numerous times (specifically May 26, 2004, June 6, 2004, August 12, 2004, September 14, 2004 and September 21, 2004) wherein the status of the negotiations surrounding the Settlement Agreement, including negotiations surrounding the amount and priority of the PBGC's Claims, were openly discussed by the Debtors and the Creditors' Committee. *See* January 18, 2005 Hearing Transcript at p. 119. The Creditors' Committee believes that representatives of LDTC and/or their professionals attended all of these meetings. Moreover, throughout this time period, professionals for the Creditors' Committee were requested to provide information to LDTC and/or their

---

settlement was truly a product of arms-length bargaining, and not fraud or collusion" such as when a subsidiary settles a claim against a parent without participation of creditors.). Indeed, none of the circumstances described in either of these two cases were present in the instant case.

professionals surrounding the PBGC's Claims. Hence, the uncontraverted evidence provided at the Hearing made it is abundantly clear that LDTC was routinely updated by the Debtors as well as the professionals for the Creditors' Committee regarding the status of negotiations surrounding the Settlement Agreement.

Moreover, LDTC was not "excluded" from the negotiation process by the parties. As noted above, LDTC participated in the first meeting with the PBGC and the Senior Noteholders held in May, 2004 to discuss the amount and priority of the PBGC's Claims. Indeed, there was uncontraverted testimony at the Hearing that LDTC declined to participate further in the settlement negotiations until there was a resolution of the subordination litigation. *See* January 18, 2005 Hearing Transcript at p. 134-135. There was no "exclusion" of LDTC from the negotiations, LDTC simply chose not to be involved in the negotiations.

In any event, even if LDTC was "excluded" from the negotiation process by the parties, it is unclear how LDTC's exclusion from the negotiation process prejudiced LDTC. Indeed, as discussed at great length above, a debtor or a trustee routinely negotiates and compromises claims against an estate without the involvement of its creditors in the negotiations. LDTC's "exclusion" argument should be summarily rejected by this Court.

### 3.    LDTC's Allegations of Collusion and Coercion are Groundless.

LDTC alleges in their Brief, for the first time, that there was collusion among certain parties, including the PBGC and the Senior Noteholders, to benefit one another to the detriment of holders of the 12-3/4% Senior Subordinated Notes. This unsubstantiated allegation should be dismissed outright.

LDTC argues that the Debtors' "abdication" of their responsibility to negotiate the amount and priority of the PBGC claims to the PBGC and the Senior Noteholders left this "critical" issue in the hands of the PBGC and the Senior Noteholders. *See* Brief at p. 27. Interestingly, however, in the LTDC Settlement Objection, LDTC objected to the Debtors' involvement in the negotiations, contending that the size of the PBGC's Claims was "nothing more than an intercreditor dispute in which the Debtors have interjected themselves at the bidding of the PBGC and other creditor constituencies. Thus, the aspects of

the [Settlement Agreement] that deal with the PBGC Claims at these estates is a matter that should properly be litigated and/or resolved among the parties who are the actual stakeholders . . . and the Debtors should not be permitted to interfere in this process." *See* LDTC Settlement Objection at pp. 7-8. LDTC's contradictory arguments and positions in their Brief before this Court represent nothing more than a veiled attempt to sling mud at everyone involved in an effort to undermine the propriety of the Settlement Agreement.

The primary factual basis for LDTC's "collusion" argument is the inclusion of certain language in a proposed term sheet drafted early in the negotiations which noted that the PBGC and the Senior Noteholders would work together and with the Debtors to propose plans of reorganization for certain bankruptcy estates that would provide for (a) the enforcement of the subordination of the 12-3/4% Senior Subordinated Notes issued by KACC in 1993 and (b) the treatment of the PBGC's Claims. *See* Brief at pp. 12-13. Importantly, this proposed language did not become a part of the Settlement Agreement that was approved by the Bankruptcy Court. In fact, the liquidating plans of reorganization for those bankruptcy estates were the subject of a recent confirmation hearing before the Bankruptcy Court, and such plans do not seek to enforce the subordination of the 12-3/4% Senior Subordinated Notes issued by KACC in 1993 (as the draft term sheet provided for), but instead provide for the Bankruptcy Court to decide the subordination issue.[21]

Moreover, even if LDTC's allegation that the parties excluded LDTC from the negotiations surrounding the Settlement Agreement was correct, this does not amount to "collusion." The fact that the

---

[21]    The Creditors' Committee also submits that this issue was never raised with the Bankruptcy Court and, as a matter of law, has been waived by LDTC and cannot be raised in this Appeal. "As a general rule, a court should refuse to consider an issue that is raised for the first time on appeal." *Hutchins v. Commonwealth Mortgage Corp.*, 165 B.R. 401, 405 (E.D. Pa. 1994)(*citing Singleton v. Wulff*, 428 U.S. 106, 121 (1976); *Salvation Army v. New Jersey Dept. of Community Affairs*, 919 F.2d 183, 196 (3d Cir. 1990)). *See In re Middle Atl. Stud Welding Co.,* 503 F.2d 1133, 1134 n.1 (3d Cir. 1974) (approving district court's refusal to entertain arguments not raised before bankruptcy referee); *Mullins v. Burtch (In re Paul J. Paradise & Assocs.),* 249 B.R. 360 (D.Del. 2000)("Because the equitable subrogation argument was not properly raised in the Bankruptcy Court, the issue is not properly before this Court on appeal."). LDTC's argument that there was "collusion" among certain parties is a new argument which LDTC failed to present to the Bankruptcy Court. Thus, LDTC has waived this argument for purposes of this Appeal.

PBGC and the Senior Noteholders led the negotiations surrounding the amount and priority of the PBGC's claims is hardly surprising—as these two parties had the primary economic interest to resolve the amount and priority of the PBGC's Claims.[22] *See* January 18, 2005 Hearing Transcript at pp. 96-97 and 134-135. Indeed, while the Debtors were heavily involved in the negotiations surrounding the amount and priority of the PBGC's claims, "the Debtors could not be put in the position of supporting one unsecured creditor over others." *See* Barneson Declaration at ¶ 24. Accordingly, it was perfectly appropriate for the Debtors to involve members of the Creditors' Committee in the negotiation process, particularly the PBGC and the Senior Noteholders, since these were the parties that had the primary economic interests regarding this issue. *See* January 18, 2005 Hearing Transcript at pp. 96-97, 135-136.

Additionally, LDTC's "prejudice" contention is belied by the reality that LDTC participated in an extensive discovery process surrounding the Settlement Agreement, had ample opportunity to review thousands of documents produced during discovery and took numerous depositions of representatives of the Debtors and the PBGC. LDTC filed numerous pleadings objecting to the Settlement Agreement and even had an opportunity to retain their own "expert" to opine on the economics surrounding the amount of the PBGC's Claims. Without question, LDTC was not prejudiced by the negotiation process and had a full and complete opportunity to litigate all of the issues surrounding the amount and nature of the PBGC's Claims. For all of the reasons set forth above, the LDTC's allegations of "prejudice" and "collusion" raised in the Brief are complete bunk.[23]

---

[22]    Since the amount of the PBGC's Claims directly impacts the eventual distributions to the PBGC from these bankruptcy estates, thereby reducing or increasing the amount of monies available to be distributed to the Senior Noteholders, the Senior Noteholders had ample economic incentive to negotiate the lowest possible claim amount for the PBGC's Claims.

[23]    LDTC also argues that the Bankruptcy Court's approval of the Settlement Agreement had the effect of forcing a settlement on LDTC. However, this argument is patently ludicrous, for several reasons. First, the case cited by LDTC in support of this argument is not even remotely analogous to the facts of the instant case. LDTC relies upon *Newton v. A.C.& S., Inc.,* 918 F.2d 1121 (3d Cir. 1990) for the proposition that courts cannot coerce parties to settlement. The facts of *Newton,* however, are clearly distinguishable from the facts before this Court, as the district court in *Newton* instituted an "innovative effort to manage its docket" which included levying fines, as sanctions, on parties to litigation who had not reached consensual settlement by a certain deadline, which was set by the court. *Newton v. A.C.& S., Inc.,* 918 F.2d at 1125. By imposing these fines, the district court was attempting the persuade the

**E.    The Settlement Agreement is Binding on LDTC.**

LDTC also argues that the Bankruptcy Court erred as a matter of law when it ruled that approval of the Settlement Agreement renders the LDTC Objection moot, because a settlement agreement is only binding on the parties to the settlement.

Indeed, LDTC is not a party to the Settlement Agreement and the terms of the Settlement Agreement do not affect or impinge upon the LDTC's rights in any way whatsoever.  Law Debenture is bound, however, to respect and abide by the Settlement Agreement, as a court order.  *Petitioning Creditors of Melon Produce v. Braunstein*, 112 F.3d 1232 (1st Cir. 1997)("The finality of court-approved settlements such as this one is important, especially to the efficient administration of the estate and to reassure settling parties that the trustee will not relitigate the settled claims."); *see also Virgin Islands Bureau of Internal Revenue v. St. Croix Hotel Corp.*, 60 B.R. 412, 415 (D.V.I. 1986)("the bankruptcy court correctly concluded that the Government is bound to the plan's settlement of pre-petition taxes"). Moreover, general creditors of the debtor's estate are bound by court-approved settlements because those creditors have an identity of interest with the settling trustee. *Petitioning Creditors of Melon Produce v. Braunstein*, 112 F.3d 1232 ("the trustee in bankruptcy is a fiduciary representing the estate and creditors," and "privity may be established by identification of interests, even where representation of those interests is not authorized")(*citing In re Medomak Canning*,  922 F.2d 895, 901 (1st Cir. 1990);  *Meza v. General Battery Corp.*, 908 F.2d 1262, 1267 (5th Cir. 1990)).

LDTC was not denied the right to file an objection to the PBGC's Claims, nor was LDTC denied the right to file responsive pleadings and attend the Hearing held pursuant to Bankruptcy Rule 9019(a) to

---

defendant to change strategy because the court believed that such a change would promote earlier and more frequent settlements.  The Bankruptcy Court did not exert any such procedure in the instant case to exert any pressure on the parties to resolve the issues contained in the Settlement Agreement.  Second, the Bankruptcy Court's approval of the Settlement Agreement was not a "pressure tactic" toward any party, and most certainly not toward LDTC.  The Bankruptcy Court merely entered the Settlement Order, which approved the Settlement Agreement, after pleadings were filed by the parties and the Hearing was held on the merits of the Settlement Agreement.  The Bankruptcy Court, by approving the Settlement Agreement, was not "pressuring" or "coercing" LDTC into any change in position and any assertion to the contrary is patently absurd.  Indeed, an extrapolation of LDTC's argument would result in a conclusion that every

consider approval of the Settlement Agreement.   Indeed, LDTC filed numerous pleadings and took comprehensive discovery surrounding the Settlement Agreement.  The Hearing specifically addressed the PBGC's Claims, as a part of the Settlement Agreement, and LDTC fully participated in the Hearing. Thus, as a party bound by the Settlement Agreement, the Bankruptcy Court properly concluded that the LDTC Objection was rendered moot, because the amount and priority of the PBGC's Claims was determined as part of the Settlement Agreement.

The two cases cited by LDTC in support of this argument are both are easily distinguishable.  In *Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaguay)*, 94 F.3d 772 (2d Cir. 1996), the terms of the settlement agreement at issue fixed claims of one of the parties to the settlement at a specific amount, which threatened the rights of the debtor's insurer, Aetna, to be paid pursuant to the debtors' insurance policy.  The Second Circuit approved the settlement agreement and "expressly noted that the settlement could have no adverse effect on Aetna's rights or claims." *Chateaugay Corp. v. U.S. Dept. of Labor*, 23 F.3d 396 (2d Cir. 1994).  The Second Circuit recognized the potential harm to the debtor's insurer in *Chateguay* because although the debtor's insurer was not a party to the subject settlement agreement, the insurer was, however, a party to the insurance policy.  The insurance policy was a binding contract between the insurer and the debtor that determined rights and obligations of those parties.  The Second Circuit's express note that the settlement could have no adverse affect on Aetna's rights or claims ensured that the debtor would not violate any obligations under the insurance policy and provided Aetna with the benefit of its bargain pursuant to the insurance policy.  Conversely, LDTC is merely a creditor, rather than an insurer that is bound to perform obligations based upon the debtor's liabilities. In *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litigation*, 55 F.3d 768, 797 (3d Cir. 1995), the Third Circuit reviewed the propriety of the district court's approval of a class action settlement under Federal Rule of Civil Procedure 23, notwithstanding the fact that there were numerous objections to the fairness and reasonableness of the settlement.  The *General Motors* case is completely distinguishable.  First, the

---

time a bankruptcy court approves a settlement agreement under Bankruptcy 9019 over the objection of a party in interest it is improperly coercing the objecting party to agree to the settlement.

settlement at issue in *General Motors* was not being approved pursuant to Bankruptcy Rule 9019 but was a class action settlement under Federal Rule of Civil Procedure 23, which involves a completely different standard from the standard applied under Bankruptcy Rule 9019. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)(discussing factors for class action settlement approval). Second, the settlement in *General Motors* was a class action settlement in which there were numerous objections. Conversely, in the instant case, there was only one objection to the Settlement Agreement. Moreover, as indicated above, the Creditors' Committee, acting in the interest of all of the estate's unsecured creditors pursuant to Section 1103 of the Bankruptcy Code, supported the Settlement Agreement after diligently monitoring the entire settlement process and reviewing and analyzing the terms and conditions of the Settlement Agreement.

It bears noting that nothing in the Settlement Agreement impairs LDTC's claims or its status in the Debtors' bankruptcy proceeding. LDTC's claims remain intact and unaffected by the Settlement Agreement as does LDTC's status as a creditor of the Debtors' estates. LDTC's objections to the Settlement Agreement were heard by the Bankruptcy Court, after appropriate notice was provided to all parties in interest, including LDTC. Notwithstanding LDTC's claims to the contrary, LDTC, like every other creditor of these estates, is bound by the terms of the Settlement Agreement and because of this undeniable conclusion, the Bankruptcy Court correctly dismissed the LDTC Objection as moot.

## V.    CONCLUSION

The Bankruptcy Court acted appropriately by approving the Settlement Agreement and dismissing the LDTC Objection to the PBGC's Claims as moot. Moreover, the Bankruptcy Court properly rejected LDTC's argument that section 502 of the Bankruptcy Code somehow conflicts with Bankruptcy Rule 9019 and provides creditors like LDTC with the unfettered ability to thwart a debtor's ability to enter into settlement agreements. Accordingly, the Bankruptcy Court's Orders should be affirmed.

June 2, 2005

ASHBY & GEDDES

William P. Bowden (#2553)
Gregory A. Taylor (#4008)
222 Delaware Avenue
P.O. Box 1150
Wilmington, Delaware  19899
Phone:  302-654-1888
Fax:      302-654-1067

-and-

Lisa Beckerman
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York  10022
Phone:  212-872-1000
Fax:      212-872-1002

Brian A. Kilmer
Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana, 44th Floor
Houston, Texas  77002
Phone:  713-220-5800
Fax:      713-236-0822

ATTORNEYS FOR THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS

158033.1