# **<u>EXHIBIT A</u>**

Westlaw.

Not Reported in B.R.                                                                                                                                     Page 1
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Only the Westlaw citation is currently available.

United States Bankruptcy Court,
S.D. Ohio, Western Division.
In the Matter of FEDERATED DEPARTMENT
STORES, INC. and Allied Stores
Corporation, et al., Debtors.
No. 1-90-00130.

Jan. 10, 1992.

FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ORDER CONFIRMING THIRD AMENDED
JOINT
PLAN OF REORGANIZATION OF FEDERATED
DEPARTMENT STORES, INC., ALLIED
STORES
CORPORATION AND CERTAIN OF THEIR
SUBSIDIARIES, AS MODIFIED

J. VINCENT AUG Jr., Bankruptcy Judge.

*1 The Debtors [FN1] having proposed the Third Amended Joint Plan of Reorganization of Federated Department Stores, Inc., Allied Stores Corporation and Certain of Their Subsidiaries, filed October 28, 1991 (the "October 28 Plan") (Bankruptcy Court Doc. No. 6245), and having proposed modifications to the October 28 Plan (the "Modifications") (Bankruptcy Court Doc. No. 7379) on January 8, 1992 (the October 28 Plan, as modified by the Modifications, being referred to herein as the "Plan"); [FN2] the Court having entered an order (the "Disclosure Statement Order"), dated October 28, 1991 (Bankruptcy Court Doc. No. 6247), approving the Debtors, Disclosure Statement for the October 28 Plan under section 1125(b) of the Bankruptcy Code; the Court having reviewed the Plan, the Disclosure Statement, the Debtors' Memorandum of Law in Support of Confirmation of the Plan (the "Confirmation Memorandum"), filed on January 6, 1992 (Bankruptcy Court Doc. No. 7239), the Debtors' Memorandum of Law in Support of the Comprehensive Settlement Agreement and the Related Releases and Injunction (the "CSA Memorandum"), filed January 6, 1992 (Bankruptcy Court Doc. No. 7238), and all filed objections and responses to, and statements and comments regarding, Confirmation; the Court having heard the statements of counsel in support of and in opposition to Confirmation at a hearing before the Court commencing on January 9, 1992 (the "Confirmation Hearing"); the Court having considered all testimony presented and evidence admitted at the Confirmation Hearing; the Court having taken judicial notice of the papers and pleadings on file in the Reorganization Cases; and the Court finding that (a) notice of the Confirmation Hearing and the opportunity of any party in interest to object to Confirmation were adequate and appropriate as to all parties to be affected by the Plan and the transactions contemplated thereby and (b) the legal and factual bases set forth in the Confirmation Memorandum and the CSA Memorandum and presented at the Confirmation Hearing establish just cause for the relief granted herein; the Court hereby makes the following Findings of Fact, Conclusions of Law and order: [FN3]

I. *FINDINGS OF FACT*
A. *JURISDICTION AND VENUE*

On January 15, 1990, the Debtors commenced their respective Reorganization Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Each of the Debtors was and is qualified to be a debtor under section 109(a) of the Bankruptcy Code. The principal place of business of Federated and Allied is Cincinnati, Ohio. Accordingly, venue in the Southern District of Ohio was proper as of the Petition Date and continues to be proper.

B.        COMPLIANCE        WITH        THE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

Page 2

(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))

REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE

1. *Section 1129(a)(1)--Compliance of the Plan with Applicable Provisions of the Bankruptcy Code*

a. Sections 1122 and 1123(a)(1)-(4)--classification and Treatment of Claims

*2 Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article II of the Plan designates separate Classes of Claims and Interests, other than Administrative Claims and Priority Tax Claims, each of which contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class. In accordance with section 1122(b) of the Bankruptcy Code, the Plan provides for a Class of general Unsecured Claims of $1,000 or less for each Debtor. These Classes are reasonable and necessary for administrative convenience. Pursuant to sections 1123(a)(2)-(4) of the Bankruptcy Code, Article II of the Plan identifies each Class that is not impaired and specifies the treatment of each Class that is impaired, and Article III of the Plan provides the same treatment for each Claim or Interest within a particular Class.

b. Section 1123(a)(5)--Adequate Means for Implementation of the Plan

Article IV and various other provisions of the Plan provide adequate means for the Plan's implementation, including: (i) the revesting of the Debtors' property in the Reorganized Debtors; (ii) the Restructuring Transactions; (iii) a minimum threshold of cash on hand as a condition to the occurrence of the Effective Date; (iv) the issuance of New Debt and New Equity in exchange for existing Claims; (v) the cancellation or modification of certain existing liens pursuant to the terms of the New Debt Instruments and the New Shared Collateral Agreements; (vi) the provision of working capital by means of, among other things, the Series C Notes, the Series D Notes and the Series F L/C Facility; (vii) the cancellation or rejection of the Debt Securities Indentures; (viii) the Debtors' entry into a number of other new agreements, such as the New Tax Sharing Agreement and the New Indemnity Agreement; and (ix) the amendment or amendment and restatement of certificates or articles of incorporation, by-laws or regulations or other similar constituent documents, pursuant to Section IV.C.1 of the Plan.

c. Section 1123(a)(6)--Prohibition Against the Issuance of Nonvoting Equity Securities

Section IV.C.1.b of the Plan includes a provision prohibiting the issuance of nonvoting equity securities. As of the Effective Date, each of the Reorganized Debtors will have outstanding only one class of capital stock with voting power. Accordingly, there is no issue regarding compliance with the requirement of section 1123(a)(6) of the Bankruptcy Code that a plan of reorganization provide for an appropriate distribution of voting power among the classes of securities possessing voting power.

d. Section 1123(a)(7)--Selection of Directors and Officers in a Manner Consistent with the Interests of Creditors and Equity Security Holders and Public Policy

The Plan provides that a majority of the initial members of the New Federated Board of Directors will be New Federated Nonemployee Directors. The current proposed roster of nine directors includes five New Federated Nonemployee Directors. In addition, the Debtors have undertaken to add four more New Federated Nonemployee Directors to the current roster (the "Additional Directors"), pursuant to the procedure described in Section III.D.2.a(i) of this Confirmation Order. That procedure resulted from discussions and negotiations among representatives of the Debtors and the Creditors' Committees. After the election of the Additional Directors, nine of the 13 seats on the initial New Federated Board of Directors will be held by New Federated Nonemployee Directors. The Debtors have selected their initial directors and officers in a manner consistent with the interests of the holders of Claims and Interests and public policy, and the manner in which the Additional Directors will be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 3

chosen also is consistent with those interests and public policy.

e. Section 1123(b)(1)-(2)--Impairment of Claims and Interests and Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases

*3 Article III of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests. Article V of the Plan provides for the assumption, assumption and assignment or rejection of the executory contracts and unexpired leases of the Debtors not previously assumed, assumed and assigned or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Court.

f. Section 1123(b)(3)--Retention, Enforcement and Settlement of Claims Held by the Debtors

(i) Section IV.G.1 of the Plan provides that, except for certain claims, rights and causes of action settled, compromised or released pursuant to the Plan, the Comprehensive Settlement Agreement or any other contract, instrument, release, indenture or other agreement entered into in connection with the Plan, the Comprehensive Settlement Agreement or this Confirmation Order, the Reorganized Debtors shall retain and may enforce any claims, rights and causes of action that any Debtor or Estate may hold against any entity, including setoff rights, as provided in Section VI.G of the Plan.

(ii) Through the Comprehensive Settlement Agreement, the injunction contemplated by Sections IV.G.2 and X.B.3 of the Plan and set forth in Section III.G.2.d of this Confirmation Order (the "CSA Injunction") and the deemed release provision set forth in Section IV.G.2 of the Plan (the "Deemed Release Provision"), the Plan incorporates a complex series of compromises of potential claims. This overall settlement is predicated on an extensive investigation by the Debtors of these claims, including extensive legal and factual analysis, assisted by parallel investigations undertaken by various of the Creditors' Committees. Following this investigation and analysis, the Debtors, the FSI Debtors and numerous creditors and creditors' representatives embarked on a lengthy series of negotiations. These negotiations were conducted at arms-length and resulted in the series of compromises that together constitute the settlement.

(iii) The settlement is essential to the Plan. Without it, the Plan could not have been accomplished. Through it, various secured and senior creditors and equity security holders have made material concessions that together comprise a very significant benefit to the Estates. Hundreds of millions of dollars of value are being reallocated through the settlement, to the direct benefit of the Estates and many of the Debtors' creditors. In addition, the Debtors are realizing the very significant benefit of accomplishing an emergence from chapter 11 in far shorter a time than would otherwise be possible. This also benefits all creditors, for a prolonged chapter 11 process would have risked severe deterioration and perhaps destruction of values for all creditors.

(iv) The Court has considered four factors in weighing this settlement: (I) the probability of success in litigation; (II) the difficulties, if any, to be encountered in the matter of collection; (III) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (IV) the paramount interest of the creditors and a proper deference to their reasonable views.

*4 (v) With respect to the probability of success, the Court notes that various of the potential defendants have vigorously denied liability, and have pointed to numerous facts and circumstances that would make success on these claims more difficult or, in their view, impossible. Moreover, particularly with respect to prospective claims held by Allied, there is a question whether it could both win a monetary recovery and also avoid or equitably subordinate Claims against its Estate by the potential defendants; if not, then any recovery of funds by Allied would benefit primarily those of the potential defendants themselves who by reason of their secured and/or senior status would be the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 4

first beneficiaries of any distribution of such a recovery.

(vi) The claims would involve a substantial body of conflicting facts and law. For example, the question of the Debtors' solvency or insolvency at various times would be contested and intensely factual. So would be the question of the adequacy of the consideration received by the Debtors in the various transactions, and the nature of the conduct alleged to generate claims of breach of fiduciary duty. Claims relating to the Federated leveraged buyout would suffer from the substantial uncertainty that exists in the case law concerning such claims. There are also issues relating to statutes of limitations. Finally, the Court notes that many potential defendants have asserted that any claim against them would generate counterclaims against the Debtors, and thus that an effort to pursue these claims through litigation could end by establishing liability on the part of the Debtors themselves.

(vii) The Court additionally takes notice of the competence and experience of counsel who support this settlement, including the fact that many of the Creditors, Committees, each represented by competent counsel and aided by the services of investment bankers, have recommended the Plan, including the settlement, to their constituents.

(viii) The Court concludes that the numerous legal and factual issues involved create sufficient uncertainty regarding ultimate success on the merits as to justify the compromises embodied in the settlement.

(ix) With respect to collection on the claims, the Court finds that important potential defendants are already effectively funding the Plan as part of the settlement. The Court additionally finds that among the potential defendants are entities that may be unable to pay more than they already would under the settlement. The FSI Debtors are in chapter 11 proceedings themselves, their assets are heavily encumbered and certain of their creditors are accepting distributions worth only a fraction of their claims. Campeau Corporation is similarly in the midst of comparable proceedings in the Canadian courts, and it also has numerous creditors who are not receiving full distributions on their claims. Thus, the possibility of obtaining larger contributions from these potential defendants through litigation is unpredictable and problematic.

*5 (x) With respect to the factors of complexity, expense, inconvenience and delay, these claims are inherently complex. Many of the issues involved raise novel and unresolved issues of law that, after appeals, could take years to resolve conclusively. The factual elements that would have to be established would require extensive, costly and time-consuming discovery and then trial. For some of the claims, the procedural complexities of a class action might be required. In addition, the extraordinary number of parties that would be involved suggests that any litigation would be complex, expensive and time-consuming, even if it were somehow limited to the Debtors' own claims. It is, moreover, unlikely or impossible that there could be such a limitation; instead, numerous of the potential defendants have indicated that, if litigation were to commence, they would bring cross-claims against other potential defendants, counterclaims against the plaintiffs and third-party claims against yet additional persons. The scope of any such litigation would be enormous, and even with the most rigorous case management it would be difficult to control and bring to conclusion in any reasonable period of time.

(xi) The pursuit of litigation to conclusion would destroy the Debtors' ability to reorganize quickly and effectively. The Plan as formulated depends on the cooperation and acceptance of these potential defendants, and a number of them have made clear to the Debtors and have informed the Court that they view the settlement as an integral part of the Plan and would not support the Plan in the absence of the settlement. The participation of these persons in the Plan is so important that, absent their consent, the Plan would not be approved by the requisite creditors and could not be confirmed.

(xii) It is the Debtors' business judgment, which the Court accepts, that a prolonged chapter 11 process could cause significant employee, vendor and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 5

customer uncertainty, with a resulting significant negative impact on operations. There would be a possibility of severe loss of value, leading to the possibility of liquidation of the Debtors and heavy human, social and financial costs. Even if creditors ultimately achieved a satisfactory distribution following litigation, the pursuit of that litigation would also delay that distribution indefinitely.

(xiii) With respect to the fairness and equity of the settlement and the extent to which it comports with creditors' views, the Court finds that creditor support in favor of the settlement is overwhelming. The great bulk of the creditors have indicated their approval of the Plan, of which the settlement is an important part, and only one objects to the settlement. Moreover, the objector proposes to reap the benefits of the settlement, while objecting to releases which are part of that settlement. The Court declines to attempt to accept one portion of the settlement while rejecting other portions, and instead finds that the settlement must be viewed in its entirety. From that perspective, it is clear that even that objector largely approves of the settlement.

*6 (xiv) Specifically, all of the releases that are exchanged as part of the Comprehensive Settlement Agreement, including those of present and former officers and directors of the Debtors, are necessary to preserve the integrity of the settlement, for in the absence of such releases signatories to the Comprehensive Settlement Agreement could become indirectly liable for the very claims that they intend to compromise here. For that reason, non-Debtor signatories insisted on these releases during negotiations, and relied on them in entering into the Comprehensive Settlement Agreement. The benefit received by the Debtors for these releases is thus the very substantial benefit of accomplishing the entire settlement. The CSA Injunction and the Deemed Release Provision are similarly necessary to enforce the overall settlement and to effectuate it as fully as possible.

(xv) The objection filed by Vasiliou & Co., Inc. ("Vasiliou") is overruled. At the hearing on Confirmation, Vasiliou endorsed the fairness of the settlement embodied in the CSA and conceded the validity of that agreement. However, Vasiliou objects to the CSA Injunction and the Deemed Release Provision. Vasiliou contends that these provisions violate section 524(e) of the Bankruptcy Code because they deprive it of claims against certain non-Debtor entities relating to the Subject Transactions and Matters (as defined in the Plan and CSA). Vasiliou failed to demonstrate, either in its objection or at the hearing on Confirmation, that these provisions deprive it of any viable claim against non-Debtor entities that is outside the scope of the Debtors' authority to compromise and settle in the Plan pursuant to section 1123(b)(3) of the Code. Vasiliou asserts in its objection that it may have "fraudulent conveyance" claims against non-Debtor entities based on the Federated LBO transactions, but Vasiliou failed to persuade the Court of the existence of any such claim that was outside the scope of the Debtors' authority to compromise. Any fraudulent conveyance claim relating to this transaction that might have been assertable by a creditor prior to these bankruptcy cases is one that, upon the commencement of these cases, became a claim that the Debtors are entitled to compromise and settle on behalf of their Estates. Vasiliou failed to demonstrate that it is being deprived of any other claim that is not within the scope of the Debtors' authority to compromise and settle. The Court credits the testimony of Ronald Tysoe and James Harris. The CSA is the cornerstone of the Plan, and the Court finds that the CSA Injunction and the Deemed Release Provision are appropriate and necessary to effectuate the CSA and to enforce the global settlement of claims in the Plan. These provisions are also necessary and appropriate to prevent the Debtors' creditors, on whose behalf the compromise was achieved, from attempting, following Confirmation of the Plan, to assert claims against non-Debtor parties to the CSA that have already been settled in the Plan and CSA.

*7 As additional findings, the Court incorporates its remarks from the bench made at the confirmation hearing on January 10, 1992, pursuant to Bankr.R. 7052, particularly as to the inapplicability of § 524(e) analysis and the contribution issue.

(xvi) For a settlement to be fair and equitable, it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.   Page 6
1992 WL 605483 (Bankr.S.D.Ohio)
**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

must give appropriate priority to senior interests over junior ones. Accordingly, in determining whether this settlement is in the Estates' best interests, the relative priorities of the contested claims and the Estates' other claims are to be considered. In the case of this settlement, secured and senior creditors are providing key consideration for the settlement, and thus voluntarily relinquishing their priority to that extent. Junior creditors are receiving concomitant benefits. To the extent that secured and senior creditors continue to receive distributions in excess of those received by junior creditors, that is a reflection of their relative priorities and a confirmation of the fair and equitable nature of the settlement.

(xvii) The Court therefore concludes that, after weighing the probability of success in litigation; the difficulties, if any, to be encountered in the matter of collection; the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and the paramount interests of the creditors and a proper deference to their reasonable views, this settlement is fair, equitable, reasonable and in the best interests of the Debtors' creditors, and should be approved. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968).

g. Section 1123(b)(5)--Other Provisions Not Inconsistent with Applicable Provisions of the Bankruptcy Code

The Plan includes additional appropriate provisions that are not inconsistent with applicable provisions of the Bankruptcy Code, including: (i) the provisions of Article V of the Plan governing the assumption, assumption and assignment or rejection of executory contracts and unexpired leases (including the provisions of Section V.A.1 of the Plan allowing any Debtor or Reorganized Debtor to amend Exhibit V.A.1 to the Plan during the time periods set forth in the Plan); (ii) the provisions of Article VI of the Plan governing distributions on account of Allowed Claims, particularly as to the timing and calculation of amounts to be distributed; (iii) the provisions of Article VII of the Plan establishing procedures for resolving Disputed Claims and making distributions on account of such Disputed Claims once resolved; and (iv) the provisions of Section XII.F of the Plan regarding the severability of Plan provisions.

2. *Section 1129(a)(2)--Compliance of the Debtors with Applicable Provisions of the Bankruptcy Code*

The Debtors solicited acceptances of the Plan in accordance with the requirements of section 1125 of the Bankruptcy Code, Bankruptcy Rule 3017 and the Disclosure Statement Order, and the Debtors and their respective directors, officers, employees, agents and professionals have acted in "good faith," within the meaning of section 1125(e) of the Bankruptcy Code. Pursuant to the Disclosure Statement Order, on November 4, 1991, the Debtors mailed, by first class mail, postage prepaid, to each creditor and equity security holder specified in paragraphs 9 and 10(a) of the Disclosure Statement Order, a solicitation package containing, among other things (as applicable): (a) a summary order and notice concerning the Confirmation Hearing, the deadlines for filing objections to Confirmation and submitting ballots and certain rules governing the tabulation of votes and related matters, in an approved form (the "Summary Order"); (b) the Disclosure Statement (including certain of the Exhibits thereto); (c) the Plan (including certain of the Exhibits thereto); (d) a solicitation letter from the Debtors, in an approved form; (e) in certain solicitation packages, a letter from the appropriate Creditors' Committee recommending a vote in favor of the Plan, in an approved form; and (f) a ballot, in an approved form, together with a preaddressed, postage prepaid return envelope. In addition, pursuant to paragraph 10(b) of the Disclosure Statement Order, Price Waterhouse coordinated with Hill and Knowlton, Inc. ("Hill and Knowlton") to mail solicitation packages on November 4-5, 1991 to the banks and brokerage firms (or agents thereof) identified by Hill and Knowlton as entities through which beneficial owners hold Debt Securities or Allied Preferred Stock. Finally, pursuant to the Disclosure Statement Order, on November 8, 1991, the Debtors published the Summary Order in *The*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.                                                                                                                    Page 7
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

*Wall Street Journal* (National Edition) and *The Cincinnati Enquirer.*

*3. Section 1129(a)(3)--Proposal of Plan in Good Faith*

**\*8** The Debtors proposed the Plan in good faith and not by any means forbidden by law. Consistent with the overriding purpose of chapter 11, the Plan is designed to allow the Debtors to reorganize by providing them with a capital structure that will allow them to satisfy their prepetition obligations with sufficient liquidity and capital resources to conduct their businesses. Moreover, the Plan itself, and the process leading to its formulation, provide independent evidence of the Debtors' good faith.

*4. Section 1129(a)(4)--Bankruptcy Court Approval of Certain Payments as Reasonable*

Section III.A.1.g(ii)(I) of the Plan provides that Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for services rendered before the Effective Date (including compensation or reimbursement requested pursuant to section 503(b)(4) of the Bankruptcy Code by any Professional or other entity for making a substantial contribution in any Reorganization Case) shall file with the Court an application for final allowance of compensation and reimbursement of expenses, which the Court will review for reasonableness under sections 328 and 330 of the Bankruptcy Code and any applicable case law. Pursuant to section 331 of the Bankruptcy Code, the Order Authorizing Procedures for Interim Compensation and Reimbursement of Professionals, dated March 28, 1990 (Bankruptcy Court Doc. No. 634), as amended (the "Interim Compensation Order"), and the Opinion and Order Establishing Interim Fee and Expense Guidelines, dated July 13, 1990 (Bankruptcy Court Doc. No. 1383), as amended, the Court has authorized the monthly payment of the fees and expenses of Professionals incurred in connection with the Reorganization Cases. All such fees and expenses, however, have been subject to quarterly review and remain subject to final review for reasonableness by the Court.

*5. Section 1129(a)(5)--Disclosure of Identity and Affiliations of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy*

The Debtors have disclosed the identity and affiliations of proposed directors of the Reorganized Debtors, the manner in which the Additional Directors will be chosen and the identity and compensation of insiders who will be employed or retained by the Reorganized Debtors. As indicated in Section I.B.1.d of this Confirmation Order, once the Additional Directors are elected, nine of the 13 members of the initial New Federated Board of Directors will be New Federated Nonemployee Directors. The Debtors also have disclosed each of their officers. In general, the Debtors will retain current management post-Confirmation, and have disclosed the identity of certain senior management personnel who presently are expected to retire or otherwise terminate their employment within the reasonably foreseeable future. The appointment or continuance of the proposed directors and officers is consistent with the interests of the holders of Claims and Interests and public policy.

*6. Section 1129(a)(6)--Approval of Rate Changes*

**\*9** The Debtors' businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation.

*7. Section 1129(a)(7)--Best Interests of Creditors and Interest Holders*

With respect to each impaired Class of Claims or Interests for each Debtor, each holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the applicable Debtor were liquidated on the Effective Date under

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R. Page 8
1992 WL 605483 (Bankr.S.D.Ohio)
**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

chapter 7 of the Bankruptcy Code.

8. Section 1129(a)(8)--Acceptance of the Plan by Each Impaired Class

As indicated in Article II of the Plan, Classes F-I through F-4, FR-1 through FR-3, FR-6, FR-8, FO-1 [FN4] through FO-3, FO-4, [FN5] FO-6, A-1, A-2, A-4, AC-1 through AC-4, [FN6] AC-6, AR-1, AR-2, AR-4, AR-7, [FN7] AR-9, AO-1 through AO-4, AO-7 [FN8] and AO-9 are unimpaired. As indicated in the Declaration of Frank E. Hydoski of Price Waterhouse Regarding Transmittal, Receipt and Tabulation of Ballots (the "Solicitation and Voting Declaration"), dated January 6, 1992 (attached as Appendix B to the Confirmation Memorandum), all impaired Classes, other than Classes F-13, F-15, A-13, A-14 and A-16 through A-20, have accepted the Plan, pursuant to sections 1126(c) and (d) of the Bankruptcy Code. It is not necessary to consider Classes F-13, A-13 and A-14, however, because there are no Claims asserted in any of these Classes. Because the Plan provides that the holders of Allowed Claims or Interests in each of Classes F-15 and A-16 through A-20 will not receive or retain any property on account of these Claims and Interests, these Classes are deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. other than Class A-18--the holders of the Allied Preferred Stock--these Classes consist solely of FSI Debtors or CIBV, an affiliate of the FSI Debtors and the Debtors (collectively, the "FSI Claimants"). Each of the FSI Claimants is a party to the Comprehensive Settlement Agreement, which provides, among other things, that the FSI Claimants will "use their best efforts to obtain confirmation of the Allied-Federated Plan and of the FSI Plan...." Comprehensive Settlement Agreement, ¶ 2 at 10. This support for the Plan rebuts the presumption that the FSI Claimants rejected the Plan; accordingly, section 1129(a)(8)(A) of the Bankruptcy Code is satisfied with respect to Classes F-15, A-16, A-17, A-19 and A-20, leaving Class A-18 as the lone nonaccepting impaired Class. As indicated in Section I.B.14 of this Confirmation Order, the Plan satisfies section 1129(b)(1) of the Bankruptcy Code with respect to Class A-18.

9. Section 1129(a)(9)--Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

The Plan provides for the treatment of Administrative Claims, Priority Tax Claims and Claims entitled to priority pursuant to sections 507(a)(3)-(6) of the Bankruptcy Code in the manner required by section 1129(a)(9) of the Bankruptcy Code.

10. Section 1129(a)(10)--Acceptance By at Least One Impaired Class

*10 As indicated in the Solicitation and voting Declaration, as to each Debtor, either: (a) at least one Class of Claims or Interests that is impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider, or (b) the only Classes of Claims or Interests that are impaired are Classes of Claims or Interests held solely by insiders, and such Classes have unanimously accepted the Plan or consented to the treatment of their Claims or Interests provided for under the Plan.

11. *Section 1129(a)(11)--Feasibility of the Plan*

Confirmation of the Plan is not likely to be followed by the liquidation, or the need for financial reorganization, of any Debtor, Reorganized Debtor or any successor to any Reorganized Debtor under the Plan, except to the extent that such liquidation or reorganization is provided for under the Plan.

12. *Section 1129(a)(12)--Payment of Bankruptcy Fees*
All fees payable under 28 U.S.C. § 1930 shall be paid as soon as reasonably practicable following the Effective Date in cash equal to the amount of such fees.

13. *Section 1129(a)(13)--Retiree Benefits*

From and after the Effective Date, the Reorganized Debtors will provide for the payment of all retiree

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

benefits (as such term is defined in section 1114 of the Bankruptcy Code) at the level established and for the duration of the period the Debtors have obligated themselves to provide such benefits pursuant to the Settlement Agreement, dated January 3, 1992, between the Official Retirees' Committee and certain Debtors, which agreement the Debtors entered into pursuant to section 1114(e)(1)(B) of the Bankruptcy Code.

14. *Section 1129(b)--Confirmation of Plan Over Nonacceptance of Impaired Classes*

The Plan does not discriminate unfairly and is fair and equitable with respect to the holders of the Allied Preferred Stock (Class A-18). There are two other Classes of Interests in Allied in addition to Class A-18: Class A-19 (Common Stock Interests of Holdings II in Allied) and Class A-20 (Interests of CIBV Related to the Right to Demand Issuance of Allied Preferred Stock). All three Classes of Interests in Allied are receiving the same treatment under the Plan, and no property is being received or retained on account of the Interests in these Classes. Moreover, no Class of Claims or Interests senior to Class A-18 is receiving more than full payment on account of the Claims or Interests in such Class.

C. *SATISFACTION OF CONDITIONS TO CONFIRMATION*

Each of the conditions precedent to the entry of this Confirmation Order, as set forth in Section VIII.A of the Plan, has been satisfied.

II. *CONCLUSIONS OF LAW*
A. *JURISDICTION AND VENUE*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (D), (L) and (O). Each of the Debtors was and is qualified to be a debtor under section 109(a) of the Bankruptcy Code. Venue in the Southern District of Ohio was proper as of the Petition Date and continues to be proper under 28 U.S.C. § 1408.

B. *MODIFICATIONS OF THE PLAN*

**\*11** The notice provided by the Debtors of the Modifications was adequate and appropriate under the circumstances and, accordingly, shall be, and hereby is, approved. The Modifications: (1) comply in all respects with section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and all other provisions of the Bankruptcy Code, including sections 1122 and 1123; and (2) do not adversely change the treatment under the Plan of any Claims or Interests. In light of the technical and immaterial nature of the Modifications, no additional disclosure under section 1125 of the Bankruptcy Code is required with respect to the Modifications. Accordingly, pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, all holders of Claims and Interests that have accepted or are deemed to have accepted the October 28 Plan are conclusively presumed to have accepted the Modifications and the Plan.

C. *EXEMPTIONS FROM SECURITIES LAWS*

1. Pursuant to section 1125(e) of the Bankruptcy Code, the Debtors' transmittal of Plan solicitation packages, as described in Section I.B.2 above, their solicitation of acceptances of the Plan and their issuance and distribution of New Debt, New Equity and New Federated Share Purchase Rights pursuant to the Plan are not and will not be governed by or subject to any otherwise applicable law, rule or regulation governing the solicitation or acceptance of a plan of reorganization or the offer, issuance, sale or purchase of securities.

2. Pursuant to section 1145(a)(1) of the Bankruptcy Code, the offering, issuance and distribution of New Debt, New Equity, New Federated Share Purchase Rights, any other securities issuable pursuant to the Plan in respect of Claims or Interests and the obligations of the Reorganized Debtors with respect to the Subsidiary Trade Obligations (as such term is defined in the Disclosure Statement) shall be exempt from section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities. In addition, pursuant to section 1145(a)(2) of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Bankruptcy Code, the following transactions shall be exempt from section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities: (a) the offering, issuance and distribution of New Common Stock (including any associated New Federated Share Purchase Rights) upon the exercise of New Series A Warrants or New Series B Warrants pursuant to the New Series A Warrants Agreement and the New Series B Warrants Agreement, respectively; (b) the offering, issuance and distribution of New Common Stock (including any associated New Federated Share Purchase Rights) upon the conversion of New Senior Convertible Discount Notes pursuant to the New Senior Convertible Discount Notes Agreement; (c) the offering, issuance and distribution of New Series B Secured Notes in exchange for New Series A Secured Notes pursuant to the New Series A Secured Notes Agreement; (d) the offering, issuance and distribution of New Series D Secured Notes in exchange for New Series C Secured Notes pursuant to the New Series C Secured Notes Agreement; (e) the offering, issuance and distribution of Series A Indenture Notes (as such term is defined in the New Series A Notes Agreement) in exchange for New Series A Secured Notes pursuant to the New Series A Notes Agreement; (f) the offering, issuance and distribution of Series C Indenture Notes (as such term is defined in the New Series C Notes Agreement) in exchange for New Series C Secured Notes pursuant to the New Series C Notes Agreement; (g) the offering, issuance and distribution of Series E Indenture Notes (as such term is defined in the New Series E Notes Agreement) in exchange for New Series E Secured Notes pursuant to the New Series E Notes Agreement; and (h) the offering, issuance and distribution of New Common Stock or any other securities upon the exercise of New Federated Share Purchase Rights.

*12 3. Pursuant to and to the fullest extent permitted under section 1145 of the Bankruptcy Code, the resale of any of the securities referenced in Section II.C.2 of this Confirmation Order shall be exempt from section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution or sale of securities.

D. *EXEMPTIONS FROM TAXATION*

Pursuant to section 1146(c) of the Bankruptcy Code , the issuance, distribution, transfer or exchange of New Debt or New Equity; the creation, modification, consolidation or recording of any mortgage, deed of trust or other security interest, the securing of additional indebtedness by such means or by other means or the additional securing of existing indebtedness by such means or by other means (whether in connection with the issuance and distribution of New Debt, the modification of the Allied Credit Postpetition Receivables Agreement, the Prudential Modifications (as such term is defined in Section III.D.4 of this Confirmation Order) or otherwise); the making, assignment or recording of any lease or sublease; or the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any merger agreements or agreements of consolidation, deeds, bills of sale, assignments or other instruments of transfer executed in connection with the Restructuring Transactions, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

E. *COMPLIANCE WITH SECTION 1129 OF THE BANKRUPTCY CODE*

As set forth in Section I.B of this Confirmation Order, the Plan complies in all respects with the applicable requirements of section 1129 of the Bankruptcy Code.

F. *APPROVAL OF THE COMPREHENSIVE*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 11

*SETTLEMENT AGREEMENT AND THE OTHER SETTLEMENTS AND COMPROMISES UNDER THE PLAN*

1. Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a): (a) the settlements and compromises embodied in the Plan, including Sections IV.G.2 and X.C thereof, and the Comprehensive Settlement Agreement, and implemented through the Comprehensive Settlement Agreement, this Confirmation Order and various releases and injunctions, pursuant to Sections IV.G.2 and X.B.3 of the Plan, are fair, equitable, reasonable and in the best interests of the Debtors, the Reorganized Debtors and their respective Estates and Claim holders; and (b) the settlement or compromise of all claims or controversies relating to the termination of all contractual, legal and equitable subordination rights that any holder of a Claim or Interest may have with respect to any Allowed Claim, or any distribution to be made pursuant to the Plan on account of such Allowed Claim, is in the best interests of the Debtors, the Reorganized Debtors and their respective Estates and Claim holders and is fair, equitable and reasonable. *See Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968).

*13 2. All settlements and compromises of claims and causes of action against non-Debtor entities that are embodied in the Plan and the Comprehensive Settlement Agreement, which are approved herein as fair, equitable, reasonable and in the best interests of the Debtors, the Reorganized Debtors and their respective Estates and Claim holders, are effective and binding on all persons and entities who, prior to the filing of these chapter 11 cases, may have had standing to assert such claims or causes of action, and no person or entity shall possess such standing to assert such claims or causes of action after the Effective Date. *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.,* 884 F.2d 688, 700-01 (2d Cir.1989).

G. *AGREEMENTS, PLANS AND OTHER DOCUMENTS*

The Debtors have disclosed all material facts relating to the various contracts, instruments, releases, indentures and other agreements or documents and plans to be entered into, executed and delivered, adopted or amended by them in connection with the Plan (collectively, the "Plan Agreements and Documents"), including the following: the certificates or articles of incorporation, by-laws or regulations and other similar constituent documents of each Reorganized Debtor; the New Debt Instruments; the New Shared Collateral Agreements; each other instrument to be entered into by any Reorganized Debtor under or in connection with any New Debt Instrument; the New Federated Share Purchase Rights Agreement; the New Warrants Agreements; the Equity Plan (as such term is defined in the Disclosure Statement); the Change-in-Control Agreements (as such term is defined in the Disclosure Statement); indemnification agreements substantially in the form set forth in Exhibit IV.C.3(a) to the Plan (the 'ID & O Indemnity Agreements"); the New Indemnity Agreement; the New Tax Sharing Agreement; the New Bonus Plan (as such term is defined in the Disclosure Statement); the Filed Restructuring Instruments (as such term is defined in Section III.D.1c(ii)(I)(A) of this Confirmation Order) and all other contracts, instruments, releases and other agreements and documents relating to the Restructuring Transactions; the Stock Transfer Provisions (as such term is defined in Section III.D.3.b of this Confirmation order); the Comprehensive Settlement Agreement; the Ralphs Registration Rights Agreement; the New Administrative Services Agreement; the Prudential Modifications (as such term is defined in Section III.D.4 of this Confirmation Order); and the comprehensive reinstatement agreement with Liberty Mutual, substantially on the terms described in Section IV.J.2 of the Plan (the "Liberty Mutual Reinstatement Agreement"). Pursuant to section 303 of the Delaware General Corporation Law, section 808 of the New York Business Corporation Law, section 73 of chapter 156B of the Massachusetts Business Corporation Law, Mass. Ann. Laws ch. 156 *et seq.* (the "Massachusetts Business Corporation Law"), section 861 of chapter

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 12

450 of the Michigan Business Corporations Act, Mich. Comp. Laws ch. 450 (the "Michigan Business Corporations Act"), section 80 of chapter 10 of the Washington Business Corporations Act, Wash. Rev.Code § 23B.10.080, section 1008 of chapter 607 of the Florida Business Corporations Act, Fla. Stat. § 607.1008, and any comparable provision of the business corporation laws of any other state (collectively, the "State Reorganization Effectuation Statutes"), as applicable, no action of the respective directors or stockholders of any Reorganized Debtor will be required to authorize such Reorganized Debtor to enter into, execute and deliver, adopt or amend, as the case may be, the Plan Agreements and Documents, and following the Effective Date, each of the Plan Agreements and Documents will be a legal, valid and binding obligation of such Reorganized Debtors as are parties thereto, enforceable against such Reorganized Debtors in accordance with the respective terms thereof (subject only to bankruptcy, insolvency and other similar laws affecting creditors' rights generally, and subject also to general equitable principles).

H. POST-CONFIRMATION ASSUMPTIONS, ASSUMPTIONS AND ASSIGNMENTS AND SECTIONS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*14 Each post-Confirmation assumption, assumption and assignment or rejection of an executory contract or unexpired lease pursuant to Sections V.A and V.C of the Plan, including any assumption, assumption and assignment or rejection effectuated as a result of any amendment to Exhibit V.A.1 to the Plan, as contemplated by Section V.A.1 of the Plan and Section III.F.2 of this Confirmation Order, shall be legal, valid and binding upon the applicable Debtor or Reorganized Debtor and all non-Debtor parties to such executory contract or unexpired lease, all to the same extent as if such assumption, assumption and assignment or rejection had been effectuated pursuant to an appropriate authorizing order of this Court entered before the Confirmation Date under section 365 of the Bankruptcy Code.

III. ORDER  
A. CONFIRMATION OF THE PLAN

All objections and responses to, and statements and comments regarding, the Plan, other than those withdrawn in writing prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are, expressly overruled. The Plan and each of its provisions shall be, and hereby are, confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code; *provided,* however, that if there is any direct conflict between the terms of the Plan and the terms of this Confirmation Order, the terms of this Confirmation order shall control.

B. EFFECTS OF CONFIRMATION

1. *Immediate Effectiveness; Successors and Assigns*

Subject to the provisions of Section VIII.B of the Plan, immediately upon the entry of this Confirmation order, the terms of the Plan shall be, and hereby are, deemed binding upon each of the Debtors, the Reorganized Debtors, any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted or are deemed to have accepted the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors and the respective heirs, executors, administrators, successors or assigns, if any, of any of the foregoing.

2. *Continued Corporate Existence; Vesting of Assets*

Subject to the Restructuring Transactions, each Debtor shall, as a Reorganized Debtor, continue to exist as of the Effective Date as a separate corporate entity, with all of the powers of a corporation under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable state law. Except as otherwise provided in or contemplated by the Plan, the New Debt Instruments, the New Shared Collateral Agreements, the Prudential

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Modifications (as such term is defined in Section III.D.4 of this Confirmation Order) and any contracts, instruments, releases, indentures, mortgages, deeds, assignments, leases or other agreements and documents evidencing any postpetition receivables or other credit facility of the Debtors approved by this Court, on the Effective Date, all property of the respective Estates of the Debtors, and any property acquired by a Debtor or Reorganized Debtor under any provision of the Plan or the FSI Plan, shall vest in the applicable Reorganized Debtor, free and clear of all Claims, liens, charges, other encumbrances and Interests. Except as otherwise provided in the Plan or this Confirmation order, on and after the Effective Date, each Reorganized Debtor may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims or Interests without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professionals' fees, disbursements, expenses or related support services without application to the Court.

3. *Cancellation of Capital Stock*

*15 Immediately prior to the Effective Date, each share of capital stock of Federated and Allied issued and outstanding or held in treasury, including the Common Stock of Federated, the Allied Preferred Stock and the Common Stock of Allied, shall be canceled and retired and no consideration shall be paid or delivered with respect thereto, in all events without any action on the part of the holders thereof.

C. CLAIMS BAR DATES

1. Bar *Dates for Administrative Claims*

a. *General Bar Date Provisions*

Except as provided below, requests for payment of Administrative Claims must be filed and served on the Reorganized Debtors no later than 30 calendar days after the Effective Date. Holders of Administrative Claims that are required to file and serve a request for payment of such Claims and that do not file and serve a request by the applicable bar date shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective property. Objections to such requests must be filed and served on the Reorganized Debtors and the requesting party no later than 90 calendar days after the Effective Date.

b. *Bar Dates for Certain Administrative claims*

(i) *Professionals.* Notwithstanding any provision to the contrary in the Interim Compensation Order, Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code (including compensation or reimbursement requested pursuant to section 503(b)(4) of the Bankruptcy Code by any Professional or other entity for making a substantial contribution in any Reorganization Case) shall file and serve on the Reorganized Debtors an application for final allowance of compensation and reimbursement of expenses (which shall include an application for allowance of compensation and reimbursement of expenses for the period from October 1, 1991 through the Effective Date) no later than 60 calendar days after the Effective Date; *provided, however,* that any Professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals' Compensation Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Effective Date, without further review or approval by this Court, pursuant to the Ordinary Course Professionals' Compensation Order. Objections to applications of Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the appropriate Reorganized Debtors and the requesting party no later than 90 calendar days after the Effective Date.

(ii) *Ordinary Course Liabilities.* Holders of Administrative Claims based on liabilities incurred by a Debtor in the ordinary course of its business (including Administrative Claims of governmental

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

units for taxes) shall not be required to file or serve any request for payment of such Claims.

**\*16** (iii) *Claims Under Certain Postpetition Financing Agreements; Intercompany Administrative Claims.* Holders of Administrative Claims under or evidenced by the Allied Postpetition Credit Agreement or the Allied Credit Postpetition Receivables Agreement and Debtors or Affiliates holding Inter-Company Balances or other Administrative Claims shall not be required to file or serve any request for payment of such Claims. Such Claims shall be satisfied pursuant to Sections III.A.1.d through III.A.1.f of the Plan.

*2. Bar Date for Rejection Damages Claims*

If the rejection by a Debtor of an executory contract or unexpired lease pursuant to Section V.C of the Plan gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, their respective successors or their respective properties unless a proof of Claim is filed and served on the applicable Reorganized Debtor no later than 30 calendar days after the Effective Date.

*3. Supplemental Bar Dates Applicable to State Tax Claims*

Pursuant to Bankruptcy Rule 3003(c)(3) and this Court's Order Establishing Additional Bar Dates for Certain States to File Proofs of Claim Relating to Certain Tax Issues, dated September 27, 1991 (Bankruptcy Court Doc. No. 5934), the Debtors have served separate notices (Bankruptcy Court Doc. Nos. 6347, 6718 and 7208) of three separate bar dates (the "Supplemental Tax Bar Dates") by which certain taxing authorities may file proofs of Claim (the "Supplemental Tax Claims") for certain specified tax obligations. Notwithstanding the provisions of Section VII.A.1 of the Plan, the last date on which the appropriate Debtors or Reorganized Debtors may file objections to any Supplemental Tax Claims shall be, and hereby is, 180 calendar days after the Supplemental Tax Bar Date that relates to such Supplemental Tax Claims.

D. *MATTERS RELATING TO IMPLMENTATION OF THE PLAN*

1. *Certain Restructuring Transactions and Corporate Filings*

As of or following the time at which the conditions to the occurrence of the Effective Date set forth in Section VIII.B of the Plan are satisfied or duly waived, pursuant to the State Reorganization Effectuation Statutes, as applicable, other appropriate provisions of applicable state business corporation laws and sections 1123(a) and 1142(b) of the Bankruptcy Code, the appropriate Debtors or Reorganized Debtors shall be, and hereby are, authorized to effectuate the following Restructuring Transactions and make the following filings, all as contemplated by Sections IV.B and IV.C.1, respectively, of the Plan, and in each case in accordance with applicable terms of the Plan, the Exhibits thereto and this Confirmation order:

a. *The Restructuring Transactions*

(i) *Delaware Restructuring Transactions*

(I) *The Federated/Allied Combination Transactions.* Reorganized Allied shall be merged with and into Reorganized Federated, the separate corporate existence of Reorganized Allied shall thereupon cease and New Federated shall be the surviving corporation pursuant to the applicable provisions of the Delaware General Corporation Law. Prior to or after the Effective Time of the Federated/Allied Combination Transactions, Federated, Reorganized Federated, Allied and/or Reorganized Allied, as appropriate, shall take such actions as any of the Chairman, Vice Chairman, President, any Executive or Senior Vice President, any Vice President or the Secretary of the applicable Debtor or Reorganized Debtor (collectively, the "Responsible officers") may determine are necessary or appropriate to effectuate such transactions, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Delaware General Corporation

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 15

Law. Notwithstanding any other provision of the Plan or this Confirmation Order, if all of the conditions to the effectiveness of the Plan set forth in Section VIII.B thereof shall be determined to have been satisfied or, to the extent expressly permitted under and in the manner provided in the Plan, duly waived by the Debtors, then for accounting, tax and/or other computational purposes, the Effective Date may be on such date or at such time as New Federated may elect and as shall be specified in the Plan Closing Memorandum (as such term is defined in Section III.D.1c(iv) of this Confirmation Order); *provided,* however, that, unless otherwise agreed by the Debtors and the FSI Debtors, in no event shall the Effective Date occur on any date earlier than one day after the FSI Plan Effective Date.

*17 (II) *The Burdine's/Maas Merger.* Federated, Reorganized Federated or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Burdines, Inc., an Ohio corporation ("New Burdines"), under the Ohio General Corporation Law. Thereafter, Reorganized Burdine's and Reorganized Maas shall be merged with and into New Burdines, the separate corporate existence of Reorganized Burdine's and Reorganized Maas shall thereupon cease and New Burdines shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized Burdine's and Reorganized Maas shall take such actions as any of their respective Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

(III) *Organization of New A & S and New Lazarus.* After the Effective Time of the Federated/Allied Combination Transactions, New Federated shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Abraham & Straus, Inc., an Ohio corporation ("New A & S"), and Lazarus, Inc., an Ohio corporation ("New Lazarus"), under the Ohio General Corporation Law, and to transfer substantially all of the assets (excluding certain real estate interests to be transferred to Reorganized A & S Real Estate, Inc. and Reorganized Lazarus Real Estate, Inc., respectively) and certain of the liabilities associated with Federated's Abraham & Straus and Lazarus divisions to New A & S and New Lazarus, respectively, including the execution and delivery of appropriate instruments of contribution, transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation.

(IV) *The New Lazarus/Reorganized Block's, Inc. Merger.* Following the organization of New Lazarus, Reorganized Block's, Inc. shall be merged with and into New Lazarus, the separate corporate existence of Reorganized Block's, Inc. shall thereupon cease and New Lazarus shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized Block's, Inc. shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

(V) *Ohio Reincorporation of Reorganized Bloomingdale's.* Federated, Reorganized Federated or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Bloomingdale's, Inc., an Ohio corporation ("New Bloomingdale's"), under the Ohio General Corporation Law. Thereafter, Reorganized Bloomingdale's shall be merged with and into New Bloomingdale's, the separate corporate existence of Reorganized Bloomingdale's shall thereupon cease and New Bloomingdale's shall be the surviving corporation pursuant to the applicable provisions of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 16

the Ohio General Corporation Law and the Delaware General Corporation Law. Prior to the effective time of such merger, Reorganized Bloomingdale's shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

**\*18** (VI) *Ohio Reincorporation of Reorganized Jordan* Marsh. Allied, Reorganized Allied or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Jordan Marsh Stores Corporation, an Ohio corporation ("New Jordan Marsh"), under the Ohio General Corporation Law. Thereafter, Reorganized Jordan Marsh shall be merged with and into New Jordan Marsh, the separate corporate existence of Reorganized Jordan Marsh shall thereupon cease and New Jordan Marsh shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized Jordan Marsh shall take such actions as any of its Responsible officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

(VII) *Ohio Reincorporation of Reorganized Stern's.*
Allied, Reorganized Allied or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Stern's, Inc., an Ohio corporation ("New Stern's"), under the Ohio General Corporation Law (*provided, however,* that, if determined by any such Responsible Officer to be necessary or appropriate, New Stern's may be named "Stern's Department Stores, Inc.," or such other name as such Responsible Officer may select). Thereafter, Reorganized Stern's shall be merged with and into New Stern's, the separate corporate existence of Reorganized Stern's shall thereupon cease and New Stern's shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized Stern's shall take such actions as any of its Responsible officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

(VIII) *Ohio Reincorporation of Reorganized The Bon.* Allied, Reorganized Allied or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize The Bon, Inc., an Ohio corporation ("New The Bon"), under the Ohio General Corporation Law. Thereafter, Reorganized The Bon shall be merged with and into New The Bon, the separate corporate existence of Reorganized The Bon shall thereupon cease and New The Bon shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized The Bon shall take such actions as any of its Responsible officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

**\*19** (IX) *Ohio Reincorporation of Reorganized Rich's.* Federated, Reorganized Federated or New Federated, as appropriate, shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to organize Rich's, Inc., an Ohio corporation ("New Rich's"), under the Ohio General Corporation Law (*provided,* however, that,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in B.R.  
1992 WL 605483 (Bankr.S.D.Ohio)

**(Cite as: 1992 WL 605483 (Bankr.S.D.Ohio))**

Page 17

if determined by any such Responsible Officers to be necessary or appropriate, New Rich's may be named "Rich's Department Stores, Inc.," or such other name as such Responsible Officer may select). Thereafter, Reorganized Rich's shall be merged with and into New Rich's, the separate corporate existence of Reorganized Rich's shall thereupon cease and New Rich's shall be the surviving corporation pursuant to the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law. Reorganized Rich's shall take such actions as any of its Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Ohio General Corporation Law and the Delaware General Corporation Law.

(X) *Merger of A & S Real Estate Subsidiaries.* Reorganized A & S Extra Real Estate, Inc., Reorganized A & S Galleria Real Estate, Inc. and Reorganized A & S Walt Whitman Real Estate, Inc. (collectively, the "Merging A & S Real Estate Subsidiaries") shall be merged with and into Reorganized A & S Real Estate, Inc., the separate corporate existence of the Merging A & S Real Estate Subsidiaries shall thereupon cease and Reorganized A & S Real Estate, Inc. shall be the surviving corporation pursuant to the applicable provisions of the Delaware General Corporation Law. Reorganized A & S Real Estate, Inc. and the Merging A & S Real Estate Subsidiaries shall take such actions as any of their respective Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Delaware General Corporation Law.

(XI) *Merger of Bloomingdale's Real Estate Subsidiaries.* Reorganized Bloomingdale's Extra Real Estate, Inc., Reorganized Bloomingdale's Short Hills Real Estate, Inc., Reorganized Bloomingdale's King of Prussia Real Estate, Inc., Reorganized Bloomingdale's White Flint Real Estate, Inc., Reorganized Bloomingdale's Willow Grove Real Estate, Inc., Reorganized Bloomingdale's Boca Raton Real Estate, Inc. and Reorganized Bloomingdale's Properties, Inc. (collectively, the "Merging Bloomingdale's Real Estate Subsidiaries") shall be merged with and into Reorganized Bloomingdale's Real Estate, Inc., the separate corporate existence of the Merging Bloomingdale's Real Estate Subsidiaries shall thereupon cease and Reorganized Bloomingdale's Real Estate, Inc. shall be the surviving corporation pursuant to the applicable provisions of the Delaware General Corporation Law. Prior to the effective time of such merger, Reorganized Bloomingdale's Real Estate, Inc. and the Merging Bloomingdale's Real Estate Subsidiaries shall take such actions as any of their respective Responsible officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Delaware General Corporation Law.

*20 (XII) *Merger of Lazarus Real Estate Subsidiaries.* Reorganized Lazarus Extra Real Estate, Inc. and Reorganized Lazarus Extra Real Estate II, Inc. (collectively, the "Merging Lazarus Real Estate Subsidiaries") shall be merged with and into Reorganized Lazarus Real Estate, Inc., the separate corporate existence of the Merging Lazarus Real Estate Subsidiaries shall thereupon cease and Reorganized Lazarus Real Estate, Inc. shall be the surviving corporation pursuant to the applicable provisions of the Delaware General Corporation Law. Reorganized Lazarus Real Estate, Inc. and the Merging Lazarus Real Estate Subsidiaries shall take such actions as any of their respective Responsible Officers may determine are necessary or appropriate to effectuate such merger, including the execution and delivery of an appropriate agreement and plan of merger and the making of such filings in connection therewith as may be required under the applicable provisions of the Delaware General Corporation Law.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.