IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re: KAISER ALUMINUM CORPORATION,
et al., Debtors.

---

| | |
|---|---|
| LAW DEBENTURE TRUST COMPANY OF NEW YORK,<br><br>Appellant,<br><br>v.<br><br>KAISER ALUMINUM CORPORATION, et al.,<br><br>Appellees. | Civ. No. 05-135 (JJF)<br><br><br>Bankr. No. 02-10429 (JKF) |

## ANSWERING BRIEF OF APPELLEE
## PENSION BENEFIT GUARANTY CORPORATION

KATHLEEN M. MILLER (2898)
Smith Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE 19899
Delaware bar # 2898
(302) 652-8400 (phone)
(302) 652-8405 (fax)
kmiller@skfdelaware.com

JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
JAMES L. EGGEMAN
Attorney
JOEL W. RUDERMAN
Attorney

PENSION BENEFIT GUARANTY
CORPORATION
Office of Chief Counsel
1200 K Street, N.W.
Washington, DC 20005-4026
(202) 326-4020 (phone)
(202) 326-4112 (fax)
efile@pbgc.gov

June 2, 2005

# TABLE OF CONTENTS

Table of Authorities .................................................................. ii

STATEMENT OF THE CASE ........................................................ 1

I.   Nature of the Case, Course of Proceedings, and
     Disposition in the Bankruptcy Court .......................................... 1

II.  Summary of Argument ......................................................... 3

III. Statement of Facts ............................................................. 4

     A.   The Debtors' Pension Plans and Negotiations with PBGC ................. 4

     B.   The PBGC Settlement ................................................... 9

     C.   PBGC's Claims on October 14, 2004 .................................. 11

     D.   The January 18, 2005 Hearing ........................................ 13

ARGUMENT ........................................................................ 13

I.   Standard of Review ........................................................... 14

II.  The Bankruptcy Court's Decision to Stay Law Debenture's Claims
     Objection was Correct ....................................................... 14

     A.   Law Debenture Lacked Standing to Object to PBGC's Claims ............ 16

     B.   There is no Conflict between Bankruptcy Code § 502(a) and
          Bankruptcy Rule 9019 ................................................ 17

III. The Bankruptcy Court's Approval of the PBGC Settlement was Correct ........... 19

     A.   The Standard for Approving Settlements in Bankruptcy Court ........... 19

     B.   The Bankruptcy Court Correctly Determined that Law Debenture's
          Claims Objection is Moot ............................................ 29

CONCLUSION ...................................................................... 31

# TABLE OF AUTHORITIES

## Federal Cases

*Alleghany International, Inc.* (In re),
   954 F.2d 167 (3d Cir. 1992) .................................................. 18

*Baron & Budd, P.C. et al. v. Unsecured Asbestos Claimants Committee,*
   321 B.R. 147 (D. N.J. 2005) .................................................. 14

*Butner v. United States,*
   440 U.S. 48 (1979) .................................................. 23

*Case v. L.A. Lumber Prods. Co.,*
   308 U.S. 106 (1939) .................................................. 19, 20

*Chateaugay Corp,* (In re)
   94 F.3d 772 (2nd Cir. 1996) .................................................. 30

*Chateaugay Corp.* (LTV) (In re),
   115 B.R. 760 (Bankr. S.D.N.Y. 1990),
   vacated, *LTV Corp. v. PBGC* (In re)
   17 E.B.C. 1102 (S.D.N.Y. 1993) .................................................. 23

*Church of Scientology v. United States,*
   506 U.S. 9 (1992) .................................................. 29

*Columbia Packing v. PBGC,*
   81 B.R. 205 (D. Mass. 1988) .................................................. 21

*Combustion Eng'g* (In re),
   391 F.3d 190 (3d Cir. 2004) .................................................. 15

*Coram Healthcare Corp.* (In re),
   315 B.R. 321 (Bankr. Del. 2004) .................................................. 20

*Cosoff v. Rodman* (In re *W.T. Grant Co.*),
   699 F.2d 599 (2d Cir. 1983) .................................................. 20

*CSC Industries, Inc.* (In re)
   232 F.3d 505 (6th Cir. 2000) .................................................. 24

*Dow Corning Corp.* (In re),
    244 B.R. 721 (Bankr. E.D. Mich. 1999) .................................... 17

*Energy Resources Co.* (In re),
    495 U.S. 545 (1990) ................................................. 14, 15

*Fred Reuping Leather Co. v. Fort Greene Nat'l Bank*,
    102 F.2d 372 (3d Cir. 1939) ............................................ 17

*Fry's Metals, Inc. v. Gibbons (In re RFE Industries., Inc.)*,
    283 F.3d 159 (3d Cir. 2002) ........................................... 20

*General Motors Corp. Pick-Up Truck Fuel Tank*
    *Prods. Liab. Litig.* (In re),
    55 F.3d 768 (3d Cir. 1995) ............................................ 30

*Gloria Mfg. Corp.* (In re),
    47 B.R. 370 (E.D. Va. 1984) ........................................... 16

*Grogan v. Garner*,
    498 U.S. 279 (1991) .................................................. 23

*Hechinger Inv. Co. of Delaware* (In re),
    298 F.3d 219 (3d Cir. 2002) ........................................... 14

*Mills v. Green*,
    159 U.S. 651 (1895) .................................................. 29

*Myer v. Martin* (In re *Martin*),
    91 F.3d 389 (3d Cir. 1996) ....................................... passim

*Nationwide Sports Distribs., Inc.* (In re),
    227 B.R. 455 (Bankr. E.D. Pa 1998) .................................... 18

*Neshaminy Office Bldg. Assoc.* (In re),
    62 B.R. 798 (E.D. Pa. 1986) ........................................... 20

*NLRB v. Bildisco & Bidisco*,
    465 U.S. 513 (1984) .................................................. 14

*North Carolina ex rel. Long v. United States*,
    1999 U.S. Appellate LEXIS 7513 (4th Cir. 1988) ...................... 21

*Patterson v. Shumate*,
    504 U.S. 753 (1992) .................................................. 23

*Pennsylvania Truck Lines* (In re),
    150 B.R. 595 (E.D. Pa 1992) ........................................... 21

*Protective Comm. for Indep. Stockholders of TMT*
    *Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ............................................... 19, 20

*Raleigh v. Illinois Dep't of Revenue*,
    530 U.S. 15 (2000) ............................................. 22, 23, 24

*RFE Indus.* (In re),
    283 F.3d 159 (3d Cir. 2002) ....................................... 18, 20

*Sacred Heart Hospital of Norristown v. Commonwealth of Penn. Dept.*
    *of Pub. Welfare* (*In re Sacred Heart Hospital of Norristown*),
    133 F.3d 237 (3d Cir. 1988) ........................................... 14

*Simon* (In re),
    179 B.R. 1 (Bankr. D. Mass 1995) ..................................... 17

*United States v. Energy Resources Co.*
    495 U.S. 545 (1990) .................................................. 14

*U.S. Airways Group, Inc.* (In re),
    303 B.R. 784 (E.D. Va 2003) ..................................... passim

*Vanston Bondholders Protective Comm. v. Green*,
    329 U.S. 156 (1946) ........................................... 22, 23, 24

**United States Code Cited**

Title 11
    Section 105 ....................................................... 4, 15
    Section 105(a) .................................................. 14, 15
    Section 105(d) ...................................................... 15
    Section 502(a) ............................................. 4, 17, 18, 19
    Section 507(a)(1) .................................................... 6
    Section 524(g) ...................................................... 15
    Section 704 ......................................................... 16
    Section 704(5) ...................................................... 16

    Section 1107 .................................................... 16
    Section 1108 .................................................... 16

Title 26
    Section 412 .................................................. 6, 10
    Section 414(b) ................................................... 1
    Section 414(c) ................................................... 1
    Section 541(a)(1) ............................................... 23
    Section 541(c)(2) ............................................... 23
    Section 7527(d)(2) .............................................. 10

Title 29
    Section 302 ...................................................... 6
    Section 1301-1461 ................................................ 1
    Section 1301(a)(14) .............................................. 1
    Section 1302(a)(1) ............................................... 2
    Section 1302(a)(2) ............................................... 2
    Section 1302(a)(3) ............................................... 2
    Section 1307 ..................................................... 6
    Section 1341(c) .................................................. 7
    Section 1341(b) .................................................. 7
    Section 1341(c)(2) ............................................... 7
    Section 1341(c)(2)(B)(ii)(iv) ................................... 10
    Section 1342(a) .................................................. 6
    Section 1362(b) .................................................. 5
    Section 1362(c) .................................................. 5

## OTHER AUTHORITIES CITED

Treas. Reg. § 1.414(b)-1 .............................................. 1

Treas. Reg. § 1.414(c)-2 .............................................. 1

Collier on Bankruptcy ¶ 502.02[2][d] (15th ed. 1993) ................. 16

Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993) ............... 19, 20

Fed. R. Bankr. P. ............................................... passim

PBGC 2004 Annual Report .............................................. 1

## STATEMENT OF THE CASE

**I.    Nature of the Case, Course of Proceedings, and Disposition in the Bankruptcy Court**

The Pension Benefit Guaranty Corporation ("PBGC") is the federal government agency that regulates the termination of defined benefit pension plans under Title IV of the Employee Retirement Income Security Act ("ERISA"),[1] and guarantees the payment of certain pension benefits under those plans. PBGC currently insures more than 31,000 pension plans, and pays nearly $2.5 billion annually in benefits to more than 459,000 participants of terminated plans and their beneficiaries.[2] PBGC guarantees the payment of pension benefits of participants under eight defined benefit pension plans currently or formerly sponsored by debtors Kaiser Aluminum & Chemical Corporation ("KACC") and Kaiser Bellwood Corporation.[3]

PBGC has performed several functions during the Debtors' consolidated bankruptcy proceedings. It is a creditor of each and every member of the Debtors' controlled group of trades or businesses[4] for liabilities arising from the termination of pension plans under Title IV of

---

[1] 29 U.S.C. §§ 1301-1461 (2000 & Supp. II 2002).

[2] PBGC Annual Report (2004), www.pbgc.gov/publications/annrpt, at p. 2 & inside front cover.

[3] PBGC is now statutory trustee and guarantor of benefits with respect to the three largest KACC-sponsored pension plans, covering just under 18,000 participants. PBGC initiated the termination of the Kaiser Salaried Plan in December 2003, approved the distress termination of the Kaiser Inactive Pension Plan in July 2004, and approved the distress termination of the Kaiser Aluminum Pension Plan ("Hourly" or "KAPP") on September 30, 2004. The five other pension plans are as follows: Kaiser Aluminum Sherman Pension Plan, the Kaiser Aluminum Tulsa Pension Plan, the Kaiser Aluminum Bellwood Pension Plan, the Kaiser Aluminum Los Angeles Extrusion Pension Plan, and the Kaiser Garage Pension Plan.

[4] A "controlled group" is a group of trades or businesses under common control, *e.g.*, a parent corporation and its 80-percent owned subsidiaries. *See* 29 U.S.C. § 1301(a)(14); 26 U.S.C. § 414(b), (c); Treas. Reg. § 1.414(b)-1, (c)-2.

ERISA. It is the administrator of the termination insurance program under Title IV of ERISA, charged with encouraging the continuation and maintenance of private pension plans, providing timely and uninterrupted payment of benefits under insured pension plans, and maintaining insurance premiums at the lowest level consistent with its obligations under ERISA Title IV.[5] And, like appellant Law Debenture Trust Company of New York, as Indenture Trustee ("Law Debenture"), PBGC is also a member of the Official Committee of Unsecured Creditors (the "Creditors' Committee").[6]

Even before the Debtors' Chapter 11 proceedings in February of 2002, representatives of the Debtors were meeting with PBGC, in its capacity as the administrator of the termination insurance program, concerning the Debtors' ability to continue to maintain their eight defined benefit pension plans. PBGC is not only the administrator of the pension termination insurance program, but also one of the Debtors' largest creditors. As the bankruptcy proceedings progressed and the issues concerning the Debtors' pension plans became more complex, both PBGC and the Debtors recognized the advantages of a global settlement of all pension-related issues.

As set forth in greater detail below, PBGC and the Debtors entered into a global

---

[5] 29 U.S.C. § 1302(a)(1) - (3).

[6] D.I. 6099: Transcript of Hearing Held ("Jan. 18, 2005 Transcript") at 136. Law Debenture represents as Indenture Trustee one of two groups of holders of unsecured notes ("Senior Subordinated Noteholders") in the amount of $400 million issued by KACC and guaranteed by certain KACC subsidiaries defined below as the alumina estates. Under Law Debenture's indenture, Law Debenture's claims against KACC are subordinate to the claims of the other group of holders of unsecured notes (the "Senior Noteholders"). Law Debenture is litigating whether its claims against the alumina estates are subordinate or *pari passu* to the claims of the Senior Noteholders.

settlement on October 14, 2004 (the "PBGC Settlement"). On October 22, 2004, the Debtors filed, pursuant to Fed. R. Bankr. P. ("Bankruptcy Rule") 9019, a motion to approve the PBGC Settlement. Before the PBGC Settlement was signed, however, on September 15, 2004, Law Debenture filed an objection to PBGC's proofs of claim that PBGC had filed in January 2003.[7] Although the PBGC Settlement resolved all outstanding issues between PBGC and the Debtors, Law Debenture's objection focused on the method by which PBGC calculated its claim for unfunded benefit liabilities. The Bankruptcy Court stayed Law Debenture's claims objection pending its consideration of the PBGC Settlement.

On January 18, 2005, the Bankruptcy Court conducted an evidentiary hearing pursuant to Bankruptcy Rule 9019 to evaluate the PBGC Settlement. On January 24, 2005, the Bankruptcy Court approved the PBGC Settlement under the standard set forth in *Myers v. Martin (In re Martin)*.[8] Law Debenture appeals the Bankruptcy Court's orders staying its claims objection and approving the PBGC Settlement.

## II. Summary of Argument

A. Compromises are favored in bankruptcy to minimize litigation and expedite the administration of a bankruptcy estate. PBGC negotiated a settlement with the Debtors to resolve numerous complex issues under ERISA and the Bankruptcy Code that, in conjunction with the other court-approved agreements in the Debtors' cases, will assist the Debtors in successfully reorganizing and thereby benefit all creditors of the Debtors' estates.

B. The Bankruptcy Court appropriately exercised its discretion under Bankruptcy

---

[7] Brief for Appellant ("Law Debenture's Brief") at 5-6.

[8] 91 F.3d 389, 393 (3d Cir. 1996).

-3-

Code § 105 in staying Law Debenture's claims objection while it evaluated the PBGC Settlement. Because the Debtors are Debtors in Possession, charged with the duties of a trustee under Bankruptcy Code § 704(5) to examine and object to claims, Law Debenture lacked standing to assert its claims objection. Furthermore, there is no inherent conflict between Bankruptcy Code § 502(a) and Bankruptcy Rule 9019 that precluded the Bankruptcy Court from staying Law Debenture's claims objection pending its consideration of the motion to approve the PBGC Settlement.

    C.    The Bankruptcy Court correctly found that the PBGC Settlement satisfied the standards under *Myers v. Martin* and correctly determined that the settlement should be approved. The Bankruptcy Court did not abuse its discretion in approving the settlement.

    D.    In finding that the PBGC Settlement was in the best interests of the Debtors' estates and dismissing Law Debenture's claims objection as moot, the Bankruptcy Court did not abuse its discretion.

## III. Statement of Facts

### A. The Debtors' Pension Plans and Negotiations with PBGC

On February 12, 2002, Kaiser Aluminum Corporation ("KAC"), KACC, and 14 affiliates and subsidiaries filed petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (hereinafter, the "Court" or the "Bankruptcy Court"). On March 15, 2002, an additional two subsidiaries of KACC filed Chapter 11 petitions. These cases were administratively but not substantively consolidated.

When the Debtors filed their initial Chapter 11 petitions, the eight pension plans were

-4-

substantially underfunded.[9] As of December 31, 2001, the Debtors' actuarial consultant projected that the aggregate underfunding for the eight pension plans amounted to $376 million.[10] At a series of meetings with PBGC, beginning in November 2002, the Debtors asserted that they could not afford the pension plans.[11]

By 2003, the extent of underfunding had significantly increased. This increase in underfunding was attributable to pension asset loss in excess of 10 percent, the distribution of lump sum benefits to retiring employees under the Kaiser Salaried Plan, and a decrease in the interest factor that PBGC used in calculating unfunded benefit liabilities.[12] As a result, in 2003, the aggregate underfunding of the pension plans ballooned to $671 million.[13]

On January 14, 2003, nine additional subsidiaries of KACC filed Chapter 11 petitions. On January 29, 2003, PBGC filed 24 proofs of claim against the Debtors with respect to the eight pension plans, asserting the following estimated claims: (1) unfunded benefit liabilities in the amount of $620 million pursuant to 29 U.S.C. § 1362(b); (2) minimum funding contributions in the amount of $17.1 million regarding the Kaiser Salaried Plan and in an unliquidated amount regarding the other seven pension plans pursuant to 29 U.S.C. § 1362(c); and (3) statutory insurance premiums in an unliquidated amount regarding the eight pension plans pursuant to 29

---

[9] D.I. 5909, Declaration of John Barneson ("Barneson Decl."), ¶ 2.

[10] D.I. 5907, Declaration of Norman Parrish ("Parrish Decl."), ¶ 4.

[11] Barneson Decl., ¶ 6.

[12] Parrish Decl., ¶ 6.

[13] Parrish Decl., ¶ 6.

U.S.C. § 1307.[14]

In September 2003, the Debtors met with PBGC to initiate negotiations regarding PBGC's claims.[15] The Debtors presented PBGC their analysis of PBGC's claims for unfunded benefit liabilities. Instead of calculating those claims under ERISA and PBGC's regulations, the Debtors discounted the liabilities using a "prudent investor rate" of 9 percent.[16] Using the prudent investor rate, the Debtors calculated PBGC's total claim for unfunded benefit liabilities to be approximately $238 million, instead of the $620 million amount asserted by PBGC. PBGC informed the Debtors that it would not accept the use of a prudent investor rate to value its claims for unfunded benefit liabilities.[17]

In December 2003, PBGC terminated the Kaiser Salaried Plan under ERISA § 4042(a), for failure to meet the minimum funding standards under ERISA § 302 and IRC § 412.[18] In January 2004, the Debtors filed a motion for an order (a) determining that the financial

---

[14] Law Debenture's Brief at 5-6. PBGC asserted administrative priority under Bankruptcy Code § 507(a)(1) for minimum funding contributions and statutory premiums that arise post-petition, as well as a portion of its claim for unfunded benefit liabilities (up to 30 percent of the controlled group's net worth).

[15] Barneson Decl., ¶ 13.

[16] *Id.*; Parrish Decl., ¶ 7.

[17] Barneson Decl., ¶ 13; Parrish Decl., ¶ 8; Moss Decl., Ex. B at 63, 111-112, 114, Binder 5, Tab 3. On December 1, 2003, the Bankruptcy Court for the Eastern District of Virginia issued its opinion regarding an objection to PBGC's claims for unfunded benefit liabilities in *In re U.S. Airways Group, Inc.*, 303 B.R. 784 (2003). After conducting a three day trial involving expert testimony from actuaries, economists, and accountants, the court rejected debtor U.S. Airways's contention that a "prudent investor rate" of 8 percent should be used instead of the method embodied in ERISA and PBGC's regulation.

[18] D.I. 5903, Declaration of Kenneth Kofsky ("Kofsky Decl."), ¶ 6.

requirements for a distress termination of the Debtors' remaining seven pension plans for hourly employees were met under ERISA § 4041(c); (b) approving a distress termination of the seven pension plans for hourly employees; and (c) authorizing the implementation of replacement pension plans for hourly and salaried employees. In February 2004, although the Court approved the motion and entered an order approving the termination of the Debtors' Hourly Plans, the order reserved PBGC's rights to review the replacement plans under its policy against plans that abuse the termination insurance program. In February 2004, PBGC appealed the Court's order determining that the Debtors' met the distress criteria under ERISA § 4041(c)(2)[19] with respect to the pension plans.[20]

In the spring of 2004, because the Senior Noteholders and the Senior Subordinated Noteholders were the only creditors besides PBGC of KACC's subsidiaries Alpart Jamaica, Inc. ("AJI"), Kaiser Jamaica Corporation ("KJC"), Kaiser Aluminum Australia Corporation ("KAAC") and Kaiser Finance Corporation ("KFC")(the "alumina estates"), PBGC negotiated with the Senior Noteholders and Senior Subordinated Noteholders (represented by Law Debenture) with respect to PBGC's claims.[21] However, because Law Debenture was not prepared to negotiate PBGC's claims, these multi-party talks ceased, and PBGC thereafter

---

[19] 29 U.S.C. § 1341(c).

[20] On March 30, 2005, this Court affirmed the Bankruptcy Court's order. PBGC filed its notice of appeal of the March 30, 2005 order on May 25, 2005.

[21] Declaration of Steven M. Rabinowitz ("Rabinowitz Decl."), Ex. B. at I: 49, Binder 5, Tab 4.

negotiated its claims with the Senior Noteholders only.[22] In July 2004, the Senior Noteholders submitted a proposal to PBGC concerning, *inter alia*, PBGC's claims and the Senior Noteholder's subordination dispute with Law Debenture, but any proposal by the Senior Noteholders could not address many of PBGC's issues with the Debtors, including PBGC's appeal of the Bankruptcy Court's order regarding the distress terminations of the pension plans, or the Debtors' proposed replacement plans.[23] Accordingly, PBGC never agreed to the proposal.

In the summer of 2004, PBGC notified the Debtors that PBGC had serious concerns with the replacement plans that the Debtors had negotiated with the United Steelworkers of America ("USWA"), and that PBGC intended to contest the implementation of the replacement plans.[24] In July 2004, the Debtors met with PBGC's Executive Director, Bradley Belt, to discuss PBGC's position regarding the replacement plans.[25] At the meeting, the Debtors challenged PBGC's methodology used in evaluating replacement plans and contended that unless the methodology

---

[22] Rabinowitz Decl., Ex. B at I: 49, Binder 5, Tab 4; Exhibit B at II: 27, Binder 5, Tab 4; Jan. 18, 2005 Transcript at 135.

[23] Exhibit L-3. Law Debenture cites the July 30 proposal embodied in Exhibit L-3 as evidence of collusion between the senior noteholders and PBGC: in particular, a term of the proposal providing that the parties would work together to propose plans of reorganization for the alumina estates containing provisions for the "*enforcement of the subordination provisions of the junior notes indenture in favor of the senior note holders*." Law Debenture's Brief at 13 (italics in original). However, Law Debenture's complaints of collusion are baseless given that under the proposed plans of reorganization for the alumina estates, the "Bankruptcy Court will determine the respective entitlement" of the senior and the senior subordinated noteholders with respect to distributions from those estates. *See, e.g.,* Law Debenture's Appendix, Tab I, Third Amended Joint Plan of Liquidation for AJI and KJC, Article II ("Classification and Treatment of Claims and Interests"), at 11-13, §§ 2.4(c)(i)(B), 2.4(c)(ii)(B).

[24] Barneson Decl., ¶ 20.

[25] Barneson Decl., ¶ 21.

was revised, the parties would be forced to engage in time-consuming litigation that could lead to the Debtors' liquidation.[26] PBGC did not agree to revise its methodology, but agreed to consider the Debtors' position.[27]

Soon thereafter, PBGC and the Debtors agreed to resolve all disputed issues between them under a global settlement.[28] Beginning in September 2004, the Debtors and PBGC engaged in "arms-length" negotiations regarding the terms of the PBGC Settlement.[29] The negotiations were "considerable and protracted."[30] These arms-length negotiations are reflected in the numerous term sheets exchanged between the parties.[31]

### B.  The PBGC Settlement

After conducting negotiations concerning a series of draft agreements, the parties

---

[26] Barneson Decl., ¶ 21.

[27] *Id.*

[28] Barneson Decl., ¶ 22; Moss Decl., Ex. B at 106, Binder 5, Tab 3.

[29] Barneson Decl., ¶ 23.

[30] *Id.*

[31] Exhibits D-2 through D-9.  As reflected in the draft term sheets, PBGC and the Debtors' negotiations produced the settlement's term requiring PBGC's claim for unfunded benefit liabilities to be calculated under ERISA and PBGC regulations, which, in turn, required PBGC and the Debtors, through their actuarial consultant Parrish, to each calculate PBGC's claim under PBGC's regulatory methodology. Parrish Decl., ¶ 10. The Debtors' calculated PBGC's unfunded benefit liabilities claim to be approximately $667 million, Parrish Decl., ¶ 10, while PBGC's calculation produced $639.9 million, D.I. 5903, Declaration of Karen Justesen ("Justesen Decl."), ¶ 14. The parties agreed to $630 million for purposes of the settlement. Exhibit D-1, ¶ 9. Although the Senior Noteholders and PBGC agreed to cap PBGC's recovery at the alumina estates at 32 percent of net distributable proceeds, the evidence shows that the requirement to calculate PBGC's claims under ERISA and PBGC regulations resulted from PBGC's negotiations with the Debtors. *See* Moss Decl., Ex. B at 63, Binder 5, Tab 3; Exhibits D-4 through D-9; Rabinowitz Decl., Ex. B at II: 14, Binder 5, Tab 4.

executed the PBGC Settlement on October 14, 2004. The PBGC Settlement contains the following material terms:[32]

- Subject to the USWA's ratification of the amended and restated agreement under sections 1113 and 1114 of the Bankruptcy Code, PBGC's assumption of the Kaiser Hourly Plan;[33]

- The Debtors' continued sponsorship of the Debtors' small pension plans[34] and PBGC's dismissal of its appeal of the Bankruptcy Court's order finding that the Debtors meet the distress termination criteria under ERISA § 4041(c)(2)(B)(ii)(IV) with respect to those plans;

- The Debtors' satisfaction of the minimum funding standard under IRC § 412 with respect to the five small pension plans by the later of five business days following the Bankruptcy Court's approval of the settlement or within 30 days of the effective date of the Intercompany Settlement Agreement;[35]

- PBGC's issuance of a no-action letter with respect to the Debtors' replacement pension plans: the salaried defined contribution plan; the USWA defined contribution plan; and the Steelworkers Pension Trust ("SPT") plan;

- The Debtors', PBGC's, and the USWA's agreement that contribution levels under the replacement plans will not increase before July 1, 2009, and that reorganized Kaiser Aluminum Corporation will not establish a defined benefit plan covering bargaining locations previously covered by the Kaiser Hourly Plan;

- PBGC's release of its claims against the Volta Aluminum Corporation ("Valco"), a Ghanaian corporation;

- The PBGC's agreement to restrictions on the transfer of equity securities received under a

---

[32] Exhibit D-1.

[33] As a result of the termination, PBGC became responsible for the payment of pension benefits to 9,264 current and retired members of the USWA, who, upon PBGC's certification of eligibility pursuant to IRC § 7527(d)(2), became eligible for the Health Care Tax Credit, giving these members a tax credit against costs of retiree health insurance.

[34] The five small pension plans are the Bellwood, Garage, Los Angeles, Sherman, and Tulsa pension plans.

[35] The Intercompany Settlement Agreement was approved by the Court on February 1, 2005.