plan of reorganization for KACC;

- An allowed PBGC administrative claim in the amount of $14 million against all debtors other than debtors Alpart Jamaica, Inc. ("AJI") and Kaiser Jamaica Corporation ("KJC");

- PBGC's claims for unfunded benefit liabilities shall be treated as allowed general unsecured claims in the amount determined under the provisions of ERISA and PBGC's regulations, which the parties agreed was $630 million, less the $14 million administrative claim. PBGC's recovery against its claim at the alumina estates is limited to 32 percent of net proceeds payable in the aggregate to holders of senior notes, the senior subordinated notes, and PBGC under confirmed plans of reorganization for the alumina estates; and

- The Debtors' affirmative support for the agreed-upon claim amounts against any challenge, including the objection filed by Law Debenture.

Despite the wide range of issues resolved, Law Debenture's principal, if not exclusive, basis for challenging the settlement is its contention that PBGC's claims for unfunded benefit liabilities under the settlement are overstated.[36]

### C.    PBGC's Claims on October 14, 2004

As of October 14, 2004, PBGC had terminated and become the statutory trustee of the Debtors' three largest pension plans: the Kaiser Salaried Plan; the Kaiser Inactive Plan; and the Kaiser Hourly Plan.[37]  As reflected in the Declaration of Karen Justesen, PBGC's Supervising Chief Negotiating Actuary,[38] PBGC's claims for unfunded benefit liabilities had increased substantially from the amounts reflected in PBGC's initial proofs of claim, as follows (in millions):

---

[36]  Law Debenture's Brief at 9.

[37]  Declaration of Kenneth Kofsky ("Kofsky Decl."), ¶ 4, 6, 8.

[38]  Law Debenture stipulated to Ms. Justesen's qualifications as an expert actuary.  Jan. 18, 2005 Transcript at 177.

| Plan/Date of Plan Termination | Total Benefit Liabilities | Market Value of Assets | Unfunded Benefit Liabilities |
|---|---|---|---|
| Salaried Plan/ 12/17/2003 | $326.2 | $73.1 | $253.1 |
| KAPP Plan/ 4/30/2004 | $629.6 | $289.7 | $339.9 |
| Inactive Plan/ 6/30/2004 | $96.4 | $49.5 | $46.9 |
| Total | $1,052.2 | $412.3 | $639.9[39] |

When initially filed in January 2003, PBGC's claim for unpaid minimum funding contributions with respect to the Kaiser Salaried Plan was $17.1 million and its claims with respect to the Debtors' seven other pension plans were unliquidated. By the time of the January 18, 2005 hearing, these claims had substantially increased.

| Plan/Date of Plan Termination | Salaried 12/17/2003 | KAPP 4/30/2004 | Inactive 6/30/2004 | Total |
|---|---|---|---|---|
| Priority I Claim (post-petition) | $66.288 | $58.997 | $7.813 | $133.098 |
| Normal Cost Portion of Priority I Claim | $5.564 | $4.805 | $0 | $10.369 |
| Total Due and Unpaid Minimum Funding Contributions | $66.288 | $58.997 | $7.813 | $133.098[40] |

---

[39] Justesen Decl., ¶ 14. Although the Bankruptcy Court used PBGC's claims as filed on January 29, 2003, for purposes of the hearing, the Court recognized that PBGC could amend its claims and assert substantially higher claims for unfunded benefit liabilities and minimum funding contributions, if the settlement were not approved. D.I. 6076: Transcript of Hearing Held ("Jan. 24, 2005 Transcript") at 94.

[40] Justesen Decl., ¶ 26.

### D.    The January 18, 2005 Hearing

On January 18, 2005, after rejecting Law Debenture's motion for reconsideration of the order staying its claims objection, the Bankruptcy Court conducted an evidentiary hearing on the Debtors' motion to approve the PBGC Settlement. The parties submitted direct evidence through declarations, and the hearing was devoted to cross-examination of witnesses and rebuttal evidence.[41] The Bankruptcy Court examined the evidence to determine whether the PBGC Settlement was in the best interests of the Debtors' bankruptcy estates, as evaluated under the four-factor test set forth in *Myers v. Martin*. Based on its findings and conclusions, the Bankruptcy Court entered two orders: an order approving the PBGC Settlement and dismissing Law Debenture's claims objection as moot; and an order denying Law Debenture's motion for reconsideration of the order staying its claims objection.[42] On February 3, 2005, Law Debenture filed notices of appeal as to both orders, and, subsequently, filed a motion to consolidate its appeals, which no party contested. On May 3, 2005, this Court consolidated the appeals.

---

[41] The Debtors submitted the declarations of John Barneson, the Debtors' Chief Administrative Officer, Norman Parrish, enrolled actuary with Hewitt and Associates, and Blake O'Dowd, one of the debtors' restructuring consultants. The PBGC submitted the declarations of Karen Justesen, PBGC's Supervising Chief Negotiating Actuary, and Kenneth Kofsky, an accountant in PBGC's Financial Operations Department. The Creditors' Committee submitted the declaration of Amit Patel, Vice President, Houlihan Lokey. Law Debenture submitted the declaration of Roger Brinner, an economist, as well as selected excerpts from the depositions of the Debtors' and PBGC's declarants, as well as Kurt Billick, a representative of Farallon Capital, a Senior Noteholder, Suzanne Kelly, PBGC's financial analyst, Marc Ness, PBGC's actuary responsible for calculating the regulatory interest factor, and Lou Bachelor, PBGC's Deputy Treasurer.

[42]    D.I. 6005, Jan. 24, 2005; D.I. 6006, Jan. 24, 2005.

## ARGUMENT

### I.    Standard of Review

The standard of review for a bankruptcy court's approval of a settlement is whether the

court abused its discretion.[43]  The bankruptcy court's findings of fact in determining whether to

approve a settlement are subject to the clearly erroneous standard of review.[44]  The standard of

review for a bankruptcy court's exercise of authority under Bankruptcy Code § 105(a) is also

whether the court abused its discretion.[45]

### II.    The Bankruptcy Court properly stayed Law Debenture's claims objection

Pursuant to section 105(a) of the Bankruptcy Code, a bankruptcy court "may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."[46]  As stated by the Supreme Court in *United States v. Energy Resources Co.*, the statutory

directive embodied in section 105(a) is "consistent with the traditional understanding that

bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor

relationships."[47]  The purpose of Chapter 11 proceedings is "to prevent the debtor from going

into liquidation, with an attendant loss of jobs and possible misuse of economic resources."[48]

---

[43]  *Myer v. Martin*, 91 F.3d at 393.

[44]  *Sacred Heart Hospital of Norristown v. Commonwealth of Penn. Dep't. Of Pub. Welfare (In re Sacred Heart Hospital of Norristown)*, 133 F.3d 237, 241 (3d Cir. 1988).

[45]  *Baron & Budd, P.C. et al. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 166 (2005)(citing *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224, 228 (3d Cir. 2002)).

[46]  11 U.S.C. § 105(a).

[47]  495 U.S. 545, 549 (1990).

[48]  *NLRB v. Bildisco & Bidisco*, 465 U.S. 513, 528 (1984).

Bankruptcy Code § 105 "has been construed to give a bankruptcy court 'broad authority' to provide equitable relief to assure the orderly conduct of the reorganization proceedings."[49] Moreover, the Bankruptcy Code grants a bankruptcy court authority to hold status conferences and, unless inconsistent with another provision of the Bankruptcy Code, to issue orders "prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically."[50]

On November 8, 2004, the Court conducted a status conference concerning the Debtors' motion to approve the PBGC Settlement and to dismiss Law Debenture's claims objection as moot.[51] The Court heard argument and made determinations as to the nature of Law Debenture's claims objection.[52] Without limiting Law Debenture to the objections raised at the November 8 hearing, the Court concluded that it could fairly adjudicate the issues underlying Law Debenture's claims objection in the context of the settlement motion without the need to conduct

_____

[49] *In re Combustion Engineering*, 391 F.3d at 236 (*citing Energy Res. Co.*, 495 U.S. 545, 549 (1990)). In *Combustion Engineering*, the bankruptcy court used section 105(a) to expand a channeling injunction under section 524(g) to include non-derivative asbestos claims against two non-debtors. Since section 524(g) expressly limits channeling injunctions to third parties whose liability is derivative of the Debtor, the Third Circuit concluded that section 105 could not be used to equitably enjoin the claims against the non-debtors, reasoning that the practical effect was to extend "bankruptcy relief to two non-debtor companies outside of bankruptcy" and "allows [the non-debtors] to cleanse themselves of . . . liability without enduring the rigors of bankruptcy." *Id.* at 237. As shown below, Law Debenture's reliance on *Combustion Engineering* in support of an argument that the Court misused section 105(a) is wholly misplaced.

[50] 11 U.S.C. § 105(d).

[51] D.I. 5286, Oct. 28, 2004.

[52] D.I. 5372: Transcript of Hearing Held ("Nov. 8, 2004 Transcript") at 65 - 70.

separate proceedings.[53]  Accordingly, the Court stayed Law Debenture's claims objection and

issued orders providing for, *inter alia*, expedited discovery.[54]

## A.    Law Debenture Lacked Standing to Object to PBGC's Claims

The Debtors are operating and managing their businesses, as debtors in possession,

pursuant to Bankruptcy Code §§ 1107 and 1108.  Under Code § 1107(a), a debtor in possession

must perform all the "functions and duties" of a trustee under Code § 704, including the duty to

examine proofs of claims and object to the allowance of any claim that is improper, except when

the objection would serve no purpose.[55]  In its capacity as trustee, a debtor in possession

represents the interests of all creditors in the bankruptcy case.[56]

Recognizing that the interests of the estate cannot be subordinate to those of an individual

creditor, courts have widely held that creditors such as Law Debenture do not have standing to

contest another creditor's claim:

> [T]he overwhelming weight of authority . . . is to the effect that a general creditor of a
> bankrupt has no right to contest another creditor's claim or to appeal from the refusal of
> the court to disallow it unless upon application the trustee has refused to do so and the
> district court has authorized the creditor to proceed in the trustee's name.[57]

---

[53]  Nov. 8, 2004 Transcript at 70 - 71, 73.

[54]  D.I. 5431.

[55]  11 U.S.C. § 704(5); *see also Collier on Bankruptcy* ¶ 502.02[2][d] at 502-15 (15th ed.
2004).

[56]  *In re Gloria Mfg. Corp.*, 47 B.R. 370 (E.D. Va. 1984); *see also Collier on Bankruptcy*
¶ 502.02[2][d] at 502-14 (A debtor in possession is the "primary spokesman for all creditors in
the bankruptcy case.").

[57]*Fred Reuping Leather Co. v. Fort Greene Nat'l Bank*, 102 F.2d 372, 373 (3d Cir. 1939);
*see also In re Dow Corning Corp.*, 244 B.R. 721, 750, 752 (Bankr. N. D. Mich. 1999) (denying
Chapter 11 creditors' committee right to object to other creditors' claims).

Otherwise, if a bankruptcy court were to allow every general creditor to appropriate the trustee's power to object to other creditors' claims, the orderly administration of the bankruptcy case could degrade into chaos.[58]  Therefore, a creditor's right to object is appropriately balanced against the needs of the orderly administration of the debtor's estate.[59]  Only if a trustee or debtor in possession fails to perform its responsibility to examine claims and take action against improper claims, should a bankruptcy court grant a creditor standing to object to another creditor's claim.[60]  Here, the Court correctly stayed Law Debenture's objection until it determined that the Debtors had properly performed their responsibility to examine PBGC's claims.

## B.    There is no Conflict between Bankruptcy Code § 502(a) and Bankruptcy Rule 9019

Law Debenture contends that the Court was required to consider its objection to PBGC's claims before considering the PBGC Settlement motion because the Court's authority to approve settlements is contained in Bankruptcy Rule 9019, whereas claim objections are governed by section 502(a) of the Bankruptcy Code, and any conflict between the two must be settled in favor of the Bankruptcy Code.  Thus, applying the absurd logic put forth by Law Debenture, once any creditor in a bankruptcy case objects to a claim, no settlement concerning the disputed claim can be resolved until after the claims litigation has been completed.  This argument has no merit.

Bankruptcy Rule 9019(a) sets forth the procedure by which a bankruptcy court may

---

[58] *In re Simon*, 179 B.R. 1, 7 (Bankr. D. Mass. 1995).

[59] *Id.* at 7.

[60] *See Dow Corning*, *supra*, 244 B.R. at 750-51.

approve a compromise or settlement.[61]  Under this rule, notice of a settlement must be given to

parties in interest to allow them to object if they believe that the proposed settlement is

unreasonable.[62]  When seeking approval of a settlement under Bankruptcy Rule 9019, a debtor in

possession acts on behalf of the bankruptcy estate.[63]

On the other hand, Section 502(a) of the Bankruptcy Code provides for the allowance of a

claim unless a party in interest objects.[64]  Section 502(a) does not set forth any specific burdens

or standards to be applied in considering an objection to such claim.  Similar to the burdens and

standards to be followed in evaluating a motion for approval of settlement, these burdens and

standards are derived from the Bankruptcy Rules and case law.[65]

There is no provision in the Bankruptcy Code requiring that claim objections must be

heard before a bankruptcy court can consider a settlement.  In fact, if such rule existed, there

would be no incentive for a debtor in possession to perform its statutory duty to examine and take

action against improper claims.  Any creditor who did not like the resolution negotiated by a

debtor could force the parties to engage in expensive and time consuming litigation merely by

filing a claim objection.  Because the interests of the bankruptcy estate, as represented by the

debtor in possession, must come before those of individual creditors, no inherent conflict exists

---

[61] Fed. R. Bankr. P. 9019(a).

[62] *In re RFE Indus.*, 283 F.3d 159, 163, 164 (3d Cir. 2002).

[63] *In re Nationwide Sports Distributors, Inc.*, 227 B.R. 455, 461 (Bankr. E.D. Pa. 1998).

[64] 11 U.S.C. § 502(a).

[65] *See* Fed. R. Bankr. P. 3001(f) (a proof of claim constitutes prima facie evidence of the validity and amount of the claim); *see also In re Alleghany International, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992)(discussing the shifting burdens applied to claim objections).

between Bankruptcy Rule 9019 and Bankruptcy Code § 502(a). Such a result is consistent with the long standing judicial preference for settlements in bankruptcy, especially given the importance of the prompt resolution of claims in bankruptcy reorganizations.[66]

In the context of this case, Law Debenture argued and presented evidence to the Court as to the amount of PBGC's claim, if the claim were litigated and determined by the Court, rather than settled. After considering the evidence, the views of Law Debenture, and the overwhelming support for the Settlement by all of the other parties in the Debtors' bankruptcy cases, the Court approved the settlement and dismissed Law Debenture's objection as moot. Despite any contention to the contrary, the Court's decision to stay Law Debenture's claims objection while considering the PBGC Settlement Motion did not violate Law Debenture's statutory rights and was not an abuse of discretion.

## III. The Bankruptcy Court's Approval of the PBGC Settlement was Correct

### A. The Standards for Approving Settlements in Bankruptcy Court

Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." It is widely recognized that "[t]o minimize litigation and expedite the administration of a bankruptcy estate, compromises are favored in bankruptcy."[67] In determining whether to approve a settlement,

---

[66] *See Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968). ("In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims to which there are substantial and reasonable doubts."); *Case v. L.A. Lumber Products Co.,* 308 U.S. 106, 130 (1939)(Compromises are a "normal part of the process of reorganization."); *Myers v. Martin,* 91 F.3d at 393 (*quoting Collier on Bankruptcy* ¶ 9019.03[1]).

[67] *Myers v. Martin,* 91 F.3d at 393 (3d Cir. 1996) *quoting 9 Collier on Bankruptcy,* ¶ 9019.03[1] (15th ed. 1993); *In re Coram Healthcare Corp.,* 315 B.R. 321, 329 (Bankr. Del.

bankruptcy courts generally consider four factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of the creditors.[68]

A bankruptcy court has broad discretion under Bankruptcy Rule 9019 to approve settlements that are in the best interests of a debtor's estate.[69] It should "defer to the trustee's judgment so long as there is a legitimate business justification for [the trustee's] action."[70] The bankruptcy court does not decide the numerous questions of law or fact raised by objections.[71] The bankruptcy court need not be convinced that the settlement is the "best possible compromise."[72] The bankruptcy court is merely required to canvas the issues and determine whether the settlement is above the lowest point in the range of reasonableness.[73]  ]

---

2004); *see also, Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)("In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims to which there are substantial and reasonable doubts."); *Case v. L.A. Lumber Products Co.*, 308 U.S. 106, 130 (1939)(Compromises are a "normal part of the process of reorganization.").

[68] *Myers v. Martin*, 391 F.3d 393; *Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3d Cir. 2002).

[69] *In re Coram*, 315 B.R. at 330.

[70] *In re Coram*, 315 B.R. at 330 (citing *Martin*, 91 F.3d at 395).

[71] *In re Neshaminy Office Building Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

[72] *In re Coram*, 315 B.R. at 331.

[73] *In re Pennsylvania Truck Lines*, 150 B.R. 595, 598 (E.D. Pa. 1992); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983).

1.    **Probability of success in litigation**

The Bankruptcy Court found that the probability of success in litigation was equally balanced between the opposing parties, meaning that there was significant litigation risk to both the Debtors and PBGC.[74]  The PBGC Settlement resolves a host of disputes that would otherwise have to be litigated.  Regarding potential litigation over PBGC's claims for unfunded benefit liabilities, the Court stated that there were "good grounds for the methodology imposed by the *U.S. Airways'* court."[75]  In light of the fact that PBGC's claims for unfunded benefit liabilities are calculated pursuant to PBGC's regulation, the Court noted that "administrative regulations adopted pursuant to an express delegation give rise to legislative rules that have the force and effect of law."[76]  The Court observed that PBGC's authority to challenge the Debtors' replacement pension plans as abusive would be "entitled to judicial deference under the arbitrary and capricious standards of the Administrative Procedure Act."  Citing *North Carolina ex rel. Long v. United States,*[77] the Court found support for PBGC's claim that post-petition minimum funding contributions and statutory premiums could be entitled to administrative priority, posing "considerable risk to the solvency of these estates."[78]  Regarding PBGC's appeal of the order approving distress terminations, the Court noted that "there is no reported decision, including any

---

[74]  Jan. 24, 2005 Transcript at 95.

[75]  Jan. 18, 2005 Transcript at 252.  The Court's reference is to *In re U.S. Airways Group, Inc.*, 303 B.R. 784 (E.D. Va. 2003).

[76]  Jan. 24, 2005 Transcript at 93.

[77]  1998 U.S. App. LEXIS 7513 (4th Cir. 1998).

[78]  Jan. 24, 2005 Transcript at 94; *see also Columbia Packing v. PBGC*, 81 B.R. 205 (D. Mass. 1988).

-21-

decision in the Third Circuit or the District of Delaware, that specifically addresses how the criteria for approving a distress termination of a pension are to be applied in the case of multiple pension plans."[79] Thus, the Court found that the evidence concerning the first factor clearly supported the PBGC Settlement.

Despite the broad range of litigation resolved under the settlement, Law Debenture challenges only a single aspect of the Court's findings with respect to the first factor. Based on two appellate court decisions that have used the prudent investor rate in calculating PBGC's claims for unfunded benefit liabilities, Law Debenture asserts that the Debtors faced no risks proceeding with a claims objection. Law Debenture, in an egregious mischaracterization of precedent, also suggests that its arguments are supported by the Supreme Court's opinion in *Raleigh v. Illinois Dep't of Revenue*.[80] However, as demonstrated by the court in *U. S. Airways Group, Inc.*., in failing to apply the substantive nonbankruptcy law to PBGC's claims, the circuit court cases are at odds with the Supreme Court's opinion in *Raleigh*. As the following analysis shows, *Raleigh* supports PBGC's position, not Law Debenture's.

A claim is determined in accordance with the substantive nonbankruptcy law under which it arises.[81] The Bankruptcy Code does not seek to displace the substantive law under which claims arise. Rather, the Bankruptcy Code provides a forum for the resolution of claims that arise under different bodies of law. The Supreme Court affirmed this principle in *Raleigh*. The

---

[79]  Jan. 24, 2005 Transcript at 93.

[80]  530 U.S. 15 (2000).

[81]  *Butner v. United States*, 440 U.S. 48, 55 (1979); *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161-62 (1946).

Court held that "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation."[82]  The Court further ruled, contrary to Law Debenture's argument, that "[b]ankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditor's entitlements."[83]

Law Debenture's erroneous notion that PBGC's method of valuing unfunded benefit liabilities should be "subject to limitations imposed as a matter of bankruptcy law" is derived from the decision in *In re Chateaugay Corp. (LTV)*.[84]  There, the court, in reliance on the Supreme Court's decision in *Vanston*, held that bankruptcy law controls allowance of ERISA-based claims, including the present value of future benefit liabilities: "once it is determined that there is a valid obligation arising from non-bankruptcy law, the court will 'still have to decide whether the allowance of the claim would be compatible with the policy of the Bankruptcy

---

[82]  530 U.S. at 20.  The Court also stated that "[t]he 'basic federal rule' in bankruptcy is that state law governs the substance of claims."  *Raleigh*, 530 U.S. at 20, *citing Butner*, 440 U.S. at 57.  In this context, the term state law "refer[s] to all nonbankruptcy law that creates substantive claims" including "claims that have their source in substantive federal law, such as federal securities law or other federal antifraud laws."  *Grogan v. Garner*, 498 U.S. 279, 283-84 & n.9 (1991).  *See also Patterson v. Shumate*, 504 U.S. 753, 758-759 (1992) (finding that, for purposes of Section 541(c)(2) (which provides for an exclusion from "property of the estate" contained in Section 541(a)(1)), the term "applicable nonbankruptcy law" encompasses any relevant federal law, including ERISA and noting that such finding "accords with prevailing interpretations of that phrase as it appears elsewhere in the [Bankruptcy] Code.").

[83]  *Id.* at 24-25; *accord US Airways*, 303 B.R. at 792 ("*Raleigh* is very clear that a creditor's claim 'in the first instance' is a function of the nonbankruptcy law giving rise to the claim.").

[84]  115 B.R. 760 (Bankr. S.D.N.Y. 1990), *vacated, LTV Corp. v. PBGC (In re Chateaugay Corp.)*, 17 E.B.C. 1102 (S.D.N.Y. 1993).

Act'."[85]

The Supreme Court's decision in *Raleigh* confirms that the *LTV* court misread *Vanston*. In *Raleigh*, the Supreme Court distinguished between the "substance" of claims, which is governed by non-bankruptcy law, and the "ordering" of claims for distribution purposes, which is a matter of bankruptcy law. Rejecting an argument based on *Vanston* that allowance of claims is a matter of federal equity principles, the Supreme Court in *Raleigh* explained that when *Vanston* was decided "'allowance' referred to the ordering of valid claims . . . and *Vanston*, in fact, concerned distribution of assets, not the validity of claims in the first instance."[86] Thus, there was no basis for the *LTV* court's invocation of bankruptcy "policy" to override the underlying substantive law in allowing PBGC's unfunded benefit liabilities claim.

Similarly, in the only post-*Raleigh* case relied upon by Law Debenture, the Sixth Circuit attempted to distinguish *Raleigh* by the following unsupported conclusory statement: "While the validity of a claim might be a matter for nonbankruptcy law, bankruptcy courts have the statutory authority to determine the allowability and amount of the claim."[87] But as correctly observed by the *US Airways* court:

> [I]t is simply not a correct reading of *Raleigh* to say that nonbankruptcy law determines only the abstract validity of the claim – that is, whether the debtor has some liability to the creditor – as divorced from the amount of the claim. Here, both the debtor's liability to the PBGC and the amount of that liability are not only creatures of statute, but of the same statute."[88]

---

[85]  115 B.R. at 770, quoting *Vanston*, 326 U.S. at 162.

[86]  530 U.S. at 23-24.

[87]  *In re CSC Industries, Inc.*, 232 F.3d 505, 509 (6th Cir. 2000).

[88]  *US Airways Group, Inc.*, 303 B.R. at 793.

-24-

Under *Raleigh*, there is no basis for the artificial distinction between validity and amount in applying the nonbankruptcy law that establishes the very substance of PBGC's claim.

Apart from its legal arguments, Law Debenture offered only indirect evidence on this factor. Although Law Debenture's expert, Dr. Roger Brinner, testified as to what he believed to be an appropriate prudent investor rate for calculating PBGC's claims for unfunded benefit liabilities, Dr. Brinner was unaware as to whether the Debtors would be able to emerge from Chapter 11 without resolving the pension issues, and apparently oblivious even to the fact that there had been a comprehensive settlement between PBGC and the Debtors.[89] Accordingly, based on the evidence in the record and the prevailing legal authorities, the Court's findings that each party faced significant litigation risks with respect to the issues resolved under the PBGC Settlement, including the appropriate method for valuing PBGC's claims, were not clearly erroneous.

## 2.   Complexity of the litigation and attendant expense

The Court determined that the second factor – difficulties in collection – was not relevant to the motion.[90] As to the third factor – the complexity of the litigation and the attendant expense – the Court concluded that the evidence clearly favored settlement.[91] Regarding the amount of

---

[89]  Jan. 18, 2005 Transcript at 142, 143, 145. In *U.S. Airways, Group, Inc.*, the court rejected a prudent investor rate of 8 percent. 303 B.R. 784. Dr. Brinner suggested a rate of 10.4 percent, while the Debtors and the Committee's proposed rate was 9 percent. PBGC believes that it is misleading to simply compare interest rates because the valuation of unfunded benefit liabilities under ERISA and PBGC's regulation is based on a number of assumption. *See, e.g.,* Justesen Decl., ¶ 11.

[90]  Jan. 24, 2005 Transcript at 95.

[91]  Jan. 24, 2005 Transcript at 97.

PBGC's claim for unfunded benefit liabilities, although the Court did not decide whether PBGC's methodology under its legislative regulation or the prudent investor rate should apply, the Court found that the determination would "likely result in extended and costly litigation."[92] Similarly, the Court found that litigation related to the replacement plans "would be complex and fact intensive."[93] The Court pointed to increased costs and delays associated with having to show that PBGC's determinations relating to the replacement plans were arbitrary and capricious under the APA and the need to engage in "intensive and invasive factual discovery."[94] Delays resulting from litigation, the Court found, could prevent the Debtors from developing plans of reorganization due to the size of PBGC's claims and the determination of other creditors' recoveries.[95] In addition, the Court found that the indirect costs arising from the Debtors' inability to establish meaningful deferred compensation arrangements would be "incalculable."[96]

Law Debenture offered no contradictory evidence on this factor. Law Debenture's expert did not offer opinions concerning potential litigation, and had no opinions concerning the reasonableness of the PBGC Settlement.[97] Based on the evidence in the record, the Court's findings that the third factor favored settlement were not clearly erroneous.

---

[92] Jan. 24, 2005 Transcript at 95.

[93] Jan. 24, 2005 Transcript at 96.

[94] Jan. 24, 2005 Transcript at 96.

[95] Jan. 24, 2005 Transcript at 96.

[96] Jan. 24, 2005 Transcript at 96-97.

[97] Jan. 18, 2005 Transcript at 142, 158.

-26-

### 3.    Paramount interests of the creditors

Regarding the fourth factor – the paramount interests of creditors – the Court observed that the PBGC Settlement is supported by the Creditors' Committee, the USWA, the senior noteholders, PBGC, and the Debtors.[98]  Only Law Debenture opposes the settlement.  The Court alluded to the interdependence among the PBGC Settlement, the USWA's legacy liability agreement, and the Intercompany Settlement Agreement ("ISA"), concluding that approval of the PBGC Settlement allowed all three to proceed and would facilitate plans of reorganization for the benefit of all creditors.[99]  The Court reiterated its view that the delays involved with resolving the issues associated with PBGC's claims would cause "incalculable" harm to the creditors entitled to distributions from the alumina estates.[100]  In addition, the Court found that the PBGC Settlement was beneficial for the alumina estates, and created the potential for reorganization of the other estates.[101]  Accordingly, based on the evidence in the record, the Court found that the PBGC Settlement was "in the best interest of all creditors."[102]

Law Debenture offered no contrary evidence on this factor.  Based on the evidence in the record, the Court's findings that this factor supported approval of the PBGC Settlement were not clearly erroneous.

---

[98]  Jan. 24, 2005 Transcript at 97.

[99]  Jan. 24, 2005 Transcript at 97.  The Court approved the ISA on February 1, 2005.

[100]  Jan. 24, 2005 Transcript at 98.

[101]  Jan. 24, 2005 Transcript at 98.

[102]  Jan. 24, 2005 Transcript at 99.

### 4.    Findings and conclusions regarding fairness of the settlement

In addition to making findings and reaching conclusions regarding the evidence relating

to the four factors in *Myers v. Martin*, the Court also made findings relating to the amount of

PBGC's potential recovery on its claim for unfunded benefit liabilities. Although the Court

expressly declined to determine whether PBGC's regulatory method or the prudent investor rate

should be used in calculating PBGC's claim,[103] the Court analyzed the settlement of PBGC's

claim on the basis of an implied discount rate of 6 percent.[104] The Court found that an implied

rate of 6 percent is derived from the settlement's 32 percent limit on net recoveries of the

proceeds from liquidation of the alumina estates, reducing PBGC's claims at each alumina estate

to approximately $400 million.[105]

PBGC's actual recovery will be much less than the claim calculated at an implied

discount rate of 6 percent. At the hearing, the Creditors Committee's witness, Amit Patel,

estimated that PBGC's total recovery would be approximately $268 million: $200 from the

alumina estates; $50 million (equity) from the estate of KACC's Canadian subsidiary

("KACoCL"); $18 million (equity) from the estates of KACC and Kaiser Finance Corporation.[106]

However, as Law Debenture's counsel acknowledged at the hearing, Law Debenture has no

---

[103]   Jan. 18, 2005 Transcript at 230, 252.

[104]   D.I. 5948, Declaration of Amit Patel ("Patel Decl."), ¶ 25; Jan. 18, 2005 Transcript at
233.

[105]   Patel Decl., ¶ 25.

[106]   Jan. 18, 2005 Transcript at 129-131.

claims against KACoCL.[107]   Thus, if PBGC recovers $200 million on claims of $620 million against the alumina estates, Law Debenture can hardly complain that PBGC is receiving a "windfall."[108]   Based on the range of potential rates for valuing the claim, *e.g.,* 10.4 % (Law Debenture's prudent investor rate), 8 - 10 % (the Debtors'/Committee's prudent investor rate), 4.0 - 4.7 % (PBGC's interest factor), and the potential recoveries, the Court concluded that the settlement amount was within the "appropriate range."[109]

### B.    The Bankruptcy Court Correctly Determined that Law Debenture's Claims Objection is Moot

A case becomes moot when it becomes "impossible for the court to grant any 'effectual relief whatever' to the prevailing party."[110]   In this case, the Court's approval of the PBGC Settlement fixes PBGC's claims for unfunded benefit liabilities at $630 million, less an allowed administrative claim of $14 million.   The settlement further limits PBGC's recovery against the alumina estates to 32 percent of the net distributable proceeds from the liquidation of those estates.   Thus, it would be impossible for the Court to grant any effectual relief whatever with respect to Law Debenture's claims objection.   Accordingly, the Court did not abuse its discretion in dismissing, as moot, the objection.

---

[107]   Jan. 18, 2005 Transcript at 254.

[108]   If Law Debenture prevails in its subordination litigation in the Bankruptcy Court, the Senior Subordinated Noteholders' claims ($474 million - AJI/KJC; $427 million – KAAC/KFC) against the alumina estates may be treated as *pari passu* with the claims of the Senior Noteholders.   Law Debenture's Brief, footnote 1.

[109]   Jan. 18, 2005 Transcript at 227, 233, 251-252.

[110]   *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992)(quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

Law Debenture cites two cases, *In re Chateaugay Corp.*[111] and *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,[112] for the general proposition that if a party is not properly represented in a settlement negotiation or is not a party to the settlement negotiation, that party may not be bound by the resulting settlement. Relying on these cases, Law Debenture argues that the approval of the PBGC Settlement improperly eliminates its rights to object to PBGC's claims and, therefore, its objection cannot be moot. These cases are inapposite to this case.

Law Debenture holds claims only against the Debtors. None of Law Debenture's claims are settled or extinguished by virtue of the Court's approval of the PBGC Settlement or the determination that Law Debenture's objection to PBGC's claims is moot. Law Debenture holds no claims against PBGC. As discussed above, Law Debenture had a full opportunity to present its objection. Because the Debtors have performed their statutory obligations and entered into a settlement of PBGC's claims for the benefit of the Debtors' estates that was approved by the Court, Law Debenture's claims objection is no longer viable. Therefore, the Court correctly determined that Law Debenture's objection to PBGC's claims is now moot.

---

[111] 94 F.3d 772 (2d Cir. 1996) (Court held that a settlement could not have any adverse effects on rights and claims of a non-party to the settlement).

[112] 55 F.3d 768 (3d Cir. 1995) (Court held that parties to a class action lawsuit who were not properly represented by the class could not be bound by the settlement).

## CONCLUSION

This District Court should affirm the Bankruptcy Court's orders staying Law Debenture's

claims objection and approving the PBGC Settlement.

Respectfully submitted

KATHLEEN M. MILLER (Id No. 2898)
Smith Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE 19899
Delaware Bar #2898
(302) 652-8400 (phone)
(302) 652-8405 (facsimile)
kmiller@skfdelaware.com

/s/ Jeffrey B. Cohen
JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
JAMES L. EGGEMAN
Attorney
JOEL W. RUDERMAN
Attorney

PENSION BENEFIT GUARANTY
CORPORATION
Office of Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005-4026
(202) 326-4020 (phone)
(202) 326-4112 (facsimile)
efile@pbgc.gov

10003361.WPD

-31-

## CONCLUSION

This District Court should affirm the Bankruptcy Court's orders staying Law Debenture's

claims objection and approving the PBGC Settlement.


KATHLEEN M. MILLER (Id No. 2898)
Smith Katzenstein & Furlow LLP
800 Delaware Avenue, 7th Floor
Wilmington, DE 19899
Delaware Bar #2898
(302) 652-8400 (phone)
(302) 652-8405 (facsimile)
kmiller@skfdelaware.com

JEFFREY B. COHEN
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
JAMES L. EGGEMAN
Attorney
JOEL W. RUDERMAN
Attorney

PENSION BENEFIT GUARANTY
CORPORATION
Office of Chief Counsel
1200 K Street, N.W.
Washington, D.C. 20005-4026
(202) 326-4020 (phone)
(202) 326-4112 (facsimile)
efile@pbgc.gov

10003361.WPD