IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| KAISER ALUMINUM CORPORATION, a Delaware corporation, et al., | : | Jointly Administered |
| | : | Case No.  02-10429 (JKF) |
| Debtors. | : | |
| | : | |
| | : | Chapter 11 |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, | : | |
| Appellant, | : | |
| v. | : | |
| KAISER ALUMINUM CORP., et al., | : | Civil Action No. 05-135 JJF |
| Appellees. | : | |

**BRIEF OF APPELLEES DEBTORS AND DEBTORS IN POSSESSION**

# TABLE OF CONTENTS

Page

STATEMENT OF ISSUES PRESENTED.............................................................. 1

STATEMENT OF FACTS ................................................................................... 1

    Procedural History ......................................................................................... 1

    Overview of Debtors' Legacy Liabilities........................................................ 4

    The Debtors Initial Meetings with the PBGC................................................ 5

    Negotiations with the Retirees' Committee, USWA and IAM ........................ 7

    Litigation of the Distress Termination Motion .............................................. 8

    Negotiations with the PBGC Regarding the Debtors' Replacement Plans ....... 9

    Terms of the PBGC Settlement Agreement................................................... 10

    The Amount of the Unsecured Claim ........................................................... 13

    The Negotiations Leading to the Settlement Agreement Were Appropriate.... 14

SUMMARY OF ARGUMENT ......................................................................... 16

ARGUMENT ................................................................................................... 17

I.    The Bankruptcy Court Properly Applied Rule 9019 Standards In Granting the
    Settlement Motion......................................................................................... 17

    A.    The Appropriate Legal Standards ..................................................... 17

    B.    The Probability of Success is Highly Uncertain ............................... 19

    C.    The Complexity of Litigation and the Attendant Expense and Delay
            Likewise Support the Bankruptcy Court's Decision ......................... 25

    D.    The Settlement Agreement Is in the Paramount Interests of Creditors ..... 26

II.    THE BANKRUPTCY COURT CORRECTLY HELD THAT LAW
    DEBENTURE'S CLAIM OBJECTION DID NOT PRECLUDE THE
    ADJUDICATION OF THE PBGC SETTLEMENT MOTION AND WAS
    RENDERED MOOT BY APPROVAL OF THE SETTLEMENT .................... 27

    A.    Section 502(a) of the Bankruptcy Code Does Not Give Law Debenture a
            Statutory Right to Prevent Any Settlement of the PBGC's Claims ........ 28

    B.    The PBGC Settlement Is Binding on All Creditors of the Debtors ......... 34

CONCLUSION................................................................................................. 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Allegheny International Inc.*,
    118 B.R. 282 (Bankr. W.D. Pa. 1990) .................................................................................27

*In re Apex Oil Company*,
    92 B.R. 847 (E.D. Mo. 1988).............................................................................................18

*In re Ashford Hotels, Ltd.*,
    235 B.R. 734 (S.D.N.Y. 1999)..........................................................................................29

*Blackwell v. Reigle (In re Blackwell)*,
    162 B.R. 117 (E.D. Pa. 1993) ...........................................................................................18

*Brown v. Phillip Morris, Inc.*,
    250 F.3d 789 (3d Cir. 2001)..............................................................................................34

*In re Burnham, Connolly, Oesterle and Henry*,
    No. 95-1306, 1996 WL 580475 (6th Cir. 1996) ...............................................................32

*In re CSC Industrial, Inc.*,
    232 F.3d 505 (6th Cir. 2000) ............................................................................................20

*In re Cajun Electric Power Co-Op, Inc.*,
    119 F.3d 349 (5th Cir. 1997) ............................................................................................18

*Case v. L.A. Lumber Products Co.*,
    308 U.S. 106 (1939).........................................................................................................30

*In re Chateaugay Corporation*,
    94 F.3d 772 (2d Cir. 1996)...............................................................................................35

*Chateaugay Corporation v United States Department of Labor*,
    23 F.3d 396 (2d Cir. 1994)...............................................................................................35

*Columbia Gulf Transmission Co. v. La. Natural Gas Pipeline, Inc.*,
No. 93-239, 1994 WL 693361 (E.D. La. Dec. 9, 1994) ........................................................35

*Columbia Packing Co. v. PBGC*,
    81 B.R. 205 (D. Mass. 1988) ...........................................................................................22

*In re Combustion Engineering, Inc.*,
    391 F.3d 190 (3d Cir. 2004)...........................................................................................3, 33

*Comerica Bank v. Johnson (In re Johnson),*
  Case No. 97-1749, 166 F.3d 1214, 1998 WL 833774 (6th Cir. Nov. 19, 1998) .......... 35

*Cosoff v. Rodman (In re W.T. Grant Co.),*
  699 F.2d 599 (2d Cir. 1983) ................................................................................ 17

*In re Debbie Reynolds Hotel & Casino, Inc.,*
  255 F.3d 1061 (9th Cir. 2001) ............................................................................. 18

*Depoister v. Mary M. Holloway Foundation,*
  36 F.3d 582 (7th Cir. 1994) ................................................................................ 18

*In re Dow Corning Corp.,*
  244 B.R. 721 (Bankr. N.D. Mich. 1999) ............................................................... 29

*Fleck v. KDI Sylvan Pools, Inc.,*
  981 F.2d 107 (3d Cir. 1992, cert. denied, 507 U.S. 1005 (1993) .......................... 34

*Fry's Metals, Inc. v. Gibbons (In re RFE Industrial, Inc.),*
  283 F.3d 159 (3d Cir. 2002) ................................................................................ 18

*In re General Motors Corp. Pick Up Truck Fuel Tank Products Litigation,*
  55 F.3d 768 (3d Cir. 1995) .................................................................................. 36

*Gleason v. Northwest Mortgage, Inc.,*
  243 F.3d 130 (3d Cir. 2001) ................................................................................ 34

*In re Grant Broadcasting, Inc.,*
  71 B.R. 390 (Bankr. E.D. Pa. 1987) ..................................................................... 17

*In re Healthco International, Inc.,*
  136 F.3d 45 (1st Cir. 1998) ................................................................................. 18

*In re Martin,*
  91 F.3d at 393 ..................................................................................... 17, 18, 30

*In re Marvel Entertainment Group, Inc.,*
  222 B.R. 243 (D. Del. 1998) ................................................................................ 17

*Newton v. A.C.&S., Inc.,*
  918 F.2d 1121 (3d Cir. 1990) .............................................................................. 36

*Northview Motors, Inc. v. Chrysler Motors Corporation,*
  186 F.3d 346 (3d Cir. 1999) ................................................................................ 30

*PBGC v. CF&I Fabricators of Utah, Inc.,*
  150 F.3d at 1293 (10th Cir. 1998) ....................................................................... 20

*PBGC v. LTV Corp.*,
   496 U.S. 633 (1990)............................................................................................25

*In re Pacific Atlantic Trading Co.*,
   33 F.3d 1064 (9th Cir. 1994) .............................................................................32

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*
   *Anderson*,
   390 U.S. 414 (1968)............................................................................................30

*Raleigh v. Illinois Department of Revenue*,
   530 U.S. 15 (2000).......................................................................................13, 20

*Reiss v. Hagmann*,
   881 F.2d 890 (10th Cir. 1989) ...........................................................................18

*Retired Pilots Association of U.S. Airways, Inc. v. US Airways Group, Inc. (In re US*
   *Airways Group, Inc.)*,
   369 F.3d 806 (4th Cir. 2004) .......................................................................13, 20

*Saccurato v. Masters, Inc. (In re Masters, Inc.)*,
   149 B.R. 289 (Bankr. E.D.N.Y 1992)................................................................31

*In re Simon*,
   179 B.R. 1 (Bankr. D. Mass. 1995) ...................................................................29

*In re Trism, Inc.*,
   282 B.R. 662 (8th Cir. 2002) .............................................................................17

*In re US Airways Group, Inc.*,
   303 B.R. 784 (Bankr. E.D. Va. 2003)...........................................................14, 20

## FEDERAL STATUTES

20 C.F.R. 4044 .....................................................................................................22

11 U.S.C. § 502(a) ................................................................................................32

26 U.S.C. § 412(c)(11)............................................................................................2

29 C.F.R. § 4044.41 ..............................................................................................13

29 U.S.C. §§ 1306(a)(3).........................................................................................22

29 U.S.C. § 1307(e) ................................................................................................22

29 U.S.C. § 1347 ....................................................................................................26

5 U.S.C. § 706(2) ...................................................................................................26

## MISCELLANEOUS

Collier on Bankruptcy, ¶ 502.02(2) .......................................................................29

PBGC Reg. § 4007.11(d) ........................................................................................23

IRS Rev. Rul. 79-237 ..............................................................................................22

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), as Appellees, hereby submit this Opening Brief on appeal pursuant to FED. R. BANKR. P. 8009 and 8010 and Del. LR 7.1.3.

## STATEMENT OF ISSUES PRESENTED

1)    Did the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in its Opinion and Order of January 25, 2005 (the "Order"), properly exercise its discretion by approving the settlement agreement (the "Settlement Agreement") between the Debtors and the Pension Benefit Guaranty Corporation ("PBGC"), based on findings that: (a) the probability of success of litigation of the various issues compromised by the Settlement Agreement would be highly uncertain; (b) litigation of the issues would be complex, costly and cause significant delay; and (c) the comprehensive settlement embodied in the Settlement Agreement is in the paramount interest of all creditors?

2)    Did the Bankruptcy Court correctly rule that (a) it should conduct the hearing on approval of the Settlement Agreement prior to any hearing on the objection of Law Debenture Trust Company of New York ("Law Debenture") to the PBGC's proofs of claims and (b) the Law Debenture objection was mooted by approval of the Settlement Agreement?

## STATEMENT OF FACTS

### *Procedural History*

On February 12, 2002 (the "Petition Date"), fifteen of the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Two additional Debtors commenced their voluntary chapter 11 cases on March 15, 2002. On January 14, 2003, the remaining nine Debtors filed their chapter 11 petitions.

On January 24, 2003, the PBGC, which is the federal governmental agency that administers the termination insurance program for defined benefit pension plans under Title IV of the Employee Retirement Income Security Act ("ERISA"), filed 24 proofs of claim (the "PBGC Claims") against the Debtors on behalf of the Debtors' eight pension plans, including: (a) claims for estimated unfunded benefit liabilities, totaling approximately $620 million; (b) unliquidated claims for missed statutory insurance premiums; and (c) a $17.1 million claim for minimum funding contributions related to certain of the pension plans. (D.I. 5003, Ex. A, Binder 1, Tab 1.) The PBGC Claims were asserted against each Debtor and alleged administrative expense and/or priority status for each component of the claims up to 30 percent of the collective worth of the "controlled group," as defined in 26 U.S.C. § 412(c)(11). (Id.) Law Debenture, as the successor indenture trustee of the Debtors' Subordinated Notes issued in 1993, filed an objection to the PBGC Claims on September 15, 2004 (the "Law Debenture Objection"). (Id.) The Law Debenture Objection was filed several months after the Debtors and certain creditors had commenced settlement negotiations with the PBGC, a fact of which Law Debenture was well aware.

On October 22, 2004, nearly two years after commencing the process to resolve their extensive legacy liabilities, the Debtors filed a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure seeking approval of the Settlement Agreement with the PBGC, and dismissing as moot the Law Debenture Objection (the "PBGC Settlement Motion"). (D.I. 5251, Binder 1, Tab 2.) As the Settlement Agreement embodied a global resolution of nearly all of the Debtors' significant legacy liabilities, both the PBGC and the Official Committee of Unsecured Creditors (the "Creditors' Committee") -- of which Law Debenture is a member --

filed responses in support of the PBGC Settlement Motion. (D.I. 5314, Binder 1, Tab 8; D.I. 5311, Binder 1, Tab 9.)

On November 8, 2004, the Bankruptcy Court held a hearing on the Law Debenture Objection and the PBGC Settlement Motion. The Bankruptcy Court ruled that it would stay the Law Debenture Objection pending the Court's ruling on the PBGC Settlement Motion, which it set for an evidentiary hearing in January 2005. On December 14, 2004, Law Debenture filed a motion for reconsideration (the "Reconsideration Motion"), claiming that the Third Circuit's decision in In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004), somehow mandated that the Bankruptcy Court defer hearing the PBGC Settlement Motion until after the Law Debenture Objection was resolved. (D.I. 5592, Binder 2, Tab 21.)

On January 18, 2005, after hearing the Reconsideration Motion, the Bankruptcy Court conducted a full-day evidentiary hearing on the PBGC Settlement Motion. In support of the Settlement Agreement, the Debtors presented substantial evidence regarding not only the reasonableness of the myriad elements of the Settlement Agreement but also, contrary to the unfounded claims of Law Debenture, the fairness of the process by which it was reached. Specifically, the Debtors offered the testimony of: (i) John Barneson, the Debtors' Senior Vice President and Chief Administrative Officer (D.I. 5909, Binder 3, Tab 3); (ii) Blake O'Dowd, a Managing Director of the Restructuring Group of Lazard Freres & Co. ("Lazard"), financial advisor and investment banker of the Debtors (D.I. 5908, Binder 3, Tab 32); and Norman W. Parrish, formerly of Hewitt Associates LLC, the Debtors' consulting actuary (D.I. 5907, Binder 3, Tab 31.) Additionally, the Creditors' Committee offered the testimony of Amit Patel, Director of the Financial Restructuring Group of Houlihan Lokey Howard and Zukin Capital ("Houlihan"), financial advisor to the Creditors' Committee (D.I. 5948, Binder 3, Tab 34.)

Finally, the PBGC offered the expert testimony of Karen Justensen, Supervising Chief

Negotiating Actuary in the Corporate Finance and Negotiations Department of the PBGC (D.I.

5903, Binder 3, Tab 29), and the testimony of Kenneth B. Kofsky, an Accountant in the

Financial Operations Department of the PBGC (D.I. 5903, Binder 3, Tab 30.)

Consistent with its position throughout this litigation, and even on appeal, Law

Debenture's entire evidentiary submission was confined to one aspect of one component of the

Settlement Agreement; specifically the interest rate used to calculate the amount of the PBGC's

unsecured claim. In support of their position, Law Debenture submitted the expert report and

declaration of one witness - Roger Brinner, Chief Economist of the Parthenon Group, regarding

his view of an appropriate "prudent investor" interest rate. (Binder 5, Tab 2 and 5.) As cross-

examination revealed, Dr. Brinner had no knowledge regarding any of the elements of the

Settlement Agreement and had no experience with the pension issues relevant to the Bankruptcy

Court's analysis. (D.I. 6099, Transcript of Jan. 18, 2005 hearing "Tr. of Jan. 18, 2005" at 142,

Binder 4, Tab 42.)

On January 25, 2005, the Bankruptcy Court entered (a) the Settlement Order

approving the PBGC Settlement Agreement and (b) the Reconsideration Order denying the

Motion for Reconsideration. (D.I. 6005, Binder 3, Tab 36; D.I. 6006, Binder 3, Tab 37.) On

February 3, 2005, Law Debenture appealed each of these orders (collectively, the "Appeals").

On March 7, 2005, Law Debenture filed with this Court an unopposed motion to consolidate the

Appeals, which was granted on May 3, 2005.

### *Overview of Debtors' Legacy Liabilities*

One of the most significant issues confronting the Debtors in these chapter 11

proceedings was their legacy liabilities, which included substantial underfunded pension

liabilities and retiree medical benefit obligations. As of the Petition Date, Debtors Kaiser

Aluminum & Chemical Corporation ("KACC") and Kaiser Center, Inc. ("KCI") sponsored eight

defined pension benefit plans (the "Pension Plans"). (Declaration of John Barneson, D.I. 5909,

"Barneson Dec." ¶ 2.) Due to low rates of return on the Pension Plans' assets and low interest

rates, as of the Petition Date the Pension Plans had become seriously under funded. (Id.)

   In addition to substantial underfunding liability, the Debtors also had significant

retiree medical benefit obligations. On the Petition Date, the Debtors KACC and Kaiser

Bellwood Corporation were obligated to provide various medical, surgical, hospital, disability,

death and other "retiree benefits" (collectively, the "Retiree Benefits") to retired salaried

employees, their spouses, surviving spouses and eligible dependants (collectively, the "Salaried

Retirees") and certain retired hourly employees represented by several unions, including their

spouses, surviving spouses and eligible dependents (collectively, the "Union Retirees"). (Id. ¶

3.) In the case of the Union Retirees, the Retiree Benefits were provided pursuant to collective

bargaining agreements with the United Steelworkers of America ("USWA"), the International

Association of Machinists and Aerospace Workers ("IAM") and other unions. (Id.) With the

Debtors' retiree medical benefit obligations mounting, shortly after the commencement of the

Chapter 11 cases, it became clear that the Debtors could not survive, much less emerge from

chapter 11, absent a global resolution of their legacy liabilities. (Id. ¶ 6; see also Declaration of

Blake O'Dowd, D.I. 5908, "O'Dowd Dec." ¶ 7.)

### *The Debtors Initial Meetings with the PBGC*

   Owing to this stark reality, the Debtors and their advisors began as early as the

Petition Date to consider how to effectively restructure these massive liabilities — which

aggregated in excess of $1 billion — recognizing the need to both provide certain benefits to

current and retired employees to the extent possible, while also ensuring the Debtors' financial

wherewithal to survive. Accordingly, commencing in November 2002, the Debtors first met

with the PBGC to at least establish a framework for resolving their pension liabilities. (Barneson Dec. ¶ 5; O'Dowd Dec. ¶ 8; Declaration of Norman Parrish, D.I. 5907 "Parrish Dec." ¶ 2.) At this initial meeting, the Debtors conveyed to the PBGC that their business plan could not provide the necessary cash flow to support the Debtors' pension liabilities. Specifically, the reorganized Kaiser entity was projected to generate annual cash flow of only $85 million to $179 million for the years 2004 through 2010, while during the same period, the restructured company would incur retiree medical costs of $449 million and pension costs of $504 million. (Barneson Dec. ¶ 6.)

With the PBGC providing no meaningful response or any substantive guidance concerning these issues at that time, the Debtors began to move forward with their business plan. (Barneson Dec. ¶¶ 7-8.) With the overhanging pension issues remaining, however, in September 2003, the Debtors and their advisors once again met with the PBGC, this time in an effort to (i) demonstrate the need to terminate the Pension Plans, (ii) commence negotiations on the resolution of the PBGC's pre- and post-petition claims and (iii) lay the groundwork for PBGC approval of follow-on replacement plans. (Id. ¶ 10; O'Dowd Dec. ¶ 9.) In regard to the PBGC's unsecured claim, while the Debtors and their advisors were well-aware of the PBGC's demand that such claims be calculated based upon the PBGC's "statutory rate," in an effort to begin the negotiation process the Debtors presented the PBGC with a settlement proposal premised upon a "prudent investor" rate of 9%. (Barneson Dec. ¶ 13; September 2003 Kaiser Aluminum presentation Binder 6, Tab D-11; Parish Dec. ¶ 7; O'Dowd Dec. ¶ 9 – 10). Not only did no substantive negotiations evolve from this meeting, but the PBGC made it clear that it would not agree to terminate the Pension Plans and that it would not agree to a claim amount based upon

any interest rate other than its statutory interest rate. (Barneson Dec. ¶ 13; Parish Dec. ¶ 8; O'Dowd Dec. ¶ 11.)

### *Negotiations with the Retirees' Committee, USWA and IAM*

With no consensual resolution of the pension liability issues imminent, during late 2003 and the beginning of 2004, the Debtors met numerous times with the Official Committee of Retired Salaried Employees (the "Retirees' Committee"), the USWA and the IAM to attempt to reach negotiated agreements restructuring the Debtors' pension and/or Retiree Benefits obligations to levels that would allow them to formulate a viable plan of reorganization. (Barneson Dec. ¶ 14.) Although progress was being made in the negotiations with the labor and retiree constituencies, to bring closure to the Debtors' efforts, in January 2004, the Debtors filed motions (collectively, the "Legacy Liability Motions") requesting that the Bankruptcy Court (a) authorize modifications to the Retiree Benefits obligations of retirees represented by the Retirees' Committee, USWA and the IAM; (b) determine that the financial requirements for a distress termination of each of the pension plans covering hourly and union employees (the "Hourly Plans") were satisfied, approve a distress termination of each of those plans and authorize implementation of replacement defined contribution plans for active employees (the "Distress Termination Motion"); and (c) authorize a rejection of certain USWA and IAM collective bargaining agreements as necessary to terminate the Hourly Plans. (Id.; D.I. 3425, 3426, 3427.)

Prior to the hearing on the Legacy Liability Motions, the Debtors reached negotiated agreements with the USWA, the IAM and the Retirees' Committee. (Barneson Dec. ¶ 15.) Specifically, the parties agreed to terminate the applicable Retiree Benefit plans and, in their place, provide retirees with alternative medical coverage. (Id.) The agreements with the USWA and the IAM also provided for the termination, and assumption by the PBGC, of the Hourly Plans covering Union Retirees, and the establishment of replacement defined pension

plans. (Id.) Notwithstanding these agreements, termination of the Hourly Plans required approval of and action by the PBGC, and the replacement plans were subject to the PBGC's review and possible challenge in connection with the PBGC's policy regarding abusive follow-on plans. (Id.)

### *Litigation of the Distress Termination Motion*

On January 28, 2004, the PBGC filed a response to the Distress Termination Motion, asserting that the Bankruptcy Court should make separate determinations for each pension plan as to whether the Debtors met the criteria for a distress termination of the Hourly Plans. (D.I. 3538.) The PBGC also reserved its right to review the proposed replacement pension plans under its policy that such plans must be "non-abusive." (Id.)

On February 5, 2004, the Bankruptcy Court held a hearing on the Distress Termination Motion. At the conclusion of the hearing, the Bankruptcy Court entered an order (a) determining that the financial requirements for a distress termination of the Debtors' Hourly Plans under ERISA section 4041(c)(2)(B) were satisfied; (b) approving a distress termination of each of the Hourly Plans[1]; and (c) authorizing the implementation of hourly and salaried replacement plans, but expressly subject to the PBGC's right to review and potentially challenge such plans pursuant to its abusive follow-on plan policy (the "Distress Termination Order"). (D.I. 3657.) The Distress Termination Order also expressly provided that termination of the Hourly Plans remained subject to the PBGC's determination that certain other requirements of ERISA with respect to distress termination had been satisfied. (Id.)

Although the Bankruptcy Court granted the Distress Termination Motion and the Debtors were able to reach, and obtain Court approval of, agreements with their retiree

---

[1]     The Debtors did not seek termination of the Kaiser Center Garage Pension Plan because the plan was not underfunded

constituencies on their retiree medical benefit liabilities and terms of certain replacement pension plans, in the end this did not bring closure to the Debtors' legacy liability issues. Specifically, in February 2004, the PBGC appealed the Distress Termination Order. (D.I. 3735.) In addition, despite the Debtors' considerable efforts negotiating and reaching agreements on replacement benefit plans, the PBGC soon advised the Debtors that it would challenge certain of the replacement plans as "abusive;" further frustrating the Debtors' efforts to restructure their pension liabilities. (Barneson Dec. ¶ 20.) Finally, there was no resolution of the PBGC's significant pre- and post-petition claims, which were among the largest filed in these cases. (Id. ¶ 22.) Again, a protracted and risky litigation battle loomed. Absent the resolution of these and other issues with the PBGC, not only would the Debtors have had no workable restructuring of their pension and retiree medical liabilities, their prospects for an emergence from chapter 11 would also have been in jeopardy. (O'Dowd Dec. ¶¶ 13-14.)

### _Negotiations with the PBGC Regarding the Debtors' Replacement Plans_

For these reasons, from July through September of 2004, the Debtors began protracted and arms-length settlement negotiations with the PBGC in an effort to arrive at a global resolution of their pension liabilities.[2] (Barneson Dec. ¶¶ 21, 22.) Indeed, while Law Debentures ponders that the Debtors could have attempted a piecemeal resolution of their legacy liabilities, the evidentiary record tells a far different story. The Debtors were confronted with a number of major issues, and an equal number of secondary issues that had to be resolved in a coordinated and consolidated manner. (Barneson Dec. ¶ 22.) Among the major issues were the PBGC's appeal of the Bankruptcy Court's distress termination finding, the PBGC's challenge of the USWA replacement plans as "abusive" and the size and classification of the PBGC's claims,

---

[2] Indeed, as reflected in the numerous term sheets that were exchanged between the parties (Barneson Dec., Ex. D2-D9), these negotiations were at arms-length and substantive.

particularly the size of any administrative claim. (Id.; O'Dowd Dec. ¶ 14.) Absent resolution of

each these critical issues, the only alternative would have been time-consuming litigation that

would delay the Debtors' emergence from chapter 11, consume recoverable cash, delay

distribution of cash recoveries from subsidiaries where assets had been or were in the process of

being liquidated while reducing overall creditor recoveries and potentially lead to the liquidation

of all the Debtors.[3] (Id.; Barneson Dec. ¶ 22.) For these very reasons, the PBGC was equally

demanding of a global settlement. (Id. ¶ 22.)

After considerable negotiations over these issues, including the exchange of

countless term sheets (Barneson Dec. Ex. D2-D9) in October 2004, the Debtors and the PBGC

entered into the Settlement Agreement, which resulted in a global resolution of the Debtors'

pension liabilities (including relieving the Debtors of 90% of their pension liabilities). (Id. ¶ 23-

25.) The Settlement Agreement is one of the key components of the Debtors' efforts to emerge

from chapter 11. (Id.)

### *Terms of the PBGC Settlement Agreement*

Based upon extensive negotiations between the parties, the following material

terms of the Settlement Agreement were agreed upon:

    a.    The PBGC would assume the Kaiser Aluminum Pension Plan (the "KAP Plan") as of April 30, 2004.

    b.    The Debtors would continue sponsorship of the Los Angeles Plan, the Garage Plan, the Tulsa Plan, the Bellwood Plan and the Sherman Plan.

    c.    On the later of (i) five business days after Court approval of the Settlement Agreement or (ii) within 30 days of the effective date of an intercompany claims settlement between the Debtors and the

---

[3] The Settlement Agreement was also central to the completion of a global intercompany claims settlement agreement (Barneson ¶ 26), which was approved and consummated after the Bankruptcy Court's approval of the Settlement Agreement. (D.I. 6164.) The intercompany settlement agreement, in turn, was necessary to prevent a termination of the USWA Agreement. (Barneson ¶ 26.) All of these agreements are cornerstones of KACC's overall reorganization effort.

Creditors' Committee, the Debtors would satisfy the minimum funding standard under section 412 of the Internal Revenue Code (the "IRC") for all five retained pension plans, which was estimated to cost approximately $4 4 million. The Debtors would also insure that the minimum funding standard was satisfied during the remainder of the chapter 11 proceedings.

d.    The PBGC would dismiss its appeal of the Distress Termination Order.

e.    The PBGC would issue a no-action letter with respect to the salaried defined contribution plan, the USWA defined contribution plan, and the Steelworkers Pension Trust (the "SPT") (collectively, the "Replacement Plans").

f.    The Debtors, the PBGC and the USWA agreed that prior to July 1, 2009, the Replacement Plans would not increase benefits (contribution levels) and the Debtors would not establish or contribute to a defined benefit plan (other than the SPT) with respect to bargaining locations previously covered by the KAP Plan.

g.    The PBGC agreed to a full release of all claims against Volta Aluminium Company Limited, a joint venture in which KACC previously held a 90% interest.

h.    The PBGC agreed to restrictions on the transfer of any equity securities to be received by it pursuant to a plan of reorganization for KACC so long as the restrictions applicable to such securities were no more restrictive than those applicable to the equity securities to be received by the VEBA established for the benefit of retirees represented by the USWA.

i.    The PBGC's claims for unfunded benefit liabilities and premiums would be treated as allowed general unsecured claims against all the Debtors in the amount of $616 million, provided that the PBGC's recovery at the estates of Alpart Jamaica Inc. ("AJI"), Kaiser Jamaica Corporation ("KJC"), Kaiser Alumina Australia Corporation ("Kaiser Australia") and Kaiser Finance Corporation ("KFC") would be limited to 32% of the net distributable proceeds payable in the aggregate to the PBGC and holders of the Senior Subordinated Notes and the 9-7/8% Senior Notes and 10-7/8% Senior Notes (collectively, the "Senior Notes") issued by KACC under confirmed plans of reorganization.

> j.    The PBGC would have an allowed administrative claim in the amount of $14 million, which claim would be a joint and several obligation of all Debtors other than AJI and KJC.
>
> k.    The Debtors would affirmatively support the agreed PBGC claim amounts, described above, against any challenge, including the Law Debenture Objection.

In accordance with the Settlement Agreement, the PBGC has assumed the KAP Plan, the Debtors have paid over $5 million to satisfy minimum funding obligations with respect to the retained pension plans, the PBGC has issued the no-action letter with respect to the Replacement Plans, the PBGC has released its claims against Volta Aluminium Company Limited and the Debtors have filed and the Bankruptcy Court has conducted confirmation hearings on plans of liquidation for AJI, KJC, KAAC and KFC, which contain provisions implementing the agreed resolution of the PBGC Claims.[4]

In the end, except for Law Debenture, each of the Debtors' significant creditor constituencies, including representatives of its employees and retirees, supported the Settlement Agreement. (Barneson Dec. ¶ 26.) And, as for Law Debenture, the indenture trustee on "out-of-the-money" subordinated debt, it is critical to note that while the Settlement Agreement reflects a global resolution of countless complex issues, Law Debenture has no complaint with the vast majority of its terms. Rather this appeal is based solely upon complaints with the process that led to one discrete aspect of this global settlement; the appropriate discount rate to be used in calculating the PBGC's unsecured claims in respect of unfunded benefit liabilities. As neither

---

[4] Over two months after filing its notice of appeal and after all these actions, other than the confirmation hearing on the liquidation plans, had been taken, Law Debenture filed with the Bankruptcy Court a motion for a stay of the Settlement Order pending appeal. Although Law Debenture was or should have been aware that these actions had been taken and is certainly now aware that all of them have been taken, Law Debenture elected not to seek a stay at the time it commenced the appeal and even now has agreed to indefinitely defer any hearing on the motion for stay.

the record nor the applicable law support Law Debenture on even these two points, the Settlement Order should be affirmed.

### *The Amount of the Unsecured Claim*

As to the amount of the allowed PBGC unsecured claim, simply put, Law Debenture claims that the PBGC's unsecured claim should not have been compromised, but, instead a "prudent investor" interest rate should have unilaterally been applied to determine the claim amount. (App. Br. at 36.) What Law Debenture fails to mention, however, is that in an effort to "jump start" the negotiations with the PBGC, at the settlement meeting in September 2003, the Debtors proposed a settlement with the PBGC using a "prudent investor" rate of 9%. (O'Dowd Dec. ¶ 10; Parrish Dec. ¶ 7; Barneson Dec. ¶ 10; Tr. of Jan. 18, 2005 at 70, 85.) Notwithstanding this position, at that meeting and throughout the negotiation process, the PBGC was resolute that the amount of its claims could only be calculated pursuant to the PBGC's established statutory rate.[5] (Barneson Dec. ¶ 11; O'Dowd Dec. ¶ 11; Tr. of Jan. 18, 2005 at 71, 97.) Not only was this position consistent with the PBGC's historic approach to other distress termination situations (Parrish Dec. ¶ 8), but that approach had recently been approved by the United States Bankruptcy Court for the Eastern District of Virginia in In re US Airways Group, Inc., which held that it was appropriate to use the discount rate specified in the PBGC's valuation regulation, rather than the debtor's proffered "prudent investor rate," or the rate that a reasonably prudent investor would receive from investing the funds.[6] In re US Airways Group, Inc., 303 B.R. 784 (Bankr. E.D. Va. 2003) (aff'd on other grounds sub nom., Retired Pilots Ass'n of U.S.

---

[5]    The PBGC's valuation regulation is codified at 29 C.F.R. § 4044.41 to 4044.75, which specifies the use of a discount rate as well as actuarial tables for life expectancy and retirement age for plan participants.

[6]    Citing the United States Supreme Court's ruling in Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15 (2000), the court in US Airways held that, because ERISA determines an employer's liability based on a valuation regulation, the regulation should control for claim allowance purposes because the PBGC's claim is, originally, a function of ERISA, a nonbankruptcy law. In re US Airways Group, Inc., 303 B.R. at 792.

Airways, Inc. v. US Airways Group, Inc. (In re US Airways Group, Inc.), 369 F.3d 806 (4th Cir. 2004).

Nonetheless, despite the PBGC's unwillingness to compromise on this issue, in the end, the agreement reached with the PBGC on this isolated issue reflected significant compromise on the part of the PBGC. Prior to the Settlement Agreement, the PBGC asserted that it had claims against the Debtors for unpaid minimum funding requirements in the aggregate amount of approximately $707.8 million (excluding interest and penalties), and that most of this amount was entitled to administrative and/or priority status. (Declaration of Amit Patel, D.I. 5948, "Patel Dec." ¶ 25.) The agreed-upon claim amount of $616 million, by itself, is less than the $637 million in total liquidated claims asserted in the PBGC's proofs of claim. In addition, the PBGC's agreement to limit its recovery at four of the liquidating debtors to 32 percent of the net distributable proceeds, effectively results in an implied claim amount of $438 million at AJI and KJC and $396 million at KAAC and FKC and an implied interest rate of approximately 6 percent. (Id.; Tr. of Jan. 18, 2005 at 137.) Based upon the PBGC's assertion that the proper discount rate is between 4-5 percent and prudent investor rates ranging between 8-10 percent, an implied discount rate of 6 percent is well within the range of reasonableness. (Patel Dec. ¶ 25.)

### *The Negotiations Leading to the Settlement Agreement Were Appropriate*

Finally, in an obvious sense of desperation, Law Debenture contends that the Debtors abdicated their responsibility to negotiate the amount of the PBGC Claim, and that the final resolution of this amount was the product of "collusion" between the holders of the Senior Notes and the PBGC. (App. Br. at 12.) At the outset, Law Debenture's position simply ignores the record that the Debtors, its counsel and advisors were intimately involved in negotiating the many components of the Settlement Agreement. (O'Dowd Dec. ¶¶ 8, 9, 12; Barneson Dec. ¶¶ 5, 10, 13, 20, 21, 23; Patel Dec. ¶ 18; Parrish Dec. ¶¶ 3, 7, 10; Tr. of Jan. 18, 2005 at 68-71, 88.)

Moreover, as Law Debenture readily concedes, the PBGC, the holders of the Debtors' Senior Notes issued in 1994 and 1996 and the holders of the Debtors' Subordinated Notes (represented by Law Debenture) were the only significant creditors of Debtors AJI, KJC, Kaiser Australia and KFC (collectively, the "Alumina Debtors"), whose assets have been liquidated and are proposed to be distributed pursuant to plans of liquidation presented to the Bankruptcy Court for confirmation in April 2005. [7] Thus, because the ultimate split between the various creditors was an inter-creditor issue, while the Debtors agreed, as part of the global resolution to support a reasonable claim of the PBGC, the Debtors made clear that they could not be placed in a position of supporting one unsecured creditor or creditor group against another. (Barneson Dec. ¶ 24.) For this reason, it was appropriate that the negotiations take place between representatives of the creditors who would share in recovery. (Tr. of Jan. 18, 2005 at 96, 135.) While Law Debenture screams foul, it simply ignores that first, the holders of the Senior Notes had every incentive to negotiate the lowest possible claim amount with the PBGC as virtually every dollar distributed to the PBGC in respect of its claim at the Alumina Debtors is a dollar that the holders of Senior Notes will not receive, (Tr. of Jan. 18 , 2005 at 132), and second, no recovery would flow to the holders of subordinated debt represented by Law Debenture unless the PBGC Claims were reduced to an amount that could never be achieved consensually, and which as a matter of economic reality and applicable law was pure fiction.

As to Law Debenture's complaints that they were excluded from this process, again, the record tells a far different story. The Creditors' Committee, which is comprised of creditors that have claims against all the Debtors, and which included Law Debenture as one of its members, was kept informed of the negotiation of the PBGC claims and supported all aspects

---

[7]     Each of the Alumina Debtors is a guarantor of the Senior Notes and Senior Subordinated Notes and jointly and severally liable with each of the Debtors for the PBGC Claims

of the Settlement Agreement, and its financial advisor Houlihan was intimately involved in preparing financial analyses of various settlement scenarios. (Tr. of Jan. 18, 2005 at 133-135; Patel Dec. ¶ 28.) Moreover, as Mr. Patel testified, it was Law Debenture that actually chose not to be involved in this negotiation process, opting to await discussions on a resolution of the dispute regarding the relative priority of the senior and subordinated notes at the Alumina Debtors (Tr. of Jan. 18, 2005 at 135-37.)

Thus, in the end, the overwhelming evidence presented to the Bankruptcy Court demonstrates that not only was the process by which the Settlement Agreement was reached arms-length and appropriate, but this global resolution embodied in the Settlement Agreement is unquestionably in the best interests of the Debtors' estates. For these reasons, the Bankruptcy Court's Order should be affirmed.

## SUMMARY OF ARGUMENT

The Bankruptcy Court's Settlement Order should be upheld because the Bankruptcy Court properly exercised its discretion in approving the Settlement Agreement. Under Bankruptcy Rule 9019, the Bankruptcy Court found that the probability of success of litigation of the various issues comprised by the Settlement Agreement would be highly uncertain. Specifically, litigation would include a continuation of the PBGC appeal of the Distress Termination Order, the commencement of litigation challenging the PBGC's application of its replacement pension plan policy and the initiation of claims litigation against the PBGC, both as to the nature and amount of the claims. The Settlement Agreement favorably resolves all of the issues with the PBGC and enables the Debtors to avoid the expense and delay attendant to litigation and substantially advances these cases toward confirmation of plans of reorganization and liquidation. Accordingly, the Bankruptcy Court clearly did not abuse its discretion by approving the Settlement Agreement.

Moreover, Law Debenture's apparent claim that it, and presumably any other party in interest, effectively has a veto right over the approval of a claim settlement between a debtor and creditor is legally unsound. This contention is not supported by section 502 of the Bankruptcy Code and, if accepted, would contravene the fundamental bankruptcy policy that favors the extra-judicial resolution of disputes.

## ARGUMENT

I.    **The Bankruptcy Court Properly Applied Rule 9019 Standards In Granting the Settlement Motion.**

A.    **The Appropriate Legal Standards**

The standard a bankruptcy court applies when deciding whether to approve a settlement under rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is well-settled: a bankruptcy court must determine whether the proposed settlement is in the best interests of the debtor's estate. See Martin, 91 F.3d at 394; In re Marvel Entm't Group, Inc., 222 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"); In re Trism, Inc., 282 B.R. 662 (8th Cir. 2002) (explaining that bankruptcy court's role in evaluating proposed settlement is to determine if settlement is in best interest of estate). A bankruptcy court need not conclusively determine the claims subject to the compromise, nor find that a compromise constitutes the best result obtainable. See Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983). Instead, a bankruptcy court need only canvass the issues to determine that the settlement does not fall "below the lowest point of reasonableness." Id. (quoting Newman v. Stein, 464 F.2d 689, 693 (2d Cir. 1972)). Thus, a debtor's judgment in recommending a settlement should not be substituted as long as the settlement is reasonable. In re Grant Broadcasting, Inc., 71 B.R. 390,

399 (Bankr. E.D. Pa. 1987); see also In re Apex Oil Company, 92 B.R. 847, 867 (E.D. Mo. 1988).

 The analysis required under these standards directed the Bankruptcy Court to "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." In re Martin, 91 F.3d at 393. In doing so, the Court was required to weigh the following four factors: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors. Id.; Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.), 283 F.3d 159, 165 (3d Cir. 2002).

 Recognizing the seminal importance of settlements in chapter 11 proceedings, and that a review of such resolutions is factually intensive, courts in this jurisdiction and elsewhere have held that the decision of a bankruptcy court to approve a settlement agreement under Bankruptcy Rule 9019 may be reversed only for abuse of discretion. See In re Martin, 91 F.3d at 393; see also In re Debbie Reynolds Hotel & Casino, Inc., 255 F.3d 1061, 1065 (9th Cir. 2001); In re Healthco Int'l, Inc., 136 F.3d 45, 50 (1st Cir. 1998); In re Cajun Elec. Power Co-Op. Inc., 119 F.3d 349, 355 (5th Cir. 1997); Depoister v. Mary M. Holloway Found., 36 F.3d 582, 586-87 (7th Cir. 1994); Reiss v. Hagmann, 881 F.2d 890, 891-92 (10th Cir. 1989). "Discretion will be found to be abused when the judicial action is arbitrary, fanciful or unreasonable[;] which is another way of saying that discretion is abused where no reasonable man would take the view adopted by the trial court." Blackwell v. Reigle (In re Blackwell), 162 B.R. 117, 119 (E.D. Pa. 1993). As one court has explained it, in determining whether to overturn a bankruptcy court order approving a settlement,

> the reviewing court need not make its own investigation into the
> reasonableness of the settlement. Instead, it should only "canvas the
> issues and see whether the settlement falls below the **lowest point** in the
> range of reasonableness.

In re Ashford Hotels, Ltd., 235 B.R. 734, 739 (S.D.N.Y. 1999) (citations omitted) (emphasis added).

**B.    The Probability of Success is Highly Uncertain.**

As to the <u>Martin</u> factors, the Bankruptcy Court found that the probability of success of litigation of the various issues compromised by the Settlement Agreement would be highly uncertain. (D.I. 6076, Tr. of Jan. 24, 2005 at 92-95, Binder 3, Tab 39.) Specifically, the Bankruptcy Court found that the Settlement Agreement eliminates the uncertainty associated with, among others, the following key issues: (a) the amount and method of calculating the prepetition and postpetition claims of the PBGC; (b) the pending PBGC appeal of the Distress Termination Order; and (c) the PBGC's challenge of certain of the Replacement Plans. (<u>Id.</u>)

*Certainty Regarding PBGC's Proofs of Claim*

Challenging the uncertainty of only one of these findings — the method of calculating the prepetition claims of the PBGC, and more specifically, the appropriate discount rate to be applied to calculate the amount of the PBGC's prepetition claims — Law Debenture argues that the Bankruptcy Court abused its discretion in approving the Settlement Agreement because "the Bankruptcy Court failed to properly assess the Debtors' litigation risks with respect to the calculation of the "Unfunded Benefit Liability Claims" and should have determined that the PBGC Settlement could not be construed as fair and reasonable where the settlement ignores the most likely outcome of this issue." (App. Br. at 35.) Specifically, Law Debenture contends the Debtors have little risk of losing a dispute with the PBGC regarding the appropriate discount rate to be applied to calculate the amount of the PBGC's claims because the "overwhelming

weight of authority" requires that the PBGC's claims be calculated using a "prudent investor rate" rather than a rate calculated pursuant to the PBGC's valuation regulations (Id. at 29, 32-37.) To put it simply, Law Debenture's overly simplistic argument is contradicted by the record.

First, the PBGC has consistently maintained the position, in this case and in all others, that the actuarial present value of the unfunded benefit liabilities must be calculated using the assumptions, including the discount rate, provided in the PBGC's valuation regulation. Indeed, dating back to the Debtors' initial meeting with the PBGC on this issue, the PBGC made it clear that no settlement could be reached unless the PBGC's statutory discount rate was utilized. (Barneson Dec. ¶ 7; O'Dowd Dec. ¶ 11; Parrish Dec. ¶ 8.)

As for Law Debenture's legal prognostications, they simply overlook the fact that the most recent judicial review of this issue upheld the very methodology Law Debenture claims is legally unsupported. In re US Airways Group, Inc., 303 B.R. at 791-93. While earlier decisions of the Sixth and Tenth Circuits had held that a bankruptcy court may value the unfunded benefit liability using the "prudent investor rate", In re CSC Indus., Inc., 232 F.3d 505, 510 (6th Cir. 2000); PBGC v. CF&I Fabricators of Utah, Inc., 150 F.3d at 1293, 1297-98 (10th Cir. 1998), both of these decisions predate the United States Supreme Court's decision in Raleigh, which was heavily relied upon in US Airways. Thus, it is wrong for Law Debenture to claim that the "overwhelming weight of authority" supports the application of a prudent investor rate. The Bankruptcy Court held as much in concluding that the likelihood of the Debtors prevailing on this issue would be "highly uncertain." (D.I. 6076, Transcript of January 24, 2005 "Tr. of Jan. 24, 2005" at 92-95, Binder 3, Tab 39.)

Furthermore, even if a court were to conclude that a prudent investor rate rather than the PBGC's rate in its valuation regulation should be used, Law Debenture ignores the fact that arguments can be advanced for a range of rates that constitute a prudent investor rate, and there is considerable uncertainty regarding what a court would ultimately conclude is a prudent investor rate. Indeed, Law Debenture's expert admitted that there is a range of possible prudent investor rates that experts could determine. (Id. at 153-54.)

Even if the 10.4 % prudent investor rate arrived at by Law Debenture's expert was somehow relevant to the totality of issues before the Bankruptcy Court, the process by which Law Debenture arrived at this rate is quite telling as to the numerous contested issues that would remain. First, Law Debenture's calculation assumes several highly speculative factors, which it attributes to the vagaries of the PBGC. For example, Law Debenture assumes that a discount rate far greater than that applicable to the Debtors' pension plans is appropriate because the PBGC has opportunities to seek legislative or regulatory action from Congress. (Id. at 161.) Perhaps most critically, Law Debenture's expert candidly admitted that the PBGC's chances of obtaining a 10.4 % return are 50/50. (Id. at 154.) Accordingly, even assuming that the Bankruptcy Court could adopt a "prudent investor rate," a coin flip could never be the basis for determining an appropriate return on investment for pensions of thousands of the Debtors current and former employees.

Based on these divergent legal standards and the evidentiary record, the Bankruptcy Court properly found that the appropriate methodology for calculating the unfunded benefit liabilities of a distress-terminated pension plan is far from certain.[8]  (Id. at 95) ("as was clear from the discussion in court about the prudent investor rate versus the PBGC's calculation,

the methodology for calculating unfunded benefit liabilities of a distress terminated pension plan is uncertain and would likely result in extended and costly litigation."). Law Debenture has advanced no basis to disturb this holding.

Owing to its short-sighted view of the global settlement, Law Debenture ignores the fact that the Bankruptcy Court also found that there was uncertainty regarding the portion of the PBGC's claim entitled to administrative priority status. (Id. at 94-95.) The PBGC asserted that minimum funding payments that came due postpetition and premium payments that arose postpetition[9] were entitled to administrative expense status. This same position has been upheld in the United States District Court for the District of Massachusetts as costs that are "necessary to preserve the estate." Columbia Packing Co. v. PBGC, 81 B.R. 205 (D. Mass. 1988) (addressing missed minimum funding contributions). The PBGC has also argued that amounts for which it could obtain a lien under section 412(n) of the Internal Revenue Code and Section 4068 of ERISA are entitled to administrative expense and/or priority status as a prepetition or postpetition tax. In the aggregate, the PBGC asserted that it was entitled to an administrative claim of nearly $70 million. (Patel Dec." ¶ 23.)

Recognizing that an administrative claim even approaching $70 million would pose enormous risk to the reorganization of the Debtors (Tr. of Jan. 18, 2005 at 134), the Debtors maintained that, although certain portions of the PBGC's claims came due postpetition, the vast majority of the claims were attributable to services performed by employees prepetition and, as a

---

(continued...)
[8]      Because the interest rate assumption used by the PBGC pursuant to its valuation regulation (20 C.F.R. 4044) can have a substantial effect on the amount of the PBGC's claims, it is generally challenged in virtually every bankruptcy proceeding. See IRS Rev. Rul. 79-237.

[9]      Under section 4007(e) of ERISA, payment of premiums to the PBGC is the responsibility of the plan sponsor and each member of its controlled group. 29 U.S.C. § 1307(e). Such required premiums consist of both (i) fixed premiums of $19 per year per participant, and (ii) variable premiums, which are calculated at $9 for each $1,000 of unfunded vested benefits. 29 U.S.C. §§ 1306(a)(3)(A)(i) and 1306(a)(3)(E)(ii). The obligation to

result, the Debtors received no benefit from these obligations postpetition. Therefore, other than the portion of the claims relating to postpetition benefit accruals and certain fixed premium payments,[10] the PBGC's claims would not constitute actual and necessary expenses entitled to administrative priority. And, while a number of courts have supported the Debtors' position that the PBGC's claims are not entitled to full administrative priority, as the Bankruptcy Court acknowledged, the PBGC has continued to maintain in this and other recently filed chapter 11 proceedings that any minimum funding payments and premiums that become due during the postpetition period are administrative expenses. (Tr. of Jan. 24, 2005 at 94.)

   In the end, as part of the global Settlement Agreement, including the amount of the PBGC unsecured claim, the Debtors were able to reach a resolution of the administrative claim at $14 million. With the risk that a court could conclude that significant portions of the PBGC's claims are administrative in nature, and considering the cost of litigating these claims, the Bankruptcy Court was correct to conclude that the Debtors' agreement to allow the PBGC's administrative expense claim in the amount of $14 million is fair and reasonable. Based upon the highly unsettled legal landscape, the wide disparity in potential interest rates and the amount and potential impact a significant administrative claim would have on the Debtors' ability to reorganize, there can be no question that the resolution of this issue was well within the range of reasonableness and that the Bankruptcy Court did not abuse its discretion in approving this element of the Settlement Agreement.

---

(continued...)

pay premiums does not end until all assets of a plan are distributed pursuant to a plan termination, or until a trustee is appointed under section 4042 of ERISA. PBGC Reg. § 4007.11(d).

   [10] Postpetition fixed premium payments could be viewed as administrative expenses because they are calculated based on the number of pension plan participants and essentially compensate the PBGC for providing a guaranteed benefit for participants, analogous to insurance. This contrasts with the variable premiums that are calculated based on the amount of plan underfunding, which in this case is predominantly a prepetition claim.

### *Dismissal of the PBGC Distress Termination Order Appeal*

The Bankruptcy Court also found that the resolution of the pending PBGC appeal of the Distress Termination Order is uncertain. (Id. at 93.) With respect to the PBGC appeal of the Distress Termination Order, the PBGC has asserted that, because section 4041(c) of ERISA, which sets forth the requirements for a distress termination of a pension plan, uses the term "plan" rather than "plans" (i.e., uses the term in the singular rather than in the plural), the Bankruptcy Court was required to analyze each plan in isolation, applying a plan-by-plan financial test to determine whether the plan must be terminated in order for the Debtors to be able to reorganize.

Although the Debtors presented several arguments in opposition to this position and the Bankruptcy Court rejected the PBGC's argument, the Bankruptcy Court noted that "there is no reported court decision, including any decisions by the Third Circuit or the District of Delaware, that specifically addresses how the criteria for approving a distress termination of a pension plan are to be applied in the case of multiple pension plans." (Id.)[11] Accordingly, the Bankruptcy Court found that there is uncertainty as to whether the Debtors will prevail in the pending appeal of the Distress Termination Order. (Id.) As to this element of the Settlement Agreement, Law Debenture is silent.

### *PBGC No-Action Letter With Respect To Replacement Plans*

The Bankruptcy Court also found that any challenge by the Debtors to the PBGC's determination of the "follow-on" pension plans as abusive would be difficult and uncertain. (Id. at 96.) When plans such as the Salaried Plan, the KAP Plan and the Inactive Plan have been terminated under sections 4041 or 4042 of ERISA, the PBGC has the unilateral

---

[11]    This Court subsequently issued an opinion affirming the Distress Termination Order. The PBGC recently filed a notice of appeal of the Distress Termination Order to the Third Circuit.

authority, "in any such case in which [the PBGC] determines such action to be appropriate and consistent with its duties under this title, to take such action as may be necessary to restore the plan to its pre-termination status." 29 U.S.C. § 1347. The PBGC has (a) long made clear its policy against so-called "follow-on" plans that abuse the insurance program and result in the PBGC subsidizing an employer's ongoing pension program in a way not contemplated by Title IV of ERISA and (b) used the implementation of an abusive follow-on plan as grounds for the restoration of a terminated plan. See PBGC v. LTV Corp., 496 U.S. 633, 642 (1990). Specifically, in July 2004, the PBGC informed the Debtors that the Replacement Plans did not comply with the PBGC's guidelines and that the PBGC considered the plans to be "abusive." (Barnseon Dec. ¶ 22.)

As the Bankruptcy Court recognized, in order to challenge the PBGC's determination, and thereby salvage the critical Legacy Liability Agreement reached with the USWA, the Debtors would have to demonstrate that the PBGC's determination was arbitrary and capricious or contrary to law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (Tr. of Jan. 24, 2005 at 93.) The Bankruptcy Court found that "[o]vercoming the judicial deference to the PBGC's decision making process would be difficult and time consuming for the debtor and objecting parties." (Id. at 93-94.) The Settlement Agreement resolves these issues by providing for the issuance of a "no-action" letter with respect to the Replacement Plans, which will allow the Debtors to implement those Plans without protracted, costly and risky litigation and clear the path for the PBGC's assumption of the KAP Plan.

### C.    The Complexity of Litigation and the Attendant Expense and Delay Likewise Support the Bankruptcy Court's Decision.

Following the Bankruptcy Court's conclusion that the second Martin factor, the likely difficulties in collection, was not applicable here, the Bankruptcy Court found that the

complexity of litigation of the various issues compromised by the Settlement Agreement and the attendant expense and delay supported approval of the Settlement Agreement. (<u>Id.</u> at 95-97.) In response to this point, Law Debenture is again conspicuously silent. Litigation would include a continuation of the PBGC appeal of the Distress Termination Order, the commencement of litigation challenging the PBGC's application of its replacement pension plan policy and the initiation of claims litigation against the PBGC, both as to the nature and amount of the claims. (<u>Id.</u>) As testified by John Barneson, each of these litigations would be time-consuming and costly. (Barneson Dec. ¶ 25.)

Moreover, continued litigation of the PBGC's claims would significantly delay, if not jeopardize, further material progress in the Debtors' cases. (Barneson Dec. ¶ 25; O'Dowd Dec. ¶ 15.) Absent a resolution of the pension plan termination and follow-on plan issues, which is necessary to restructure the Debtors' substantial pension liabilities, KACC would likely not be able to move forward with a plan of reorganization. (<u>Id.</u>) Similarly, without a resolution of the PBGC's claims, including the administrative expense and/or priority status of such claims, potential recoveries to creditors could not be determined given the substantial size of the PBGC's claims. An order affirming the Bankruptcy Court's decision will allow the Debtors to avoid the expense and delay attendant this litigation and will substantially advance the reorganization process. (<u>Id.</u>)

**D.    <u>The Settlement Agreement Is in the Paramount Interests of Creditors.</u>**

Law Debenture disputes that "the paramount interest of the creditors" supports approval of the Settlement Agreement because Law Debenture argues that the "prudent investor rate" should have been used to determine the PBGC's claims. (App. Br. at 29, 32-37.) However, the Bankruptcy Court properly found that approval of the Settlement Agreement is in the paramount interests of the Debtors' creditors. (Tr. of Jan. 24, 2005 at 97-98.) As the Bankruptcy

Court noted, the Creditors' Committee, which includes Law Debenture, supports all aspects of the Settlement Agreement, and was actively involved in analyzing all aspects of the agreement. (Id. at 97.) Additionally, representatives of holders of the Debtors' Senior Notes, also members of the Creditors' Committee, were directly involved in the negotiation of the PBGC unsecured claim. (Id.)

The Bankruptcy Court also emphasized that approval of the Settlement Agreement would also enable the intercompany settlement agreement and the amended Legacy Liability Agreement with the USWA to proceed. (Id.) Together with the intercompany settlement agreement and the amended Legacy Liability Agreement with the USWA, the Settlement Agreement is a significant milestone in the Debtors' bankruptcy cases. Because of the agreement, the Debtors have been able to proceed with plans of liquidation for certain subsidiaries and, after a resolution of the asbestos and other tort liabilities, will be able to proceed with a plan of reorganization for the remaining Debtors, including KACC. The fact that resolution of all these issues with the PBGC will facilitate a prompt resolution of these cases for the benefit of all creditors strongly supports the Bankruptcy Court's approval of the Settlement Agreement. See In re Allegheny Int'l Inc., 118 B.R. 282, 309 (Bankr. W.D. Pa. 1990) (approving settlement, in part, because it allowed reorganization to proceed). Accordingly, based upon the record before it the Bankruptcy Court did not abuse its discretion in finding the final Martin factor satisfied.

## II. THE BANKRUPTCY COURT CORRECTLY HELD THAT LAW DEBENTURE'S CLAIM OBJECTION DID NOT PRECLUDE THE ADJUDICATION OF THE PBGC SETTLEMENT MOTION AND WAS RENDERED MOOT BY APPROVAL OF THE SETTLEMENT

Seeking to avoid a review of the Settlement Agreement under the appropriate legal framework, Law Debenture, through a variety of meritless legal arguments, essentially

contends that it, and presumably any other party in interest, in effect has a veto right over approval of any settlement between the Debtors and another creditor that involves the allowance of the creditor's claim. Specifically, based on (a) the language in section 502 of the Bankruptcy Code providing for the ability of a party in interest to object to the claim of any creditor and (b) the fact that Law Debenture is not a party to the PBGC Settlement Agreement, Law Debenture asserts that it has the right to force the Debtors and the PBGC to litigate, and the Bankruptcy Court to adjudicate, the amount of the PBGC's claims, effectively defeating a key component of the PBGC Settlement. The law does not support the absurd result Law Debenture advocates.

### A.    Section 502(a) of the Bankruptcy Code Does Not Give Law Debenture a Statutory Right to Prevent Any Settlement of the PBGC's Claims

Law Debenture argues that because it filed an objection to the PBGC's claims, the Bankruptcy Court was required, as a result of Law Debenture's purported rights under section 502(a) of the Bankruptcy Code, to determine the amount and priority of the PBGC's claims through adjudication of Law Debenture's Objection. According to Law Debenture's strained logic, it was error for the Bankruptcy Court to initially consider the settlement because (a) the Bankruptcy Court's authority to approve settlements is contained in Federal Rule of Bankruptcy Procedure 9019 whereas Law Debenture's claim objection is governed by section 502(a) of the Bankruptcy Code and any conflict between the two must be settled in favor of the Bankruptcy Code and (b) Law Debenture's right to object to claims of other creditors under section 502(a) cannot be "thwarted" by section 105. (App. Br. at 19-24.) Both of these arguments are baseless.

As an initial matter, it is highly questionable whether Law Debenture has any rights under section 502(a) to object to the PBGC's Claims given the considerable involvement of the Debtors and Creditors' Committee in addressing those claims and ultimately negotiating

their global resolution. In the interest of the orderly administration of cases, bankruptcy courts have long recognized a general rule denying creditors the ability to object to the claims of other creditors under section 502(a) unless the trustee charged with administering the estate has failed to address the claims and the creditor has first made a demand upon the trustee to bring an objection. Collier on Bankruptcy, ¶ 502.02(2)(d) (15th ed. rev. 2004). In essence, courts have recognized that "the needs of orderly and expeditious administration do not permit the full and unfettered exercise of such right [to object under section 502(a)]." Id.; see also In re Simon, 179 B.R. 1, 7 (Bankr. D. Mass. 1995) ("If every creditor were entitled to challenge the claim of another creditor filed in a particular case, an orderly administration could degrade to chaos."). Because a debtor in possession fulfills the same role as a trustee pursuant to section 1107(a) of the Bankruptcy Code, this rule has likewise been adhered to in a chapter 11 reorganization with a debtor in possession. See In re Dow Corning Corp., 244 B.R. 721 (Bankr. N.D. Mich. 1999).[12]

Even if Law Debenture has rights under section 502(a), no court to the Debtors' knowledge has ever held, in the context of a debtor's proposed settlement of a claim, that the right of parties in interest under section 502(a) to object to the allowance of claims is not satisfied through the ability to object to the settlement. In fact, if Law Debenture's argument that section 502(a) grants parties in interest "an unrestricted substantive right to object to the claims

---

[12]    In Dow Corning, the official committee of unsecured creditors objected to the confirmation of the debtor's plan of reorganization because the plan proposed to permit the debtor, pursuant to the provisions of the plan, to settle breast implant personal injury tort claims. The committee had previously filed an objection to the proofs of claim and argued that any settlement of those claims without the bankruptcy court first ruling on the committee's objection deprived the committee of its statutory right to object to claims in violation of section 502 of the Bankruptcy Code. Dow Corning, 244 B.R. at 749. The bankruptcy court held that the committee lacked standing to object to the proofs of claim because the committee did not make a demand on the debtor to object to the claims that the debtor refused. Id. at 751. To the contrary, the debtor had filed an objection to the claims on its own initiative, and the plan subsequently granted the debtor authority to settle and pay those claims. The bankruptcy court reasoned that allowing the committee to nonetheless pursue its objections "would waste judicial resources and delay administration of the bankruptcy estate to its and its creditors' detriment with no corresponding benefit to the estate." Id. As in Dow Corning, the Debtors here did not fail to address the PBGC Claims; rather they, along with other members of the Creditors Committee, engaged in settlement negotiations with the PBGC that ultimately resulted in a settlement that resolved, among other things, the PBGC Claims.

of another creditor" (App. Br. at 20) were accepted, any single creditor could force a debtor to litigate a claim of another creditor that the debtor proposes to settle simply by filing an objection to the proof of claim. Such a result flies in the face of the often-expressed judicial preference for settlements in bankruptcy, especially given the importance of the prompt resolution of claims in a bankruptcy reorganization. See Protective Committee for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) ("In administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims to which there are substantial and reasonable doubts."); Case v. L.A. Lumber Products Co., 308 U.S. 106, 130 (1939) (compromises are "a normal part of the process of reorganization."); In re Martin, 91 F.3d at 393 ("To minimize litigation and expedite the administration of a bankruptcy estate, [compromises] are favored in bankruptcy.") (quoting Collier on Bankruptcy ¶ 9019.03[1] (15th ed. 1993)).

Consistent with section 502(a), once the debtor has compromised issues relating to the allowance of a claim and proposed a settlement, parties in interest have the right to object to the settlement if they believe it is unreasonable. See In re EFE Indus., 283 F.3d 159, 163-64 (3d Cir. 2002) (explaining general proposition that notice requirements of Bankruptcy Rule 9019 and 2002 enable parties affected by settlement agreement to object); Northview Motors, Inc. v. Chrysler Motors Corporation, 186 F.3d 346, 351 (3d Cir. 1999) ("[T]he Bankruptcy Code contemplates notice, a hearing, and bankruptcy court approval in this situation. These protections afford due process to parties interested in the disposition of the estate but who do not themselves enter into the settlement agreement."). Moreover, in the context of consideration of the settlement, parties in interest have the opportunity to argue and present evidence regarding their views as to what the amount of the claim would be if the claim was litigated and determined

by the court rather than settled. See Saccurato v. Masters, Inc. ( In re Masters, Inc.), 149 B.R.

289, 292-93 (Bankr. E.D.N.Y 1992) ("[T]he purpose behind the procedural rules governing

notice to creditors is to allow those parties with a pecuniary interest in the settlement to have an

opportunity to be heard and to object if they find it unsatisfactory.").

　　　　　　Here, following extensive discovery by the parties, the Bankruptcy Court held a

full-day evidentiary hearing to address the merits of the PBGC Settlement, and the evidence and

arguments focused almost exclusively on the PBGC's Claims. Law Debenture has not contested

and cannot contest the fact that it had a full and fair opportunity to present all of the evidence and

make all of the arguments related to the merits of the PBGC's Claims that it would have

presented and made in connection with litigation of its claim objection. (Tr. of Jan. 18, 2005 at

34.) In point of fact, Law Debenture's only complaint is that "the standard for determining

whether to grant a motion under Bankruptcy Rule 9019 is entirely different from the standard

applied in the adjudication of a claim objection under section 502 of the Bankruptcy Code,"

(App. Br. at 21), and the "qualitatively different . . . [and] less exacting" standard of proof and

standard of review purportedly prejudiced Law Debenture. (Id. at 22-23.)

　　　　　　This does not, however, as suggested by Law Debenture, create an irreconcilable

conflict between Bankruptcy Rule 9019 and section 502(a), requiring the Court to resolve the

conflict in favor of the Bankruptcy Code. (Id. at 18, 23.) Nor does this somehow lead to the

conclusion that the Bankruptcy Court, by approving the PBGC Settlement Motion and

determining that Law Debenture's Objection was rendered moot, relied on section 105 of the

Bankruptcy Code to contravene section 502(a).

　　　　　　Section 502(a) of the Bankruptcy Code provides merely that "[a] claim or interest,

proof of which is filed under section 501 of this title, is deemed allowed, unless a party in

interest . . . objects." 11 U.S.C. § 502(a). Law Debenture's argument that it was prejudiced by not being able to force the PBGC and the Debtors to litigate, and the Bankruptcy Court to determine, the amount and priority of the PBGC's various claims is premised entirely on the burdens of proof and the shifting of those burdens of proof that would apply in that litigation. (App. Br. at 21-22.) Notably, however, the burdens of proof and the shifting of the burden is not set forth in section 502 of the Bankruptcy Code, but rather, as with the burdens and standards to be applied to a settlement, is derived from the Bankruptcy Rules and caselaw. Accordingly, there is no inherent conflict between Bankruptcy Rule 9019 and section 502(a) of the Bankruptcy Code, and the Bankruptcy Court's adjudication of the PBGC Settlement and conclusion that approval of the settlement rendered Law Debenture's Claim Objection moot does not implicate "the statutory mandate that Bankruptcy Code provisions prevail over Bankruptcy Rules."[13] (Id. at 18.)

There is no affront to Law Debenture's statutory rights or due process rights for Law Debenture to be required to overcome the standards for approval of the proposed settlement. This is especially the case where, as here, the Debtors, the Creditors' Committee (of which Law Debenture is a member) and holders of the Senior Notes all carefully considered and supported the settlement, and the only objecting party is a representative for holders of Subordinated Notes, who unlike other creditors have an incentive to litigate for a "home run" against the PBGC on its claims regardless of the risks involved. It is simply not the case, as Law Debenture suggests, that

---

[13]    In all of the cases cited by Law Debenture, the courts merely stated the general principle that a Bankruptcy Rule cannot directly conflict with and trump a related Bankruptcy Code provision, which the Bankruptcy Rule is intended to implement. See, e.g., In re Pacific Atlantic Trading Co., 33 F.3d 1064, 1066 (9th Cir. 1994) (explaining that for purposes of chapter 7 cases — where distributions to late-filed claims are allowed — Bankruptcy Rule 3002, "which purportedly implements section 501," cannot be used to disallow a claim that is otherwise allowable under sections 501 and 502 of the Bankruptcy Code); In re Burnham, Connolly, Oesterle and Henry, No. 95-1306, 98 F.3d 1341, 1996 WL 580475, at *2 (6th Cir. 1996) (same). These cases even recognize that "[t]o the extent the [Bankruptcy] Rule does not contradict the statute, . . . there is no reason for the [Bankruptcy] Rule to be ignored." See Burnham, Connolly, Oesterle and Henry, 1996 WL 580475, at *2; see also Pacific Atlantic Trading, 33 F.3d at 1067.

the Bankruptcy Court "allowed the Debtor and the PBGC to make an 'end run' around the due process procedures attendant to the Law Debenture claim objection." (Id. at 22.)

Relying solely on the Third Circuit Court of Appeal's opinion in In re Combustion Engineering, 391 F 3d 190 (3d Cir. 2004), Law Debenture similarly contends that the Bankruptcy Court should not have adjudicated the PBGC Settlement Motion without first having adjudicated Law Debenture's Objection because Law Debenture's purported "statutory right to object to the PBGC Claims under section 502(a) of the Bankruptcy Code could not be thwarted . . . " by a reliance on section 105, which was, according to Law Debenture, the only statutory basis for the relief requested in the PBGC Settlement Motion (App. Br. at 19.) Law Debenture's arguments fundamentally fail because, as explained above, the Bankruptcy Court did not in any way undermine substantive rights under section 502(a) of the Bankruptcy Code.

The Third Circuit in Combustion Engineering issued a narrow ruling regarding the interaction of sections 105 and 524(g) of the Bankruptcy Code. In particular, as acknowledged by Law Debenture (Id. at 19 n. 18), the Third Circuit held in Combustion Engineering that a section 524(g) asbestos channeling injunction may not be extended, pursuant to a bankruptcy court's broad equitable powers under section 105, to non-derivative claims against non-debtors. Id.; 391 F.3d at 236-237. The Third Circuit cited a variety of case precedent interpreting the breadth of section 105 of the Bankruptcy Code and specifically noted that "[w]hatever may be the limits of § 105(a) in other contexts, we hold only that § 105(a) cannot be used to achieve a result not contemplated by the more specific provisions of § 524(g), which is the means Congress prescribed for channeling the asbestos liability of a non-debtor." Id. at 237 n.50 (emphasis added).

As is evident, the narrow holding in <u>Combustion Engineering</u> has absolutely no application here. Furthermore, the Bankruptcy Court's decision to stay Law Debenture's Objection pending consideration of the PBGC Settlement Motion was not, as Law Debenture asserts, "in spite of controlling authority to the contrary" (App. Br. at 19) and in no way constituted the use of section 105 to contravene section 502(a) of the Bankruptcy Code.

The Bankruptcy Court carefully considered and reconsidered Law Debenture's argument that the approval of the Settlement Agreement must yield to adjudication of the Law Debenture Objection and properly held that Law Debenture has no right to have its Claim Objection decided first, which would have the effect of nullifying a significant component of a settlement that is supported by every other interested party. (Tr. of Jan. 18, 2005 at 16-17.) For these same reasons, the Bankruptcy Court similarly did not err in dismissing the Claim Objection as moot following approval of the settlement.

**B.     The PBGC Settlement Is Binding on All Creditors of the Debtors.**

In yet another attempt to convince the Court to reverse the Bankruptcy Court's approval of the Settlement Agreement without considering its merits, Law Debenture argues that the Bankruptcy Court erred in dismissing Law Debenture's Objection because the Subordinated Noteholders are not bound by the PBGC Settlement. According to Law Debenture, "a settlement is only binding on the parties to the settlement" and the rights of each Subordinated Noteholder "cannot be affected by a settlement to which it was not a party." (App. Br. at 24-25.) As an initial matter, this argument should not even be considered by the Court given that Law Debenture never made this argument to the Bankruptcy Court. See <u>e.g.</u>, <u>Brown v. Phillip Morris,</u> <u>Inc.</u>, 250 F.3d 789, 799 (3d Cir. 2001); <u>Gleason v. Northwest Mortgage, Inc.</u>, 243 F.3d 130, 142 (3d Cir. 2001); <u>Fleck v. KDI Sylvan Pools, Inc.</u>, 981 F.2d 107, 116 (3d Cir. 1992, <u>cert.</u> denied, 507 U.S. 1005 (1993).

More importantly, this absurd argument, if accepted, would permit any creditor whose claim is not comprised by the debtor's settlement to later litigate the amount of the claim notwithstanding bankruptcy court approval of the settlement. Not surprisingly, there are no cases that support this position and Law Debenture's argument squarely contradicts the well-established principle in bankruptcy cases that a trustee or debtor represents the interests of, and binds, all general unsecured creditors when entering into settlements. See, e.g., Comerica Bank v. Johnson (In re Johnson), Case No. 97-1749, 166 F.3d 1214, 1998 WL 833774, at *3 (6th Cir. Nov. 19, 1998) ("Whatever interest Comerica has in the Life Policy thus necessarily derives from its status as an unsecured, rather than secured, creditor of Debtor's bankruptcy estate. As such, Comerica is bound by the settlement between the Debtor and the Trustee, who is the sole and exclusive representative of all unsecured creditors of the Debtor's bankruptcy estate, including Comerica."); Columbia Gulf Transmission Co. v. La. Natural Gas Pipeline, Inc., No. 93-239, 1994 WL 693361, at *3 (E.D. La. Dec. 9, 1994) ("Under Rule 9019 of the Bankruptcy Code, a debtor . . . cannot generally bind its estate to a settlement agreement absent specific authorization from the bankruptcy court . . . This rule prevents debtors from entering into secret agreements and safeguards the rights of creditors who otherwise might be harmed by providing them with an opportunity to object to the proposed settlement if they find it unsatisfactory.").

Indeed, the lone authority relied on by Law Debenture fails to support a contrary conclusion. In In re Chateaugay Corporation, the Second Circuit Court of Appeals reversed the bankruptcy court's denial of a motion by a secured party (Aetna) seeking to protect its security interest in a tax refund of the debtor. 94 F.3d 772, 775 (2d Cir. 1996).[14] A proposed settlement

---

[14]    Law Debenture also cites Chateaugay Corporation v. United States Dep't of Labor, 23 F.3d 396 (2d Cir. 1994) (table), a related decision where the Second Circuit had approved a settlement between the debtor and the Department of Labor fixing the amount of the DOL's claim. Chateaugay, 94 F.3d at 774. There is no explanation in either of the Chateaugay cases, however, as to why the Second Circuit had made a statement that "the settlement [between the DOL and the debtor] could have no adverse effect on [Aetna's] rights or claims." Id. The

between the debtor and the IRS—the validity of which was not before the Second Circuit—

effectuated a setoff of mutual claims between these parties that, in turn, directly affected Aetna's

setoff rights with respect to the tax refund. Id. at 774-75, 778-79, 783. One of the primary issues

in the case was whether the setoff rights of Aetna, which had been subrogated to the setoff rights

of a third party, were somehow waived or not properly effectuated by the third-party subrogor,

thereby precluding Aetna's recovery from the tax refund. Id. at 777-780. Once the Second

Circuit determined that "the [third-party subrogor] possesse[d] a common law right to offset . . .

against the [debtor's] tax refund and that Aetna [was] subrogated to the [third party's] right of

setoff," it had little problem concluding that "Aetna ha[d] a right to adequate protection for the

use of its interest in the settlement [with the IRS]." Id. at 783.

     As opposed to Chateaugay, here, the Subordinated Noteholders do not—and

cannot—assert that they have any secured claim that is being compromised by the Settlement

Agreement. Even more critically, nowhere in Chateaugay did the court determine that a duly-

approved settlement was not binding on the debtor's estate and its creditors.[15]

     In the end, Law Debenture's position that the Bankruptcy Court erred in

considering the PBGC Settlement Motion and in proceeding with a hearing that afforded Law

---

(continued . . )

Second Circuit only mentioned that, notwithstanding the partial satisfaction of the DOL's claim as a result of the
settlement between the debtor and DOL, that settlement could not be used to subordinate Aetna's derivative setoff
claim against the debtor pursuant to section 509(c) of the Bankruptcy Code, which requires subordination of a
subrogated claim where the principal creditor (i.e., the DOL) has not been paid in full Id. at 779-780.

[15]    Law Debenture also asserts that the Subordinated Noteholders should not be bound by the PBGC
Settlement because (a) allegedly "the Debtors abdicated their responsibility to negotiate on behalf of all creditors the
terms of the PBGC Settlement . . ." and (b) "the PBGC Settlement Motion had the effect of forcing a settlement on
[Law Debenture] with respect to the [Law Debenture] Claim Objections . . ." and a court cannot force parties to
settle. (App. Br. at 27-28 ). As discussed supra, the suggestion that the Debtors abdicated their responsibility to
negotiate on behalf of all creditors and to exercise their business judgment to determine that the terms of the PBGC
Settlement were reasonable and fair is wholly unsupported by the evidence and relates to the merits of the settlement
itself, which, as the Bankruptcy Court properly concluded, is overwhelmingly supported by the evidence. Not
surprisingly the cases cited by Law Debenture are wholly inapposite. See, e.g., In re General Motors Corp. Pick Up
Truck Fuel Tank Prods. Litig., 55 F.3d 768, 797 (3d Cir. 1995) (involving multidistrict products liability cases
where litigants sought approval of proposed class action settlement); Newton v. A.C.&S., Inc., 918 F.2d 1121 (3d

Debenture an unbounded opportunity to present its objection to the Settlement Agreement, fails as a matter of law.

## CONCLUSION

Based upon the foregoing, the Debtors respectfully request that the Court affirm the Settlement Order and the Reconsideration Order entered by the Bankruptcy Court on January 25, 2005.

Dated:    June 2, 2005
          Wilmington, Delaware.

Respectfully submitted,

Daniel J. DeFranceschi (DE 2732)
Kimberly D. Newmarch (DE 4340)
Jason M. Madron (DE 4431)
RICHARDS, LAYTON & FINGER
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

- and -

Gregory M. Gordon (TX 08435300)
Richard A. Chesley (IL 6240877)
Daniel P. Winikka (TX 00794873)
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

ATTORNEYS FOR DEBTORS
AND DEBTORS IN POSSESSION

---

(continued...)

Cir. 1990) (involving diversity personal injury cases where the court sanctioned litigants for not settling within a certain time frame before trial).

# UNREPORTED OPINIONS

Westlaw.

Not Reported in F Supp.
1994 WL 693361 (E.D.La.)
**(Cite as: 1994 WL 693361 (E.D.La.))**

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
COLUMBIA GULF TRANSMISSION CO
v.
LOUISIANA NATURAL GAS PIPELINE, INC.
Civ. A. No. 93-239.

Dec. 9, 1994.

*MEMORANDUM AND ORDER DENYING MOTION
FOR SUMMARY JUDGMENT TO ENFORCE
SETTLEMENT*

VANCE, District Judge.

**\*1** This matter is before the Court on plaintiff Columbia Gulf Transmission Company's Motion for Summary Judgment to Enforce Settlement. The motion was set for hearing on an expedited basis for Wednesday, November 30, 1994, but was submitted on the briefs. For the reasons stated herein, plaintiff Columbia Gulf Transmission Company's Motion for Summary Judgment to Enforce Settlement is hereby DENIED.

I. BACKGROUND

Ten days prior to their November 10, 1994 trial date plaintiff Columbia Gulf Transmission Company (Columbia Gulf) and defendant Louisiana Natural Gas Pipeline, Inc. (LNGP) reached a settlement agreement. Taking part in the settlement negotiations and agreeing to the terms of the settlement were the parties' sister corporations, Columbia Gas Transmission Corporation (TCO) and Louisiana Natural Gas Gathering Company (LNGG). The agreement purports to settle all claims, demands, and causes of action, including those involved in this litigation, among Columbia Gulf, LNGP, TCO and LNGG.

The parties confirmed their intent to settle their dispute in a letter agreement dated November 1, 1994. In their letter agreement, the parties agreed that TCO would execute two joint and mutual

releases. The parties further agreed in subsequent negotiations that the releases would state that TCO has "a substantial financial interest in some of the claims that Columbia Gulf has asserted or could have asserted against LNGP in the Lawsuit." Shortly thereafter, however, counsel for Columbia Gulf and TCO notified LNGP that TCO may not have the authority to release claims arising prior to July 31, 1991 without bankruptcy court approval, because it is a debtor in a Chapter 11 bankruptcy proceeding. TCO subsequently informed Columbia Gulf that it would execute the releases, but only in the event the language pertaining to TCO's "substantial financial interest" in this lawsuit was deleted.

The parties offer two very different versions of the consequences that would follow from Columbia Gulf's and TCO's proposed modification. Columbia Gulf and TCO contend that the original language is superfluous and unnecessary since TCO's participation in the settlement negotiations was only "an accommodation to facilitate the settlement between Columbia Gulf and LNGP" and since it has no affirmative claim against LNGP or LNGG. LNGP, on the other hand, asserts that the consideration language originally agreed upon by the parties is essential to the validity of the releases. This disagreement, together with Columbia Gulf's prior statements regarding the need for bankruptcy court approval, have led LNGP to refuse closing on the settlement documents absent bankruptcy court approval and inclusion of the consideration language.

II. DISCUSSION

In its Motion for Summary Judgment, Columbia Gulf seeks to have the Court compel LNGP to execute the documents necessary to implement the settlement agreement and to otherwise perform its obligations under that agreement. This Court may enforce the terms of the settlement entered into between the parties pursuant to its Order of Dismissal in which, at the parties' request, the Court dismissed the action, but retained jurisdiction over the settlement agreement. *See Kokkonen v. Guardian Life Insurance Co.*, 511 U.S. 375, 114 S.Ct. 1673 (1994). The Court's jurisdiction extends to TCO and LNGG, who while not parties to the underlying litigation, have appeared in this Court through counsel and submitted to jurisdiction for purposes of the settlement agreement. *See Karcher v. May*, 484 U.S.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp
1994 WL 693361 (E D La )
(Cite as: 1994 WL 693361 (E.D.La.))

Page 2

72, 77, 108 S.Ct. 388, 392 (1987).

*2 Columbia Gulf contends that since the letter agreement confirming settlement did not specifically require TCO to obtain bankruptcy court authorization, LNGP should be compelled to execute the documents without demanding that TCO agree to additional obligations not contemplated by the agreement.    Paragraphs 6 and 7 of the letter agreement provide as follows:

6. LNGP on the one hand and Columbia Gulf and Columbia Gas Transmission ("TCO") on the other, will execute a joint and mutual release, releasing each other from any and all claims, demands and causes of action (including, without limitation, any claims for imbalance gas or penalties) whether or not previously asserted, that relate to any transactions that have taken place prior to September 30, 1994, except solely for obligations expressly assumed in the settlement and release

7. Columbia Gulf and TCO on the one hand, and Tim Edwards and Louisiana Natural Gas Fathering Company ("LNGGC"), on the other, will execute a joint and mutual release, releasing the other parties from any and all claims, demands, and causes of action, whether or not previously asserted, to the extent such claims, demands, and causes of action relate to imbalances, claims for adjustment to imbalances, imbalance penalties assessed and gas transportation services occurring on or before September 30, 1994, including any claims which were or could have been asserted in the lawsuit

Columbia Gulf is correct in its assertion that the language in these paragraphs does not explicitly require TCO to obtain bankruptcy authorization prior to executing the settlement document   It is incorrect, however, in its assertion that LNGP is attempting to impose additional obligations not contemplated by the agreement by insisting that the bankruptcy court's approval be obtained prior to the execution of the documents

The parties' unmistakable intent in entering into the letter agreement was to release each other of all potential or actual claims accruing prior to September 30, 1994 in exchange for the obligations undertaken as part of the settlement   Columbia Gulf's suggested interpretation of the agreement would lead to the absurd result of compelling LNGP to close on a settlement agreement that may subsequently be set aside by the bankruptcy court   Under this scenario, LNGP would be exposed to liability on claims for which it had already compensated Columbia Gulf and TCO.

A more appropriate interpretation of the parties' letter agreement is that by entering into the agreement, TCO implicitly warranted that it was authorized to execute the releases or would take whatever legal steps were necessary to obtain the appropriate authorization   LNGP is therefore not imposing an additional obligation on Columbia Gulf and TCO by requesting TCO to obtain authorization from the bankruptcy court if such approval is necessary   TCO contends that the bankruptcy court's approval of the settlement agreement is unnecessary as a matter of law

*3 Under Rule 9019 of the Bankruptcy Code, a debtor, such as TCO, cannot generally bind its estate to a settlement agreement absent specific authorization from the bankruptcy court. [FN1]  In re Masters, 149 B.R. 289, 291 (E.D.N.Y.1992)   This rule prevents debtors from entering into secret agreements and safeguards the rights of creditors who otherwise might be harmed by providing them with an opportunity to object to the proposed settlement if they find it unsatisfactory   Id. at 291-92;   In re Jeffrey Rothwell, 159 B.R. 374, 378 (Bankr.Ct.1993) While some courts have endorsed dispensing with the notice requirements of Rule 9019 when all interested parties to the agreement are present during the settlement negotiations or when the settlement is placed on the record in open court, see In re Masters, 149 B.R. at 292 (citing cases), their rulings are not implicated where, as here, neither TCO's creditors nor the Creditor's Committee have been provided with an opportunity to review the disputed release forms   Indeed, one of Columbia Gulf's stated reasons for not seeking approval from the bankruptcy court is that parties to the proceeding may, in fact, object to the releases   Rule 9019 was conceived to prevent behind the scenes dealing such as this Accordingly, if TCO's creditors have an actual or potential pecuniary interest in the claims underlying this litigation or any other claims that will be waived by the release, they are entitled to the notice provided for under Rule 9019

Columbia Gulf devotes much of its brief to addressing the issue of whether TCO has a financial stake in the claims underlying this litigation According to Columbia Gulf, TCO has no actual claims against LNGP and its participation in the settlement agreement was simply an accommodation to the parties in the underlying litigation   LNGP, on the other hand, asserts that TCO has an interest in Columbia Gulf's claims against LNGP and that TCO will, in fact, receive in excess of ninety percent of the funds transferred from LNGP to Columbia Gulf as a

© 2005 Thomson/West  No Claim to Orig  U.S. Govt  Works

Not Reported in F Supp                                                    Page 3
1994 WL 693361 (E.D.La.)
(Cite as: 1994 WL 693361 (E.D.La.))

result of the settlement agreement. Ultimately, whether TCO, a nonparty to the underlying litigation, has viable claims against LNGP is not for the Court to determine. *See Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200 (1969) (stating well-established rule against advisory opinions). It is clear that the parties have agreed to resolve *all* potential or actual claims arising prior to September 30, 1994. Given the breadth of their agreement, TCO's creditors must be provided with an opportunity to make their own assessment of any actual or potential claims TCO may have against LNGP. Accordingly

IT IS ORDERED that defendant Louisiana Natural Gas Pipeline's Motion for Summary Judgment to Enforce Settlement is hereby DENIED.

> FN1. TCO argues that it has specific authorization to enter into the settlement pursuant to a September 20, 1991 Order by the Bankruptcy Court for the District of Delaware. The order reads, in part, that:
> 3. [TCO] is hereby authorized to remedy imbalances which may exist between [TCO] and its customers or other parties as of July 31, 1991 under various transportation agreements authorized by FERC.
> The settlement accord reached by the parties purports to resolve all actual or potential claims existing between the parties at this time. The bankruptcy court's order does not authorize TCO to enter into such a broad agreement without prior approval. The quoted language instead apparently applies to imbalances under transportation agreements to which TCO was a party. TCO disavows ever having had any contractual relationship with LNGP.

1994 WL 693361 (E.D.La.)

**Motions, Pleadings and Filings (Back to top)**

•      2:93CV00239       (Docket)
(Jan. 21, 1993)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

98 F 3d 1341 (Table)                                                      Page 1
98 F 3d 1341 (Table), 1996 WL 580475 (6th Cir (Mich )), 65 USLW 2303, 78 A F T R 2d 96-7050
**Unpublished Disposition**
**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

▷

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter  Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions )

United States Court of Appeals, Sixth Circuit
In the Matter of BURNHAM, CONNOLLY,
OESTERLE and HENRY, Debtor.
UNITED STATES of America, Plaintiff-Appellee,
v
Basil T. SIMON, Trustee, Defendant-Appellant.
**No. 95-1306.**

Oct 8, 1996

On Appeal from the United States District Court for the Eastern District of Michigan, No. 94-74511; Horace W. Gilmore, Judge

E D Mich , 199 B.R. 156

REVERSED.

Before: GUY, NELSON and BATCHELDER, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

**\*\*1** The question in this appeal is whether a proof of claim, filed by the Internal Revenue Service in a proceeding under Chapter 7 of the United States Bankruptcy Code prior to the 1994 Bankruptcy Amendments, is entitled to "first-tier" priority even though filed long after the deadline established under Bankruptcy Rule 3002--a deadline of which the IRS presumably had timely notice

The Second, Ninth and Eleventh Circuits have accorded first-tier status to claims filed under similar circumstances  See In re Vecchio, 20 F.3d 555 (2d Cir.1994); In re Pacific Atlantic Trading Co., 33 F.3d 1064 (9th Cir.1994); In re Davis, 81 F.3d 134 (11th Cir.1996)  The Fifth Circuit, however, has held first-tier status unavailable  See In re Waindel, 65 F.3d 1307 (5th Cir.1995)  We think that the Fifth

Circuit's is the better view, and we conclude that the claim at issue here should be relegated to third-tier status

I

The debtor filed a voluntary petition under Chapter 7 in November of 1988  The clerk of the bankruptcy court subsequently sent creditors a notice to file claims by March 29, 1989.  The IRS tells us that its file in this case has been destroyed, but the agency was listed on the matrix of creditors filed with the bankruptcy court  Absent evidence to the contrary, we must presume that the IRS received its copy of the notice

On June 21, 1994--more than five years after the deadline--the IRS filed "an unsecured priority claim" for $81,231 58 in 1988 payroll taxes and "an unsecured non-priority claim" for $30,261 08 in related penalties  The only excuse offered for the delay in filing is that, for reasons not explained, the IRS was initially under the impression that no assets would be distributed

The bankruptcy court disallowed the IRS claim as untimely  The district court reversed the disallowance and held that the tax claim should be allowed as a priority claim  The trustee has appealed to this court

II

Section 726(a) of the Bankruptcy Code sets forth the order in which the assets of a Chapter 7 estate are to be distributed to unsecured creditors  The version of that section in effect at the time this case was commenced provided as follows:

"(a) Except as provided in section 510 of this title, property of the estate shall be distributed--
(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title;
(2) second, in payment of any allowed unsecured claim, other than a claim of a kind specified in paragraph (1), (3), or (4) of this subsection, proof of which is--
(A) timely filed under section 501(a) of this title;
(B) timely filed under section 501(b) or 501(c) of this title; or
(C) tardily filed under section 501(a) of this title, if--

© 2005 Thomson/West No Claim to Orig U.S. Govt Works

Page 2

98 F.3d 1341 (Table)
98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir (Mich )), 65 USLW 2303, 78 A F T R 2d 96-7050
Unpublished Disposition
(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))

(i) the creditor that holds such claim did not have notice or actual knowledge of the case in time for timely filing of a proof of such claim under section 501(a) of this title; and

**2 (ii) proof of such claim is filed in time to permit payment of such claim;

(3) third, in payment of any allowed unsecured claim proof of which is tardily filed under section 501(a) of this title, other than a claim of the kind specified in paragraph (2)(C) of this subsection;

(4) fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty, or forfeiture

* * *

(5) fifth, in payment of interest ...

(6) sixth, to the debtor."

Among the claims specified in section 507 are "allowed unsecured claims of governmental units," a category that includes claims for delinquent withholding taxes    If the unsecured payroll tax claim at issue in this case had been timely filed, therefore, it would be entitled to first-tier distribution under § 726(a)(1). The IRS concedes that the claim for related penalties is not entitled to priority status.

The Bankruptcy Code does not itself contain a claims deadline  By distinguishing between timely and tardily filed claims in § § 726(a)(2) and (3), however, and by allowing a debtor or the trustee to file a proof of claim on behalf of a creditor who has not filed a timely notice of claim under § 501(c), the Code clearly reflects an understanding that a claims deadline will exist  *Waindel*, 65 F.3d at 1309  Such a deadline has been provided by Bankruptcy Rule 3002(a), which says that a proof of claim must be filed within 90 days of the first meeting of creditors if the claim is to be "allowed "

Despite its literal language, it is apparent that Rule 3002(a) should not be deemed to set an absolute bar to allowance of tardy claims in Chapter 7 proceedings   The statute authorizing the Supreme Court to prescribe rules for bankruptcy proceedings, 28 U.S.C. § 2075, provides that the rules "shall not abridge, enlarge, or modify any substantive right." Consequently, "any conflict between the Bankruptcy Code and the Bankruptcy Rules must be settled in favor of the Code." *Pacific Atlantic*, 33 F.3d at 1066. The Code clearly contemplates situations--see § 726(a)(2), *e g*--where a tardily filed claim is "allowed " In addition, § 502(a) provides that a claim is allowed unless a party in interest objects. Section 502(b) lists eight grounds for disallowance,

none of which is untimely filing  "We cannot have a statute that specifically allows payment of tardily filed claims and rules that prohibit their filing. Accordingly, to the extent that [the Rule] contradicts the statute, it cannot stand " *United States v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1089 (6th Cir.1990); see also *Vecchio*, 20 F.3d at 559

To the extent that the Rule does not contradict the statute, conversely, there is no reason for the Rule to be ignored   In Chapter 7 cases, at least, we believe that the Rule may appropriately be read as "providing a dividing line between timely and tardy claims, rather than a flat ban on the allowance of late-filed claims " *Waindel*, 65 F.3d at 1309

III

**3 If the claim for delinquent payroll taxes is one that may be "allowed" even though tardily filed, we must determine the tier to which the claim is to be assigned under § 726   The IRS argues that the claim is entitled to top-priority status under § 726(a)(1) because that section explicitly accords such status to "unsecured claims of governmental units"-- and § 726(a)(1), unlike § 726(a)(2), makes no distinction between timely and tardily filed claims. Accord, *Vecchio*, 20 F.3d at 557 ("[t]he absence of a timeliness distinction in § 726(a)(1) strongly suggests that this subsection encompasses all priority claims whenever filed"); *Davis*, 81 F.3d at 135; *Pacific-Atlantic*, 33 F.3d at 1067.

Such a result, however, requires us to ignore the express of language of 11 U.S.C. § 726(a)(3)   That section prescribes third-tier status for "*any* allowed unsecured claim proof of which is tardily filed under § 501(a)." (Emphasis added.)   We follow the familiar principle of statutory interpretation that when confronted by a choice between a general statutory provision and a specific one, we are to prefer the specific over the general. Section 726(a)(3) is clearly the more specific provision, and it means what it says: "for obvious reasons going to the heart of the efficiency and fairness of the bankruptcy system, the Code attaches consequences to failure to comply with proof of claim deadlines " *Waindel*, 65 F.3d at 1311

The interpretation offered by the IRS is not only inconsistent with § 726(a)(3), it is inconsistent with § 501(c)   The latter section provides that where a creditor has not filed a timely proof of claim, the debtor or the trustee may do so in his stead   Such claims are entitled to second-tier status under §

98 F.3d 1341 (Table)                                                                                      Page 3
98 F.3d 1341 (Table), 1996 WL 580475 (6th Cir.(Mich.)), 65 USLW 2303, 78 A.F.T.R.2d 96-7050
Unpublished Disposition
(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))

726(a)(2)(B). As the *Waindel* Court explained,

"This provision was intended to allow debtors to complete the list of claims against the estate in a timely fashion and to ascertain the basis for and amounts of creditors' distributions. The particular object of this salutary provision was untimely priority claims, because of their potentially heavy impact on a case." 65 F.3d at 1311.

If we were to accord such claims first-tier priority status, we would "emasculate[ ]" the scheme established by § 726(a)(2)(B) and § 501(c). *Id*.

Nor do we agree with the argument that it would be "anomalous" not to allow § 726(a)(1) status for tardily filed priority claims because otherwise creditors with general unsecured claims filed tardily because of lack of notice would receive distributions under § 726(a)(2) ahead of similarly situated priority claimants. There can be no such anomaly in this circuit, because our court has already decided that a creditor who files a priority claim tardily because of late notice is entitled to § 726(a)(1) status absent bad faith or unreasonable delay. *In re Century Boat Co., 986 F.2d 154 (6th Cir.1993); Cardinal Mine, 916 F.2d 1087*.

Strong practical considerations also support denying § 726(a)(1) status to claims filed tardily despite the giving of notice. A trustee often will undertake litigation to reduce the amount of general unsecured claims so as to allow other claimants a greater distribution. If priority claims can be asserted at the last minute, the trustee's efforts will sometimes be wasted. In fact, as the *Vecchio* court acknowledged, the logic of the IRS interpretation would lead "to the conclusion that first priority payment could be accorded even to claims filed after the distribution of the estate's assets." 20 F.3d at 560. The *Vecchio* court thought these problems could be dealt with under principles of equitable subordination and the exercise of discretion over whether to enter disgorgement orders. *Id*. Possibly so, but it seems to us the interests of efficient management of bankruptcy estates would be better served by an interpretation eliminating these problems at the source.

**4 An untimely priority claimant who has received notice must, in our view, stand in line behind the creditors listed in §§ 726(a)(1) and (2). Accord, *In re Larry Merritt Co., 169 B.R. 141 (E.D.Tenn 1994)*. Existing Sixth Circuit precedent, as we read it, is not inconsistent with this view.

In *Cardinal Mine, 916 F.2d 1087*, we held that first-tier creditors who did not file timely claims because they did not receive notice of the bankruptcy are entitled to first-tier status. The *Cardinal Mine* decision was premised on "[d]ue process and equitable concerns" not implicated here--*i e* concerns that "basic principles of justice require notice and an opportunity to be heard." *Id*. at 1089, 1092.

As the district court noted in the case at bar, there are dicta in *Cardinal Mine* which might be read as suggesting that *all* untimely filed first-tier claims retain their priority status. *Id*. at 1091 ("Since [the] priority [of § 726(a)(1) claims] is set in the statute, it is reasonable that that priority is more important than whether they were tardily filed either because they had received no notice of the bankruptcy or for some other reason"). Any question that such statements are anything more than dicta, however, was put to rest in *Century Boat Co., 986 F.2d at 158*:

"We simply decided [in *Cardinal Mine Supply* ], and we reaffirm today, the principle that a priority creditor who fails to receive notice of the bankruptcy and consequently files an untimely proof of claim is not barred from receiving priority distribution as a matter of law. Generally, every creditor will adhere to the timing requirements established in Bankruptcy Rule 3002. *Cardinal Mine Supply* established a narrow exception for priority creditors who lack notice of the bankruptcy."

In a Chapter 13 case where notice was received, this circuit seems to have held that tardiness in the filing of a proof of claim bars recovery altogether. See *In re Chavis, 47 F.3d 818 (6th Cir.1995)*. This result goes beyond the one we reach here under Chapter 7. But the *Chavis* panel-- at pains to distinguish *Vecchio* and *Pacific-Atlantic*--stressed the differences between Chapter 7 and Chapter 13 bankruptcies. *Chavis, 47 F.3d at 824*. Although there may be little point in drawing an "extra-textual distinction" between the two chapters, *Waindel, 65 F.3d at 1309 n. 6*, it is clear that section 726, with its explicit contemplation of untimely but allowed claims, applies by its terms only to Chapter 7, not to Chapter 13.

### IV

We note in closing that the problem presented here will not trouble the courts much longer. The 1994 Bankruptcy Amendments, which govern cases filed after October 22, 1994, provide that a tardily filed claim is disallowed except to the extent that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

98 F 3d 1341 (Table)                                                                                          Page 4
98 F 3d 1341 (Table), 1996 WL 580475 (6th Cir (Mich )), 65 USLW 2303, 78 A F T R 2d 96-7050
**Unpublished Disposition**
**(Cite as: 98 F.3d 1341, 1996 WL 580475 (6th Cir.(Mich.)))**

provisions of § 726 allow distribution on such claims 11 U.S.C. § 502(b)(9)    A claim of a governmental unit is deemed timely if filed "before 180 days after the date of the order for relief or such later time as the Federal Rules of Bankruptcy Procedure may provide " *Id.* Section 726(a)(1) has been modified to allow first-tier distribution status to timely filed claims and those that are "tardily filed before the date on which the trustee commences distribution "    As the *Chavis* panel observed, the amendments "reveal[ ] Congress' intent to demand that claims be timely filed " 47 F.3d at 823

V

**\*\*5** The judgment of the district court is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion

98 F 3d 1341 (Table), 1996 WL 580475 (6th Cir (Mich )), 65 USLW 2303, 78 A F T R 2d 96-7050 Unpublished Disposition

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works

Westlaw.

166 F.3d 1214 (Table)                                              Page 1

166 F.3d 1214 (Table), 1998 WL 833774 (6th Cir.(Mich.))
**Unpublished Disposition**

**(Cite as: 166 F.3d 1214, 1998 WL 833774 (6th Cir.(Mich.)))**

**Briefs and Other Related Documents**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)

United States Court of Appeals,
Sixth Circuit.

In re: Tom D. JOHNSON, Debtor
COMERICA BANK, Plaintiff-Appellant,
v.
Tom D. JOHNSON, Defendant-Appellee.
**No. 97-1749.**

Nov. 19, 1998.

On Appeal from the United States District Court for the Eastern District of Michigan.

Before KEITH, BATCHELDER, and COLE, Circuit Judges.

**\*\*1** Comerica Bank ("Comerica") has appealed a district court order affirming the bankruptcy court's determination that, under Michigan law, a life insurance policy and its cash surrender value (collectively, the "Life Policy") are exempt from the claims of the creditors of Appellee Tom D. Johnson, a debtor in a pending Chapter 7 bankruptcy proceeding ("Debtor"). [FN1] Arguing that a recent Global Settlement Agreement between the Debtor and the trustee of his bankruptcy estate ("Trustee") moots this appeal, Debtor has filed a motion seeking the appeal's dismissal. For the

reasons stated below, we find that Debtor's motion is well taken and hereby dismiss the appeal.

> FN1. Michigan affords Chapter 7 debtors the opportunity to choose between federal and state exemptions. The Debtor claimed the Life Policy as an exempt asset pursuant to Mich. Comp. Laws Ann. § 500.2207. Debtor's exemption claim was sustained by the bankruptcy court over Comerica's objection.

I. BACKGROUND

Before suffering a disabling stroke, Debtor was a sales representative for The Equitable Life Assurance Society of the United States ("Equitable"). Debtor also was engaged in the business of commercial real estate development. In connection with that endeavor, Debtor signed as a comaker, and also guaranteed the repayment of, a note to Comerica (the "Comerica Note") from Greenwood Centre, Inc. ("Greenwood"), a corporation wholly owned by the Debtor. The Comerica Note is secured by a mortgage on commercial real estate owned by Greenwood as well as a security interest granted by the Debtor, individually, in his accounts receivable, general intangibles and contract rights. As additional security for the Comerica Note, Debtor was required to obtain and assign to Comerica a $1,000,000 term life insurance policy designating Comerica as beneficiary (the "Assigned Policy").

Upon default by Greenwood on its obligations under the Comerica Note, Comerica initiated collection efforts against Greenwood and the Debtor. In response to Comerica's collection efforts, on February 14, 1994, Greenwood filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (11 U.S.C. §§ 101, *et seq.*). Subsequently, on September 1, 1994, the Debtor filed a voluntary Chapter 11 bankruptcy proceeding.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 F.3d 1214 (Table)                                                                 Page 2

166 F.3d 1214 (Table), 1998 WL 833774 (6th Cir.(Mich.))
**Unpublished Disposition**

**(Cite as: 166 F.3d 1214, 1998 WL 833774 (6th Cir.(Mich.)))**

Comerica's motion to convert Debtor's Chapter 11 case to a liquidation proceeding under Chapter 7 of the Bankruptcy Code was granted by order of the bankruptcy court entered on December 31, 1996

## II. PROCEEDINGS BELOW
A. *The Bankruptcy Court*

Following protracted litigation between the Debtor and Comerica during the pendency of Debtor's Chapter 11 case, the bankruptcy court made the following rulings:

(1) The court found that only one of the thirteen life insurance policies owned by the Debtor, *i.e.*, the Assigned Policy, was subject to Comerica's security interest covering accounts receivable, contract rights and general intangibles;

(2) The court concluded that Debtor's contractual right to receive future commissions and fees from Equitable on account of renewals of life insurance policies previously sold by Debtor ("Renewals") also was subject to Comerica's security interest;

(3) The court upheld, over the objection of Comerica, the Debtor's claimed exemption in the Life Policy, which named Debtor's wife as beneficiary; and

**\*2** (4) The court determined that certain disability payments the Debtor was receiving under an Equitable welfare benefit plan (the "Disability Benefits") also were exempt under Michigan law.

B. *Appeal to the District Court*

Comerica appealed the bankruptcy court's holding that the Debtor's Life Policy and the Disability Benefits were exempt under Michigan law from the claims of his creditors. Comerica elected, however, not to appeal the bankruptcy court's determination that, of the thirteen insurance policies owned by the Debtor, only the Assigned Policy fell within the reach of Comerica's security interest.

On appeal, the district court affirmed the bankruptcy court's finding that both the Life Policy and the Disability Benefits enjoyed exempt status under Michigan law. Concluding from its examination of the record that the bankruptcy court did not determine whether the Disability Benefits were subject to Comerica's security interest and, if so, whether the Debtor had waived his right to claim an exemption for the Disability Benefits, the district court remanded the case for a resolution of this specific issue. Comerica filed a timely notice of appeal of the district court's decision.

## III. ANALYSIS
Following the conversion of Debtor's Chapter 11 case to a Chapter 7 liquidation proceeding, the Trustee attempted to liquidate a number of the Debtor's life insurance policies that had been determined by the bankruptcy court to be nonexempt assets. The Trustee also sought the recovery of fraudulent conveyances that allegedly were made by the Debtor to his wife.

While the instant appeal pended, the Trustee and the Debtor entered into a "Global Settlement Agreement," resolving the disputes between the Debtor and the Trustee relative to all the Debtor's life insurance policies as well as the fraudulent conveyance claims. The Global Settlement Agreement, which provides for the Debtor's cash payment of $165,000 to the Trustee and the Debtor's assumption of liability for and payment of certain priority tax claims (estimated in the Global Settlement Agreement at $75,000 to $80,000 in amount), contains the following provision:

In exchange for the settlement amount and the Debtor's agreement to assume all responsibility for and pay for all allowed unsecured filed priority tax claims, the bankruptcy estate and Trustee will release any rights and waive any and all claims against Tom Johnson and Shirley Johnson and their property including but not limited to any claims that the Trustee has to personal property, land contracts, all insurance policies, stock, and fraudulent transfer claims or actions under state law and/or under Chapter 5 of the Bankruptcy Code, including but not limited to the Fraudulent Conveyances.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

166 F.3d 1214 (Table)                                                                    Page 3

166 F.3d 1214 (Table), 1998 WL 833774 (6th Cir.(Mich.))
**Unpublished Disposition**

**(Cite as: 166 F.3d 1214, 1998 WL 833774 (6th Cir.(Mich.)))**

The Global Settlement Agreement also contains the following proviso (the "Carve-out Provision"): "This Global Settlement does not, however, compromise any of the claims of Comerica Bank as a secured creditor."

**\*\*3** The Global Settlement Agreement was approved by the bankruptcy court pursuant to a stipulated order, entered on April 23, 1998 by the bankruptcy court. The stipulated order was signed by Comerica's counsel.

Asserting that the Global Settlement Agreement settled any claim that the bankruptcy estate may have to an interest in all of the insurance policies he owns, Debtor maintains that this appeal is moot and should be dismissed. Comerica, on the other hand, relies on the Carve-Out Provision, which excluded its claims as a secured creditor from the reach of the global settlement. The Carve-Out Provision, Comerica argues, enables it to continue prosecuting the appeal of the issue of the Life Policy's exempt status. We disagree.

Having failed to appeal the bankruptcy court's holding that--of the thirteen insurance policies owned by the Debtor--only the Assigned Policy is subject to Comerica's security interest, Comerica can make no legitimate claim that the Life Policy secures the Comerica Loan. *See Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190, 194 (6th Cir.1992) (stating that absent exceptional circumstances, an issue not raised first before the district court is waived on appeal); *Chandler v. Jones,* 813 F.2d 773, 777 (6th Cir.1987) (declining to consider new argument not raised before the district court). Whatever interest Comerica has in the Life Policy thus necessarily derives from its status as an unsecured, rather than secured, creditor of Debtor's bankruptcy estate. As such, Comerica is bound by the settlement between Debtor and the Trustee, who is the sole and exclusive representative of all unsecured creditors of Debtor's bankruptcy estate, including Comerica. *See Bauer v. Commerce Union Bank,* 859 F.2d 438, 441 (6th Cir.1988) ("It is ... clear that the trustee in bankruptcy acts as representative of the estate.");

*Vreugdenhil v. Hoekstra,* 773 F.2d 213, 215 (8th Cir.1985) ("The trustee is the 'legal representative' of the bankruptcy estate."); *In re Convenient Foods, Inc.,* 197 B.R. 6, 7 (Bankr.D.N.H.1996) ("Unless otherwise authorized by the Court, [the Chapter 7 trustee and counsel to the Chapter 7 trustee] are the sole representatives of the estate and responsible for its liquidation."); *Mini-Miners, Inc. v. Lansberry (In re Lansberry),* 177 B.R. 49, 55 (Bankr.W.D.Pa.1995) ("With his appointment, the Chapter 7 trustee became the sole representative of debtors' estates."); *Price v. Gaslowitz (In re Price),* 173 B.R. 434, 440 (Bankr.N.D.Ga.1994) ("A Chapter 7 trustee is the estate's sole representative."). [FN2]

> FN2. We do not suggest that only a trustee may contest a debtor's exemption claim. To the contrary, Federal Rule of Bankruptcy Procedure 4003(b) expressly authorizes the trustee or any creditor to file an objection to the list of property claimed as exempt by the debtor. Here, while Comerica's appeal concerning the exempt status of the Life Policy pended, and after Comerica had waived its right to challenge the bankruptcy court's finding that only the Assigned Policy was subject to its security interest, the Trustee entered into the Global Settlement Agreement with the Debtor that released the bankruptcy estate's claims to all of the insurance policies owned by the Debtor. This Global Settlement Agreement binds all unsecured creditors of the bankruptcy estate, including Comerica.

Comerica concedes that its interest in the Life Policy is confined to that of a general unsecured creditor. [FN3] Having acknowledged that relative to the Life Policy its rights are confined to that of general unsecured creditor, Comerica's argument that it may nonetheless continue the prosecution of the appeal is a nonsequitur. The trustee has relinquished the bankruptcy estate's claims to any and all of Debtor's insurance policies (including the Life Policy) in consideration for a substantial cash

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

166 F.3d 1214 (Table)                                                                   Page 4

166 F.3d 1214 (Table), 1998 WL 833774 (6th Cir.(Mich.))
**Unpublished Disposition**

**(Cite as: 166 F.3d 1214, 1998 WL 833774 (6th Cir.(Mich.)))**

payment from the Debtor and his agreement to satisfy certain priority tax claims. We find nothing in the Global Settlement Agreement--including the Carve-Out Provision--suggestive of an agreement by the parties that Comerica, as the Trustee's surrogate, may continue to appeal on behalf of the bankruptcy estate's general unsecured creditors the lower courts' determination that the Life Policy constitutes an exempt asset. A far more plausible construction of the Global Settlement Agreement is that the Carve-Out Provision merely establishes that Comerica's rights in its security--the commercial real estate owned by Greenwood, the Assigned Policy, the Renewals and, potentially, the Disability Benefits (if, on remand, the bankruptcy court concludes that they are subject to Comerica's security interest)--remain unaffected by the Global Settlement Agreement. Accordingly, we find that the appeal has been rendered moot by the Global Settlement Agreement and hereby GRANT the Debtor's motion to dismiss.

> FN3. Comerica acknowledges that if it were successful in overturning the lower courts' exemption determination, the Variable Life Policy would be "liquidated and the proceeds distributed to the unsecured creditors" of the Debtor's bankruptcy estate. Brief in Support of Answer to Motion to Dismiss at 4. Comerica also notes that even though the Trustee and Debtor have reached a settlement, "[t]his Court can still have the Bankruptcy Court use its equitable powers to order the relief Comerica is seeking, by having the Insurance Policy liquidated and the proceeds distributed to unsecured creditors." *Id.*

**\*\*4** The Debtor urges us to impose costs or other sanctions upon Comerica, contending that Comerica's refusal to dismiss the appeal after the Global Settlement Agreement was executed has resulted in its prosecution of a frivolous appeal. Under 28 U.S.C. § 1912 and Fed. R.App. P. 38, we may award the appellees just damages and single or double costs if Comerica's appeal is found to be frivolous. *See Barney v. Holzer Clinic, Ltd.,* 110 F.3d 1207, 1212 (6th Cir.1997) An appeal is frivolous if it is obviously without merit and is prosecuted for delay, harassment, or other improper purposes. *Id.* While we conclude that Comerica's arguments are ultimately meritless, they are not so obviously without merit as to be frivolous. Hence, while Comerica may have tread perilously close to the sanctionable-conduct line in pursuing this appeal after the Global Settlement Agreement was approved, we do not believe that the line has been crossed. Debtor's request for an award of costs is therefore DENIED.

166 F.3d 1214 (Table), 1998 WL 833774 (6th Cir.(Mich.)) Unpublished Disposition

**Briefs and Other Related Documents (Back to top)**

• 97-1749 (Docket)

(Jul. 16, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | Bankruptcy Case 02-10429 (JKF) |
| | : | |
| Debtors. | : | |
| | : | |
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | Civil Action No. 05-135 (JJF) |
| | : | |
| KAISER ALUMINUM CORP., et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2005, the Court electronically filed an **Brief of Appellees Debtors and Debtors in Possession** with the Clerk of Court using CM/ECF which will send notifications of such filing to the following:

Daniel J. DeFranceschi
defranceschi@rlf.com
 rbgroup@rlf.com

Kathleen M. Miller
kmiller@skfdelaware.com,
mcm@skfdelaware.com

Francis A. Monaco, Jr.
fmonaco@monlaw.com,
hsasso@monlaw.com

Theodore J. Tacconelli
ttacconelli@ferryjoseph.com

I herby certify that on June 2, 2005, I mailed via the United States Postal

Service the **Brief of Appellees Debtors and Debtors in Possession** to the following non-registered

participants:


William P. Bowden
Ashby & Geddes
222 Delaware Avenue
P.O. Box 1150
Wilmington, DE 1899

David Klauder
Richard Schepacarter
Office of the U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE 19801

James L. Eggeman
Pension Benefit Guaranty Corporation
Office of General Counsel
1200 K Street, N.W., Suite 340
Washington, DC 20005-4023

Dated: June 2, 2005
         Wilmington, Delaware

                              _Kimberly D. Newmarch_
                              Daniel J. DeFranceschi (DE 2732)
                              Kimberly D. Newmarch (DE 4340)
                              Richards, Layton & Finger, P.A.
                              One Rodney Square
                              P.O. Box 551
                              Wilmington, DE 19899
                              Tel: 302-651-7700
                              Fax: 302-651-7701
                              defranceschi@rlf.com
                              newmarch@rlf.com