Appellant, Law Debenture Trust Company of New York ("LDTC" or "Appellant") respectfully submits this Reply Brief[1] in reply to the Briefs on Appeal filed by the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), and the Pension Benefit Guaranty Corporation (the "PBGC") (collectively, "Appellees").

I.

**APPELLEES HAVE FAILED TO DEMONSTRATE THAT THE BANKRUPTCY COURT'S DETERMINATION TO HEAR AND CONSIDER THE DEBTORS' MOTION TO APPROVE THE PBGC SETTLEMENT AND DISMISS THE LDTC CLAIM OBJECTION AS MOOT WAS PROPER.**

In over 100 pages of responsive briefs, Appellees have failed to demonstrate any cognizable basis for the Bankruptcy Court's decision to hear, consider and approve the proposed PBGC Settlement, and dismiss as moot the pending claim objection of LDTC. Appellees fail to cite any persuasive case law or any statutory authority for the proposition that when one creditor's objection to the claim of another creditor is pending, a Bankruptcy Court may (i) approve, over the objection of that creditor, a settlement of that claim proposed by the Debtors and (ii) dismiss as moot the pending objection of the other creditor. This is simply impermissible in light of the statutory rights afforded to creditors under section 502 of the Bankruptcy Code and, as discussed at length in LDTC's Brief on Appeal, flies in the face of the Third Circuit's recent decision in <u>In re Combustion Eng'g</u>, 391 F.3d 190 (3d Cir. 2004). The Bankruptcy Court erred in this regard, and this Court should reverse its decision.

The Bankruptcy Court determined that it would consider the merits of the PBGC Settlement prior to any adjudication of the LDTC Claim Objection under section 502. Therefore, the evidentiary hearing conducted below proceeded under the less exacting standards set forth in Bankruptcy Rule 9019. Appellees argue that there is no conflict between section 502 and

---

[1] To the extent not otherwise defined, capitalized terms used herein have the meanings ascribed to them in LDTC's Brief on Appeal.

Bankruptcy Rule 9019 because LDTC was afforded an opportunity to litigate the PBGC Claims in the context of a Bankruptcy Rule 9019 settlement. This argument fails to account for the material differences in the standards under section 502 and Bankruptcy Rule 9019 and the resulting prejudice to PBGC both at trial and on appeal, as previously discussed at length in LDTC's Brief on Appeal. (D.I. 17, LDTC's Brief on Appeal at 18, 21-23; see D.I. 20, Debtors' Brief on Appeal at 31; D.I. 18,Committee's Brief on Appeal at 25.)

Indeed, the Bankruptcy Court expressly declined to view the evidence offered by LDTC as it would in the context of a claim objection hearing and did not require Appellees to justify the rates used by the PBGC through the use of expert testimony. (D.I. 6099, 1/18 Tr. at 230, Binder 4, Tab 41.) This step was critical to demonstrating the legitimacy of the PBGC Unfunded Benefit Liability Claims under section 502 of the Bankruptcy Code – the precise claim which the Debtors sought to settle. When this issue was argued before the Bankruptcy Court by LDTC, the Bankruptcy Court responded:

> [t]oday is not the objection to claim. Today is a determination as to whether this settlement is fair and reasonable for this estate – <u>without getting into the evidence that would be required</u> if I determined that the prudent investor rate, in an objection to claim process, was the rate that had to be applied – as opposed to the statutory calculation method or regulatory method that the PBGC is using.

Id. (Emphasis added). This statement by the Bankruptcy Court illuminates the precise problem with the manner in which the Bankruptcy Court proceeded. Put simply, LDTC had the right, as a creditor, to require the PBGC <u>to prove its claim</u> in accordance with the standards established under section 502 of the Bankruptcy Code and applicable case law. The PBGC was essentially let off the hook by the Bankruptcy Court's determination to proceed with a settlement hearing. As a result, LDTC's rights under section 502 were no less than trampled upon, and Appellee's assertions that these rights were somehow addressed in connection with the Bankruptcy Court's

2

consideration of the proposed PBGC Settlement are without merit and should be disregarded by this Court.[2]

## II.

**APPELLEES HAVE FAILED TO POINT TO ANY COGNIZABLE EVIDENCE SUPPORTING THEIR ASSERTIONS REGARDING THE GOOD FAITH AND ARM'S LENGTH NATURE OF THE SETTLEMENT OF THE PBGC'S UNFUNDED BENEFIT LIABILITY CLAIMS AND ALL OF THE RELEVANT EVIDENCE SUPPORTS A CONTRARY CONCLUSION.**

In their briefs on appeal, Appellees portray the negotiation of the PBGC Settlement as a model of propriety. If Appellees are to be believed, the Debtors did not abdicate their duty to make certain that the resolution of the PBGC Unfunded Benefit Liability Claims was fair, ceding that critical task to the Senior Noteholders, but were intimately involved in the negotiations. If what Appellees assert is true, LDTC and the Senior Subordinated Noteholders were not excluded from the negotiation process, but were kept fully apprised of all that transpired (even though they supposedly chose to withdraw from the negotiations). And if what Appellees claim is correct, LDTC cannot now raise any claim of collusion, because it failed to do so at the evidentiary hearing before the Bankruptcy Court. All of Appellees' assertions, however, are untrue and are flatly belied by the record.

Any honest reading of the record reveals that the Debtors' claim that they were "intimately involved" in the negotiation of the settlement of the PBGC Unfunded Benefit Liability Claims is false. (D.I. 20, Debtors' Brief on Appeal at 32, citing Barneson Declaration at ¶¶ 13, 7, 21, 22 and 23; and Patel Declaration at ¶18.) The portions of the Declaration of John

---

[2] To the extent that the Committee relies upon In re Dow Corning Corp., 244 B.R. 721 (Bankr. E.D. Mich. 1999), rev'd on other grounds, 255 B.R. 445 (E.D. Mich. 2000), Fred Reuping Leather Co. v. Fort Greene Nat'l Bank (In re Honesdale Union Stamp Shoe Co.), 102 F.2d 372 (3d Cir. 1939), and Lawrence v. Steinford Holding B.V. (In re Dominelli), 820 F.2d 313 (9th Cir. 1987), in support of the contention that the Bankruptcy Court's determination to proceed with the settlement hearing was proper, we respectfully refer the Court to Point IV, infra, for a discussion of these cases.

Barneson that the Debtors rely upon for this claim actually make no reference to the Debtors having any involvement in the negotiation of the PBGC Claims after July 2004 (although it is undisputed that the negotiations of the PBGC's Unfunded Benefit Liability Claims did not begin in earnest until after that time). (See D.I. 6099, 1/18 Tr. at 126-127, Binder 4, Tab 41.) The Debtors citation to ¶18 of Amit Patel's Declaration is similarly misleading. (D.I. 20, Debtors' Brief on Appeal at 14.) While Patel makes mention in that paragraph of various other components of the PBGC Settlement in which the Debtors were involved, he makes no mention of the Debtors having any involvement in the <u>negotiation</u> of the treatment of the PBGC's Unfunded Benefit Liability Claims.[3]

Contrary to the position Appellees take in their briefs on appeal, Barneson admitted during cross-examination that he had no direct knowledge of how the PBGC's Unfunded Benefit Liability Claims came to be resolved, acknowledging that the Debtors ceded responsibility to the Senior Noteholders for negotiating these enormous claims with the PBGC. (D.I. 6099, 1/8 Tr. at 72-72, Binder 4, Tab 41.) Furthermore, Barneson admitted that when he signed the PBGC Settlement, he did not even know what dollar amount the PBGC would receive as a result of that settlement. (D.I. 6099, 1/18 Tr. at 79-81, Binder 4, Tab 41.) As for Appellees' other witnesses, Appellees do not dispute that none of those witnesses had any direct knowledge of the negotiations surrounding the PBGC's Unfunded Benefit Liability Claims.

Appellees' assertion that LDTC and the Senior Subordinated Noteholders were not excluded from the negotiations, but chose to absent themselves (and were kept fully apprised of all that transpired nonetheless) is, to borrow a term from the Committee's brief, bunk. The testimony Appellees advance for this false claim – Amit Patel, D.I. 6099, 1/18 Tr. at 135-137

---

[3] Furthermore, since Patel admitted under cross-examination that he had no direct knowledge of the negotiations, any testimony he offered about those is inadmissible hearsay. (D.I. 6099, 1/18 Tr. at 118-119, Binder 4, Tab 41.)

(D.I. 20, Debtors' Brief on Appeal at 16; D.I. 18, Committee's Brief on Appeal at 10) – says no such thing and, in any event, was properly rejected by the Bankruptcy Court as hearsay. (D.I. 6099, 1/18 Tr. at 92-94, 135-136, Binder 4, Tab 41.) As for the claim that LDTC and the Senior Subordinated Noteholders were kept fully apprised of the negotiations — a claim which the Committee asserts it believes to be true, though it cites no support for this belief in the record (D.I. 18, Committee's Brief on Appeal at 33)[4] — the true facts are quite different. The record reflects that the Senior Subordinated Noteholders were not kept apprised of the negotiations or even provided with drafts of the PBGC Settlement. (D.I. 6099, 1/18 Tr. at 72-73, Binder 4, Tab 41; Decl. of Steven M. Rabinowitz – *filed under seal* – Ex. B at Vol. I, 50, Binder 5, Tab 4.)

With regard to the evidence of collusion between the Senior Noteholders and the PBGC, Appellees take a different tack. Both the PBGC and the Debtors simply ignore this evidence, making no comment about it in their briefs. As for the Committee, they disingenuously argue that LDTC ought not to be allowed to raise the issue of collusion on appeal, because it purportedly was not raised below. Yet the record belies the Committee's claim. In two separate places in its trial brief, LDTC raised the issue of collusion; furthermore, LDTC submitted documentary evidence and excerpts from the deposition of Kurt Billick to prove this collusion. (Trial Brief of LDTC – *filed under seal* – at 6, 10, Binder 5, Tab 1; L-3, Trial Exhibit of LDTC – *filed under seal* – at ¶¶2, 6, Binder 7, Tab L-2; Decl. of Tina N. Moss – *filed under seal* – Ex. C at 91-102, Binder 5, Tab 3.)

At the hearing before the Bankruptcy Court, none of Appellees provided any evidence to rebut the evidence of collusion offered by LDTC. Thus, it remains undisputed that one of the

---

[4] Such sophistry is routinely condemned by the courts, which have held that it is patently improper upon appeal to attempt to include facts not in the trial record. See Halvajian v. Bank of New York (In re Halvajian), 216 B.R. 502, 508-509 (D.N.J. 1998), aff'd, 168 F.3d 478 (3d Cir. N.J. 1998); Crefisa, Inc. v. Washington Mut. Bank, F.A. (In re Colonial Mortgage Bankers Corp.), 186 F.3d 46, 49-50 (1st Cir. 1999); Siewert v. Christy (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey), 194 B.R. 728, 733 (S.D.N.Y. 1995).

Senior Noteholders' motives in taking control of the negotiations with the PBGC was to obtain the PBGC's support in the "subordination dispute" with LDTC. The Bankruptcy Court, it appears, did not take this evidence into consideration in approving the PBGC Settlement. Indeed, the Bankruptcy Court made no specific finding that the PBGC Settlement was the product of good faith and arm's length negotiations.

For these reasons, this Court should conclude that the PBGC Settlement was improper and unreasonable because the most crucial component of it to creditors of the Alumina Estates – the resolution of PBGC's Unfunded Benefit Liability Claims – was not the product of good faith and arm's length negotiations.

### III.

### APPELLEES HAVE FAILED TO DEMONSTRATE THE REASONABLENESS OF THE PBGC SETTLEMENT.

Under the standards set forth in In re Martin, the Bankruptcy Court can only approve a proposed settlement if it is shown to be in the best interests of the debtor's estate. Myers v. Martin (In re Martin), 91 F.3d 393, 394 (3d Cir. 1996). The Debtors did not meet their burden under Martin before the Bankruptcy Court and, therefore, the Bankruptcy Court abused its discretion in approving the PBGC Settlement.

As an initial matter, the Appellees' contention that LDTC's objection was limited to only one aspect of the PBGC Settlement (the PBGC's Claims), though oft-repeated throughout this litigation, continues to be without any basis in reality. (D.I. 18, Committee's Brief on Appeal at 13; D.I. 20, Debtors' Brief on Appeal at 19-20; D.I. 19, PBGC's Brief on Appeal at 22.) Rather, the essence of LDTC's objection is that the entire settlement is patently unreasonable because of the apparent exchange of the treatment of the PBGC's Unfunded Benefit Liability Claims (the aspect with direct economic impact on the Alumina Estate noteholders) with the other aspects of the PBGC Settlement that the Debtors assert are essential to their reorganization of other

components of their business. Put simply, the PBGC Settlement uses the treatment of the PBGC Claims at the Alumina Estates (and the resulting economic prejudice to the Alumina Estate noteholders) as consideration for concessions from the PBGC on matters that are wholly unrelated to the economic interests of the Alumina Estate noteholders. This is highly prejudicial to the interests of the Alumina Estate noteholders and is the fatal flaw of the PBGC Settlement. LDTC expressly made this argument to the Bankruptcy Court at the PBGC Settlement hearing and in its Trial Brief. (D.I. 6099, 1/18 Tr. at 62-63, 223-225, Binder 4, Tab 41; Trial Brief of LDTC – *filed under seal* – at 6, 10, Binder 5, Tab 1.)

With respect to the Martin factors, none of the Appellees offered any evidence below of the complexity of the litigation that would have to be undertaken in the absence of the PBGC Settlement or the costs associated therewith. Despite the lack of such evidence, the Bankruptcy Court determined that the litigation results were uncertain. (D.I. 6076, 1/24 Tr. at 92, Binder 4, Tab 39.). Even on this Appeal, neither the Debtors nor the Committee discuss exactly why the costs and complexity of the litigation could not be predicted – indeed the Committee's only comment is a passing one – it simply asserts, "these issues are highly fact intensive and involve many uncertain areas of the law, and therefore, the outcomes were difficult to predict." (D.I. 18, Committee's Brief on Appeal at 14.)

As to the Debtors' likelihood of success on the merits with respect to the other aspects of the PBGC Settlement, one need look no further than the Debtors' own motion papers in support of the PBGC Settlement for a comprehensive discussion of the all of the various pitfalls facing the PBGC on its assertions with respect to administrative priority status of its claims, which assertions have been repeatedly rejected by the courts. (D.I. 5251, Debtors' Motion for Approval of PBGC Settlement at 16-19, Binder 1, Tab 2.). As for the PBGC's contention that each of the Debtors' pension plans must be reviewed separately for distress termination purposes (see id. at

7

12-14), this Court has already rejected that position on the PBGC's appeal of the Bankruptcy Court's order, which this Court affirmed.[5] (Pension Benefit Guaranty Corp. v. Kaiser Aluminum Corp., et al., Civ. No. 04-145 JJF, 2005 U.S. Dist. LEXIS 5106 (D. Del. March 30, 2005)(attached hereto as Exhibit A).) That leaves at issue the Debtors' proposed replacement plans for its reorganized business. The issue of whether the Debtors would ultimately prevail on these proposed plans with the PBGC is dwarfed by the fact that these plans inure strictly to the benefit of the Debtors and their employees, not to the creditors of the Alumina Estates.

Most significantly, based upon the law and the evidence, the Bankruptcy Court could not have properly decided that the PBGC's Unfunded Benefit Liability Claims should have been compromised as favorably as they were to the PBGC. As a matter of law, there is no merit to Appellees' position that a compromise was necessary to avoid the supposed risk that the PBGC would prevail if it litigated the issue of whether it was entitled to use its own low interest rate, rather than a much higher "prudent investor rate," in calculating its Unfunded Benefit Liability Claims. As discussed more fully below, Appellees' position rests on a lone, wrongly-decided, lower-court decision, rendered outside of this jurisdiction, that has not been followed by any other court and conflicts with uncontroverted Supreme Court and Circuit Court authority. Thus, while Appellees portray the Bankruptcy Court's acceptance of the PBGC Settlement as representing some sort of Solomonic splitting-of-the-baby, the vast sums to be awarded the PBGC under that Settlement are grossly out of proportion to the exceedingly modest risk that the PBGC would prevail on its Claims as a matter of law.

The Debtors' assertion that the Bankruptcy Court was correct not to follow the decisions in In re CF&I Fabricators of Utah, Inc., 150 F.3d 1293 (10th Cir. 1998) and In re CSC Indus., Inc., 232 F.3d 505 (6th Cir. 2000) and to follow the decision in In re US Airways Group, Inc.,

---

[5] The PBGC has appealed this order to the Third Circuit.

303 B.R. 784 (Bankr. E.D. Va. 2003) because it is "the most recent judicial review of this issue" and because "both of these decisions predate the United States Supreme Court decision" in Raleigh v. Illinois Dep't of Revenue, 30 U.S. 15 (2000) is simply wrong on the facts and mischaracterizes the analysis in those opinions. (See D.I. 20, Debtors' Brief on Appeal at 20.) First, the Debtors' erroneous assertions notwithstanding, CSC Indus. was decided several months *after* Raleigh and *expressly relies on it.* See CSC Indus., 232 F.3d at 509. In fact, the Sixth Circuit's reliance on Raleigh is even acknowledged in the US Airways decision, a case Appellees cite as their only support for the application of the PBGC regulatory rate to value its claims. See US Airways, 303 B.R. at 792. Even a cursory review of these cases will confirm that the Debtors have advanced a blatantly uninformed position, and this Court should disregard this argument in its entirety.

Second, the notion that the law of valuing claims in bankruptcy was so radically changed by Raleigh as to overrule the decision in CF&I Fabricators is ludicrous. As noted by the Sixth Circuit in CSC Indus., in deciding Raleigh the Supreme Court simply "reiterated" the time-honored principle that the validity of a claim in bankruptcy is governed by nonbankruptcy law. CSC Indus. at 509; see also Raleigh, 530 U.S. at 20 (citing authorities dating back to 1942 for this principle). Adhering to this principle, the Sixth Circuit cited Raleigh en route to its critical holding that the "allowability and amount" of a claim in bankruptcy is governed by the Bankruptcy Code. CSC Indus. at 509. Any notion that Raleigh undermines CF&I Fabricators in any sense was eliminated by the opinion in CSC Indus., which cited and analyzed the CF&I Fabricators decision in the same opinion that discusses Raleigh, and adopted the CF&I Fabricators rationale without noting any conflict between these opinions.

The Debtors' contention is that US Airways should be followed simply because it is the most recent decision on this issue, but of course the persuasive value of an opinion is not based

1:05-cv-00135-JJF

on how recently it was decided, but on how well. Here, the US Airways decision is from a Bankruptcy Court, not a Circuit Court, and the Bankruptcy Court decision was just plain wrong. Moreover, despite all of the Appellees' urgings to the contrary, the decisions of Circuit Courts have far more persuasive force that those of Bankruptcy Courts from non-binding jurisdictions, particularly when the only Circuit Courts to consider the issue are united in a position on the law against a lone Bankruptcy Court judge.

There can be no question that the US Airways decision was wrongly decided. Rather than recognize the distinction made in Raleigh between the validity of a claim in the first instance and the "allowability" and "amount" of the recovery on that claim, as was done in CSC Indus. and CF&I Fabricators, the Bankruptcy Court for the Eastern District of Virginia held that because the PBGC's claims were to be valued pursuant to ERISA in the first instance, the claims were therefore valid and fully recoverable from the bankruptcy estate. See US Airways, 303 B.R. at 792. This shortcut ignores the clear holding in Raleigh that all claims in bankruptcy are "subject to any qualifying or contrary provisions of the Bankruptcy Code." Raleigh, 530 U.S. at 20. Furthermore, the holding in US Airways is inconsistent with the provisions of Section 1123(a)(4) of the Bankruptcy Code, which require that similarly situated creditors be treated alike.

Lastly, a crucial fact in US Airways may have made the issue of the discount rate to be applied far less meaningful in that case than it is here. The creditors in US Airways were to receive "stock having an estimated value equal to less than two cents for each dollar in allowed claims", rather then the cash proceeds the PBGC will receive in this case from the liquidation of the Alumina Estate assets. US Airways, 303 B.R. at 791, n. 6. Here, Mr. Patel acknowledged that the PBGC's expected recovery under the PBGC Settlement would be about $268 million (D.I. 6099, 1/18 Tr. at 130-131, Binder 4, Tab 41), which is more than $100 million greater than the $168 million amount he calculated the PBGC's Unfunded Benefit Liability Claim would be

worth using a 10% discount rate[6] (D.I. 6099, 1/18 Tr. at 122, Binder 4, Tab 41.) In US Airways, the court noted that there was no possibility of a "windfall" to the PBGC on those facts. In other words, the detailed analysis required by Raleigh and utilized in CSC Indus. and CF&I Fabricators may not have radically changed the amount of the PBGC's recovery in US Airways, but the failure to make that analysis here will result in a windfall to the PBGC and in direct and substantial prejudice to the other creditors of the Alumina Estates.

This Court should, therefore, conclude that the decision of the Bankruptcy Court in US Airways does not dictate the analysis of a fair resolution of the PBGC's Unfunded Benefit Liability Claims in the context of the PBGC Settlement, but rather that the Bankruptcy Court must apply a prudent investor rate to calculate those Claims for the purpose of determining the reasonableness of the PBGC Settlement.

In addition to their flawed legal argument, Appellees also argue that the PBGC Settlement was fair because the Bankruptcy Court properly found that there was considerable uncertainty even with respect to the proper calculation of the "prudent investor rate." (See D.I. 20, Debtors' Brief on Appeal at 21.) Yet there is no proper support in the record for any such finding. The only expert testimony offered concerning the prudent investor rate was that of LDTC's expert, Dr. Roger Brinner. No countervailing expert testimony was offered by any of Appellees' witnesses.[7]

Furthermore, Appellees' attempts to call into question Dr. Brinner's prudent investor rate of 10.4% are wholly unavailing. Debtors assert in their brief that upon cross-examination of Dr.

---

[6] Because present values decrease the higher the discount rate, Dr. Brinner's 10.4% prudent investor rate would yield an even lower figure than $168 million and, hence, an even greater difference than $100 million.

[7] While Blake O'Dowd and Amit Patel testified on Appellees' behalf about their own view of the prudent investor rate, such testimony was not offered as expert testimony, nor did it begin to reflect the scientific rigor of Dr. Brinner's analysis. At most, their testimony served only to buttress Dr. Brinner's testimony, given that their rates were much closer to Dr. Brinner's than to the regulatory rates asserted by the PBGC.

Brinner he "candidly admitted that the PBGC's chances of achieving a 10.4% return are 50/50," which Debtors then deride as a mere coin toss. (Debtor's Brief at 21, citing Tr. p. 154). What Dr. Brinner actually testified to, however, is that the 10.4% rate is the mean of all possible rates, i.e., 50% of the time, the prudent investor rate is higher than 10.4%, and 50% of the time it is lower, but the average or "mean" rate over time is 10.4%. (D.I. 6099, 1/18 Tr. at 154, Binder 4, Tab 41; see also Decl. of Roger Brinner – *filed under seal* – at ¶28, Binder 5, Tab 2.) And what the Debtors fail to note, but which Dr. Brinner also stated in that same bit of testimony, was that the data range on either side of that mean was exceptionally narrow, with a standard deviation of only plus or minus one percent (1%). Id. Thus there was no proper basis in the record for the Bankruptcy Court to conclude that Dr. Brinner's calculation of the prudent investor rate at 10.4% was at all uncertain.

Appellees argue that the imputed 6% interest rate reflected in the PBGC Settlement amounts to a reasonable compromise between Dr. Brinner's 10.4% interest rate and the 4-5% rate used by the PBGC. Yet merely because a figure falls somewhere between two numbers does not mean it is a reasonable compromise. One must first consider whether each party's starting point is reasonable. If one party begins by demanding a figure ten times greater than his claim is worth, and then "compromises" at a figure that is twice the true value of his claim, no real compromise has been reached. Even assuming that this first test is satisfied, one must next determine whether the compromise point falls within the range of reasonableness; i.e., that it does not disproportionately favor one party over another without sufficient justification.

Here, where there is but one, idiosyncratic case that supports the PBGC's methodology for calculating its Unfunded Benefit Liability Claims — and uncontroverted Supreme Court and Circuit Court authority which rejects that methodology — there is serious doubt that the PBGC's starting point in the negotiation of those claims was a fair and reasonable one. Moreover, given

12

the far greater legal support for LDTC's position that the PBGC's Unfunded Benefit Liability Claims should be calculated using a prudent investor rate, the Bankruptcy Court could not have properly determined that to compromise those claims using an imputed interest factor of 6% was within the range of reasonableness. Because the so-called "compromise" at a 6% interest rate is but one point higher than the rate actually used by the PBGC to calculate its claims, and is more than four points lower than the prudent investor rate put forth by LDTC, there can be no question that PBGC Settlement heavily favored the PBGC.

But the favoritism afforded the PBGC is even greater than appears at first blush. As a matter of simple mathematics — given that the PBGC's Unfunded Benefit Liability Claims involve the present value of benefits that will be paid over roughly thirty years — with each incremental reduction in the interest rate, the size of the PBGC's Unfunded Benefit Liability Claims grows exponentially. Thus, by approving a settlement which incorporates a 6% interest factor, the Bankruptcy Court was not approving a reasonable compromise, but one that overwhelmingly and unjustifiably favored the PBGC.

For the foregoing reasons, this Court should determine that the PBGC Settlement was unfair, unreasonable, and improper and should reverse the decision of the Bankruptcy Court approving it.

## IV.

**THE ISSUE OF LDTC'S STANDING TO OBJECT TO THE PBGC CLAIMS IS NOT BEFORE THIS COURT ON APPEAL; ALTERNATIVELY, LDTC HAS THE REQUISITE STANDING TO PROSECUTE THE LDTC CLAIM OBJECTION.**

A blatantly inappropriate issue raised in certain of the Appellees' Briefs is whether LDTC has standing to object to the PBGC Claims. (See D.I. 19, PBGC's Brief on Appeal at 16-17; D.I. 18, Committee's Brief on Appeal at 22-24; D.I. 20, Debtors' Brief on Appeal at 28-29.) The Bankruptcy Court heard argument on this issue and determined that LDTC did have

standing. (D.I. 6076, 1/24 Tr. at 100, Binder 4, Tab 39.) None of the Appellees has filed a cross-appeal for the purpose of preserving this issue on appeal. They are, therefore, barred from raising this issue and these arguments should be disregarded. See Fed. R. Bankr. Pro. 8006; Main, Inc. v. Blatstein, 1999 WL 424296, *2 (E.D. Pa. 1999)(holding that the defendants were obligated to cross-appeal from the [appellant's] appeal in order to preserve their ability to argue these issues in the district court)(attached hereto as Exhibit B).

If a party seeks review of a determination that is unfavorable to it, it must present these issues to the appellate court in accordance with the law. Bankruptcy Rule 8006 has established strict rules regarding what issues shall be considered on appeal. An aggrieved party is required to file a timely notice of appeal and specifically state the issues to be presented on appeal. Id. There is no authority providing that an appellee may include issues for appeal, specifically issues asserting that the court below erred, for the first time in its brief. Indeed, the appellee must be required to follow the rules for appealing issues to the same extent as the appellant, and failure to do so should result in the waiver of such issues on appeal. Thus, to permit Appellees here to raise the issue of whether LDTC has standing to assert the LDTC Claim Objection in the absence of a properly filed cross-appeal would be highly prejudicial to LDTC and a violation of LDTC's due process rights.

Should this Court determine, however, that it will consider Appellees' standing arguments, this Court must determine that LDTC had the requisite standing to prosecute the LDTC Claim Objection. Both Sections 502(a) and 1109(b) provide LDTC with the requisite standing. The Supreme Court has concluded that where statutory language is plain and unambiguous, "'the sole function of the court is to enforce it according to its terms.'" United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)). Furthermore, the "plain meaning of legislation should be conclusive,

except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" Ron Pair, 489 U.S. at 242 (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982)). "In such cases, the intention of the drafters, rather than the strict language, controls." Id.

Section 502(a) of the Bankruptcy Code provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, **unless a party in interest ... objects.**" 11 U.S.C. § 502(a) (West 2004). (Emphasis added). This language is clear and unambiguous on its face. The statutory language of section 502(a) contains no prerequisites to the filing of a claim objection by a creditor, nor does any bankruptcy rule of procedure. Surely Congress would have specified such a requirement if it had intended that creditors yield their substantive statutory rights under section 502(a) to a debtor. It did not, and this Court should enforce the plain language of the statute as written.

"Parties in interest include not only the debtor, but anyone who has a legally protected interest that could be affected by a bankruptcy proceeding". Adair v. Sherman, 230 F.3d 890, 894 (7th Cir. 2000) (citations omitted). Collier on Bankruptcy further states that "[t]here is no doubt that the phrase 'parties in interest' in section 502(a) includes those who have some interest in the assets of the debtor being administered in the case.... In fact, the right of a creditor to object to the allowance of another's claim should be undisputed on principle." 1 Collier on Bankruptcy ¶ 5.02[2][d]. Accordingly, as a party in interest within the meaning of section 502(a), it is without question that LDTC has standing to object to the PBGC Claims.

Furthermore, section 1109(b) of the Bankruptcy Code provides an independent ground for standing of an indenture trustee to "be heard on any issue in a case under [chapter 11]." 11 U.S.C. § 1109(b) (West 2004). See In re Metropolitan Hosp., 110 B.R. 731, 735 (Bankr. E.D. Pa.

1990), aff'd, 131 B.R. 283 (E.D. Pa. 1991) (stating that "11 U.S.C. § 1109(b) expressly accords . . . an indenture trustee with the right to be heard on any issue in a chapter 11 case").

Indeed, at least one bankruptcy court has held that the standing of a creditor such as LDTC cannot be disputed when the debtor is not properly representing the creditors' rights. In re Charter Comp., 68 B.R. 225, 228 (Bankr. M.D. Fla. 1986), aff'd, 81 B.R. 644 (M.D. Fla. 1987), aff'd, 862 F.2d 1500 (11th Cir. 1989). The Court explained:

> [t]o require a creditor in a chapter 11 proceeding to first request the debtor-in-possession to take action would be an act in futility in most instances. *If the debtor-in-possession has not already taken the action it may be because it has entered into a compromise agreement with the non-objecting creditor which is beneficial to the debtor but may or may not be beneficial to the general creditors. Objecting to the allowance of the non-objecting creditor's proof of claim is one of the most viable means by which a creditor can show that the compromise is not in the best interests of the general creditors.* Since the law does not impose a duty on the debtor-in-possession to act in the best interest of all general creditors, the Court will not disregard the plain language of § 502(a) and limit the right of general creditors to object to the allowance of a proof of claim in a chapter 11 proceeding.

Id. (Emphasis added). As was demonstrated to the Bankruptcy Court, although the terms of the proposed PBGC Settlement may be beneficial to the Debtors seeking to reorganize and their respective creditor constituencies, these terms are highly prejudicial to the Senior Subordinated Noteholders as creditors of the Alumina Estates whose assets have been liquidated. Thus, LDTC's standing under section 502(a) is in no way impacted by its filing of the LDTC Claim Objection without first formally requesting that the Debtors file such an objection. As can be seen by the course of events following the filing of the LDTC Claim Objection, undoubtedly such request would have been futile.

Finally, denying LDTC standing under these circumstances would contravene long-established federal case law that affords standing to parties who comply with three criteria. First,

the party must show an injury in fact which is both (a) concrete and particularized and (b) actual or imminent. Second, there must be a causal connection between the injury and the conduct complained of. And finally, it must be likely that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982). It is undisputed that LDTC meets all these criteria because of the enormous pecuniary impact of the Unfunded Benefit Liability Claims on its constituents, which is undoubtedly actual and imminent, and which would be redressed by an appropriate reduction in the amount of these claims.

The principal cases cited by the PBGC and Committee are readily distinguishable from the facts of the case at bar. In In re Dow Corning Corp., the bankruptcy court denied the creditors' committee the right to object to certain claims where the debtor had already filed an objection to those claims. 244 B.R. 721 (Bankr. E.D. Mich. 1999), rev'd on other grounds, 255 B.R. 445 (E.D. Mich. 2000). As the court explained, [u]nder these circumstances, no useful purpose would be served in allowing the [creditors' committee] to pursue its own objections to these claims. Conversely, allowing such a course of action would waste judicial resources and delay administration of the bankruptcy estate to its and its creditors' detriment with no corresponding benefit to the estate. Here, the Debtors did not file an objection to PBGC Claims until instructed to do so by the Bankruptcy Court Judge at the evidentiary hearing. (See D.I. 6099, 1/18 Tr. at 22, Binder 4, Tab 41.) Prior to the Debtors' objection filed on January 21, 2005, no party other than LDTC filed an objection to the PBGC Claims. Rather, the Debtors filed the PBGC Settlement Motion without first having filed an objection to the PBGC Claims. Under these circumstances, Dow Corning offers no support whatsoever for the Committee's and the PBGC's assertion that LDTC lacks standing to prosecute the LDTC Claim Objection, and that

argument should be rejected by this Court. This Court may easily dispense with Fred Reuping Leather Co. v. Fort Greene Nat'l Bank (In re Honesdale Union Stamp Shoe Co., Inc.), because it is a pre-Bankruptcy Code case from over sixty years ago, and the language cited by the Committee and the PBGC is in direct contravention of the plain language of section 502 of the Bankruptcy Code. 102 F.2d 372 (3d Cir. 1939).

Finally, Lawrence v. Steinford Holding B.V. (In re Dominelli), 820 F.2d 313 (9th Cir. 1987), is factually distinguishable in the most material way. There the trustee joined in an adversary proceeding brought by a junior lien holder challenging the claims of the senior lien holder on the basis of usury in the underlying loan terms. Id. at 315. The court ruled that the settlement of that adversary proceeding by the trustee operated as *res judicata* with respect to the objections of the junior lien holder to the senior lien holder's claim brought in the same litigation. Id. at 316. Here, the Debtors brought no such litigation and indeed made no attempt whatsoever to challenge the grossly inflated claims of the PBGC despite the pendancy of the LDTC Claim Objection and ample opportunity to do so. Rather, the Debtors ceded responsibility for the negotiation of the PBGC's Unfunded Benefit Liability Claims to the Senior Noteholders, and, only when the Bankruptcy Court ordered the Debtors to file an objection to the PBGC's Claims as a prerequisite to ruling on the Debtors' settlement motion, did the Debtors file only the most perfunctory claim objection to the PBGC's Claims. (D.I. 5995, Binder 3, Tab 35.) Furthermore, to the extent that Lawrence stands for the proposition that participation in a settlement hearing under Rule 9019 is good enough protection of a creditor's rights under Section 502 (see id. at 317), it is wrongly decided and should be rejected by this Court. The Bankruptcy Court below itself recognized that it was expressly not providing a full opportunity to consider the issues raised by the LDTC Claim Objection. Rather, it was purposefully viewing the burdens and

evidence in the context of the truncated requirements of Rule 9019. (D.I. 6099, 1/18 Tr. at 230-237, Binder 4, Tab 41.)

For the reasons discussed *supra*, this Court should decline to consider whether LDTC has standing to prosecute the LDTC Claim Objection as an issue on this Appeal, but if it chooses to do so, this Court must conclude that LDTC plainly has the requisite standing under both the Bankruptcy Code and applicable case law authority.

## CONCLUSION

For the foregoing reasons, this Court should (i) reverse the Orders approving the PBGC Settlement, dismissing the LDTC Claim Objection as moot, and denying LDTC's Motion for Reconsideration, (ii) remand this matter to the Bankruptcy Court for further proceedings with respect to the LDTC Claim Objection, and (iii) grant such other and further relief as this Court deems just and proper.

Dated: June 13, 2005                    Respectfully submitted,

MONZACK AND MONACO, PA

By: _____
Francis A. Monaco, Jr., Esq. (#2078)
1201 No. Orange Street, Suite 400
Wilmington, Delaware 19899
Telephone: (302) 656-8162
Telecopy:  (302) 656-2769


PRYOR CASHMAN SHERMAN & FLYNN LLP

Tina Niehold Moss, Esq.
Steven M. Rabinowitz, Esq.
410 Park Avenue
New York, New York 10022
Telephone: (212) 421-4100
Telecopy:  (212) 326-0806