**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 11 |
| | : | |
| KAISER ALUMINUM CORPORATION, et al., | : | Bankruptcy Case No. 02-10429-JKF |
| | : | |
| Debtors. | : | |
| | : | |
| | : | |
| PENSION BENEFIT GUARANTY CORP., | : | |
| | : | |
| Appellant, | : | |
| v. | : | Civil Action No. 04-145-JJF |
| | : | |
| KAISER ALUMINUM CORPORATION, et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |
| | : | |

## O R D E R

At Wilmington, this $\underline{30}$ day of March 2005, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the Bankruptcy Court's February 5, 2004 Order assessing and approving the distress termination of the Debtors' plans and authorizing implementation of a replacement plan is AFFIRMED.

UNITED STATES DISTRICT JUDGE

**EXHIBIT B**

Westlaw.

Not Reported in F.Supp.2d                                          Page 1
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
In re MAIN, INC., Debtor,
In re Eric J. BLATSTEIN, Debtor,
Mitchell MILLER, Esq., Trustee,
v.
Eric J. BLATSTEIN, et al.
**No. CIV. A. 98-5947.**

June 23, 1999.

*MEMORANDUM AND ORDER*

YOHN, J.

*1 This is an appeal by the Trustee of the Main, Inc. ("Main") bankruptcy estate from a final order of the bankruptcy court entering judgment in favor of the Trustee and against a number of closely-held corporations [FN1] (the "Non-Debtor Corporate Defendants"), owned and controlled by debtor Eric J. Blatstein ("Blatstein"), and against those corporations' former accountant, Morris Lift. *See Miller v. Blatstein (In re Main, Inc.),* 223 B.R. 457 (Bankr.E.D.Pa. Aug.6, 1998) (as modified on order for reconsideration dated Sept. 4, 1998) ("*Main IV* "). In this appeal, the Trustee challenges the bankruptcy court's refusal to enter judgment (1) against Airbev, Inc. ("Airbev") for licensing fees allegedly owed to the Trustee; (2) against Cobalt, Inc. ("Cobalt") for the debts of Delawareco, Inc. ("DECO"), as DECO's alleged successor in interest; (3) against Eric and Lori Blatstein for the funds they personally received from Main; (4) against Eric and Lori Blatstein for the alleged breach of their fiduciary duties to Main by allowing it to make loans to the Non-Debtor Corporate Defendants; and (5) against Eric and Lori Blatstein for the tax penalties that were assessed against Columbusco, Inc. ("Columbusco"). After considering the Trustee's Appeal Brief ("Trustee's Brief"), the oppositions by the Non-Debtor Corporate Defendants (the "Corps.' Brief"), and by the Blatsteins (the "Blatsteins' Brief"), and the Trustee's Reply (the "Trustee's Reply"), I conclude that the bankruptcy court's order should be affirmed in part,

vacated in part, and reversed in part.

FN1. The corporate Appellants are Airbev, Inc., Cobalt, Inc., Delawareco, Inc., Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc., Waterfront Management Corporation, and Waterfront Valet, Inc.

**PRIOR PROCEEDINGS**
The litigious history of the current dispute is chronicled in a number of prior opinions by the bankruptcy court and the district court, and that history will not be repeated here except as necessary to resolve the issues currently before the court. For further background on Main, Blatstein, and the Non-Debtor Corporate Defendants, see *718 Arch St. Assoc. v. Blatstein (In re Blatstein ),* 226 B.R. 140, 144-47 (E.D.Pa.1998) ("*Blatstein II* "); *718 Arch St. Assoc. v. Blatstein (In re Main, Inc.),* No. 96-19098, 1998 WL 778017 (Bankr.E.D.Pa. Nov.4, 1998) ("*Main V* "); *718 Arch St. Assoc. v. Blatstein (In re Main, Inc.),* 213 B.R. 67, 72-770 (Bankr.E.D.Pa.1997) ( "*Main II* "); *In re Main,* 207 B.R. 832 (Bankr.E.D.Pa.1997) ("*Main I* ").

On February 9, 1998, after conducting an audit of the books and records of Main, the Trustee filed adversary complaints against the Blatsteins, their former accountant, Morris Lift, and the Non-Debtor Corporate Defendants, alleging that all of the defendants owe money to Main's estate. The defendants filed a motion to dismiss the Trustee's claims, alleging that (1) these claims were resolved in a prior adversary action against the same defendants and that the Trustee's claims were thus barred by the doctrines of res judicata, and law of the case; (2) the bankruptcy court lacked subject matter jurisdiction over the Trustee's claims because of the pendency of prior appeals; (3) the defendants were improperly served; and (4) the Trustee's claims were barred by laches, waiver, judicial estoppel and the relevant statutes of limitations. *See Miller v. Blatstein (In re Main ),* No. 98-73, 1998 WL 156684, at *1 (Bankr.E.D.Pa. Mar. 31, 1998). The motion to dismiss was denied on March 31, 1998. *See id.* at *4.

*2 The Trustee's claims were tried before the bankruptcy court on April 23, 24, and 27, and May 6, 1998. After considering the parties' post-trial submissions, the bankruptcy court entered judgments in favor of the Trustee and against Morris Lift,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Cobalt, DECO, Engine 46 Steak House, Inc., Pier 53 North, Inc., Reedco, Inc., Waterfront Valet, Inc., and Waterfront Management Corp. *See Main IV, 223 B.R. at 480.* The bankruptcy court, however, denied all of the Trustee's claims for relief against Airbev and against Eric and Lori Blatstein. *See id. at 465-66, 477-80.*

The Trustee appealed the bankruptcy court's denial of his claims against Airbev and Eric and Lori Blatstein, and the denial of his claim that Cobalt is liable for DECO's debt to Main, as DECO's successor. *See Trustee's Brief, at 1- 3.* Neither the Non-Debtor Corporate Defendants, nor Morris Lift, appealed the judgments entered against them, which are thus, final.

### STANDARD OF REVIEW
The district court, sitting as an appellate tribunal, applies a clearly erroneous standard to review the bankruptcy court's factual findings and a de novo standard to review its conclusions of law. *See In re Siciliano,* 13 F.3d 748, 750 (3d Cir.1994). Mixed questions of fact and law require a mixed standard of review, under which the court reviews findings of historical or narrative fact for clear error but exercises plenary review over the bankruptcy court's "choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991), *cert. denied,* 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992); *see also Chemetron Corp. v. Jones,* 72 F.3d 341, 345 (3d Cir.1995), *cert. denied,* 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996).

### DISCUSSION
I. Defendants' Objections on Procedural and Jurisdictional Grounds are Waived

As a preliminary matter, the Blatsteins and the Non-Debtor Corporate Defendants contend that the Trustee's claims are barred by res judicata, collateral estoppel, laches, waiver, judicial estoppel, and the statutes of limitations, and assert that the bankruptcy court lacked subject matter jurisdiction over the Trustee's claims. *See Corps.' Brief, at 16-24; Blatstein's Brief, at 14-24.* On these issues, the Blatsteins' and the Non-Debtor Corporate Defendants' briefs are identical, and appear to be substantially verbatim repetitions of the parties' arguments to the bankruptcy court in their unsuccessful motion to dismiss. *See id.; Miller v. Blatstein,* 1998 WL 156684, at * 1.

It is unnecessary for the court to explore the merits of these assertions by the defendants because these arguments are not properly before this court. [FN2] The Trustee argues, and the court agrees, that the defendants were obligated to cross-appeal from the Trustee's appeal in order to preserve their ability to argue these issues in the district court. *See Trustee's Reply, at 21-24.* In order to present issues on appeal, the defendants were required to file a timely notice of cross-appeal from the Trustee's appeal, which they never did. *See Bankruptcy Rule 8001(a)* (providing that an appeal may be taken by filing a notice of appeal); Bankruptcy Rule 8002(a) (allowing a party to file notice of cross-appeal within ten days of the first notice of appeal). All courts to have considered the issue agree that the failure to file a timely notice of appeal deprives the district court of jurisdiction over the issues presented in the appeal. *See FHC Enter., Inc. v. Drevlow (In re Drevlow ),* 221 B.R. 767, 768 (B.A.P. 8th Cir.1998) (dismissing appeal when appellant failed to file timely notice of appeal even though filing fees were paid); *In re Abdallah,* 778 F.2d 75, 77 (1st Cir.1985), *cert. denied,* 476 U.S. 1116, 106 S.Ct. 1973, 90 L.Ed.2d 657 (1986); *In re Universal Minerals Inc.,* 755 F.2d 309, 312 (3d Cir.1985) ("Failure to file a timely notice of appeal thus deprives the district court of jurisdiction to review the bankruptcy court's order or judgement."); *Carnahan, Carnahan & Hickle v. Rozark Farms, Inc. (In re Rozark Farms, Inc.),* 139 B.R. 463, 465 (E.D.Mo.1992) (dismissing appeal when appellant filed a Statement of Issues on Appeal and Designation of the Record on Appeal but did not file a timely notice of appeal).

> FN2. Even if the court were to find that the Blatsteins and the Non-Debtor Corporate Defendants did not waive their challenge to the bankruptcy court's subject matter jurisdiction, the court would agree with the bankruptcy court's conclusion that it had jurisdiction over the claims presented in this adversary proceeding as they were new claims. *See Miller v. Blatstein,* 1998 WL 156684, at * 4.

*3 In situations like that presented here, courts have dismissed cross-appeals when the cross-appellant has failed to file a timely notice of appeal. For example, in *Frymire v. PaineWebber, Inc.,* 107 B.R. 506, 514 (E.D.Pa.1989), the district court struck PaineWebber's cross-appeal because it failed to file a timely notice of cross-appeal and instead filed a "Counterstatement of Issues on Appeal and Designation of Additional Documents for Record on

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

Page 3

Appeal." The court concluded that it was without jurisdiction to consider the issues raised by PaineWebber because it had failed to comply with the jurisdictional prerequisite of filing a notice of cross-appeal. *See id.; see also In re Maruko, Inc.,* 219 B.R. 567, 570 (S.D.Cal.1998) (refusing to entertain debtor's arguments that were decided by the bankruptcy court and raised for the first time in the district court in the debtor's opposition to the Trustee's appeal because they were "presented in an untimely and improper fashion"). The Blatsteins and the Non-Debtor Corporate Defendants, without filing a statement of issues on appeal, much less a timely notice of appeal, have presented the district court with issues that the bankruptcy court decided in ruling on their motion to dismiss. In order to challenge either the bankruptcy court's denial of their motion to dismiss or the bankruptcy court's decision reached after trial of this adversary proceeding, the Blatsteins and the Non-Debtor Corporate Defendants were required to file a notice of appeal. Moreover, their position that the bankruptcy court was without authority to adjudicate the Trustee's claims contradicts the Blatsteins' statement that the bankruptcy court's judgments against some of the Non-Debtor Corporate Defendants "had been largely conceded, and [ ] have *not* been appealed by the defendants." Blatsteins' Brief, at 6 (emphasis in original). The district court is thus, without jurisdiction to consider these arguments and will proceed to the merits of the Trustee's claims.

II. Airbev Does Not Owe Licensing Fees to the Trustee for Using the Philly Rock Name or Trade Dress

Before its assets were transferred to Columbusco, Main owned and operated the Philly Rock Bar and Grill ("Philly Rock"), a casual restaurant filled with rock and roll memorabilia. The Trustee claims that Airbev owes a licensing fee to Main's estate for the permission it received to use the Philly Rock name and logo to operate a Philly Rock restaurant at the Philadelphia International Airport. *See* Trustee's Brief, at 43-44. Columbusco, which received the right to the Philly Rock name as part of the transfer of the Philly Rock and its assets from Main, granted Airbev the right to use the Philly Rock trade dress in a licensing agreement signed on December 23, 1996. [FN3] *See* Record on Appeal ("Record"), No. 6, at P-170. The licensing agreement allowed Airbev to use the trade dress without compensating Columbusco. *See id.,* ¶ 2 (granting a "royalty-free license"). In the agreement, Airbev also agreed to certain quality control measures designed to protect the "highly

valuable goodwill and reputation [that] has become associated with such marks and trade dress." *Id.,* ¶ 3. Eric Blatstein signed the agreement on behalf of both Columbusco and Airbev. *See id.* at 5.

> FN3. In a previous opinion, the bankruptcy court concluded that the transfer of Philly Rock's assets from Main to Columbusco was a fraudulent transfer and that Columbusco therefore held the Philly Rock and its assets in constructive trust for Main's bankruptcy estate. *See Main V,* 1998 WL 778017, at * 16. That decision by the bankruptcy court is the focus of a group of appeals currently before me on which the briefing is not yet complete. Solely for purposes of resolving the Trustee's claims concerning Airbev's obligation to pay a licensing fee to Main's estate, I will assume, as the bankruptcy court did, that the transfer of Philly Rock from Main to Columbusco was fraudulent.

*4 The bankruptcy court found that "[t]he Trustee ... did not prove that the Philly Rock name has any value to Airbev for which it should logically compensate the debtor." *Main IV,* 223 B.R. at 466. After evaluating the testimony of both the Trustee's and the Non-Debtor Corporate Defendants' experts, the court concluded that the defendants' opinion of the value of the Philly Rock trade dress was more credible because "the patrons of the Airport Philly Rock were in that establishment principally because of its proximity in the Airport and because they could smoke and drink there, and not because they associated that restaurant with the downtown Philly Rock establishment.... Consequently, it is clear that the use of the "Philly Rock" name by Airbev at its Airport establishment did not transfer to that establishment any ready-made customer base." *Id.* at 466.

The Trustee attacks the bankruptcy court's ruling on three grounds: that it was clearly erroneous, that the bankruptcy court applied the incorrect burden of proof in reaching its conclusion, and that he is entitled to damages because the transfer violated the automatic stay established by 11 U.S.C. § 362(a)(3), since the transfer occurred after Main's bankruptcy case was converted to Chapter 7. *See* Trustee's Brief, at 43-44. Though the briefs do not explicitly discuss which theory of recovery the Trustee is pursuing when he alleges that the bankruptcy court applied an incorrect burden of proof, the discussion in the bankruptcy court's opinion and in the briefs suggests that the Trustee is pursuing the fraudulent transfer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

theory he explained in his post-trial briefing in the bankruptcy court. [FN4] *See Main IV,* 223 B.R. at 461 (explaining that the bankruptcy court decided the issues as presented in the parties' post-trial submissions, as the proof at trial had differed from the claims contained in the Trustee's complaint); Record, No. 11, ¶ 66 (Trustee's proposed findings of facts and conclusions of law).

FN4. In his post-trial brief, the Trustee also argued that Columbusco's transfer of the license to Airbev is a voidable post-petition transfer under 11 U.S.C. § 549(a). *See* Record, No. 11, ¶ 67. Section 549(a) allows the trustee to avoid "a transfer of property of the estate ... that occurs after the commencement of the case; and ... that is not authorized under this title or by the court." 11 U.S.C. § 549(a). In his post-trial submissions, the Trustee argued that the Philly Rock license was property of Main's estate which was transferred on December 23, 1996, after the case was commenced on September 20, 1996, and converted to Chapter 7 on December 18, 1996, and that the transfer was authorized neither by the Bankruptcy Code nor the court. *See* Record, No. 11, ¶¶ 61- 64. The burden of proof in actions under § 549 is on the party asserting the validity of the transfer; here, that party is Airbev. *See* Bankruptcy Rule 6001 ("Any entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."); *In re Bryant,* 103, B.R. 95, 101 (Bankr.E.D.Pa.1989) (imposing burden of proof on alleged good faith purchaser seeking to uphold the validity of post-petition transfer). There is no mention in the bankruptcy court's opinion of the Trustee's claims under § 549(a), and no mention that Airbev bears the burden of proving the validity of the licensing agreement in the face of the Trustee's claim. *See Main IV,* 223 B.R. at 465-66. Though the bankruptcy court may have improperly assigned the Trustee the burden of proving his § 549 claim, the Trustee has abandoned this claim on appeal as it is not mentioned in the briefs filed in this appeal.

The court will first address the Trustee's claim that the bankruptcy court applied an incorrect burden of proof to evaluate his fraudulent transfer claim. A transaction is fraudulent if the transferee, *inter alia,* did not receive "reasonably equivalent value" for the

transfer. 11 U.S.C. § 548(a)(2) (allowing trustee to avoid constructively fraudulent transfers). Even assuming (though doubtful) that § 548 applies to a transfer, such as this, that occurred after the commencement of a bankruptcy case, the burden of proving that the transferee did not obtain "reasonably equivalent value" is on the party asserting that the transfer was fraudulent. *See* 11 U.S.C. § 548(a) (allowing trustee to avoid transfer that was made "on or within one year before the date of the filing of the petition"); *Mellon Bank,* 945 F.2d at 646 ("548 (a)(2)(A) requires the trustee to show that the debtor received 'less than a reasonably equivalent value' " for the transfer); *Murdock v. Plymouth Enter., Inc. (In re Curtina Enter., Inc.),* 23 B.R. 969, 974 (Bankr.S.D.N.Y.198) (burden of proof is on trustee). Here, the Trustee is the party asserting that Main's estate, held in trust by Columbusco, received "less than reasonably equivalent value" for the license it gave to Airbev, and therefore bore the burden of demonstrating that the license had value to Airbev. The bankruptcy court thus properly placed the burden of proof on the Trustee. *See Main IV,* 223 B.R. at 466 ("The Trustee therefore did not prove that the 'Philly Rock' name has any value to Airbev for which it should logically compensate the Debtor.").

\*5 The Trustee next argues that the bankruptcy court's factual finding that the license had no value to Airbev was clearly erroneous. *See* Trustee's Brief, at 43-44. The Trustee contends that he "offered unrebutted expert testimony on the value of the Philly Rock name and other Licensed Property" which the bankruptcy court ignored. *Id.* at 43. Contrary to the Trustee's assertions, the defendants successfully questioned the weight which should be assigned to the Trustee's expert's opinion that a 3 % licensing fee is appropriate in these circumstances. *See* Trial Transcript ("Tr."), April 24, 1998, at 187-95. The bankruptcy court's decision to attach weight to the Trustee's expert's opinion is not clearly erroneous given the conflicting testimony of defendants' witnesses, George Miller and Eric Blatstein, that the airport Philly Rock was likely to benefit the downtown restaurant and that the use of the Philly Rock name added little value to the airport restaurant. *See* Tr. April 27, 1998, at 127-29; Tr. May 6, 1998, at 25-29. The bankruptcy court's decision to credit the testimony of defendants' witnesses, Miller in particular, is thus upheld as not clearly erroneous.

Finally, the Trustee contends that he deserves compensation for Airbev's use of the Philly Rock trade dress because the licensing agreement violated the automatic stay imposed by 11 U.S.C. § 362. *See*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

Page 5

Trustee's Brief, at 43. Even accepting, for argument's sake, that Columbusco's transfer to Airbev did violate the automatic stay, and was a willful violation of the stay, it appears that Main's estate is only entitled to compensation from Airbev for accepting the transfer and using the Philly Rock trade dress if the estate suffered actual damages as a result of the transfer. [FN5] See 11 U.S.C. § 362(h) (allowing "actual damages" to an "individual injured by any willful violation of a stay"); Whitt v. Philadelphia Hous. Auth. (In re Whitt ), 79 B.R. 611, 615 (Bankr.E.D.Pa.1987) (explaining that "no damages will be awarded as a result of the violation of the automatic stay ... [if] there was no evidence that the debtor suffered any harm") (citation omitted). The burden of proving that the estate suffered actual damages as a result of any stay violation is on the Trustee. See Beair v. Polhamus (In re Beair ), 168 B.R. 633, 637 (Bankr.N.D.Ohio 1994) (finding that the party seeking an award of damages under § 362(h) must prove those damages "with some degree of certainty"). Because the bankruptcy court ruled that the Trustee "did not prove that the 'Philly Rock' name has any value to Airbev for which it should logically compensate the Debtor," and that ruling is not clearly erroneous, it is clear that the Trustee has not proved that Main's estate suffered actual damages as a result of the license transfer. The bankruptcy court's decision that Airbev is not liable to the Trustee for licensing fees flowing from the licensing agreement between Columbusco and Airbev is affirmed.

> FN5. The Non-Debtor Corporate Defendants argue that the transfer did not violate the automatic stay because, at the time of the transfer, Columbusco owned the Philly Rock name, and Columbusco was a separate entity from Main, and therefore, was not subject to the automatic stay imposed on the assets of Main's estate. See Corps.' Brief, at 11. Resolving the issue of whether the Philly Rock name was indeed property of Main's estate on December 23, 1996, would require the court to determine whether the transfer of assets from Main to Columbusco was actually a fraudulent transfer such that Main retained an equitable interest in the Philly Rock name on that date. See 11 U.S.C. § 362(a)(3) (staying "any act to obtain possession of property of the estate or property from the estate or to exercise control over property of the estate"); 11 U.S.C. § 541(a)(1) (defining property of the estate as "all legal or equitable interests of

the debtor in property as of the commencement of the case ... wherever located and by whomever held"). As that issue is currently before the court in another unbriefed appeal, the court will not attempt to decide it now.

### III. Cobalt is Liable for DECO's Debt to the Trustee as DECO's Successor in Interest

*6 The Trustee next contends that Cobalt is responsible for paying the $76,950 debt [FN6] which DECO owes to Main's estate because Cobalt is DECO's successor in interest. DECO, incorporated on March 9, 1992, is a corporation owned and operated by the Blatsteins, and its primary business was owning and operating the Maui nightclub. See Main II, 213 B.R. at 72. On March 13, 1997, DECO and Cobalt entered into an "Asset Agreement" under which Cobalt agreed to buy "the furniture, fixtures, equipment and tradename" of the Maui nightclub at 1143-51 North Delaware Avenue, in exchange for $1.00 and the assumption of approximately $350,000 in debts and obligations which DECO allegedly owed to Morris Lift. [FN7] Record, No. 6, P-341, at 1-2. This agreement was executed by Blatstein on behalf of both DECO and Cobalt. [FN8] See id. at 6. The asset sale closed in May, 1997, once Cobalt obtained the liquor license referred to in the agreement. See id. From the record before the court, it is unclear whether Cobalt was operating a business prior to its acquisition of the Maui nightclub.

> FN6. The Trustee originally argued that DECO owed $180,567.98 to the Trustee. See Main IV, 223 B.R. at 467. The bankruptcy court determined, however, that the debt was properly fixed at $76,950, and entered judgment against DECO in that amount. See id. at 468. As the Trustee has not appealed this aspect of the bankruptcy court's decision, that award is final.

> FN7. The Trustee claims that DECO's debt to Lift was grossly overstated in the Asset Agreement, and was actually closer to $61,000. See Trustee's Brief, at 16 n. 10.

> FN8. Blatstein was a controlling shareholder and director of both Cobalt and DECO. See Tr. April 27, 1998, at 67-69.

Cobalt later sold the assets of the Maui nightclub to Marc Harris under an "Agreement of Sale" dated December 29, 1997. See Record, No. 6, P-348, at 1.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

That agreement provided that Harris would purchase the "business" located at 1143-51 North Delaware Avenue, including its "goodwill, tradenames, supplies, smallwares and paraphernalia," its "merchantable edibles [and] foodstuffs" and its liquor license, for $23,000. *Id.* at 1-2. The agreement also specified that Harris would not assume or "be liable for any liabilities, debts or obligations of [Cobalt] to any person, whether in respect to the assets purchased herein or otherwise." *Id.* at 4. Once the Pennsylvania Liquor Control Board approved the transfer of Cobalt's liquor license to Harris, Cobalt lent $35,966 to Harris's corporation while receiving a security interest in all of the assets originally transferred to Harris and all of the stock of Harris' corporation, and the right to appoint two-thirds of the directors of Harris' corporation on demand. *See* Record, No. 6, P-350 ("Loan, Security and Stock Pledge Agreement" dated Feb. 2, 1998 between Blatstein (on behalf of Cobalt) and Harris (on behalf of his corporation, 1143 NRG, Inc.)).

At the bankruptcy court trial, both Kenneth Shoop and Blatstein testified concerning the substance of the DECO to Cobalt transfer. *See* Tr. April 24, 1998, at 232-52; Tr. April 27, 1998, at 3-10, 64-78. Despite their testimony, and the transfer documents included in the record, the bankruptcy court found that "[t]here was little, if any, testimony at the trial regarding the details of the transfer of DECO's assets ... to Cobalt" and that "[c]onsequently, the Trustee has not proven that any of the exceptions to the general rule of nonliability apply in this case." *Main IV,* 223 B.R. at 467. The bankruptcy court performed no analysis of the legal standards applying to each of the exceptions or of the facts, disputed or undisputed, to which those standards were to be applied.

*7 The Trustee asserts that though it identified the correct legal principle by which to evaluate his successor-in-interest claim, the bankruptcy court failed to apply those principles to the facts in the record. *See* Trustee's Brief, at 37-38. Both parties agree with the bankruptcy court that the question of whether Cobalt is liable for DECO's debt to the Trustee is governed by the Third Circuit's decision in *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303 (3d Cir.1985), *cert. denied,* 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). *See* Trustee's Brief, at 37, Corps.' Brief, at 12. The bankruptcy court's decision as to the non-liability exceptions should, therefore, be reviewed under a plenary standard as the finding that Cobalt was not DECO's successor in interest can only be resolved by the application of legal principles to historical facts. *See*

*Mellon Bank,* 945 F.2d at 642. Even were the court to apply a clearly erroneous standard of review, the conclusion is inescapable that the bankruptcy court erred when it ignored substantial testimony and documents concerning the transfer in the record. While the bankruptcy court may have understandably desired more, or more clearly presented, information concerning the DECO to Cobalt transfer, that desire does not override its failure to undertake a substantive analysis of the Trustee's claim that Cobalt should be liable for DECO's debt to the Trustee. Because the historical facts necessary to analyze whether Cobalt is DECO's successor in interest are undisputed and are contained in the bankruptcy court's record, it is unnecessary for me to remand this issue to the bankruptcy court for factual findings, and I may resolve this issue as a matter of law. *See* *Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assoc., Ltd.),* 61 F.3d 197, 212 (3d Cir.1995) (finding that the "district court did not engage in independent fact finding" when it "simply applied the law ... to the record developed before the bankruptcy court"); *Hercules,* 762 F.2d at 309 (approving district court's resolution of successor in interest issues as a matter of law).

As explained in *Hercules,* Pennsylvania law generally provides that "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Hercules,* 762 F.2d at 308. At least five exceptions to this general rule exist. The successor corporation will be held liable for the debts of its predecessor where

    (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; [ ] (4) the transaction is fraudulently entered into to escape liability .... [or (5) ] the transfer was without adequate consideration and provisions were not made for creditors of the transferor.

*8 *Id.* at 308-09 (quotations omitted); *see also* *Benefit Control Methods, Inc. v. Health Care Services, Inc.,* No. 97-4418, 1998 WL 961357, at * 3 (E.D.Pa. Dec.11, 1998); *Nova Ribbon Products, Inc. v. Lincoln Ribbon, Inc.,* No. 89-4340, 1995 WL 154749, at * 3 (E.D.Pa. Mar.30, 1995); *Grugan v. BBC Brown Boveri, Inc.,* 729 F.Supp. 1080, 1084 (E.D.Pa.1990). The Trustee claims that Cobalt is liable for DECO's debts to the Trustee under all of these theories of liability, while the Non-Debtor Corporate Defendants assert that none of them apply

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

Page 7

in the current situation. [FN9] I will address the Trustee's arguments in turn.

> FN9. The Non-Debtor Corporate Defendants also contend that the bankruptcy court already decided the issue of whether Cobalt is DECO's successor when it determined that none of the Non-Debtor Corporate Defendants were alter egos of one another. *See* Corps.' Brief, at 11. This position is incorrect for two reasons; not only was Cobalt not a party to the first adversary proceeding, but also the issue of whether two corporations are alter egos is logically separate from the issue of whether one corporation succeeded to the debts of the other.

A. Express or Implied Assumption of the Debt

While admitting that Cobalt did not expressly assume DECO's debt to the Trustee, the Trustee argues that the asset transfer agreement implicitly included an assumption of the debt because it included an express assumption of DECO's only other substantial debt, that to Morris Lift. *See* Record, No. 6, P-341, at 2. The Trustee claims that since the Defendants believed, at the time the agreement was signed, that DECO did not owe money to the Trustee, Cobalt's assumption of the Lift debt means that Cobalt "expressly or impliedly agreed to assume all of [DECO's] liabilities, as it understood them to be." Trustee's Brief, at 38.

Contrary to the Trustee's assertion, Cobalt's express assumption of the debt to Lift does not implicitly include an assumption of the debt to the Trustee. There is no language in the agreement which would possibly be construed to cover the assumption of this, or other outstanding, debts. The agreement specifically covers only the debt to Lift. *See* Record, No. 6, P-341, at 2. Cobalt's decision to assume one debt does not automatically make it liable for other debts. *See Nova Ribbon*, 1995 WL 154749, at * 3 (concluding that a purchaser "is only liable for the specific debts or obligations which it assumes"). Unlike other situations where courts have found that a successor corporation implicitly assumed its predecessor's debt, there is no ambiguous language in the transfer agreement, and no evidence that Cobalt intended to assume the debt by making payments on it. *See Hercules*, 762 F.2d at 309-10 (holding that successor assumed liabilities that were unknown at the time of the transfer because it assumed "all of the debts, obligations and liabilities of [the predecessor]

as of the Closing Date"); *Benefit Control*, 1998 WL 961357, at * 3-4 (finding genuine factual issue concerning defendant's implicit assumption of contract based on blurring of defendant's identity with predecessor corporation and defendant's continuation of business with plaintiffs, including commission payments pursuant to the allegedly assumed contract). There is thus no basis for concluding that Cobalt either expressly or implicitly assumed DECO's debt to the Trustee.

B. De Facto Merger

*9 The Trustee next argues that the asset sale agreement created a de facto merger between DECO and Cobalt. *See* Trustee's Brief, at 38-39. When determining whether an asset sale should be properly characterized as a de facto merger, courts commonly look beyond the form of the transaction and evaluate its substance in light of several factors. *See Hercules*, 762 F.2d at 310-11; *Knapp v. North Am. Rockwell Corp.*, 506 F.2d 361, 367 (3d Cir.1974) (looking beyond form of asset sale transaction to conclude that it "should be treated as a merger"). Relevant factors include whether

> (1) [t]here is a continuity of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations; (2)[t]here is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock ...; (3)[t]he seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; (4)[t]he purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Smithkline Beecham Corp. v. Rohm & Hass Co.*, 89 F.3d 154, 162 n. 6 (3d Cir.1996) (quoting *Hercules*, 762 F.2d at 310 and concluding that de facto merger doctrine cannot alter sophisticated indemnification agreement between two large, independent corporations); *see also Knapp*, 506 F.2d at 367 (considering the "insubstantiality of the continued existence of [the seller], including the brevity of the corporation's continued life, the contractual requirement that [the seller] be dissolved as soon as possible, the prohibition on engaging in normal business transactions, and the character of the assets [the seller] controlled"). Of these factors, the continuity of ownership between the buying and selling corporations is arguably the most significant. *See Benefit Control*, 1995 WL 961357, at *5. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 8
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

adequacy of consideration received by the selling corporation is also significant because it will determine whether the sale served as a mechanism to "denude" the seller of assets, and thus the ability to satisfy the claims of its creditors. _Knapp,_ 506 F.2d at 366; _Nova Ribbon,_ 1995 WL 154749, at * 3.

 The sum of these factors indicates that the asset sale between DECO and Cobalt actually functioned as a merger agreement. There is undisputed evidence in the record which compels the conclusion that when the parties closed the asset sale agreement in May, 1997, Cobalt continued the business operations of DECO. Cobalt began to operate the Maui nightclub using former DECO employees (in addition to new Cobalt employees), former DECO equipment, former DECO alcohol, former DECO facilities, and DECO's former tradename. _See_ Tr. April 24, 1998, at 240-43, 245. Though Cobalt apparently changed a room or section of the Maui nightclub to operate as a "club-within-a-club" which catered to a slightly different audience, it continued to operate Maui, the essential business activity of DECO, and added to, rather than subtracted from, those operations. _See id._ The bankruptcy court also concluded that Waterfront Management, another of Blatstein's corporations, continued to provide management services for the Maui nightclub after it was transferred from DECO to Cobalt. _See_ _Main IV,_ 223 B.R. at 474 (discussing management fees paid by DECO, and then Cobalt, to Waterfront Management); Tr. April 27, 1998, at 4-7, 56-57. The record thus establishes that Cobalt continued the business enterprise of DECO by continuing to use the same "management, personnel, physical location, assets, and general business operations." _Hercules,_ 762 F.2d at 310.

 **\*10** The record is similarly undisputed that the shareholders of DECO and Cobalt were, and remain, identical. Eric and Lori Blatstein are the sole shareholders of both corporations. _See_ Tr. April 27, 1998, at 67-69. Though the asset purchase agreement did not compensate DECO for its assets with shares of Cobalt stock, the Blatsteins were undeniably "a constituent part of the purchasing corporation." _Hercules,_ 762 F.2d at 310. The transfer of stock is unnecessary to demonstrate a continuity of ownership when there is no doubt that the owners of the buyer and the seller corporations are the same. _See_ Record, No. 6, P-341, at 6 (showing that Eric Blatstein executed agreement on behalf of both parties).

 With respect to the third _Hercules_ factor, that the selling corporation ceases its normal business operations and dissolves, the parties do not dispute

that DECO indeed ceased its operations entirely, though it continues to exist formally. _See Hercules,_ 762 F.2d at 310; Tr. April 24, 1998, at 238, 240-42; April 27, 1998, at 65-70. After the closing of the asset sale agreement, DECO no longer owned the Maui nightclub, which had been its sole business endeavor. Like the selling corporation in _Knapp,_ DECO "technically existed as an independent corporation, [but] it had no substance." _Knapp,_ 506 F.2d at 369; _see also Benefit Control,_ 1998 WL 961357, at * 5 (finding that there was evidence supporting an "actual cessation of function" by seller corporation that "never legally liquidated or dissolved").

 Finally, _Hercules_ directs the court to consider whether the buyer corporation assumes those obligations of the seller which are necessary to continue its normal business operations. _See_ _Hercules,_ 762 F.2d at 310. There is little testimony in the record about the relationship between DECO, Cobalt and the trade creditors of the Maui nightclub, though the record is clear that Cobalt assumed DECO's most significant outstanding liability, its debt to Lift. _See_ Record, No. 6, P-341, at 2, 7. Moreover, it seems reasonable to conclude that Cobalt paid DECO's trade debts, such as those incurred to purchase food, alcohol, and entertainment for the nightclub, when it abruptly took over the management of Maui without time to replace all of those supplies. _See_ Tr. April 24, 1998, at 241-42 (agreeing that "one day it's Maui and the money goes to [DECO] and then the next day it's Maui and the money goes to Cobalt"). Though such an conclusion would be reasonable, it would require a factual finding more appropriately made by the bankruptcy court. Accordingly, 1 will disregard this element when balancing the factors outlined in _Smithkline._ Based on all of the undisputed historical facts and given all of the factors described above, however, _Smithkline_ directs that the transaction between DECO and Cobalt, though labeled as an asset sale, was in actuality a de facto merger, and that Cobalt, as DECO's successor, is liable for DECO's debt to the Trustee, particularly as the sale left DECO assetless and thus unable to satisfy its creditors' and the Trustee's claims.

 C. Mere Continuation

 **\*11** The undisputed evidence in the record also compels the legal conclusion that Cobalt was a "mere continuation" of DECO. _See Hercules,_ 762 F.2d at 308. The mere continuation doctrine only applies to hold one corporation liable for the debts of its

Not Reported in F.Supp.2d

1999 WL 424296 (E.D.Pa.)

(Cite as: 1999 WL 424296 (E.D.Pa.))

Page 9

predecessor when there is "a common identity of officers, directors and stock between the selling and purchasing corporations" and when one corporation has continued the business operations of the other. [FN10] *Nova Ribbon*, 1995 WL 154749, at *7 (citing *Stutzman v. Syncro Machine Co.,* No. 88-9673, 1991 WL 66796, at *4 (E.D.Pa. April 18, 1991)); *Bogart v. Phase II Pasta Machines, Inc.,* 817 F.Supp. 547, 549 (E.D.Pa.1993); *Bostick v. Schall's Brakes & Repairs, Inc.,* 725 A.2d 1232, 1237 (Pa.Super.Ct.1999). Pennsylvania has adopted a broad interpretation of when one corporation is the successor of another by emphasizing "the nature of the business operations" rather than "corporate formalities." *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 434 A.2d 106, 108 (Pa. Super Ct.1981). Here, all parties agree that the officers, directors and shareholders of both DECO and Cobalt are Eric and Lori Blatstein. *See* Tr. April 27, 1998, at 67-69. Also, as discussed above, Cobalt continued DECO's business operations by operating the Maui nightclub, and though DECO continues to exist on paper, it has transacted no business since the asset sale closed. *See supra,* pt. III.B; *Bogart,* 817 F.Supp. at 549 (holding successor corporation liable for predecessor's debts when the two corporations had identical officers and directors, continuous business operations, and served the same customers without interruption).

> FN10. The Trustee's citation to *Gould, Inc. v. A & M Battery & Tire Service,* 950 F.Supp. 653, 657 (M.D.Pa.1997), for a description of the factors to be considered under a "continuity of enterprise" theory of successor liability is inapposite, as that theory has only been applied when evaluating a successor's corporation's liability under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). *See id.* (explaining why doctrine may be used in CERCLA cases).

The Non-Debtor Corporate Defendants argue that neither the de facto merger doctrine nor the continuation doctrine applies to this case because Cobalt had a shareholder and manager that DECO did not have, namely Marc Harris. *See* Corps.' Brief, at 14. The court does not appreciate the Non-Debtor Corporate Defendants' attempt to obfuscate the record by making misleading statements about Harris' involvement in Cobalt. The record reflects that Harris purchased Cobalt's assets more than nine months after the DECO to Cobalt transfer occurred and there is no evidence in the record that I could locate to

suggest that he was involved in Cobalt, as either a director or a shareholder, on March 13, 1997. *See* Record, No. 6, P-348, P-350. At the time of the asset transfer between DECO and Cobalt, their directors and shareholders were identical. Regardless of where the assets originally belonging to DECO reside today, whether in Harris' corporate coffers, or in those of Pier 53 North, Inc., it is clear that Cobalt purchased those assets from DECO in a transaction that made Cobalt a mere continuation of DECO and therefore liable for DECO's debts. The undisputed facts, discussed above, which were extracted from the bankruptcy court record, lead ineluctably to the legal conclusion that Cobalt is liable for DECO's debt to the Trustee under both the continuation and de facto merger theories. Because Cobalt is liable for DECO's $76,950 debt to the Trustee under these two theories, it is unnecessary to address the Trustee's argument that the DECO to Cobalt asset sale was a fraudulent conveyance. [FN11] *See* Trustee's Brief, at 41-42. On remand, the bankruptcy court shall enter judgment against Cobalt for $76,950.

> FN11. The Trustee also contends that the DECO to Cobalt sale was a fraudulent transfer because DECO received inadequate consideration for the assets it transferred to Cobalt. *See* Trustee's Brief, at 42 (arguing that, at best, Cobalt paid DECO one-third of its assets' value). There was substantial debate between the parties over whether the purchase price was adequate, and fairly approximated the value of the assets transferred. Because the value of DECO's assets was hotly contested, and deciding whose valuation of the assets to accept inherently involves credibility determinations, and thus requires factual findings that the bankruptcy court should make, the court will not base its decision on a finding that the assets' purchase price was inadequate.

IV. The Blatsteins' Breaches of Fiduciary Duty

*12 In addition to recovering specific sums from the Non-Debtor Corporate Defendants, the Trustee seeks to hold Eric and Lori Blatstein liable for all of the Non-Debtor Corporate Defendants' debts to Main's estate, and separately seeks damages against the Blatsteins for the funds they personally withdrew from Main, in violation of their fiduciary duties. *See* Trustee's Brief, at 30- 36. In reply, the Blatsteins argue extensively that Lori cannot be liable to the Trustee for any of these sums, but do not specifically

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

Page 10

address Eric's liability. *See* Blatsteins' Brief, at 6-10. Instead, the Blatsteins attack the caselaw supporting the Trustee's arguments by contending that the cases discussing breaches of fiduciary duty accomplished by diverting corporate opportunities to officers or shareholders are inapposite. *See id.* at 8-9 (attempting to distinguish *Brown v. Presbyterian Ministers Fund,* 484 F.2d 998 (3d Cir.1973); *Committee of Creditors Holding Unsecured Claims v. Citicorp Venture Capital, Ltd. (In re Paper Craft Corp.),* 187 B.R. 486 (Bankr.W.D.Pa.1995), *rev'd on other grounds,* 211 B.R. 813 (W.D.Pa.1997), *aff'd,* 160 F.3d 982 (3d Cir.1998); and *Bernstein v. Donaldson* (*In re Insulfoams, Inc.*), 184 B.R. 694 (Bankr.W.D.Pa.1995), *aff'd,* 104 F.3d 547 (3d Cir.1997)). The court will address the Trustee's claims against Eric and Lori separately in order to address the Blatsteins' contention that Lori's liability is different from Eric's because she played a different role in the management of Main and the Non-Debtor Corporate Defendants.

The Trustee seeks to recover a total of $1,058,055.09 from Eric and Lori Blatstein, jointly. [FN12] This sum can be divided, as the bankruptcy court did, into two major components: amounts which the Blatsteins personally received from the Philly Rock assets ($372,734.31), and amounts which the Blatsteins allowed their other corporations to receive as loans from the Philly Rock assets ($685,320.78). The Trustee contends that the Blatsteins are liable for both of these amounts because they breached their fiduciary duties to Main's estate by allowing these sums to be paid from the assets of Main while Main was insolvent. *See* Trustee's Brief, at 30.

> FN12. The Trustee wishes to collect the following amounts from the Blatsteins: $372,734.31, which the Blatsteins allegedly received as loans and salary from the Main and Columbusco in the year preceding Main's bankruptcy; $337,504.85, which Waterfront Management owes to the Trustee; and $401,355.93, which the other Non-Debtor Corporate Defendants owe to the Trustee. *See Main IV,* 223 B.R. at 480; *In re Main, Inc.,* slip. op. at 2 (Bankr.E.D.Pa. Sept. 4, 1998); Trustee's Brief, at 22. As Pier 53 has already paid its $53,540 debt to the Trustee, the outstanding amount which the Non-Debtor Corporate Defendants owe to the Trustee is $685,320.78. The Trustee apparently seeks to recover the $685,320.78 from the Blatsteins, as well as from the Non-Debtor

Corporate Defendants, because the Trustee believes that the Non-Debtor Corporate Defendants are judgment-proof. *See* Trustee's Brief, at 15-17.

A. The Bankruptcy Court's Opinion

The bankruptcy court outlined the legal principles describing the fiduciary duties which officers, directors and shareholders owe to their closely held corporations, and to their corporation's creditors. *See Main IV,* 223 B.R. at 471-73; 477. Both Eric and Lori Blatstein were directors and shareholders of Main, and many of the Non-Debtor Corporate Defendants. *See* Tr. April 27, 1998, at 64-69. Neither party disputes that the bankruptcy court has correctly identified the controlling legal principles in this area. *See* Trustee's Brief, at 27-30; Blatsteins' Brief, at 7-8. As there is little that the court could add to the bankruptcy court's description of officers', directors' or sole shareholders' fiduciary duties to their closely held corporations, I will adopt the section of the bankruptcy court's opinion describing those obligations. As the bankruptcy court held:

*13 [a] director, officer or dominant or controlling shareholder has the burden of proving the good faith of any transaction with the corporation that is challenged by outside parties. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939). Consequently, such parties must "not only prove the good faith of the transaction but also ... show its inherent fairness from the viewpoint of the corporation and those interested therein." *Id.; see also In re Insulfoams, Inc.,* 184 B.R. 649, 703 (Bankr.W.D.Pa.1995), *aff'd,* 104 F.3d 547 (3d Cir.1997).

The test for determining the fairness of any agreement or transaction between a corporation and one of its officers, directors and/or dominant or controlling shareholders is whether "the transaction carries the earmarks of an arm's length bargain." *Pepper,* 308 U.S. at 306-07. In *Twin-Lick Oil Co. v. Marbury,* 91 U.S. 587, 589-90, 23 L.Ed. 328 (1875), a case in which a director of a corporation loaned money to the corporation, the Court opined that
the directors are the officers or agents of the corporation, and represent the interests of that abstract legal entity, and of those who own the shares of its stock ... a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with the other stockholders, who, with him, constitute the whole of that artificial entity, he is

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality, and freedom from motives of selfishness.

Thus, it is clear that the duties owed to a corporation by its officers, directors or dominant shareholders is enhanced when the corporation is closely held. Typically, only the corporation can enforce a fiduciary's obligation to it or a stockholder in a derivative action. *See Pepper,* 308 U.S. at 307. However, when the corporation is in bankruptcy, the bankruptcy trustee is entitled to enforce the fiduciary obligation on behalf of the debtor corporation. *See id.; Brown v. Presbyterian Ministers Fund,* 484 F.2d 998, 1005 (3d Cir.1973); *Insulfoams,* 184 B.R. at 704.

**\*14** Moreover, Pennsylvania courts have held that directors of insolvent corporations "hold their powers 'in trust' for all creditors of the corporation." *Insulfoams,* 184 B.R. at 703-04 (citing *Sicardi v. Keystone Oil Co.,* 24 A. 163, 164 (Pa.1892)). These courts have further stated that directors "may not use their powers for their own benefit and to the detriment of creditors." *Id.; Committee of Unsecured Creditors v. Doemling,* 127 B.R. 945, 951 (W.D.Pa.), *aff'd,* 952 F.2d 1391 (3d Cir.1991).

Furthermore, it is well settled that officers, directors and dominant or controlling stockholders of corporations are fiduciaries of those corporations. *See Pepper,* 308 U.S. at 306 (usurpation of corporate opportunities case); *Doemling,* 127 B.R. at 951 (case concerning usurpation of corporate opportunity by director); *In re Logan Mech. Contracting Corp.,* 106 B.R. 436, 439 (Bankr.W.D.Pa.1989); *In re Complete Drywall Contracting, Inc.,* 11 B.R. 697, 699 (Bankr.E.D.Pa.1981); *Seaboard Indus., Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 308 (Pa.1971). The fiduciary relationship between the directors of an insolvent corporation and the

corporation's creditors is created at the point the corporation becomes insolvent. *In re Martin,* 154 B.R. 490, 494 (Bankr.C.D.Ill.1993). As such, any dealings that the officer, director or dominant shareholder has with the corporations for which they are fiduciaries "are subjected [to] rigorous scrutiny." *Pepper,* 308 U.S. at 306. Pennsylvania law provides that directors and officers of corporations are jointly and severally liable for any willful neglect, mismanagement "or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director." *Seaboard,* 276 A.2d at 309.

....

... courts have refused to hold that the approval of officers, directors or shareholders of closely held corporations "will free an officer thereof, acting with knowledge of the corporation's insolvency" to the detriment of the creditors of the corporate debtor. *Brown,* 484 F.2d at 1005. A person in a fiduciary relationship with a bankrupt corporation cannot serve himself first and his cestuis second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty.... He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment.... He cannot use his power for his personal advantage....

**\*15** *Pepper,* 308 U.S. at 311; *see also Doemling,* 127 B.R. at 951.

The fiduciaries of corporations also owe the corporation a duty of loyalty. *Insulfoams,* 184 B.R. at 707; *CST, Inc. v. Mark,* 360 Pa.Super. 303, 520 A.2d 469, 471 (Pa.Super.), *appeal denied,* 517 Pa. 630, 539 A.2d 811 (Pa.1987). The duty of loyalty obligates the directors and officers to commit themselves to the business of the corporation with the attitude of promoting the interests of the corporation and not themselves. *Id.*

*Main IV,* 223 B.R. at 471-73. In summary, once Main became insolvent, both Eric and Lori Blatstein, as Main's directors and shareholders, owed fiduciary duties toward Main, and its creditors. *See Main IV,* 223 B.R. at 477. These duties prevented the Blatsteins from using Main's assets for their personal gain in a manner contrary to its creditors' best interests. *See id.*

Applying these principles, the bankruptcy court first

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
(Cite as: 1999 WL 424296 (E.D.Pa.))

commented that the Trustee's claims were a "rehashing of the alter ego claims" it had previously rejected. [FN13] *See id.* The court then characterized the Trustee's claims against the Blatsteins for funds they personally received from Main, and from Main's assets, as essentially claims that the Blatsteins received excessive salaries and loans, which they recorded as income, for their services on Main's behalf. *See id.* Finding that "the person challenging the reasonableness of the compensation has the burden of proving it is unreasonable," the bankruptcy court thus held the Trustee responsible for proving that the $372,734.31 received by the Blatsteins in the year preceding Main's bankruptcy was an unreasonably high salary and therefore, that the Blatsteins breached their fiduciary duties by accepting it. *See id.* at 478- 79 (citing *In re Allegheny Int'l, Inc.,* 131 B.R. 24, 29 (W.D.Pa.1991)). After considering the lack of focused evidence presented at the trial, the bankruptcy court then decided that the Trustee had failed to establish that the compensation which the Blatsteins received was excessive, especially in light of Blatstein's "ingenuity," hard work and "dedication," which have inspired a "solid, loyal customer base" to continue patronizing the Philly Rock restaurant even when it is obscured by the construction of neighboring buildings, and the Trustee's failure to present evidence concerning the salaries received by similarly situated restaurant professionals. *Id.* at 478-79.

> FN13. The bankruptcy court's conclusion that the Non-Debtor Corporate Defendants were not Blatstein's, or one another's, alter egos is not determinative of the Trustee's breach of fiduciary duty claims raised now. *See Blatstein II,* 226 B.R. at 158-59; *Main II,* 213 B.R. at 93. The issue of whether the Non-Debtor Corporate Defendants are Blatstein's alter egos is logically distinct from whether Blatstein breached his fiduciary duties to Main. As a result, the Blatsteins' oft-repeated assertion that the Trustee's claims are meritless because the Trustee has already unsuccessfully attacked the transactions at issue here is irrelevant. *See* Blatsteins' Brief, at 9-10.

With respect to the Trustee's second claim, that the Blatsteins breached their fiduciary duties to Main by allowing it to make loans to the Non-Debtor Corporate Defendants without establishing either interest rates or repayment schedules for these loans, the bankruptcy court found that there was "no evidence whatsoever regarding the amounts owed to

other of the corporate Debtors by their sister corporations." *Id.* at 479. The bankruptcy court also found credible the testimony of George Miller, the Blatsteins' and the Non-Debtor Corporate Defendants' accounting expert, who observed that it is neither illegal nor "uncommon that entities owned or controlled by the same person or [ ] parties will loan money to others owned or controlled by that same person." *Id.* at 480. Absent a showing that Main was more of a "chosen victim of plunder" than any of the Non-Debtor Corporate Defendants, the bankruptcy court refused to hold that the Blatsteins were liable for the loans which Main made to the Non-Debtor Corporate Defendants. *Id.* at 479. The bankruptcy court thus rejected the Trustee's attempt to recoup from the Blatsteins the $685,320.78 which the Non-Debtor Corporate Defendants owe to the Trustee.

**B. Did Eric or Lori Blatstein Breach their Fiduciary Duties to the Trustee by Receiving Funds and Loans from Main and the Philly Rock Assets?**

**\*16** The bankruptcy court recognized that Eric and Lori Blatstein may have breached their fiduciary duties to the Trustee if they had withdrawn an excessive salary from Main while it was insolvent. *See id.* at 477. If a corporate director or officer withdraws an excessive salary from his or her corporation while the corporation is insolvent, those actions could be considered a breach of that officer or director's fiduciary duties to the corporation and its creditors. *See Schwartz v. Kursman (In re Harry Levin, Inc.),* 175 B.R. 560, 569 (Bankr.E.D.Pa.1994) (allowing Trustee to pursue claims against debtor's parent company and president for alleged breaches of fiduciary duty based on taking excessive management fees and salary from the debtor); *cf. Flannery Bolt Co. v. Flannery,* 16 F.Supp. 803, 805-06 (W.D.Pa.1935), *aff'd in part,* 86 F.2d 43 (3d Cir.1936) (finding that director's withdrawal of corporate funds for his personal use was illegal when no "corporate purpose was served by these withdrawals").

The bankruptcy court erred, however, when it required the Trustee to demonstrate that the salaries received by the Blatsteins were excessive. As described above, the fiduciary duty and the duty of loyalty imposed on directors, officers and controlling shareholders of closely held corporations require the Blatsteins to prove that their dealings with the corporation were reasonable, in good faith, and in the corporation's best interests. *See Pepper,* 308 U.S. at 306 (finding that when a director's dealings with his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

Page 13

or her corporation are challenged, "the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein"); *Bellis v. Thal,* 373 F.Supp. 120, 123 (E.D.Pa.1974), *aff'd,* 510 F.2d 969 (3d Cir.1975) ("when a transaction which is not a completely arm's length transaction is challenged, the burden is on the fiduciary to prove the fairness of the transaction").

In support of its assignment of the burden of proof, the bankruptcy court erroneously cited *Allegheny* for the proposition that one contesting an officer's or director's compensation must prove that salary unreasonable. *See Main IV,* 223 B.R. at 478. *Allegheny* provides no support for this assertion. In the context of determining a bank's entitlement to recover, from the debtor's estate, fees incurred in a due diligence examination of the debtor, the *Allegheny* court found that "the burden of proof as to reasonableness of compensation requested from a debtor's estate is upon the person making the request." *Allegheny,* 131 B.R. at 29. Compensation for corporate officers and directors was not at issue. *Allegheny* is better read as supporting the opposite of the proposition urged by the bankruptcy court, *i.e.,* that once Main became insolvent, the Blatsteins bore the burden of proving that the compensation they received from assets comprising Main's estate was reasonable for they are the parties receiving compensation from the debtor's estate. Because the bankruptcy court mistakenly assigned the burden of proof to the Trustee when it held that there was "insufficient evidence that fair consideration was not in fact given" by the Blatsteins in exchange for their compensation, the court's holding must be vacated. Though the bankruptcy court may again, on remand, determine that the compensation which each of the Blatsteins received was reasonable and fair under all of the circumstances present, the court should only do so after placing the burden of proof on Eric and Lori Blatstein to demonstrate that the compensation each received was reasonable in light of his or her services to the debtor.

C. Did Eric or Lori Blatstein Breach their Fiduciary Duties to the Trustee by Allowing Main to Make Interest-Free Loans to Their Other Corporations While Main Was Insolvent?

**\*17** The Trustee next claims that both Eric and Lori Blatstein are liable for the debts which the Non-Debtor Corporate Defendants owe to the Trustee because they breached their fiduciary duties to the

Trustee by allowing Main to make the loans generating those debts. *See* Trustee's Brief, at 30-35. The bankruptcy court's analysis of the Trustee's claim fails to apply the legal analysis set forth above to determine whether the Blatsteins' decisions to make, and not to repay, these loans was a breach of their fiduciary duties. *See supra,* pt. IV.A. Instead, without citation to authority for its unique approach, the bankruptcy court held that the Blatsteins could not have breached their fiduciary duty to Main if they had also made similar inter-company loans with the assets of their non-bankrupt corporations. *See Main IV,* 223 B.R. at 479 ("In the absence of evidence that [Main] has been a chosen victim of plunder, we are unwilling to compensate it any more than it has been in our previous determinations of the liabilities of the corporate Defendants and Lift to it."). Instead of analyzing whether the Blatsteins breached their fiduciary duties to the creditors of their bankrupt corporation, the court apparently accepted the testimony of George Miller that inter-company loans between closely held corporations with the same owners were neither illegal nor uncommon and did not question the applicability of his opinions when the lending corporation is bankrupt. *See id.* at 480. In their brief, the Blatsteins offer no support for the approach to the Trustee's claim taken by the bankruptcy court, but rather focus on reasons why Lori Blatstein should not be held responsible for the Non-Debtor Corporate Defendants' failure to repay their loans from Main. *See* Blatsteins' Brief, at 10-14.

The bankruptcy court did not offer, nor can the court locate, support for the proposition that an officer of director can be relieved of liability for his or her breach of fiduciary duty to the creditors of his or her bankrupt corporation if he or she has made similarly unwise business decisions concerning the assets of his or her non-bankrupt corporations. As discussed above, a director, officer or dominant shareholder's fiduciary duties to his or her corporation's creditors arise when the corporation becomes insolvent. *See Insulfoams,* 184 B.R. at 703-04; *Martin,* 154 B.R. at 494; *Fox v. Shervin (In re Shervin ),* 112 B.R. 724, 729 (Bankr.E.D.Pa.1990) ("under Pennsylvania law corporate officers and directors stand in a fiduciary relationship to corporate creditors"); *Committee of Unsecured Creditors v. Logue (In re Logue Mech. Contracting Corp.),* 106 B.R. 436, 439 (Bankr.W.D.Pa.1989) (noting that directors, officers and controlling shareholders have a fiduciary duty to the corporation's creditors). There is no evidence in the record on appeal that the Non-Debtor Corporate Defendants were, or are, insolvent, such that the Blatsteins' (mis)use of those corporations' assets

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

might breach their fiduciary duties to the creditors of the Non-Debtor Corporate Defendants. There is substantial evidence in the record, however, to suggest that Main was insolvent when the Blatsteins authorized many of the inter-company loans which generated the debts at issue here. At the time these loans were made, therefore, there is substantial evidence in the record to suggest that the Blatsteins were under a fiduciary obligation to use Main's assets only in transactions that carried the "earmarks of an arm's length bargain." *Pepper,* 308 U.S. at 306-07; *Bellis,* 373 F.Supp. at 123. The bankruptcy court's conclusion that neither Eric nor Lori Blatstein breached their fiduciary duties to the Trustee by allowing Main to make the disputed loans, and by allowing the Non-Debtor Corporate Defendants to fail to repay them, because of the occurrence of similar loans among the Non-Debtor Corporate Defendants, must be vacated.

*18 The questions of whether Main was actually insolvent at the time each of the loans at issue were made, and whether these loans carry sufficient indicia of arms's length transactions involve factual issues that the bankruptcy court in the first instance should decide. *See Indian Palms,* 61 F.3d at 210 n. 19 (prohibiting district court from engaging in independent factual findings when deciding a bankruptcy appeal). Though the Trustee argues with considerable force that these loans, which lack interest rates and repayment terms, would never have been made by parties dealing at arm's length, that is a question initially for the bankruptcy court, and not for this court. *See Voest-Alpine Trading USA Corp. v. Vantage Steel Corp.,* 919 F.2d 206, 217 n. 25 (3d Cir.1990) (noting that corporate officers breached their fiduciary duty to the corporation when they transferred its assets for "less than full consideration"). If, on remand, the bankruptcy court concludes that the loans from Main to the Non-Debtor Corporate Defendants were made while Main was insolvent, and that these loans cannot be considered arm's length transactions, the bankruptcy court should determine whether the Blatsteins have proved that the loans were in Main's best interest. *See Bellis,* 373 F.Supp. at 125-32 (examining directors' use of insolvent company's assets to make loans to, and enter into transactions with, other companies they own or control to determine whether the directors have proved the fairness of the transaction to the insolvent company).

The Blatsteins seem to argue that even if Eric breached his fiduciary duty to the Trustee by allowing Main to make the loans at issue here, Lori had no fiduciary duty to the Trustee because she was not a dominant or controlling shareholder of Main or could not have breached a fiduciary duty to the Trustee because she had no day-to-day control over Main's financial affairs. [FN14] *See* Blatsteins' Brief, at 10-14 (arguing that the cases cited by the Trustee only support personal liability for an "officer/director/principal stockholder who controlled the day-to-day operations of the affected corporation"). The Trustee counters that Lori may not avoid her fiduciary duties by pleading ignorance of Main's corporate affairs, for such a theory would relieve all outside directors of their fiduciary duties to their corporations, and that Lori was not, in fact, ignorant of Main's financial decisions, including the decision to make the loans at issue here. *See* Trustee's Reply, at 6. The issue of Lori's liability for breach of fiduciary duty was not discussed by the bankruptcy court. Because the bankruptcy court will be obligated to consider, on remand, whether she had a fiduciary duty to prevent Main from making interest-free loans without repayment schedules to the other corporations of which she was a director and shareholder, and whether she breached that fiduciary duty, the court will briefly discuss the parties' arguments concerning Lori's liability.

> FN14. The Trustee contends that a judgment against Eric Blatstein for a breach of his fiduciary duties to Main's creditors is meaningless unless a judgment is also entered against Lori Blatstein because all of their assets are jointly owned as tenants by the entireties. *See* Trustee's Reply, at 5.

*19 The Blatsteins contend that the evidence presented at the bankruptcy court trial establishes that Lori did not have responsibility for Main's financial decisions, including whether to make the loans at issue here, or whether the Non-Debtor Corporate Defendants should repay those loans. *See* Tr. April 27, 1998, at 107-11, 143-46. Eric testified that Lori's only role in the businesses they jointly owned was to consult with him on the restaurants' designs, color schemes, menus, promotional events, and overall concept. *See id.* at 134. Moreover, the Blatsteins' accounting expert testified that the accounting records of Main and the Non-Debtor Corporate Defendants do not reveal that Lori participated in the financial affairs of the Blatsteins' companies. *See* Tr. May 6, 1998, at 65-66.

Even accepting that Lori Blatstein played no role in the financial decision-making of the Blatsteins' corporations, a proposition which the Trustee

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

vigorously disputes, [FN15] there is no dispute that she was a director of Main. *See* Tr. April 27, 1998, at 85-86, 89, 109. Even if she is not a "dominant or controlling shareholder," a factual question the court declines to resolve, it is undisputed that she was a director of Main, and that a director of an insolvent corporation owes a fiduciary duty to the corporations's creditors. *See supra,* pt. IV.A. The question presented by the current situation, which the Blatsteins' brief does not address, is whether a director's fiduciary duty extends to overseeing her corporation's financial transactions, at even a cursory level, to ensure that the transactions are in the corporation's best interests. The Trustee, on the other hand, though relying heavily on New Jersey law, does address this very question, and contends that a director's fiduciary responsibilities do require her to inform herself about her corporation's financial transactions, and to object to transactions such as the loans at issue here, when it is clear that the insolvent corporation has lent its assets to other corporations without consideration, or even the promise of repayment. *See* Trustee's Brief, at 6-11.

> FN15. The Trustee points out that Lori testified that she was aware of the loans which Main made to the Non-Debtor Corporate Defendants, and to her and her husband, and that some of these loan proceeds were deposited in her brokerage account. *See* Tr. April 27, 1998, at 110-12.

Pennsylvania law requires all corporate directors to act "in good faith, in a manner [she] reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. Cons.Stat. Ann. § 512(a), 1712(a) (West 1995 & Supp.1998). The language of the statute imposes a duty of reasonable care on all directors, regardless of whether they are responsible for managing a corporation's day-to-day affairs. *See Richard Royce Collections, Ltd. v. New York City Shoes, Inc. (In re New York City Shoes, Inc.),* 84 B.R. 947, 958 (Bankr.E.D.Pa.1988) (explaining that "corporate directors in even close, family-owned corporations are liable if they act in such a way as to profit their individual and other corporate enterprises at the expense of the corporation in issue"); *accord Francis v. United Jersey Bank,* 87 N.J. 15, 432 A.2d 814, 823 (N.J.1981) ("The New Jersey Business Corporation Act, in imposing a standard of ordinary care on all directors, confirms that dummy, figurehead and accommodation directors are anachronisms with no

place in New Jersey law."). Because every director has the "positive duty to manage the affairs of the corporation," a director can be held liable for breaching her fiduciary duty if she failed "to take positive steps to correct an illegal corporate action." *Metzger v. American Food Mgmt., Inc.,* 389 F.Supp. 469, 471 (W.D.Pa.1975).

**\*20** Courts will not ordinarily question business judgments made by corporate directors in good faith if the director "is not interested in the subject of the business judgment, is informed with respect to the subject of the business judgment to the extent [she] reasonably believes to be appropriate under the circumstances, and rationally believes that the business judgment is in the best interests of the corporation." *Cuker v. Mikalauskas,* 547 Pa. 600, 692 A.2d 1042, 1045 (Pa.1997) (formally adopting the business judgment rule in Pennsylvania). The business judgment rule will not apply, however, if there is evidence that the director's decisions were either made in bad faith or influenced by self-interest. *See id.* at 1048; *Loge,* 106 B.R. at 439; *Enterra Corp. v. SGS Assoc.,* 600 F.Supp. 678, 685-86 (E.D.Pa.1985) (describing the circumstances under which the business judgment rule applies). Directors and officers can also be held jointly and severally liable for "mismanagement, willful neglect or misconduct of corporate affairs if they jointly participate in the breach of fiduciary duty or approve of, acquiesce in, or conceal a breach by a fellow officer or director." *Seaboard Indus., Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 309 (Pa.1971); *see also Higgins v. Shenango Pottery Co.,* 256 F.2d 504, 509-11 (3d Cir.1958) (discussing partnership's liability for director/partner's breach of fiduciary duty to corporation he controlled when partnership had reason to know of the breach); *Bellis,* 373 F.Supp. at 124-25.

On remand, the bankruptcy court should apply these principles to determine whether Lori Blatstein had a fiduciary duty, as a director, to object to the loans to the Non-Debtor Corporate Defendants and whether she breached her fiduciary duty to Main and to its creditors by acquiescing in Eric's decision to lend Main's assets to other corporations they controlled.

**D. Did Eric and Lori Blatstein Breach their Fiduciary Duties to the Trustee by Failing to Pay Withholding Taxes and thus Allowing Columbusco to Incur Tax Penalties?**

The bankruptcy court, in prior opinions, found that the transfer of Philly Rock from Main to Columbusco

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

Page 16

was a fraudulent transfer, and that Columbusco therefore held Philly Rock in constructive trust for the Trustee of Main's estate. *See Main V,* 1998 WL 778017, at * 16. During the time period at issue here, Columbusco operated Philly Rock and was responsible for paying the expenses of its operation, including its taxes. *See In re Blatstein,* order at ¶¶ 3, 7 (E.D.Pa. Nov. 3, 1997). The Trustee seeks to hold the Blatsteins liable for more than $20,873 in tax penalties incurred by Columbusco, the constructive trustee of Main's assets, in 1997 and 1998. *See* Trustee's Brief, at 25, 44-45. The Trustee contends that Columbusco failed to pay federal withholding taxes even though it had funds available to do so since it paid management fees to Waterfront Management during the time that the tax payments were due. *See id.* As a result of the Blatsteins' actions through Columbusco, the Trustee argues, the Philly Rock's assets were unnecessarily diminished by $20,873 which Columbusco paid to the IRS, while Blatstein received profits, in the form of management fees paid to Waterfront Management, through Columbusco's operation of Philly Rock. *See id.* The Blatsteins' Brief does not address the propriety of Columbusco's decision to incur tax penalties while continuing to pay Waterfront Management's fees. *See* Blatsteins' Brief, at 6-14.

**\*21** The bankruptcy court initially held that the Blatsteins were not liable for the tax penalties because the Trustee, and not the Blatsteins, was responsible for preparing Main's tax return and making all required tax payments. *See Main IV,* 223 B.R. at 479-80. On reconsideration, the bankruptcy court apparently withdrew this finding, but nonetheless declined to hold the Blatsteins liable for this asserted breach of fiduciary duty for the same reasons that it declined to hold them liable for the other asserted breaches of fiduciary duty. *See In re Main, Inc.,* slip. op. at 5 (Bankr.E.D.Pa. Sept. 4, 1998) ("we believe that it would be inconsistent with our conclusion that the Blatsteins are not liable to the debtor for fiduciary breaches to now hold them liable for this poorly-presented, rather obscure claim"). The court also concluded that there was no evidence that the Blatsteins engaged in "pervasive or bad faith conduct" which would render them liable for these "mistakes." *Id.*

As with the claims of breach of fiduciary duty discussed above, the bankruptcy court failed to apply the correct standards by which directors' and dominant shareholders' fiduciary duties to their corporations and their corporation's creditors should be judged. *See supra,* pt. IV.B, IV.C. The bankruptcy

court's refusal to hold the Blatsteins liable for these tax penalties must therefore, be vacated. On remand, the bankruptcy court should consider whether the Blatsteins can prove that their decision not to pay withholding taxes, when funds were apparently available to do so, was in the best interests of Main, Columbusco, and its creditors.

## CONCLUSION

The bankruptcy court's August 6, 1998, order, modified on September 4, 1998, will be affirmed in part, reversed in part, and vacated in part. The bankruptcy court's conclusion that Airbev does not owe licensing fees to the Trustee for Airbev's use of the Philly Rock name and trade dress is affirmed. As a matter of law, Cobalt is liable for DECO's debts to Main's estate as DECO's successor in interest, and the bankruptcy court's conclusion to the contrary is reversed. The bankruptcy court failed to apply the proper legal standards to determine whether the Blatsteins are liable for a number of alleged breaches of their fiduciary duties to Main and its creditors, and thus, these sections of the bankruptcy court's opinion will be vacated. The matter will be remanded to permit the bankruptcy court to make further factual findings and legal conclusions consistent with this memorandum, and to enter judgment against Cobalt, as DECO's successor in interest.

### *ORDER*

AND NOW, this _____ day of June, 1999, after consideration of the Trustee's Appeal Brief, the oppositions by Appellees Eric and Lori Blatstein, and the Non-Debtor Corporate Defendants, and the Trustee's reply thereto, IT IS ORDERED that the bankruptcy court's Order dated August 6, 1998, and modified on September 4, 1998, is:

**\*22** (1) AFFIRMED with respect to its decision that Airbev does not owe licensing fees to Main's estate;

(2) REVERSED with respect to its finding that Cobalt was not liable for Delawareco's debts to Main as its successor in interest and remanded to enter judgment in favor of Main's estate against Cobalt in the amount of $76,950; and

(3) VACATED with respect to its discussion of Eric and Lori Blatsteins' alleged breaches of fiduciary duty and remanded to permit the bankruptcy court to make the findings described in the court's memorandum.

1999 WL 424296 (E.D.Pa.)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1999 WL 424296 (E.D.Pa.)
**(Cite as: 1999 WL 424296 (E.D.Pa.))**

**Motions, Pleadings and Filings (Back to top)**

•          2:98CV05947                    (Docket)
(Nov. 10, 1998)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

**I, Kristie L. Dalton, certify that I am not less than 18 years of age, and that I caused service of the foregoing document to be made by electronic service, hand delivery (local counsel only) and U.S. Regular Mail on June 13, 2005 upon:**

Frank J. Perch, III, Esq.
David Klauder, Esq.
Office of the U.S. Trustee
844 King Street
Suite 2313
Wilmington, DE 19801

Daniel J. DeFranceschi, Esq.
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

Gregory M. Gordon, Esq.
Jones Day
2727 North Harwood Street
Dallas, Texas 75201-1515

Lisa A. Beckerman, Esq.
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022-2524

Francis A. Monaco, Jr., Esq.
Monzack and Monaco, PA
1201 N. Orange Street, Suite 400
Wilmington, DE 19801

Kathleen M. Miller, Esq.
Smith, Katzenstein, & Furlow
800 Delaware Ave.
P.O. Box 410
Wilmington, DE 19899

Document #: 43895

William P. Bowden, Esq.
Ashby & Geddes
222 Delaware Avenue
17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

Theodore J. Tacconelli, Esq.
Ferry, Joseph & Pearce, P.A.
824 Market Street, Suite 904, P.O. Box 1351
Wilmington, Delaware 19899

Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103

Patrick M. Healy
Law Debenture Trust Company of New York
767 Third Avenue, 31st Floor
New York, NY  10017

James L. Eggeman
Pension Benefit Guaranty Corporation
Office of the General Counsel
1200 K Street, N.W., Suite 340
Washington, D.C. 20005-4026

Carl N. Kunz, III, Esq.
Morris, James, Hitchens & Williams, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  June 13, 2005

Kristie L. Dalton

Document #: 43895